**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 02 2026

TAMMY H. DOWNS, CLERK
By: _____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

NATIONAL CASUALTY COMPANY                                    PLAINTIFF

V.                          CASE NO. 3:26-cv-00001-BSM

CASEY DUNN, Individually and on Behalf of G.D.,
a Minor; THOMAS DUNN; and
ELECTRONIC ARTS INC.                                        DEFENDANTS

## COMPLAINT FOR DECLARATORY JUDGMENT

Comes the Plaintiff, National Casualty Company ("Nationwide"), by and

through its attorneys, WDTC Law, P.A., and for its Complaint for Declaratory

Judgment pursuant to Rule 57 and 28 U.S.C. § 2201, herein states:

### PARTIES

1.    Nationwide is an insurance company organized under the laws of Ohio,

with a principal place of business in Columbus, Ohio.

2.    Defendant G.D., a minor, is a citizen and resident of the State of

Arkansas whose principal place of residence is in Poinsett County, Arkansas.

3.    Defendant Casey Dunn is a citizen and resident of the State of Arkansas

whose principal place of residence is in Poinsett County, Arkansas.

4.    Casey Dunn is the mother of G.D. and represents G.D.'s interests in the

underlying lawsuit at issue.  See ¶¶ 11-62, infra.

5.    Defendant Thomas Dunn is a citizen and resident of the State of

This case assigned to District Judge _____
and to Magistrate Judge _____

Arkansas whose principal place of residence is in Poinsett County, Arkansas.

6.     Defendant Electronic Arts Inc. ("EA") is a Delaware Corporation with a principal place of business at 209 Redwood Shores Parkway, Redwood City, CA 94065.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332. This is an action between citizens of different states. There is complete diversity of citizenship between the parties. The amount in controversy exceeds $75,000 exclusive of interest and costs.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendants G.D., Casey Dunn, and Thomas Dunn are citizens of this judicial district and certain acts or omissions giving rise to this action occurred in this judicial district.

## THE UNDERLYING DUNN SUIT

9.     This lawsuit relates to a civil matter filed in this Court:  Casey Dunn, et al. v. Activision Blizzard, Inc., et al., Case No. 3:23-cv-00224-JM, an action brought by Casey Dunn, individually and on behalf of G.D., a minor, and Thomas Dunn (collectively the "Dunn Claimants"), in the United States District Court for the Eastern District of Arkansas Northern Division, against Defendants EA and others (the "Dunn Suit").  A copy of the Complaint filed in the Dunn Suit is attached

hereto as **Exhibit A**.

10.     Among other things, the Dunn Suit seeks damages for video game addiction and/or internet gaming disorder ("IGD") allegedly suffered by the minor plaintiff.

11.     Among other things, the Dunn Suit alleges that EA and other Defendants named therein manufactured, published, marketed, and sold video games, including those played by the minor Plaintiff, and that Defendants had specifically developed and designed these video games to cause the addiction allegedly experienced by the minor Plaintiff.

12.     On February 23, 2024, EA filed a Motion to Compel Arbitration in the Dunn Suit.  A copy of this motion is attached hereto as **Exhibit B**.  In it, EA argued both Plaintiff Casey Dunn's and Plaintiff G.D.'s claims should be sent to arbitration because Casey Dunn and G.D. both assented to EA's User Agreement, which contains a binding arbitration provision and an agreement to delegate issues of arbitrability to an arbitrator.  Ex. B, ¶ 1-2.

13.     On April 12, 2024, the Dunn Claimants filed a Response in Opposition to EA's Motion to Compel Arbitration.  A copy of this motion is attached hereto as **Exhibit C**.

14.     On January 7, 2025, this Court entered an Order directing the Clerk of the Court to stay the Dunn Suit and compel arbitration allowing parties to refile

motions following the completion of arbitration. A copy of this Order is attached

hereto as **Exhibit D**.

15.     To Nationwide's knowledge, no arbitration of the Dunn Suit has yet to

be initiated. The "Dunn Suit," as used herein, includes the prospective arbitration.

<u>THE DUNN SUIT ALLEGATIONS</u>

16.     In October 2023, the Dunn Claimants initiated the Dunn Suit against

twelve (12) defendants, including EA.

17.     The Dunn Claimants' claims against EA are based on G.D.'s alleged

addiction to the Battlefield game. Ex. A, ¶¶ 46-50.

18.     Casey and Thomas Dunn also seek redress on their own behalf, seeking

damages for loss of society and companionship, as well as for economic injuries and

losses sustained as a result of G.D.'s alleged gaming addiction.

19.     It is alleged that Battlefield is a series of first-person shooter video

games published by EA. Ex. A, ¶ 337. It is alleged that Battlefield was first released

in 2002 and the series is now comprised of multiple separate games. Ex. A, ¶ 338.

20.     It is alleged that EA "intentionally created and developed the Battlefield

series with psychologically addictive features and tactics to ensure players would keep

coming back to the game, playing longer, and spending more in in-game purchases

within the game." Ex. A, ¶ 341.

21.     It is alleged that the addictive features and tactics utilized in Battlefield

include player ranking; increasing difficulty to advance in the game; centrally recording online statistics for each player; employing daily and weekly challenges for players to get a reward; employing special campaigns that provide specific tasks or assignments for special rewards within the game; licensing patented addictive technologies from other video game developers and publishes to include additional addictive features in the Battlefield games; encouraging users to purchase in-game content, including battle packs and battle passes, that unlock additional content; and requiring players to upgrade to a "premium" path to unlock items and access more progression opportunities, weapons, and other game content.  See Ex. A, ¶¶ 342-353.

22.    The Dunn Suit alleges that, as a result of gaming addiction, G.D. "has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Dyslexia and has also experienced the following as a result of gaming addiction: physical pain in his hands, elbow, and shoulders; increased weight and morbid obesity; diminished social interactions; a drop in his grades and inability to attend school; depression; a lack of interest in other sports/ hobbies; a loss and/or lack of friends at school when able to attend; withdrawal symptoms such as rage, anger, and physical outbursts; loss of friends; and other emotional distress, mental anguish, pain and suffering." Ex. A, ¶ 232.  As a result of gaming addiction, G.D. "has required an Individual Educational Plan ("IEP"), out-patient counseling, and Focalin medication to control impulsivity and lack of control.  Ex. A, ¶ 21.

23.     The Dunn Suit alleges that G.D. plays video games 12-14 hours a day and is spending approximately $350.00 per month on gaming.  Ex. A, ¶¶ 235, 241.

24.     The Dunn Suit asserts the following causes of action against all defendants, including EA:

| | |
|---|---|
| Count I | Strict Liability – Design Defect |
| Count II | Strict Liability – Failure to Warn |
| Count III | Negligence – Design |
| Count IV | Negligence – Failure to Warn |
| Count V | Negligence – Failure to Instruct |
| Count VI | Negligence |
| Count VII | Outrage |
| Count VIII | Violation of Deceptive Trade Practice Act, §§ 4-88-101 |
| Count IX | Deceit / Fraudulent Misrepresentation |
| Count X | Deceit / Fraudulent Omission or Nondisclosure |
| Count XII | Fraudulent Concealment |
| Count XIII | Fraudulent Inducement |
| Count XIV | Civil Conspiracy |
| Count XV | Loss of Consortium |

25.     The Dunn Suit alleges, among other things, that EA "defectively designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm."  Ex. A, ¶ 403.

26.     The Dunn Suit alleges, among other things, that EA "designed the Battlefield games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users."  Ex. A, ¶ 403.

27.     The Dunn Suit alleges, among other things, that EA knew of the risks of harm posed by their products and "[t]hese risks were known and knowable in the

light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to G.D." Ex. A, ¶ 481.

28.    The Dunn Suit alleges, among other things, that EA "intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, like G.D., to use each Defendant's respective product and intended for users, like G.D., to become addicted to the product . . ." Ex. A, ¶ 526.

29.    The Dunn Suit alleges, among other things, that EA 's conduct "in designing and developing its products to purposefully addict and harm users – especially minors and neurodivergent individuals – was extreme and outrageous, is beyond all possible bounds of decency, and utterly intolerable in a civilized community." Ex. A, ¶ 527.

30.    The Dunn Suit alleges, among other things, that EA should have known that users like G.D. would become addicted "because each Defendant designed and developed their respective products to become more simulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users , including G.D., after initial purchase or download." Ex. A, ¶ 528.

31.    The Dunn Suit alleges, among other things, that EA "intended to inflict

emotional distress (e.g. addiction) on users, like G.D." and as a direct and proximate result of EA 's outrageous conduct and infliction of emotional distress, G.D. has experienced extreme emotional distress. Ex. A, ¶¶ 529-533.

32.     The Dunn Suit alleges, among other things, that the conduct of EA "in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community." Ex. A, ¶ 531.

33.     The Dunn Suit alleges, among other things, that EA engaged in deceptive and unconscionable trade practices in connection with the sale and advertisements of their gaming products, including but not limited to:  (i) knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of the products; (ii) advertising goods or services with the intent not to sell them as advertised; (iii) employing bait-and-switch advertising consisting of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell; (iv) knowingly taking advantage of consumers who are reasonably unable to protect their interest because of their age; (v) using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within the games; (vi) concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like

G.D., rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services; (vii) using false and misleading representations, while omitting and concealing material facts, relating to the safety of the product in that EA  designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, including but not limited to increasing difficulty to move up with levels within the game, daily and weekly challenges, and special event campaigns; and (viii) communicating the purported benefits and safety of using the product while failing to disclose the serious harms related to use, in that EA knew that Battlefield games contained an inherent risk of abuse, addiction, and compulsive use by youth and harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by youth.  <u>See</u>  Ex. A, ¶ 541.

34.    The Dunn Suit alleges, among other things, that EA violated the Arkansas Deceptive Trade Practices Act, ("ADTPA"), Ark. Code. Ann. § 4-88-01, et seq., by offering misleading or deceptive prize promotions, including but not limited to: (i) representing directly or by implication that players, including G.D., will have an increased chance of receiving a prize by making multiple or duplicate purchases, payments, or donations, or by entering a game, drawing, sweepstakes, or other contest more than one time, unless the representation is true; (ii) representing directly or by implication that users, like G.D., are being notified a second or final

time of the opportunity to receive or compete for a prize unless the representation is true; (iii) representing directly or by implication that a prize notice is urgent, or otherwise convey an impression of the urgency by use of description, narrative copy, phrasing on an envelope, or similar method unless there is a limited time period in which the recipient must take some action to claim or be eligible to receive a prize, and the date by which such action is required appears in immediate proximity to each representation of urgency and in the same type size and boldness as each representation of urgency; (iv) failing to give the disclosures related to a prize promotion required by Ark. Code. Ann. § 1-102-106; and (v) offering misleading or deceptive prize promotions through its respective games, including but not limited to, timed quests, battle passes or pacs, and loot boxes, that encourage users like G.D. to continually keep making in-game purchases.  Ex. A, ¶ 543.

35.    The Dunn Suit alleges, among other things, that the Dunn Claimants have suffered pecuniary loss of more than $500 as a result of EA's intentional, knowing, and willful violations of the ADTPA.  Ex. A, ¶ 550.

36.    The Dunn Suit alleges, among other things, that each defendant, including EA "made representations of material facts about their respective products, while knowing or believing those representations to be false *and* with the intent that [the Dunn Claimants] (and the public) rely on those misrepresentations."  Ex. A, ¶ 554.

37.    The Dunn Suit alleges, among other things, that "EA misrepresented the Battlefield game series as safe for use by minors and young adults, while knowing that it had been designed with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that the Battlefield game series posed significant risk of harm." Ex. A, ¶ 555.

38.    The Dunn Suit alleges, among other things, that EA "knew their games posed risk to minors, like G.D., based on internal research and external studies known in the industry and [to EA]; yet [EA] misrepresented the safety and value of their games for the purpose of inducing users, like G.D., to purchase/ download the game and to continue using [EA ]'s products to the addiction knowingly caused by [EA]'s products." Ex. A, ¶ 557.

39.    The Dunn Suit alleges, among other things, that EA "knowingly and recklessly misled the public- particularly product users, and their parents, including [the Dunn Claimants], into believing these products were safe or even beneficial for children to use." Ex. A, ¶ 557.

40.    The Dunn Suit alleges, among other things, that EA "marketed its games for play by youth and directed their misstatements at youth, despite knowing their Battlefield game series contain an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been

experienced by G.D." Ex. A, ¶ 558.

41.    The Dunn Suit alleges, among other things, that EA intended to mislead the public, users, and their parents, including the Dunn Claimants, into believing their products were safe for children to use by "intentionally making numerous material misrepresentation[s], including but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including [the Dunn Claimants], that its products were safe." Ex. A, ¶ 558.

42.    The Dunn Suit alleges, among other things, that EA "intended [their] material misstatements and false representations to induce the public, users, and parents, including [the Dunn Claimants] to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each . . . product." Ex. A, ¶ 561.

43.    The Dunn Suit alleges, among other things, that as a direct and proximate result of EA 's material misrepresentations and false statements, the Dunn Claimants have been damaged.  Ex. A, ¶ 565.

44.    The Dunn Suit alleges, among other things, that EA "intentionally and knowingly did not disclose the serious safety risks presented by [their] products" and, specifically, "did not inform the public that the Battlefield game series posed a significant risk of harm to the public, including G.D., because it was designed with

psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, despite their knowing that abuse, addiction, and compulsive use by youth can lead to injury." Ex. A, ¶¶ 572-573.

45.     The Dunn Suit alleges, among other things, that EA knew of the risks associated with their respective products based on internal research and external studies known to the industry and to EA yet, intentionally omitted and failed to disclose those findings, to induce youth, including G.D., to continue using their respective products. See Ex. A, ¶ 574.

46.     The Dunn Suit alleges, among other things, that as a direct and proximate result of EA 's material omissions and nondisclosures, the Dunn Claimants have been damaged, and, more specifically, that EA "engaged in deceitful conduct through [their] fraudulent omissions and nondisclosure, and that deceitful conduct is a proximate cause of [the Dunn Claimants'] injuries and losses. Ex. A, ¶ 579.

47.     The Dunn Suit alleges, among other things, that EA concealed the serious safety risks presented by their product in that EA "designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public [sic] and product users, including [the Dunn Claimants]." Ex. A, ¶ 584.

48.     The Dunn Suit alleges, among other things, that EA intended their concealment to induce the public, users, and parents, including the Dunn Claimants, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in their product.  Ex. A, ¶ 587.

49.     The Dunn Suit alleges, among other things, that EA  designed Battlefield to include the ability for users to purchase in-game downloadable content or microtransactions.  Ex. A, ¶ 596.

50.     The Dunn Suit alleges, among other things, that users of EA's products, including minors such as G.D., "were induced into microtransactions by [EA] to make such purchases through false representations and material misstatements built into each of [their] products.  [EA]'s methods of fraudulent inducement include but are not limited to, using features and patented technology in each of [their] product, including patented matchmaking technologies and algorithms to 'put' players in certain game scenarios requiring additional purchases to advance, AI avatars or 'friends' to encourage purchase, and disguised features of [their] products, which misrepresent to users, like [the Dunn Claimants], that game-selected purchases would help them advance in the game or complete necessary missions."  Ex. A, ¶ 597. Further, EA  made these false representations and material nondisclosures with the intent to induce G.D. into the microtransactions.  Id. at ¶ 598.

51.     The Dunn Suit alleges, among other things, that "[a]t the time [EA]

utilized these technologies to induce G.D. to make in-game purchases, [EA ] knew that the misrepresentations made through the game were false and existed only to entice G.D. to continue spending." Ex. A, ¶ 599.

52.    The Dunn Suit alleges, among other things, that EA "intended [their] fraudulent in-game content to induce G.D. to continue purchasing in-game downloadable content and/or in-game transactions within [their] product." Ex. A, ¶ 600. At the same time, it is alleged that EA "knew that the inducements to make additional in-game purchases served only to increase users' – including G.D.'s – inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects." Ex. A, ¶ 601.

53.    The Dunn Suit alleges, among other things, that "[e]ven though [EA] knew of the risks based on its internal information and external studies known to [them], [EA] intentionally and knowingly concealed those findings to avoid losing revenue and to induce G.D. to continue using [their] respective products." Ex. A, ¶ 605.

54.    The Dunn Suit alleges, among other things, that "[b]y intentionally making numerous material misrepresentations, downplaying any potential harm associated with [their] respective products, and reassuring the public, users, and

parents, including [the Dunn Claimants], that [their] products were safe, [EA] did fraudulently induce the public, users, and parents, including [the Dunn Claimants], to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in [their] product." Ex. A, ¶608.

55.     The Dunn Suit alleges, among other things, that EA conspired to addict users, like G.D., to their gaming products. Ex. A, ¶ 618. Specifically, EA "intentionally targeted users, including minors like G.D., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products – an addiction that [EA ], individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by G.D. and other users." Ex. A, ¶ 619.

56.     The Dunn Suit alleges, among other things, that EA "entered into agreements to license patented technology to further the purpose of targeting users, including minors like G.D., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products." Ex. A, ¶ 621.

57.     It is alleged that EA , in particular, "conspired and otherwise acted in concert to violate the ADTPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce [the Dunn Claimants] to enter into contracts for purchase, and design the Battlefield game series to addict minors and young adults" and further alleged that EA "knowingly agreed to,

coordinated their efforts, and carried out a shared plan and acts in furtherance of a

common agreement to fraudulently and deceptively design, develop, manage, operate,

test, product, manufacture, label, marker, advertise, promote, control, sell, supply,

lease, distribute, and benefit from the harmful Battlefield games that addicted and

harmed G.D." Ex. A, ¶¶ 624-625.

58.     The Dunn Suit alleges, among other things, that each defendant,

including EA , "made a conscious commitment to participate in the selling, lease, or

otherwise distribution of its respective product to users, including G.D., while

knowing of the unreasonable risk of harms from their products (including an

unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression,

or other physical or mental injuries)" and each defendant "shared a common purpose

of fraudulently concealing the unreasonable risk of harms in its gaming product while

continuing to market, sell, and otherwise distribute its product to users, including

G.D." Ex. A, ¶¶ 629-630.  It is alleged that these conspiracies allowed the defendants

to maximize profits while causing users significant harm.  Id. at ¶ 631.

59.     The Dunn Claimants seek, among other things, compensation for their

financial loss and reasonable attorney's fees for violation of the ADTPA, as well as

twice the amount of their pecuniary loss as permitted by the ADTPA.  Ex. A, ¶¶ 549-

550.

60.     The Dunn Claimants seek, among other things, an award of punitive

damages on grounds that EA's actions were intentional, willful, wanton, reckless,

malicious, and displaced an entire want of care and a conscious and depraved

indifference to the consequences of their conduct, including to the health, safety, and

welfare of their customers in an amount sufficient to punish EA and deter others

from like conduct.

THE INSURANCE POLICIES

Nationwide Commercial Liability Policy

61.     Nationwide issued Commercial General Liability Policy No.

NGO0001162 to Electronic Arts Inc. with effective dates of October 1, 2023, to

October 1, 2024 with a consecutive renewal through October 1, 2025 (the "Policy").

A true and complete copy of the Policy in effect from October 1, 2023 to October 1,

2024, is attached hereto as **Exhibit E**.  The full terms of the policy are incorporated

by reference herein.

62.     The Policy states the following with respect to the coverage afforded

thereunder for bodily injury and property damage:

**SECTION 1 – COVERAGES**
**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**Insuring Agreement**

**a.**     We will pay those sums that the insured becomes legally
obligated to pay as damages because of "bodily injury" or
"property damage" to which this insurance applies. We will
have the right and duty to defend the insured against any
"suit" seeking those damages. However, we will have no

18 of 55

duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1)    The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

(2)    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

This insurance applies to "bodily injury" and "property damage" only if:

(1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)    The "bodily injury" or "property damage" occurs during the policy period; and

(3)    Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c.    "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to

have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.**    "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence"or claim:

**(1)**    Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)**    Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)**    Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**\*\*\***

63.    The Policy defines those that qualify as "insureds" in Section II – Who Is An Insured, which includes the following:

### SECTION II – WHO IS AN INSURED?[1]

1.    If you are designated in the Declarations as:

**\*\*\***

**d.**    An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as

---

[1]As modified by the Magellan General Liability Pak+ (N2G Worldwide) endorsement.

your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

***

2.    Each of the following is also an insured:

***

Any organization which is a legally incorporated entity of which you own a majority interest of the voting stock on the effective date of this Coverage Form will be a Named Insured, provided there is no other available insurance to that organization.

66.    The Policy contains exclusions to coverage for "bodily injury" and "property damage" including:

2.    **Exclusions**

This insurance does not apply to:

a.    **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

***

o.    **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury."

p.    **Access Or Disclosure Of Confidential Or**

21 of 55

### Personal Information And Data-related Liability[2]

Damages arising out of:

(1)    Any access to or disclosure of any person's or
       organization's confidential or personal information,
       including patents, trade secrets, processing methods,
       customer lists, financial information, credit card
       information, health information or any other type of
       nonpublic information; or

(2)    The loss of, loss of use of, damage to, corruption of,
       inability to access, or inability to manipulate
       electronic data.

This exclusion applies even if damages are claimed for
notification costs, credit monitoring expenses, forensic expenses,
public relations expenses or any other loss, cost or expense
incurred by you or others arising out of that which is described in
Paragraph (1) or (2) above.

However, unless Paragraph (1) above applies, this exclusion does
not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts
or programs stored as or on, created or used on, or transmitted to
or from computer software, including systems and applications
software, hard or floppy disks, CD-ROMs, tapes, drives, cells,
data processing devices or any other media which are used with
electronically controlled equipment.

q.    **Recording And Distribution Of Material Or Information In
      Violation Of Law**

      "Bodily injury" or "property damage" arising directly or indirectly
      out of any action or omission that violates or is alleged to violate:

---

[2]As modified by the Exclusion – Access or Disclosure of Confidential or Personal Information
And Data-related Liability With Limited Bodily Injury Exception (CG 21 06 (05-14)).

(1)    The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2)    The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3)    The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4)    Any federal, state or local statute, ordinance or regulation, other than the TCPA, CANSPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communication or distribution of material or information.

**\*\*\***

64.    The Exclusion – Designated Ongoing Operation (CG 21 53 01 96) adds

the following exclusion to the policy:

### EXCLUSION – DESIGNATED ONGOING OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Description of Designated Ongoing Operation(s):**
SPECIAL EVENTS PROMOTED, PRODUCED, SANCTIONED BY, ORGANIZED, OR CONTRACTED BY ANY NAMED INSURED, SUCH AS: COMPETITIVE GAMING EVENTS, COMPETITIONS OR EXHIBITIONS; ATHLETIC OR SPORTS CONTESTS OR EXHIBITIONS; AUTO, MOTORCYCLE OR BOAT RACES OR

23 of  55

EVENTS, BIKING EVENTS; EVENTS WITH INFLATABLE AMUSEMENT DEVICES OF ANY KIND, SUCH AS MOONWALKS AND SLIDERS; CONCERTS OF ANY KIND, SUCH AS ROCK, RAP HIP HOP, JAM, TECHNO, OR PUNK; OR BUNGEE JUMPING EVENTS.

**Specified Location (If Applicable):**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph 2., Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

This insurance does not apply to "bodily injury" arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such operations are conducted by you or on your behalf. If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described ongoing operations conducted at the "location."

For the purposes of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of way of a railroad.

***

65.    The Policy states the following with respect to "personal and advertising injury" coverage:

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

1.     **Insuring Agreement**

    a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

        (1)     The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

  (2)     Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

    b.     This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory"during the policy period.

***

67.     Exclusions specific to coverage for "personal and advertising injury"

apply, including:

2.     **Exclusions**

25 of 55

This insurance does not apply to:

**a.    Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

**b.    Material Published With Knowledge of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c.    Material Published Prior to Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**\*\*\***

**g.    Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement."

**\*\*\***

**j.    Insureds in Media And Internet Type Business**

"Personal and advertising injury" committed by an insured whose business is:

**(1)**    Advertising, broadcasting, publishing, or telecasting:

**(2)**    Designing or determining content of web sties for others; or

26 of  55

(3)   An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

\*\*\*

**p.   Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1)   The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2)   The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3)   The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4)   Any federal, state or local statute, ordinance or regulation, other than the TCPA, CANSPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communication or distribution of material or information.

\*\*\*

68.   The Policy in effect from October 1, 2024 to October 1, 2025 contains

Punitive or Exemplary Damage Exclusion (UT-47g (8-95)), which limits coverage as

follows:

> THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT
> CAREFULLY.
>
> ### PUNITIVE OR EXEMPLARY DAMAGE EXCLUSION
>
> In consideration of the premium charged, it is agreed that this policy
> does not apply to a claim of or indemnification for punitive or
> exemplary damages.
>
> Punitive or exemplary damages also include any damages awarded
> pursuant to statute in the form of double, treble or other multiple
> damages in excess of compensatory damages.
>
> If suit is brought against any insured for a claim falling within coverage
> provided under the policy, seeking both compensatory and punitive or
> exemplary damages, then the Company will afford a defense to such
> action; however, the Company will have no obligation to pay for any
> costs, interest or damages attributable to punitive or exemplary
> damages.
>
> ***

69.     The Policy contains conditions that may impact the coverage afforded

under the Policy including:

> ### SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS
>
> **2.     Duties In The Event Of Occurrence, Offense, Claim or Suit**
>
>> a.     You must see to it that we are notified as soon as
>> practicable of an "occurrence" or an offense which may
>> result in a claim. To the extent possible, notice should
>> include:
>>
>>> **(1)**     How, when and where the "occurrence" or offense

28 of 55

took place;

    **(2)**    The name and addresses of any injured persons and witnesses; and

    **(3)**    The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.**    If a claim is made or "suit" is brought against any insured, you must:

    **(1)**    Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)**    Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.**    You and any other involved insured must:

    **(1)**    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

    **(2)**    Authorize us to obtain records and other information;

    **(3)**    Cooperate with us in the investigation or settlement of the claim or defense against the "suit;" and

    **(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

***

70.    The Policy defines certain terms and phrases, including:

## SECTION V – DEFINITIONS

3.    "Bodily Injury"[3] means bodily injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright or death sustained by that person which results from that bodily injury, sickness or disease.

***

13.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

***

14.    "Personal and advertising injury"[4] means injury, including consequential "bodily injury"arising out of one or more of the following offenses:

    a.    False arrest, detention or imprisonment;

    b.    Malicious prosecution; or

    c.    The wrongful eviction from, wrongful entry to, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

***

17.    "Property damage" means:

---

[3]As modified by the Magellan General Liability Pak + (GL-601-N2G 03 21)

[4]As modified by the Amendment to Personal and Advertising Injury Definition Endorsement (UT-3g 3 92).

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CDROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

<u>Nationwide Commercial Liability Umbrella Policy</u>

71.    Nationwide issued Commercial Liability Umbrella Policy No. UNO0000178 to Electronic Arts Inc. with effective dates of October 1, 2023, to October 1, 2024 and which was consecutively renewed through October 1, 2025 to October 1, 2025 (the "Umbrella Policy"). A true and complete copy of the Umbrella Policy in effect from October 1, 2023 to October 1, 2024 is attached hereto as **Exhibit G**. The full terms of the Umbrella Policy are incorporated by reference herein.

72.    The Umbrella Policy states the following with respect to the coverage afforded thereunder for bodily injury and property damage:

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE**

**LIABILITY**

1.    **Insuring Agreement**[5]

    **a.**    We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend. But:

        **(1)**    The amount we will pay for the "ultimate net loss" is limited as described in Section **III** – Limits Of Insurance; and

        **(2)**    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B**.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

---

[5]As modified by the New York Changes Endorsement (CU 01 25 06 22)

     **b.**    This insurance applies to "bodily injury" or "property damage" that is subject to an applicable "retained "limit". If any other limit, such as a sublimit, is specified in the "underlying insurance," this insurance does not apply to "bodily injury" or "property damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "underlying insurance."

**c.**    This insurance applies to "bodily injury" and "property damage" only if:

    **(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    **(2)**    The "bodily injury" or "property damage" occurs during the policy period; and

    **(3)**    Prior to the policy period, no insured listed under Paragraph **1.a.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**\*\*\***

**e.**    "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.a.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1)    Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2)    Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3)    Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

When we have a duty to defend, we will defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent.

**\*\*\***

73.    The Umbrella Policy includes the following definition of who is an "insured:"

### SECTION II – WHO IS AN INSURED

1.    Except for liability arising out of the ownership, maintenance or use of "covered autos":

a.    If you are designated in the Declarations as:

**\*\*\***

(3)    A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

(4)    An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are

34 of 55

insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

\*\*\*

74.     The Umbrella Policy contains exclusions to coverage for "bodily injury" and "property damage," including:

### 2.     Exclusions

This insurance does not apply to:

#### a.     Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

\*\*\*

#### r.     Personal And Advertising Injury

"Bodily injury" arising out of "personal and advertising injury".

\*\*\*

#### t.     Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability[6]

Damages arising out of:

---

[6]As modified by the Confidential or Personal Information and Data-Related Liability – With Limited Bodily Injury Exception Endorsement (CU 21 86 05 14).

(1) Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

(2) The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph (1) or (2) above.

However, unless Paragraph (1) above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

***

**u.** **Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

36 of 55

> **(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or
>
> **(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or
>
> **(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communication or distribution of material or information.

***

75.   The Exclusion – Designated Ongoing Operations (CU 21 16 09 00)

adds the following exclusion to the Umbrella Policy:

**EXCLUSION – DESIGNATED ONGOING OPERATIONS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY UMBRELLA COVERAGE PART

**SCHEDULE**

**Description of Designated Ongoing Operation(s):**
SPECIAL EVENTS PROMOTED, PRODUCED, SANCTIONED BY, ORGANIZED, OR CONTRACTED BY ANY NAMED INSURED, SUCH AS: COMPETITIVE GAMING EVENTS, COMPETITIONS OR EXHIBITIONS; ATHLETIC OR SPORTS CONTESTS OR EXHIBITIONS; AUTO, MOTORCYCLE OR BOAT RACES OR EVENTS, BIKING EVENTS; EVENTS WITH INFLATABLE AMUSEMENT DEVICES OF ANY KIND, SUCH AS MOONWALKS AND SLIDERS; CONCERTS OF ANY KIND, SUCH AS ROCK, RAP

37 of 55

HIP HOP, JAM, TECHNO, OR PUNK; OR BUNGEE JUMPING EVENTS.

**Specified Location (If Applicable):**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury and Property Damage** Liability: This insurance does not apply to "bodily injury" or "property damage" arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such operations are conducted by you or on your behalf. If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described ongoing operations conducted at the "location".

For the purposes of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

***

76.     The Umbrella Policy states the following with respect to "personal and advertising injury" coverage:

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

1.      **Insuring Agreement**

        a.      We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit"because of

38 of 55

"personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "personal and advertising injury" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. At our discretion, we may investigate any offense that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend. But:

(1)   The amount we will pay for the "ultimate net loss" is limited as described in Section III – Limits Of Insurance; and

(2)   Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.**   This insurance applies to "personal and advertising injury" that is subject to an applicable "retained limit". If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "personal and advertising injury" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "underlying insurance".

  c. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

***

77. The Umbrella Policy contains exclusions specific to coverage for

"personal and advertising injury" including:

  **2.** **Exclusions**

  This insurance does not apply to:

  a. "Personal and advertising injury"

    **(1)** **Knowing Violation Of Rights Of Another**

     Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

***

    **(7)** **Quality Or Performance Of Goods – Failure To Conform To Statements**

     Arising out the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

***

    **(10)** **Insureds In Media And Internet Type Business**

     Committed by an insured whose business is:

     **(a)** Advertising, broadcasting, publishing, or telecasting

40 of 55

**(b)**   Designing or determining content of
web sites for others; or

**(c)**   An internet search, access, content or service
provider.

However, this exclusion does not apply to
Paragraphs **14.a.**, **b.** and **c.** of "personal and
advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames,
borders or links, or advertising, for you or others anywhere
on the Internet, is not by itself, considered the business of
advertising, broadcasting, publishing or telecasting.

\*\*\*

**(17)   Recording And Distribution Of Material Or
Information In Violation Of Law**

"Personal and advertising injury" arising directly or
indirectly out of any action or omission that violates or is
alleged to violate:

**(a)**   The Telephone Consumer Protection Act (TCPA),
including any amendment of or addition to such
law; or

**(b)**   The CAN-SPAM Act of 2003, including any amendment
of or addition to such law; or

**(c)**   The Fair Credit Reporting Act (FCRA), and any
amendment of or addition to such law, including the Fair
and Accurate Credit Transactions Act (FACTA); or

**(d)**   Any federal, state or local statute, ordinance or regulation,
other than the TCPA, CAN-SPAM Act of 2003 or FCRA
and their amendments and additions, that addresses,
prohibits, or limits the printing, dissemination, disposal,

> collecting, recording, sending, transmitting,
> communication or distribution of material or information.

***

78.    The Umbrella Policy in effect from October 1, 2024 to October 1, 2025

contains the Punitive or Exemplary Damage Exclusion (UT-74g (8-95)), which limits

coverage as follows:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT
CAREFULLY.

**PUNITIVE OR EXEMPLARY DAMAGE EXCLUSION**

In consideration of the premium charged, it is agreed that this policy
does not apply to a claim of or indemnification for punitive or
exemplary damages.

Punitive or exemplary damages also include any damages awarded
pursuant to statute in the form of double, treble or other multiple
damages in excess of compensatory damages.

If suit is brought against any insured for a claim falling within coverage
provided under the policy, seeking both compensatory and punitive or
exemplary damages, then the Company will afford a defense to such
action; however, the Company will have no obligation to pay for any
costs, interest or damages attributable to punitive or exemplary
damages.

***

79.    The Umbrella Policy contains conditions which may impact the

coverage available under the policy, including:

3.    Duties In The Event Of Occurrence, Offense, Claim, or Suit[7]

a.    You must see to it that we are notified as soon as
practicable of an "occurrence" or an offense,
regardless of the amount, which may result in a
claim. To the extent possible, notice should include:

(1)    How, when, and where the "occurrence" or offense
took place;

(2)    The names and addresses of any injured person and
witnesses; and

(3)    The nature and location of any injury or damage
arising out of the "occurrence" or offense.

b.    If a claim is made or "suit" is brought against any insured,
you must:

(1)    Immediately record the specifics of the claim or
"suit" and the date received; and

(2)    Notify us as soon as practicable.

You must see to it that we receive written notice of the
claim or "suit" as soon as practicable.

c.    You and any other involved insured must:

(1)    Immediately send us copies of any demands,
notices, summonses or legal papers received in
connection with the claim or "suit";

(2)    Authorize us to obtain records and other
information;

(3)    Cooperate with us in the investigation or settlement

---

[7] As modified by the New York Changes Endorsement (CU 01 25 06 22).

of the claim or defense against the "suit"; and

**(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.**    No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**e.**    Notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York state, with particulars sufficient to identify the insured, shall be considered to be notice to us.

**\*\*\***

80.    The Umbrella Policy defines certain terms and conditions, including:

## SECTION V – DEFINITIONS

**3.**    "Bodily injury" means bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" included mental anguish or other mental injury resulting from "bodily injury".

**\*\*\***

**13.**    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.**    "Personal and advertising injury"[8] means injury, including consequential "bodily injury", arising out of one or more of the

---

[8]As modified by the Amendment to Personal and Advertising Injury Definition Endorsement (UT-3g 3-92).

following offenses:

a.    False arrest, detention, or imprisonment;

b.    Malicious prosecution; or

c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy or a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

\*\*\*

18.    "Property damage" means:

a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

With respect to the ownership, maintenance or use of "covered autos", property damage also includes "pollution cost or expense", but only to the extent that coverage exists under the "underlying insurance" or would have existed but for the exhaustion of the underlying limits.

For the purposes of this insurance, with respect to other than the ownership, maintenance or use of "covered autos", electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

45 of 55

## COUNT I – DECLARATORY JUDGMENT – DUTY TO DEFEND

81.    Nationwide repeats, reiterates, and re-alleges each and every allegation contained in Paragraphs 1-82 with the same force and effect as if fully set forth herein.

82.    Nationwide has no duty to defend EA against any and all claims alleged in the Dunn Suit pursuant to the terms of the Policy and the Umbrella Policy (referred to in the collective as the "Policies"):

a.    The Dunn Suit does not allege "bodily injury" or "property damage" caused by an "occurrence";

b.    Even if "bodily injury" or "property damage" were alleged, coverage is excluded pursuant to Exclusion 2.a. of the Policy and Exclusion 2.a. of the Umbrella Policy, which exclude coverage for "bodily injury" or "property damage" expected or intended from the standpoint of the insured;

c.    Even if "bodily injury" or "property damage" were alleged, coverage is excluded pursuant to Exclusion 2.o. of the Policy and Exclusion 2.r. of the Umbrella Policy, which exclude coverage for "bodily injury" arising out of "personal and advertising injury";

d.    Even if "bodily injury" or "property damage" were alleged, coverage is excluded pursuant to Exclusion 2.p. of the Policy and

Exclusion 2.t. of the Umbrella Policy, which excludes coverage for "bodily injury" or "property damage" arising out of the access or disclosure of confidential or personal information;

e.     Even if "bodily injury" or "property damage" were alleged, coverage is excluded pursuant to Exclusion 2.q. of the Policy, and Exclusion 2.u. of the Umbrella Policy for "bodily injury" or "property damage" arising out of any act or omission that violates, or is alleged to violate, any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communication or distribution of material or information;

f.      Even if "bodily injury" were alleged, coverage is excluded under the Policy and the Umbrella Policy pursuant to the Exclusion – Designated Ongoing Operations for "bodily injury" arising out of one or more of the described operations;

g.     The Underlying Suit does not allege damages resulting from an offense of "personal and advertising injury";

h.     Even if "personal and advertising injury" were alleged, coverage is

excluded under Exclusion 2.a. of the Policy, Exclusion 2.a.(1) of the Umbrella Policy, which excludes coverage for "personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

i.      Even if "personal and advertising injury" were alleged, coverage is excluded under Exclusion 2.g. of the Policy and Exclusion 2.a.(7) of the Umbrella Policy, which exclude coverage for "personal and advertising injury" arising out of the failure of goods products or services to confirm with any statements of quality of performance;

j.      Even if "personal and advertising injury" were alleged, coverage is excluded under Exclusion 2.j. of the Policy and Exclusion 2.a.(10) of the Umbrella Policy, which excludes coverage for "personal and advertising injury" committed by insured whose business is advertising, broadcasting, publishing, or telecasting, designing or determining content of websites for others; or an internet search, access, content or service providers;

k.      Even if "personal and advertising injury" were alleged, coverage is excluded under Exclusion 2.p of the Policy and Exclusion 2.t. of

the Umbrella Policy, which exclude coverage for damages arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information;

l. Even if "personal and advertising injury" were alleged, coverage is excluded under Exclusion 2.p. of the Policy and Exclusion 2.a.(17) of the Umbrella Policy, which excludes coverage for "personal and advertising injury" arising out of any act or omission that violates, or is alleged to violate, any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communication or distribution of material or information;

m. Any punitive damages are not "damages" as contemplated by the Policies;

n. Coverage for punitive damages is prohibited as a matter of public policy;

o.     With respect to the coverage afforded under the Policy and Umbrella Policy in effect from October 1, 2024 to October 1, 2025, coverage for punitive and exemplary damages is excluded under the Punitive Or Exemplary Damage Exclusion;

p.     There is no coverage for claims that did not occur during the effective dates of the Policies;

83.     There are actual bona fide and substantial questions and issues in dispute regarding Nationwide's obligations pursuant to the Policies to defend the Defendants in the Dunn Suit.

## COUNT II – DECLARATORY JUDGEMENT – DUTY TO INDEMNIFY

84.     Nationwide repeats, reiterates, and re-alleges each and every allegation contained in Paragraphs 1 through 85 with the same force and effect as if fully set forth herein.

85.     Nationwide has no duty to indemnify EA against any and all claims alleged in the Dunn Suit pursuant to the terms of the Policies as:

a.     The Dunn Suit does not allege "bodily injury" or "property damage" caused by an "occurrence";

b.     Even if "bodily injury" or "property damage" were alleged, coverage is excluded pursuant to Exclusion 2.a. of the Policy and Exclusion 2.a. of the Umbrella Policy, which exclude coverage for

"bodily injury" or "property damage" expected or intended from the standpoint of the insured;

c.   Even if "bodily injury" or "property damage" were alleged, coverage is excluded pursuant to Exclusion 2.o. of the Policy and Exclusion 2.r. of the Umbrella Policy, which exclude coverage for "bodily injury" arising out of "personal and advertising injury";

d.   Even if "bodily injury" or "property damage" were alleged, coverage is excluded pursuant to Exclusion 2.p. of the Policy and Exclusion 2.t. of the Umbrella Policy, which excludes coverage for "bodily injury" or "property damage" arising out of the access or disclosure of confidential or personal information;

e.   Even if "bodily injury" or "property damage" were alleged, coverage is excluded pursuant to Exclusion 2.q. of the Policy, and Exclusion 2.u. of the Umbrella Policy for "bodily injury" or "property damage" arising out of any act or omission that violates, or is alleged to violate, any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communication or distribution of material or

information;

f.  Even if "bodily injury" were alleged, coverage is excluded under the Policy and the Umbrella Policy pursuant to the Exclusion – Designated Ongoing Operations for "bodily injury" arising out of one or more of the described operations;

g.  The Underlying Suit does not allege damages resulting from an offense of "personal and advertising injury";

h.  Even if "personal and advertising injury" were alleged, coverage is excluded under Exclusion 2.a. of the Policy and Exclusion 2.a.(1) of the Umbrella Policy, which exclude coverage for "personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

i.  Even if "personal and advertising injury" were alleged, coverage is excluded under Exclusion 2.g. of the Policy and Exclusion 2.a.(7) of the Umbrella Policy, which exclude coverage for "personal and advertising injury" arising out of the failure of goods products or services to confirm with any statements of quality of performance;

j.  Even if "personal and advertising injury" were alleged, coverage is

excluded under Exclusion 2.j. of the Policy and Exclusion 2.a.(10) of the Umbrella Policy, which excludes coverage for "personal and advertising injury" committed by insured whose business is advertising, broadcasting, publishing, or telecasting, designing or determining content of websites for others; or an internet search, access, content or service providers;

k.    Even if "personal and advertising injury" were alleged, coverage is excluded under Exclusion 2.p of the Policy and Exclusion 2.t. of the Umbrella Policy, which exclude coverage for damages arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information;

l.    Even if "personal and advertising injury" were alleged, coverage is excluded under Exclusion 2.p. of the Policy and Exclusion 2.a.(17) of the Umbrella Policy, which excludes coverage for "personal and advertising injury" arising out of any act or omission that violates, or is alleged to violate, Any federal, state or local statute, ordinance or regulation, other than the TCPA,

CAN-SPAM Act of 2003 or FCRA that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communication or distribution of material or information;

m.    Any punitive damages are not "damages" as contemplated by the Policies;

n.    With respect to the coverage afforded under the Policy and Umbrella Policy in effect from October 1, 2024 to October 1, 2025, coverage for punitive and exemplary damages is excluded under the Punitive Or Exemplary Damage Exclusion;

o.    There is no coverage for claims that did not occur during the effective dates of the Policies;

86.    There are actual bona fide and substantial questions and issues in dispute regarding Nationwide's obligations pursuant to the Policies to indemnify EA in the Dunn Suit.

**WHEREFORE**, the plaintiff, Nationwide, seeks a judgment:

A.    Declaring that Nationwide does not have an obligation to defend the Defendant EA for the claims made in the Dunn Suit pursuant to the Policies;

B.    Declaring that Nationwide does not have an obligation to

indemnify the Defendant EA for the claims made in the Dunn

Suit pursuant to the Policies;

C.    Declaring that Nationwide does not have an obligation to satisfy

any judgment or fund any settlement for the benefit of the Dunn

Claimants regarding the Dunn Suit pursuant to the Polices;

D.    Declaring that Nationwide may withdraw from, and may instruct

assigned defense counsel to withdraw from, any defense afforded

to the Defendant EA in the Dunn Suit;

E.    Such other and further relief as this Court may deem just,

reasonable, and equitable as shown by the evidence;

F.    For an award of costs; and

G.    For an award of reasonable attorney's fees.

> WDTC LAW, P.A.
> 2120 RIVERFRONT DRIVE, SUITE 275
> LITTLE ROCK, AR  72202
> (501) 372-1406
> (501) 372-1209 FAX

By: _____

> DAVID M. DONOVAN (81184)
> STACI DUMAS CARSON (2003158)
> MACKENZIE CLAIRE JACKSON (2025053)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

| | | |
|---|---|---|
| CASEY DUNN, Individually and on<br>Behalf of G.D., a Minor; and<br>THOMAS DUNN, | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | Case No.: 3:23-cv-00224-JM |
| ACTIVISION BLIZZARD, INC.;<br>INFINITY WARD, INC.;<br>TREYARCH CORP.<br>SLEDGEHAMMER GAMES, INC.<br>MICROSOFT CORPORATION;<br>EPIC GAMES, INC.;<br>EA DIGITAL ILLUSIONS CE AB<br>d/b/a DICE; ELECTRONIC ARTS, INC.;<br>UBISOFT DIVERTISSEMENTS, INC.<br>d/b/a UBISOFT MONTREAL;<br>UBISOFT ENTERTAINMENT;<br>NINTENDO OF AMERICA, INC.<br>GOOGLE LLC; and<br>JANE & JOHN DOE I-XX,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | JURY TRIAL DEMANDED |

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 03 2023

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

## AMENDED COMPLAINT

Plaintiffs Casey Dunn, Individually and On Behalf Of G.D., a Minor, and Thomas Dunn

hereby file their *Amended Complaint* against the Defendants—Activision Blizzard, Inc.; Infinity

Ward, Inc.; Treyarch Corp.; Sledgehammer Games, Inc.; Microsoft Corporation; Epic Games, Inc.;

EA Digital Illusions CE AB d/b/a DICE; Electronic Arts, Inc.; Ubisoft Divertissements Inc. d/b/a

Ubisoft Montreal; Ubisoft Entertainment; Nintendo of America, Inc.; Google LLC; and Jane &

John Doe I-XX notifying each Defendant of Plaintiffs' claims for relief as available under Arkansas

law. In support thereof, Plaintiffs allege and state:

1



## NATURE OF THE ACTION

1.      Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school and work.

2.      Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering often stop interacting with friends and family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.      Video game addiction causes rifts between gaming-addicted minors and young adults and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.      Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.      Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.      The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, game players) addicted to the Defendants' video games in order to maximize Defendants' profits.

2

7.     Defendants manufactured, published, marketed, and sold video games, gaming platforms, and/or gaming hardware, including those played or used by G.D., that Defendants had *specifically developed and designed* to cause the addiction experienced by G.D. and other users.

8.     Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.     Defendants rely on microtransactions to increase their profits from individual games.

10.     Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors and young adults.

11.     Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game software is their own bottom line.

12.     By making their games addictive, Defendants maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game content or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

13.     "Microtransactions" often occur as a result of Defendants' use of "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times they are subjected to Defendants' deceptive and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

3

14. By keeping minors and young adults playing longer—and spending more in the game in the process—Defendants are consistently increasing their revenue.

15. By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

16. Defendants are exploiting consumers, particularly minors and young adults, through the use of unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

17. Video game addiction impacts thousands of youths and their families across the country, including in Arkansas.

18. G.D. and their parents, Casey and Thomas Dunn, are one of those families who have been negatively impacted by the addiction caused by each of Defendants' products.

19. Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused G.D.'s gaming addiction and other damages, as described herein..

20. As a result of gaming addiction, G.D. specifically has experienced severe emotional distress, physical injuries, diminished social interactions, a drop in grades and inability to attend school, depression, lack of interest in other hobbies and sports, withdrawal symptoms such as rage, anger, and physical outburst, and diagnoses of ADHD and Dyslexia.

21. As a result of G.D.'s gaming addiction, G.D. has required an Individualized Educational Plan ("IEP"), out-patient counseling, and Focalin medication to control impulsivity and lack of control.

22. G.D.'s gaming addiction has also had negative effects on their relationship with their father, Thomas Dunn.

4

23.     Plaintiffs have been injured, damaged, and harmed as a proximate result of Defendants' actions and misconduct; for that they are entitled to compensation and other damages under Arkansas law.

24.     Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiffs, but countless other Arkansans and citizens of the world. For this they should be punished and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

## I.   **PARTIES**

25.     G.D., a minor, is and at all times relevant to this action, was a citizen and resident of the State of Arkansas whose principal place of residence being in Poinsett County, Arkansas.

26.     G.D. is 13 years old at the time of filing of this lawsuit.

27.     G.D. played or plays the following video games: Fortnite, Rainbow Six, Battlefield, and Call of Duty.

28.     G.D. downloaded the games through Google Play and the Microsoft Store, and also plays through Xbox Game Pass Cloud Streaming.

29.     G.D. subscribes to and plays games on Xbox Game Pass Ultimate.

30.     G.D. also plays games on their Xbox Series X, Nintendo Switch, and on their Android mobile phone.

31.     Plaintiff Casey Dunn is, and at all times relevant to this action was, a citizen and resident of the State of Arkansas whose principal place of residence is in Poinsett County, Arkansas.

32.     Casey Dunn is the mother of G.D. and represents G.D.'s interests in this lawsuit.

5

33.     She also seeks redress on her own behalf, seeking damages for loss of society and companionship, as well as for mental anguish, pain, suffering, emotional distress, actual financial loss, and other economic injuries and losses sustained as a result of Defendants' unlawful, negligent, fraudulent, reckless, intentional, and deceptive conduct that proximately caused G.D.'s gaming addiction.

34.     Plaintiff Thomas Dunn is, and at all times relevant to this action was, a citizen and resident of the State of Arkansas whose principal place of residence is in Poinsett County, Arkansas.

35.     Thomas Dunn seeks redress on his own behalf, seeking damages for loss of society and companionship, as well as for mental anguish, pain, suffering, emotional distress, actual financial loss, and other economic injuries and losses sustained as a result of Defendants' unlawful, negligent, fraudulent, reckless, intentional, and deceptive conduct that proximately caused G.D.'s gaming addiction.

36.     Defendant Activision Blizzard, Inc. ("Activision") is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard Building B, Santa Monica, CA 90404.

37.     At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

38.     Defendant Infinity Ward, Inc. ("Infinity Ward") is a Delaware corporation with its principal place of business at 21255 Burbank Blvd, Ste 600, Woodland Hills, CA 91367.

39.     At all times material hereto, Infinity Ward developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

6

the video gaming Call of Duty series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

40.     Defendant Treyarch Corp. ("Treyarch") is a Delaware corporation with its principal place of business at 3420 Ocean Park Blvd., Santa Monica, CA 90405.

41.     At all times material hereto, Treyarch developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

42.     Defendant Sledgehammer Games, Inc. ("Sledgehammer Games") is a Delaware corporation with its principal place of business at 1001 E Hillsdale Blvd., Ste 610, Foster City, CA 94404.

43.     At all times material hereto, Sledgehammer Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

44.     Defendants Activision, Infinity Ward, Treyarch, and Sledgehammer Games acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Call of Duty series with all the addictive features and technologies contained therein.

45.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, NC 27518.

46.     At all times material hereto, Epic Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

7

the video gaming Fortnite series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

47.    Defendant EA Digital Illusions CE AB ("DICE") is a Swedish company with its principal place of business in Stockholm, Sweden.

48.    At all times material hereto, DICE developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Battlefield series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

49.    Defendant Electronic Arts, Inc. ("EA") is a Delaware corporation with its principal place of business at 209 Redwood Shores Parkway Redwood City, CA 94065.

50.    At all times material hereto, EA developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Battlefield series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

51.    DICE and EA acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Battlefield series with all the addictive features and technologies contained therein.

52.    Defendant Ubisoft Divertissements Inc., d/b/a Ubisoft Montreal ("Ubisoft Montreal") is a Canadian corporation with its principal place in Montreal, Quebec, Canada.

53.    At all times material hereto, Ubisoft Montreal developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied,

8

and/or sold the video gaming Rainbow Six series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

54. Defendant Ubisoft Entertainment SA ("Ubisoft") is a French company with its principal place in Pasteur, France.

55. At all times material hereto, Ubisoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Rainbow Six series either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs.

56. Ubisoft Montreal and Ubisoft acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Rainbow Six series with all the addictive features and technologies contained therein.

57. Defendant Microsoft Corp. ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052. Microsoft is authorized to and does business in the State of Arkansas. Microsoft's registered agent for service of process in Arkansas is Corporation Service Company, 300 Spring Building, 300 S. Spring Street, Suite 900, Little Rock, AR 72201.

58. At all times material hereto, Microsoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox Series X either directly or indirectly, to members of the general public within the State of Arkansas, including to Plaintiffs, and developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold subscriptions to Xbox Game Pass to members of the general public within the State of Arkansas, including to Plaintiffs.

9

59.     Microsoft acted in concert with Activision, Infinity Ward, Treyarch, Sledgehammer Games, Epic Games, DICE, EA, Ubisoft Montreal, and Ubisoft to distribute, market, supply, and/or sell the Call of Duty, Fortnite, Battlefield, and Rainbow Six video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

60.     On October 13, 2023, Microsoft acquired Activision for $68.7 billion.[1] This acquisition has no impact on Activision's liability for the harm it caused Plaintiffs, and Microsoft is responsible for any damages that may be assessed against Activision.

61.     Defendant Nintendo of America, Inc. ("Nintendo") is a Washington corporation with its principal place of business at 4600 150th Avenue NE, Redmond, Washington 98052. Nintendo is authorized to and does business in the State of Arkansas. Nintendo's registered agent for service of process in Arkansas is C T Corporation System, 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201. Nintendo is a wholly-owned subsidiary of Nintendo Co. Ltd., a Japanese company with its principal place of business in Kyoto, Japan.

62.     At all times material hereto, Nintendo developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Nintendo Switch console and the Nintendo eShop either directly or indirectly, to members of the general public within the State of Arkansas, including Plaintiffs.

63.     Nintendo acted in concert with Epic Games to distribute, market, supply, and/or sell the Fortnite video games and all in-game downloadable content and in-game purchases contained

---

[1] *See Microsoft closes $69 billion acquisition of Activision Blizzard after lengthy regulatory review*, CNBC, https://www.cnbc.com/2023/10/13/microsoft-closes-activision-blizzard-deal-after-regulatory-review.html (Oct. 13, 2023).

therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.[2]

64.     Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Pkwy., Mountain View, CA 94043.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business at 1600 Amphitheatre Pkwy., Mountain View, CA 94043, and is a wholly owned subsidiary of the publicly traded company Alphabet Inc..  Google LLC is the primary operating subsidiary of Alphabet Inc.

65.     Google acted in concert with Activision, Infinity Ward, Treyarch, Sledgehammer Games, Ubisoft Montreal, and Ubisoft to distribute, market, supply, and/or sell the Call of Duty and Rainbow Six video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

66.     Defendants Jane & John Doe I-XX are individuals, corporations, or entities as yet unidentified to Plaintiffs who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions—and who introduced such products into interstate commerce or marketed such products with knowledge and intent that such products be sold in the State of Arkansas—and who also may be liable for some or all of Plaintiffs' injuries and damages as described herein.  Despite reasonable and diligent inquiries by Plaintiffs,. the identity of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery in order to determine the identity

---

[2] *See Nintendo Switch Online - Nintendo - Official Site*, https://www.nintendo.com/us/switch/online/

of said tortfeasor(s).  If a John Doe Tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint in accordance with Ark. Code Ann. § 16-56-125.[3]

67.     Upon information and belief, each Defendant was aware—or should have been aware—that other game developers and publishers, including the other Defendants named herein, were engaging in the same unlawful, deceptive, negligent, outrageous, immoral, and reckless behavior.

68.     Upon information and belief, Activision, Infinity Ward, Treyarch, Sledgehammer Games, Microsoft, Epic Games, DICE, EA, Ubisoft Montreal, Ubisoft, Nintendo, Google, and Jane & John Doe I-X acted in concert and entered into licensing agreements to utilize the same patents to keep users, including minors like G.D., addicted to Defendants' video games.

69.     At all times material hereto, each Defendant targeted consumers/purchasers, including minors like G.D., to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money, known as "microtransactions," through in-game advertising and "fake" avatar friends.

70.     Each Defendant—with knowledge of G.D.'s age and Arkansas residency—targeted G.D. and induced them to enter into thousands of dollars of microtransactions.

## II.     JURISDICTION AND VENUE

71.     Plaintiffs' reallege and incorporate by reference each of the preceding paragraphs of the *Amended Complaint*.

72.     This *Amended Complaint* brings forth claims for relief arising under the laws of the State of Arkansas, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce, Plaintiffs have

---

[3] The affidavit required by Ark. Code Ann. § 16-56-125 is attached hereto as Exhibit 1.

suffered and continue to suffer both injuries and damages, as described herein, within the State of Arkansas that exceed the sum or value of $75,000, exclusive of interest and costs..

73.     This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

74.     This Court has personal jurisdiction over each Defendant because each routinely conducts business in Arkansas and has sufficient minimum contacts in Arkansas to have intentionally availed itself to this jurisdiction by marketing video games and transacting business in the State of Arkansas.

75.     At all relevant times, each Defendant was present and transacted, solicited and conducted business in the State of Arkansas through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

76.     Defendants are conclusively presumed to have been doing business in this State and are subject to Arkansas's long arm jurisdiction.

77.     At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Arkansas and throughout the United States.

78.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

### III.     GENERAL ALLEGATIONS

#### A. The Rise of Video Games

79.     A "game" is a closed, formal system that engages players in structured conflict and

13

resolves its uncertainty in unequal outcome. Games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

80. A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

81. Unlike traditional games of chance, video games require active, lengthy participation, during which players are exposed to the psychological techniques designed to manipulate and exploit this vulnerable population.

82. Such manipulation and exploitation is possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board ("ESRB").

83. The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

84. The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality platforms.

85. Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time—a long and slow method of earning profits.

86. A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

14

87.     Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games ("RPGs") that can take hundreds of hours to beat, there is a staggering amount of content in modern games.

88.     The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

89.     The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

90.     In 2023, the video game industry's revenue was $365.6 billion globally.

91.     With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors like G.D.

92.     The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable content.

93.     Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the appropriateness of games.

94.     To entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money in microtransactions.

15

**B. Microtransactions**

95.     Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

96.     The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly in order to meaningfully advance the game.

97.     Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

98.     Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

99.     Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

100.     While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

101.     Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

102.     In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

103.     Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

104.     Developers and publishers can also use microtransactions to lock potentially significant content behind paywalls.

105.     Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

106.     The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

107.     This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

108.     This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

109.     Microtransactions rely on the impulsive behavior of players and the gaming environment and peer pressure to drive purchases. For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking drive players to make microtransaction purchases.

110.     Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

111.     Microtransactions are not only benefiting the gaming industry publishers and developers; the platforms that allow the microtransactions take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google,

17

Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their platforms.

112.    While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

113.    Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

**C. The Monetization Schemes Built into Video Games**

114.    Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

115.    The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

116.    Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

117.    Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

    a.  The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

18

b. "Chasing": encouraging players to keep playing to get back any money they just lost;

c. "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

d. "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

e. "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

f. The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

118. The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

119. Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

120. Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

121. Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game.

This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

122.    Games linked to players' social network pages also gather information from these pages in order to personalize content to players' unique interests and preferences.

123.    As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.*, spending or playing longer).

124.    The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm takes into account the player's available funds and cost sensitivity to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

125.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

126.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

127.    These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

20

128.    A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and rubber-banding.

**i.  Loot Boxes**

129.    A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

130.    Through purchasing a loot box, the player acquires a seemingly random assortment of items.

131.    The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

132.    Loot boxes require no player skill and have a randomly determined outcome (*i.e.*, prize).

133.    Loot prizes are essentially a lottery—a way for gaming developers, publishers, and even game platforms to increase revenue through underage gambling.

134.    It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

135.    After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

136.    Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

137.    Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

138.    Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii. Rubber-Banding**

139.    Another example of a monetization scheme is "rubber-banding."

140.    Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

141.    Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

142.    In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

143.    If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

22

144.    Such technical sophistication in these purchasing systems aim to reduce the player's uncertainty or reluctance regarding purchasing decisions.

### iii. Pay-To-Win

145.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

146.    Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

147.    For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make them impossible to beat by ordinary, non-paying players.

148.    Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

### D. Patents Target Minors to Increase In-Game Spending

149.    Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

150.    However, game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

151.    Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

> a.    U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player

23

character." Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

b. U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c. U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (e.g., of interest to) a first player," then locates "a second user that has acquired (e.g., purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d. U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e.  U.S. Patent No. 9,138,639 B1, assigned to Kabam Inc., describes a system
which modifies the "pricing of in-game virtual items associated with [players']
experience and their progress in the game." In this way, "while all players may
receive a message for a particular item, the cost for each player may be more or
less than other players based on the individual's in-game statistics."

f.  U.S. Patent No. 702,523 B2, assigned to Microsoft Technology Licensing LLC,
was created to capitalize on a player's tendency to commit to a purchase after
investing significant time into the game. In short, a user is made "aware of an
opportunity to add an achievement to their collection by downloading and
playing a demo or trial version of a particular game," but "[i]nstead of recording
the achievement" upon completion, the game "initiates a notification to the user
. . . that the achievement will not be recorded unless they purchase the full
version of the game at that time."

g.  U.S. Patent No. 9,795,886 B1, assigned to EA, allows new users to purchase
in-game support more cheaply than experienced users. Particularly, the system
determines "prices for a protection extension in an online game" based on "the
user's power and/or strength in a game." This allows a less experienced player
to "build up their strength in a game, thus promoting further player
engagement."

h.  U.S. Patent No. 10,252,170 B2, assigned to Hasbro Inc., encourages players to
make purchases outside of a game to receive in-game benefits. Players can earn
in-game points for scanning codes that come with separately purchased physical
toys.

i. U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j. U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k. U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

26

l. U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m. U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on a number of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n. U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o. U.S. Patent App. No. 2016/0346677 A1, assigned to EA., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p. U.S. Patent App. No. 2016/0346677 A1, for which Sony Interactive Entertainment LLC has applied and which is currently pending, seeks to patent

27

technology that would suggest microtransactions to players who are stuck in the game. This patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective.

152. There was once a time when such lopsided consumer video game monetization-related invention would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers are able to further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

153. The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

154. It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E. These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

155. What players, like G.D., often do not understand is that their gaming experience is not accidental, but rather, carefully engineered by the game's manufacturers.

156. In every game, there are several hundred, or maybe even thousands, of heavy players who spend much more money in the game than the other players.

157. Companies employ tactics specifically to gain heavy users—or "whales" or "VIPs"—and to induce them into spending more money. For instance, when "whales" get stuck in

the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

158.    Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

159.    To target those who may be likely to spend additional money in the game, game developers and publishers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

160.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

## F. Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted

161.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new game content, and using tactics to ensure users are creating habits in their gameplay.

162.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

29

163.    For instance, Activision in particular holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[4]

164.    Upon information and belief, Activision works in concert with the other Defendants to license this patented technology and allow all Defendants to control users' experiences within the game.

165.    Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

166.    Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

167.    Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

168.    There are two kinds of feedback loops: positive and negative.

169.    Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

170.    Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

171.    Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

172.    By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

---

[4] *See* Patents assigned to Activision publishing, JUSTITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

173.   A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

174.   When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

175.   In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

176.   Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

177.   Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

178.   Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

179.   Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

180.   By constantly adding downloadable content, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the content and the game.

31

### G. Cloud Gaming Enhances Defendants' Predatory Activities

181.   Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

182.   Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

183.   Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

184.   Cloud gaming platforms allow users to stream any game available on the platform at any time.

185.   Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

186.   This means players have easy access to hundreds or even thousands of games at one time.

187.   What's more, the catalogue of games on streaming platforms is ever-changing and evolving.

188.   The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming platform, by ensuring they always have something new and different to play.

### H. Defendants' Predatory Schemes Created a Generation of Gaming Addicts

189.   The feedback loops, other psychological properties, and cloud gaming platforms are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game

32

content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, platforms, and predatory monetization schemes work together to addict players to the games.

190.    During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[5]

191.    The very nature of action-entertainment games not only attracts young people with focus, attention, and anger issues (particularly in the case of violent video games), but it also tends to reinforce these negative behaviors.

192.    In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[6]

193.    Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, an occupational responsibilities.

194.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over

---

[5] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis.* 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).
[6] *Id.*

gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

195.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

196.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

197.    The main features of IGD are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

198.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

199.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

200.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

201.    Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

202.    The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

34

203.    For instance, IGD may be an impulse control disorder similar to compulsive gambling.

204.    The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

205.    These nine criteria are also outlined in the DSM-5.

206.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

207.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

208.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

209.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

210.    The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

35

211.    Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

212.    The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

213.    Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

214.    These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

215.    Comorbidity studies also indicate that individuals with attention deficit hyperactivity disorder (ADHD) may have an increased susceptibility to developing gaming disorder.

### I.    Effects of Video Games on Adolescent Brains

216.    Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

217.    Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

218.    In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

219.     Furthermore, empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

220.     Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

221.     Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

222.     The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

223.     The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

224.     This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

225.     Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[7]

226.    Similarly, brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions like those activated by cue-exposure to drugs.

227.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure:



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[8]

---

[7] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).
[8] *Id.*

228.    Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

229.    One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

230.    Further, videogame play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

231.    These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

232.    As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

233.    As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

234.    By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

**J.  G.D.'s Addiction, Injuries, and Damages**

235.    G.D. is a 13-year-old individual addicted to video games; specifically, Fortnite, Call of Duty, Battlefield, and Rainbow Six, many of which offer cross-playing on multiple platforms and/or single sign on for Xbox Game Pass Ultimate or on their Xbox Series X, Android mobile phone, and Nintendo Switch.

236.    G.D. spends approximately 13 hours per day playing these games across these multiple platforms.

237.    G.D. cannot control their gameplay or spending in the game, and they will sometimes sneak to play video games after the rest of their family has gone to bed.

238.    G.D. has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Dyslexia, and has also experienced the following as a result of gaming addiction: physical pain in their hands, elbow, and shoulders; increased weight and morbid obesity; diminished social interactions; a drop in their grades and inability to attend school; depression; a lack of interest in other sports/hobbies; a loss and/or lack of friends at school when able to attend; withdrawal symptoms such as rage, anger, and physical outbursts; loss of friends; and other emotional distress, mental anguish, pain and suffering.

239.    As a result, G.D. has undergone out-patient counseling, medication therapy, and has an individualized educational plan ("IEP").

240.    Due to worsening symptoms of lack of impulse control and inability to learn in a traditional classroom setting, and, in part, because of the aforementioned harm to G.D. caused by Defendants' gaming products, G.D. is now homeschooled.

241.    Despite parental efforts to limit game time, G.D. plays video games 12-14 hours per day.

242.    G.D.'s mother, Casey Dunn, has lost hope in her ability to control G.D.'s game playing time and fears G.D. when she attempts to take games away.

243.    G.D.'s father, Thomas Dunn, is only able to interact with their child by playing video games with them.

244.    G.D. has lost interest in all social and physical activities leading to their current weight of 300 pounds.

245.    He plays games with and on their Xbox Game Pass Ultimate subscription, and also plays games on Xbox Series X, their Android mobile phone, and Nintendo Switch.

246.    G.D. has frequent bouts of gamers' rage where he throws game controllers and breaks them.

247.    G.D. is spending approximately $350 per month on gaming.

248.    G.D. has spent approximately $3,000 on in-game transactions and downloadable content. These funds do not include the costs spent on Xbox Game Pass Ultimate, gaming consoles, and copies of games.

249.    As a result of each Defendant's intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, as described herein, Casey and Thomas Dunn have each experienced mental anguish, emotional distress, pain, suffering, and financial loss—and are reasonably likely to continue to experience those injuries in the future due to the permanent impact of Defendants' wrongs on Plaintiffs.

250.    As a result of G.D.'s gaming addiction, which was proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, Casey and Thomas Dunn have experienced loss of society and companionship—and have been financially damaged due to G.D.'s uncontrollable in-game spending.

41

**K. Defendants' Conduct Specifically Led to Plaintiffs' Damages**

251.    Each Defendant is aware that its video games are harmful to minors and young adults because Defendants specifically designed their games to addict.

252.    To this avail, each Defendant employs behavioral psychologists and/or neuroscientists in order to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

253.    Due to the psychological aspects of the games, many of Defendant's products have been banned in other countries to avoid the harm to children Defendants are causing daily in the United States.

254.    No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including the Dunns.

**L. Defendants' Products Used by G.D.**

**<u>Fortnite</u>**

255.    Fortnite, developed and published by Epic Games, was first released in 2017 and is now available in three distinct game mode versions that otherwise share the same general gameplay and game engine.

256.    Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 players fight to be the last person standing. Players can play alone, in a duo, or in a "squad" of 3-4 players. When players land in the game, they must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players.

257.    Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four players fight off zombie-like creatures and defend objects with traps and fortifications they can build. From missions, players are awarded a number of in-game items,

42

which include hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes.

258.    Fortnite Creative is a sandbox game mode in which players are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

259.    Each game mode has similar graphics, art assets, and game mechanics.

260.    Battle Royale and Save the World are rated T for Teen—*i.e.,* recommended for individuals aged 13 and above. However, this does not mean younger children are not playing the game.

261.    Epic Games is currently working with the International Age Rating Commission ("IARC") to rate all islands and other content published through the Creative mode.

262.    Save the World is the only pay-to-play game mode of the Fortnite franchise.

263.    And while Fortnite can be played through Microsoft's Xbox Cloud Gaming, no subscription to Microsoft's Xbox Game Pass is required to play Fortnite. The games are free through the Xbox Cloud Gaming service:

> **YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO** ⋯ ⟨⋯⟩ **TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS.** [9]

---

[9] https://www.fortnite.com/mobile/xbox-cloud-gaming

264.     Fortnite is also available for free on multiple other platforms, including Epic Games, Steam, and PlayStation.

265.     Fortnite games are monetized through the use of V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

266.     V-Bucks in Save the World can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

267.     V-Bucks in Battle Royale can be used to buy cosmetic items like character models or the game's battle pass: a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a Battle Royale season.

268.     Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.

269.     Less than two years after Fortnite's release in 2017, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.

270.     The addictive properties of Fortnite are so dangerous on young minds that several health and behavioral centers across the country have published resources for parents specifically warning about Fortnite addiction.

271.     Several studies have concluded that Fortnite is "more addictive than heroin and other illegal drugs."

272.     Despite these third-party express warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into its game.

44

273.     Fortnite gained immense popularity because of its clever manipulation of human psychology. Epic Games developed Fortnite games to make sure that the players keep coming back and playing Fortnite.

274.     The team that developed Fortnite included psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a game that was as addictive as possible.

275.     One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

276.     The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

277.     In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

278.     Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

279.     With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

45

280.    Additionally, the design of Fortnite keeps players drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

281.    Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing such mechanics, Epic Games ensures that players never once get bored while playing.

282.    To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well.

283.    Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



10

---

10 https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

284.    Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

285.    These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

286.    Upon information and belief, Epic Games has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

287.    Epic Games does not disclose any of the psychological tactics or addictive features it purposefully includes in Fortnite to any of its users.

288.    Instead, Epic Games touts its game as "educational" and markets it for use in the classroom.

289.    On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



---

[11] https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

290.     Engaging—and addicting—children early and in environments such as their classroom serves only to increase Epic Games's revenue through continued play of young users, at the expense of these users' mental and physical health.

291.     Epic Games does not adequately inform users of the inherent risks involved with using and playing Fortnite or that the game was designed to addict and harm users.

**Call of Duty**

292.     Call of Duty is a first-person shooter game series that simulates infantry and combined arms warfare.

293.     Call of Duty releases annual versions of the game; currently there are 22 mainline Call of Duty versions.

294.     Call of Duty is the most successful video game franchise created in the United States, and the fourth best-selling video game franchise of all time.

295.     As of April 2021, the series has sold over 400 million copies.

296.     Each iteration of Call of Duty is largely similar, but each has different stories, guns, and abilities.

297.     Activision is the publisher for each Call of Duty version.[12]

298.     Infinity Ward is the developer of Call of Duty games from 2003 to the present.

299.     Treyarch is the developer of Call of Duty games from 2005 to the present.

300.     Sledgehammer Games is the developer of Call of Duty games from 2011 to the present.

301.     Call of Duty offers both single-player and multiplayer modes.

---

[12] Raven Software Corporation is also the developer of Call of Duty games from 2016 to the present, but Raven Software Corporation is wholly part of Defendant Activision.

302. While there are several multiplayer shooter games on the market, Call of Duty remains most popular because of its specific, addictive features.

303. For instance, Call of Duty involves unlock progression, wherein each kill, assist, or win all seep into a feedback loop that unlocks new equipment as players progress.

304. Each gun used gets better the more a player uses it, with new attachments becoming available with more points scored.

305. At the outset, Call of Duty is harmful to youth because those who frequently play violent video games such as Call of Duty show neural desensitization to painful images.

306. The rewards in the Call of Duty games are immediate and constitute a constant stream of progression.

307. It takes a significant amount of time for players to unlock everything, but once they reach the top and everything is unlocked, they have the option to reset it all.

308. This constant stream of rewards allows players to feel they are making constant progress toward unlocking everything in the whole game—a form of operant conditioning.

309. With operant conditioning, players are reinforced to enact the correct behavior: in this case, making "kills" to earn extra game content.

310. Combining these addictive feedback loops with fast-paced play, satisfying graphics, sounds, and other dopamine lifts make the Call of Duty franchise extremely addicting to players.

311. Activision, Infinity Ward, Treyarch, Sledgehammer Games, and Raven Software (collectively the "Call of Duty Defendants") were aware that the Call of Duty games included significant psychological aspects to encourage continuous game play and eventually lead to the addiction of its plays—especially minors.

49

312.    In fact, upon information and belief, the Call of Duty Defendants specifically designed the Call of Duty games in concert with psychologists and neuroscientists to discover the best addictive aspects to include in their games.

313.    Several of these addictive technological features have even been patented by Activision.

314.    Upon information and belief, the Call of Duty Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Call of Duty games.

315.    The Call of Duty Defendants also utilize several schemes to increase game time, consequently increasing in-game spending on downloadable content and microtransactions.

316.    Several of the Call of Duty versions include loot box schemes, and others include "battle passes" which allow users to unlock additional tiers of game play for a certain price:

> If you've already experienced the full version of *Call of Duty*: *Black Ops Cold War* or *Modern Warfare*, you are probably familiar with the Battle Pass system. For those that aren't, here's how it works:
>
> The Battle Pass has 100 tiers of content for you to progress through and earn once you've purchased the Battle Pass.
>
> To advance through these tiers, you simply play the game (either *Warzone*, *Black Ops Cold War*, or *Modern Warfare*). The longer you play, the more Tier progress you get. Sometimes, there are events where Double Tier progress can be gained, and it does exactly what you'd expect; double the rate at which you get Battle Pass Tiers through time played.
>
> Through the Battle Pass system, everyone can unlock and enjoy tiers of free content, and all functional content that has an impact on game balance, including base weapons and attachments, can be unlocked simply by playing the game.
>
> So, to recap: you play the game, you get Battle Pass Progress which unlocks Tiers, and then you get rewards from Tiers. Yes, it's that simple. [13]

317.    While users can play 20 of the 100 levels for free, to continue gameplay through additional "tiers," a user has to pay 1,000 "Call of Duty Points" which equates to $9.99 in real-world funds:

---

[13]    https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

Free Tiers (of the Battle Pass system): Everyone can earn over 70 free tiers of content, including two functional weapons just by playing.

Wartracks: Among the rewards that can be earned at specific Free Tiers are Wartracks, packs of popular songs from the Call of Duty universe and in the real world! Equip a track to a specific vehicle in the Vehicle Customization menu (like Battle Horns), then as soon as you hop in, the music gets turned up. Your entire squad can listen to the beat while you drive, and let the song guide you to your primary objective    survival.

Battle Pass: Players looking for the ultimate customization can purchase the Battle Pass for 1,000 Call of Duty® Points and get access to unlock up to 100 tiers of content. These Tiers include scores of Rare, Epic, Legendary, and occasionally Ultra weapon blueprints, Operator skins, Operator Missions, and more, including a new Operator at Tier 0 in most, if not all, seasons.

Dual Reward Tiers: Some tiers within the Battle Pass include two rewards  one for Black Ops Cold War and one for Warzone. These are marked within the Battle Pass, offering those who own Black Ops Cold War with their own special item in addition to one they can use in Warzone.

Battle Pass Bundle: Purchase the Battle Pass Bundle and get access to everything you get with the Battle Pass, plus 20 Tier skips which grant instant access to your next 20 tiers of content.

Tier Skips: Buy individual Tier skips for 150 COD Points.

You can purchase at any time without missing any content. If you choose to purchase the Battle Pass after already ranking up a few tiers, no problem. You'll immediately be awarded everything from the Tiers you have already unlocked through gameplay.[14]

318.    Though the Call of Duty Defendants know of the addictive features and technology included in their games, they do not inform their users of the risks inherent with playing this game.

319.    Activision touts the game as a "heart-racing saga" with "unrivaled intensity," "breathtaking covert operations," "an immersive narrative," and "the ultimate online playground."[15]

320.    The Call of Duty Defendants do not adequately inform users of the inherent risks involved with using and playing Call of Duty or that the game was designed to addict and harm users.

**Rainbow Six**

321.    Tom Clancy's Rainbow Six is an online tactical shooter video game developed by Ubisoft Montreal and published by Ubisoft (collectively the "Rainbow Six Defendants").

---

[14]    https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

[15] https://www.activision.com/games/call-of-duty/call-of-duty-modern-warfare

322.   The game is based on the novel Rainbow Six by author Tom Clancy and was first released in 1998 for PC.

323.   The series today consists of over 20 separate games, in which players travel around the world hunting down terrorists as part of a global anti-terrorist unit.

324.   Ubisoft confirms that, as of 2021, the Rainbow Six Siege version of the series had over 70 million registered players across platforms.

325.   In Ubisoft's 2021-2022 investor report, it stated that the Rainbow Six game series generated €300 million, or nearly $317 million, throughout the year across licensing agreements and raw sales.

326.   In the popular Rainbow Six Siege game, released in 2015, Ubisoft included microtransaction models in the game.

327.   While the maps and game modes continue to be available for free, new characters and weapon skins require in-game currency known as "Renown" to purchase.

328.   Players can accumulate Renown by playing the game but can also purchase Renown with real-world funds.

329.   "R6 Credits" are another in-game currency that can be purchased with real money to obtain premium weapon skins in the game.

330.   Unlike Renown, R6 Credits cannot be obtained through other means within the game.

331.   Credit packs are available in varying amounts at varying costs; 600 credits cost $4.99, 1,200 credits cost $9.99, 2,400 credits cost $19.99, 4,200 credits cost $34.99, 6,000 credits cost $49.99, and 12,000 credits cost $99.99.

52

332.   The first credit pack of 600 credits is essentially enough to purchase one seasonal operator or an epic weapon skin within the game.

333.   Elite skin bundles in the game cost 1,800 R6 Credits, and conveniently, there are no credit bundle packs for 1,800 credits—meaning a user would have to purchase a 2,400-credit pack to purchase an elite skin bundle in the game.

334.   Thus, the credit bonuses that one can get by buying expensive currency packs incentivizes people to buy more in order to obtain more downloadable content within the game.

335.   The Rainbow Six Defendants intentionally developed the game with addictive psychological features to keep users playing more often and for longer periods of time.

336.   Upon information and belief, the Rainbow Six Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Rainbow Six games.

337.   Specifically, the game is set up such that no two game-play sessions are the same; within the game there are multiple map entry points and places for players to explore that the game is constantly changing and a different experience for players every time.

338.   Such constant variety keeps players hooked and coming back daily and playing for hours.

339.   The amount of time it takes to "level up" within the game increases significantly over time, causing players to spend more and more hours to achieve the same experience of "leveling up."

340.   Players are also afforded only one life per round, making players pay closer attention to the game in each match, use significant mental capacity to try and win, and frustrate players all the more with each loss.

341.     Though they are equipped with the knowledge of the addictive risks inherent in their game, the Rainbow Six Defendants have failed to inform the public, users, or parents of such risks.

342.     The Rainbow Six Defendants know that many users—like Plaintiff—play in excess, but rather than discourage such play, the Rainbow Six Defendants profit off their continued game time and spending.

343.     The Rainbow Six Defendants do not adequately inform users of the inherent risks involved with using and playing Rainbow Six or that the game was designed to addict and harm users.

**Battlefield**

344.     Battlefield is a series of first-person shooter video games developed by DICE and published by EA (the "Battlefield Defendants").

345.     Battlefield was first released in 2002 and the series is now comprised of multiple separate games.

346.     The series features a particular focus on large maps, teamwork, and combined arms warfare. Generally, the games feature large-scale, online multiplayer battles.

347.     The Battlefield series averages thousands of players per day and has sold 88.7 million copies across all of its games.

348.     The Battlefield Defendants intentionally created and developed the Battlefield series with psychologically addictive features and tactics to ensure players would keep coming back to the game, playing longer, and spending more in in-game purchases within the game.

349.    The Battlefield games promote player engagement—and addiction—by including tactics such as player ranking, determined by the amount of Experience Points or "XP" accumulated by the player.

350.    XP is earned by playing matches, so the more a player plays, the more they rank up.

351.    Ranks range from #0 (Private, from 0-999 XP) up to #150 (Five-Star General, 50,000,000 XP). The trick, however, is that rank progression is not linear. As a player approaches higher ranks, they are required to obtain more and more points to reach the next level.

352.    Thus, for newcomers, it is really easy to progress—keeping them motivated and happy by ranking up quickly. But as users get more addicted to the game, they also need to invest considerably more time to advance, creating a harmful cycle for users.

353.    The series centrally records online statistics for each player, allowing users to receive rank promotions and weapon unlocks based on their performance.

354.    Battlefield also employs daily and weekly challenges to be completed for players to get a reward:



16

---

16 https://medium.com/@andrefre/5-ways-battlefield-1-hooks-the-players-72bbf27c05a1

355.    Daily and weekly challenges help create a habit in users, as they encourage them to continually log in daily and play for at least some period of time.

356.    The Battlefield games also employ special campaigns that provide specific tasks or assignments for special rewards within the game. Players thus play longer trying to complete these special challenges as they are designed to seem limited and often involve exclusive rewards.

357.    Upon information and belief, the Battlefield Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Battlefield games.

358.    Users are also encouraged to purchase in-game content, including battle packs and battle passes that unlock additional content.

359.    To expand the game beyond the "free" path containing a set number of unlockable items, users are required to upgrade to a "premium" path with exponentially more progression opportunities, weapons, and other game content.

360.    The more a player wants to advance in the game, the more they will have to spend to do so.

361.    Though they are equipped with the knowledge of the addictive risks inherent in their game, the Battlefield Defendants have failed to inform the public, users, or parents of such risks.

362.    The Battlefield Defendants know that many users—like G.D.—play in excess, but rather than discourage such play, the Battlefield Defendants profit off their continued game time and spending.

363.    The Battlefield Defendants do not adequately inform users of the inherent risks involved with using and playing Battlefield or that the game was designed to addict and harm users.

**Xbox Store, Game Pass, and Cloud Gaming**

364.    Microsoft is the manufacturer of the Xbox gaming consoles.

365.    Additionally, Microsoft developed and maintains the Xbox Store—a platform through which users can purchase and download thousands of games and their respective downloadable content.

366.    Through the Xbox Store, users can download games and certain downloadable content for said games.

367.    Microsoft markets this store as "safe" for the whole family to use:



---

368. Xbox Game Pass is a paid tiered subscription service offered by Microsoft that provides users access to online games. The highest tier—Xbox Game Pass Ultimate—has access to Xbox Cloud Gaming.

369. Xbox Cloud Gaming is Microsoft's Xbox cloud gaming service.

370. Xbox Cloud Gaming was initially released in beta testing in November of 2019. The service was later launched for subscribers of Xbox Game Pass Ultimate on September 15, 2020.

371. Xbox Cloud Gaming is available to all members of Xbox Game Pass Ultimate, which is an ongoing $17 per month subscription.

372. Xbox Cloud Gaming operates by linking the device to a remote server in the cloud.

373. Gameplay is saved in the cloud and can be accessed and played from numerous devices at any given location.

374. In fact, Xbox Cloud Gaming allows for gameplay from a number of devices—no longer is a console required. Games can be accessed instead from the content library of Xbox Cloud Gaming includes thousands of games spanning every game rating category:



<sup></sup>

---

<sup>18</sup> https://www.xbox.com/en-US/browse/games

375.    This means that anyone with an Xbox Cloud Gaming account can access and play any game on the platform.

376.    Games can be played on computers, consoles, or mobile devices.

377.    The games in the Xbox Cloud Gaming library are not only extensive but is everchanging. This keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play:



19

378.    Xbox Game Pass Ultimate (the subscription plan that includes Xbox Cloud Gaming) also offers users daily, weekly, and monthly "quests" that can be completed for varying amounts of Microsoft Reward points:

---

[19] https://www.xbox.com/en-us/games?xr=shellnav

# How it works

Xbox Game Pass Ultimate and Console plan members can earn Microsoft Rewards points by playing games from the Xbox Game Pass library. Here's how to get started.

## 1.

### Browse current Quests

Check out current Quests on your Xbox console in the Xbox Game Pass section or on your Xbox Game Pass mobile app. New Quests are added every day.

## 2.

### Participate in Quests

Find the list of Quests in the Xbox Game Pass membership area on your Xbox console or on the Xbox Game Pass mobile app. You will receive an instant notification when your Quest is ready to be turned in.

## 3.

### Claim and track your points

Go to the Xbox Game Pass area on your Xbox console or on your Xbox Game Pass mobile app to claim and track your points.

## 4.

### Redeem points

Head to the Microsoft Rewards app to spend your points! Redeem points for Xbox gift cards and use for in-game content, games, devices, movies, apps accessories and more. [20]

379.    The ease of access, quest challenges, and constantly evolving game library draws players in, and keeps them coming back.

380.    In fact, Microsoft CEO announced that over 20 million people have streamed video games using Xbox Cloud Gaming.

381.    Xbox Cloud Gaming allows these users to connect with each other within the platform, by including a feature to add and interact with friends, called "Xbox Social."

---

[20] https://www.xbox.com/en-US/xbox-game-pass/quests

60

382.    This social media-esque feature permits users to add friends to a Friends list and then see what games your friends are playing and/or invite them to join your game:



383.    Users can chat with each other individually or in groups.

384.    To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

---

[21] https://support.xbox.com/en-US/help/friends-social-activity/share-socialize/use-xbox-game-bar-to-play-and-chat-with-friends

385.    Minors and young adults are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

386.    Microsoft does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon—were designed to addict and harm users.

**Nintendo Switch and Nintendo eShop**

387.    Nintendo is the manufacturer for the gaming console the Nintendo Switch and Nintendo Switch Lite.

388.    While it is a handheld device, the Switch allows for online gaming and online game purchases.

389.    Through the Switch, Nintendo provides a platform for users to download certain games and play them on the Switch device.

390.    This platform is called the "Nintendo eShop."

391.    ' Fortnite video games played by Plaintiff t are available on Switch are also available through the Nintendo eShop.

392.    Once a game is downloaded, Nintendo provides a framework, through the eShop, for in-game purchases to initiate and process transactions:

62



393.   This framework enables game developers to sell microtransactions and/or loot boxes through the Nintendo platform.

394.   In exchange, Nintendo keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

395.   Nintendo specifically designed this platform to attract users to purchase games and in-game content therein—regardless of the harmful content such games may include.

396.   Nintendo hires behavioral psychologists and neuroscientists to design its consoles, games, platform, and marketing in the best way possible to attract users, especially minors and young adults.

---

. 22
https://www.nintendo.com/us/search/#q=minecraft&p=1&cat=gme&sort=df&f=topLevelFilters&topLevelFilters=DLC

397.    Nintendo is aware that several of the games on its platform that it sells and encourages users to purchase continuous in-game content are addictive and pose unreasonable risk of harm to users, particularly minors.

398.    Nintendo does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon—were designed to addict and harm users.

**Google Play**

399.    Through the Google Play app, Google provides a platform for users to download certain games and play them on Android mobile devices.

400.    Both Call of Duty and Rainbow Six games are available in the Google Play App.

401.    Once a gaming app is downloaded, Google provides a framework for "in-app billing" to initiate and process transactions.

402.    This framework enables game developers to sell microtransactions and/or loot boxes through the Google platform.

403.    In exchange, Google takes 30% of all revenue generated by these microtransactions and in-app purchases.

404.    Google does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon—were designed to addict and harm users.

405.    Instead, Google specifically designed this platform to attract users to purchase games and in-game content therein—regardless of the harmful content such games may include.

64

406. Google hires behavioral psychologists and neuroscientists to design its consoles, games, platform, and marketing in the best way possible to attract users, especially minors and young adults.

407. Google is aware that several of the games on its platform that it sells and encourages users to purchase continuous in-game content are addictive and pose unreasonable risk of harm to users, particularly minors.

## L. Minors' Access to Defendants' Products

408. In order to use any of Defendants' respective products, a user must first obtain access to the product.

409. G.D. played Call of Duty, Fortnite, Battlefield, and Rainbow Six on their Xbox Series X, through Xbox Game Pass Ultimate, and other games downloaded through Google Play on their Android mobile phone.

410. Due to cross-playing, G.D. is able to play Call of Duty, Fortnite and Rainbow 6 Siege on any gaming platform, including Nintendo Switch, X-Box Game Pass, Google Play and Android phone.

411. G.D. can easily sign on to multiple gaming platforms with a single sign on option across multiple game platforms.

412. To sign up to play the Defendants' games through the Xbox Game Pass, a user must first create an account. A new account can be created by entering an email address, creating a password, and adding a name.

413. A prospective user is then invited to press the button to create the account; however, in very small print below this button, the user is informed that signing up means the user agrees to the platform's terms and conditions. The text of such policies is not presented on the sign-up page.

65

The user is not informed that they can or should click on the terms or otherwise told to first review them.

414.    G.D.—as a minor—lacked the capacity to contract, and thus expressly disaffirms any contract they may have made with any of the Defendants, or that Defendants may claim they made with Plaintiff before reaching the age of majority.

415.    G.D.'s continued use of Defendants' products was thereafter compulsive and due to addiction and in no way was an affirmation of any contract.

416.    Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable. Likewise, Defendants' products were designed to addict G.D. to the products, which caused a slew of mental and physical health issues to G.D. Defendants' terms and conditions and any other purported contracts are therefore void as against public policy as an individual cannot consent to harming a child.

## IV.    TOLLING OF STATUTE OF LIMITATIONS

417.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

418.    Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

419.    Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

420.    Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

421.    Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

422.    Defendants' fraudulent concealment has tolled the running of any statute of limitations.

423.    Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

424.    Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

425.    Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

426.    Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

427.    G.D. was unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

428.    Casey and Thomas Dunn were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged

67

herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

429.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## V.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
### (Against all Defendants)

430.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

431.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play.

432.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

433.    Each of the Defendant's respective products are marketed and advertised to minors and young adults.

434.    Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products. More specifically:

68

a. Epic Games designed Fortnite to be as addictive as possible and includes numerous psychological tricks to ensnare users, including but not limited to a "near miss" effect, random rewards, bright and vibrate colors, and continual gameplay variety;

b. Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds;

c. Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, including but not limited to constantly changing game-play sessions and increasing difficulty to move up levels within the game;

d. DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, including but not limited to increasing difficulty to move up levels within the game, daily and weekly challenges, and special event campaigns;

e. Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features that include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

69

    f.   Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and to pushed users to make purchases of addictive materials on the platform; and

    g.   Google designed the Google Play app as a platform to house addictive gaming products and to pushed users to make purchases of addictive materials on the platform.

435.    The defects in the design of each of the Defendant's respective products existed prior to the release of these products to G.D. and the public, and there was no substantial change to any of the Defendants' products between the time of their manufacture (in regards to consoles or physical game copies) and the time of their distribution to G.D. via download or URL access (in regards to digital game copies and cloud gaming).

436.    G.D. used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use these products without inspection for their addictive nature.

437.    Each Defendant defectively designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

    a.    Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

    b.    Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

c.  Ubisoft Montreal and Ubisoft designed the Rainbow Six games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d.  DICE and EA designed the Battlefield games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

f.  Nintendo designed the Switch and Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content; and

g.  Google designed the Google Play app in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

438.  Each of the Defendant's respective products are defective in design and unreasonably dangerous for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

439.  Youth, like G.D., and young adults are among the ordinary consumers of each of the Defendant's products. Pre-teen and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the

71

products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable content and/or microtransactions.

440.    Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

441.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including G.D., who used the products without any substantial change in the products' condition.

442.    The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

443.    Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

        a.      Choosing not to use "addictive" patents identified herein in the game design;

b.　　Redesigning gaming software to limit rather than promote addictive engagement;

c.　　Implementing robust age verification;

d.　　Implementing effective parental controls;

e.　　Implementing effective parental notifications;

f.　　Warning of health effects of use and extended use upon sign-up or log-in;

g.　　Implementing default protective limits to the length and frequency of gaming sessions;

h.　　Implementing opt-in restrictions to the length and frequency of gaming sessions;

i.　　Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j.　　Implementing blocks to use during certain times of day (such as during school hours or late at night);

k.　　Implementing limits on number of games playable per day;

l.　　Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m.　　Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and overall in-game spending per day;

n.　　Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o.　　Others as set forth herein.

73

444.    Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

445.    G.D. used Defendants' products as intended or in reasonably foreseeable ways.

446.    As a direct and proximate result of their use of Defendants' defectively designed products, G.D. sustained physical and mental injuries, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

447.    G.D.'s injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution.

448.    The defective design of the products used by G.D. was a substantial factor in causing harm to G.D.

449.    As a direct and proximate result of Defendants' respective products' defective design, G.D. suffered serious injuries, including mental health diagnoses, physical pain in their hands, elbow, and shoulders, diminished social interactions, a drop in their grades and inability to attend school, depression, a lack of interest in other sports/hobbies, a loss and/or lack of friends at school, withdrawal symptoms such as rage, anger, and physical outbursts, pain and suffering, mental anguish, and emotional distress.

450.    G.D. was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

451.     The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to G.D. Plaintiffs' damages proximately caused by Defendants' defective design are G.D.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; G.D.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to G.D.'s physical and mental injuries. G.D.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

452.     Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

453.     The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

454.     The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, G.D. continues to use Defendants' respective products. While G.D. uses Defendants' respective products, they will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

455.     The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of

75

its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

456. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

457. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming; Nintendo Switch, Nintendo eShop, and Google Play. .

458. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

459. Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

460. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

461. Each of the Defendants sold and distributed its respective products to G.D. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to,

76

dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

462.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

463.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

464.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

> a.  Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;
>
> b.  Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;
>
> c.  The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming content to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;
>
> d.  New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or

77

usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e.  The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f.  The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

465.  Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

466.  Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or instructions.

467.  Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

468.  As a direct and proximate result of each Defendant's failure to warn, G.D. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

469.  Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs

are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

470.     The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

471.     The nature of the fraudulent and unlawful acts that created safety concerns for G.D. are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, G.D. continues to use Defendants' respective products. When G.D. uses Defendants' respective products, they will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

472.     The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

### COUNT III
### NEGLIGENCE – DESIGN
### (Against All Defendants)

473.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

474.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

79

game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass

Ultimate, Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play.

475.    Each of the Defendant's products are designed and intended to be gaming products

and are marketed and advertised to the public for the personal use of the end-user/consumer.

476.    Each of the Defendant's respective products are also marketed and advertised to

minors and young adults.

477.    Each Defendant knew or, by the exercise of reasonable care, should have known,

that its respective products were dangerous, harmful, and injurious when used by youth in a

reasonably foreseeable manner. More specifically:

a.   Epic Games designed Fortnite with numerous psychological tricks to be as

addictive as possible, while knowing that abuse, addiction, and compulsive use

by youth can lead to injury, including but not limited to dissociative behavior,

withdrawal symptoms, social isolation, negative consequences on cognitive

processes, and other harmful effects;

b.   Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the

Call of Duty games with addictive features, while knowing that abuse,

addiction, and compulsive use by youth can lead to injury, including but not

limited to dissociative behavior, withdrawal symptoms, social isolation,

negative consequences on cognitive processes, and other harmful effects;

c.   Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive

psychological features to keep users playing more often and for longer periods

of time, while knowing that abuse, addiction, and compulsive use by youth can

lead to injury, including but not limited to dissociative behavior, withdrawal

symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

g. Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social

81

isolation, negative consequences on cognitive processes, and other harmful effects.

478.     Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to G.D.

479.     Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include abuse, addiction, and compulsive use in youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

480.     Each Defendant knew that minors such as G.D. would use its respective products.

481.      G.D. was a foreseeable user of the Defendants' respective products.

482.     Each Defendant had a duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

483.     Each Defendant owed this duty to use ordinary care in designing a safe product to users, like G.D.

484.     Each Defendant breached this duty. These breaches include, but are not limited to:

82

a.   Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

b.   Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

c.   Failing to use ordinary care in the design of its products by negligently designing them to push users—including minors like I.C.—to continually purchase addictive content;

d.   Failing to limit minor users' ability to access and purchase addictive content;

e.   Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

f.   Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.   Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

83

h.  Otherwise failing to use ordinary care in its design and packaging in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while using the product as intended.

485.   Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have served effectively the same purpose as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minors such as G.D..

486.   A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

487.   At all relevant times, G.D. used Defendants' respective products in the manner in which they were intended by Defendants to be used. As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs were harmed. Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

488.   As a direct and proximate result of each of the Defendant's breached duties, G.D. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

489.   As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs have suffered—and continued to suffer—economic loss and damages, as described herein.

490.   Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

84

## COUNT IV
## NEGLIGENCE – FAILURE TO WARN
### (Against All Defendants)

491.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

492.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play.

493.   Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

494.   Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

495.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

        a.    Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

        b.    Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse,

85

addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.    Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.    DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.    Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.    Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction,

86

and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

g.  Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

496.  Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to G.D.

497.  Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as G.D. would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

498.  Each Defendant knew that minors such as G.D. would use its respective products.

87

499.     None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

500.     Had Plaintiffs received proper or adequate warnings about the risks of Defendants' respective products, Plaintiffs would have heeded such warnings.

501.     Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

502.     Each Defendant owed this duty to users like G.D.

503.     Each Defendant breached this duty owed to G.D., a foreseeable user. These breaches include, but are not limited to:

    a.     Failing to warn users that Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

    b.     Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product.

504.     A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

505.     At all relevant times, each Defendant could have provided adequate warnings to prevent the harm and injuries described herein.

88

506.     Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, G.D. and their parents would have heeded such warnings.

507.     As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

508.     Each Defendant negligently failed to warn consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

### COUNT V
### NEGLIGENCE – FAILURE TO INSTRUCT
#### (Against All Defendants)
#### (Pleaded in the Alternative)

509.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

510.     Plaintiffs plead this Count in the alternative.

511.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play..

512.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

513.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

514.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

a.    Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.    Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.    Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.    DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to

90

the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g. Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

515. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable

91

in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to G.D.

516.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

517.    Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by them.

518.    Each Defendant breached its duty by failing to provide reasonable and adequate instructions to G.D., a foreseeable user. More specifically, Defendants did not give any instructions with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harm built into each Defendants' respective gaming products...

519.    A reasonable company under the same or similar circumstances as Defendants would have used provided adequate instructions to consumers, including minor users and parents like Plaintiffs.

520.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

521. Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, G.D. and their parents would have followed such instructions.

522. As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing harm to Plaintiffs.

523. As a direct and proximate result of each Defendant's failure to instruct, G.D. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

524. Plaintiffs have also incurred economic losses, in the tune of thousands of dollars spent by G.D. while using Defendants' products that they would not have incurred but for the addictive and harmful propensities of Defendants' gaming products.

525. Each Defendant negligently failed to instruct consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VI
## NEGLIGENCE
### (Against All Defendants)

526. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

527. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

93

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D. – Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play.

528.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

529.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

530.    Each Defendant owed G.D. a duty to act as a reasonably careful company would under the circumstances.

531.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

532.    A reasonably careful company would protect G.D. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

533.    A reasonably careful company would not invite, encourage, or facilitate youth, such as G.D., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

534.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

    a.    Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by

94

foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products posed significant risk of harm;

b.      Activision, Infinity Ward, Treyarch, and Sledgehammer Games failed to disclose that they designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products posed significant risk of harm;

c.      Ubisoft Montreal and Ubisoft failed to disclose they designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products posed significant risk of harm;

d.      DICE and EA failed to disclose they designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products posed significant risk of harm;

e.      Microsoft failed to disclose that it designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features, while knowing that abuse, addiction, and compulsive use by foreseeable

users, *i.e.,* minors, can lead to injury and, as such, the products posed
significant risk of harm;

    f.      Nintendo failed to disclose that it designed the Switch with addictive
features and the Nintendo eShop as a platform to house and push
addictive content to users, while knowing that abuse, addiction, and
compulsive use by foreseeable users, *i.e.*, minors, can lead to injury
and, as such, the products posed significant risk of harm;

    g.      Google failed to disclose that it designed the Google Play app as a
platform to house and push addictive content to users, while knowing
that abuse, addiction, and compulsive use by foreseeable users, *i.e.*,
minors, can lead to injury and, as such, the products posed significant
risk of harm.

535.    G.D. was a foreseeable user of the Defendants' respective products.

536.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen
the fact, extent, and manner of G.D.'s use of Defendants' respective products.

537.    Each Defendant knew or, by the exercise of reasonable care, should have known,
that the reasonably foreseeable use of its respective products (as developed, set up, managed,
maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious
when used by youth such as G.D. in a reasonably foreseeable manner. More specifically:

    a.      Epic Games designed Fortnite with numerous psychological tricks to be as
addictive as possible, while knowing that abuse, addiction, and compulsive
use by youth can lead to injury, including but not limited to dissociative

behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.  DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to

97

dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.     Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

g.     Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

538.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as G.D., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

539.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as G.D., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited

98

to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

540.    Each Defendant's conduct was closely connected to G.D.'s injuries and Plaintiffs' damages, which were highly certain to occur.

541.    Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed G.D.

542.    Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.*

543.    Each Defendant also owes a duty to not to engage in unconscionable acts or practice in business, commerce, or trade. *See* Ark. Code. Ann. § 4-88-101, *et seq.*

544.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular game-play in order to avoid such risks.

545.    Each Defendant also owed a duty to consumers not to engage in deceptive or misleading practices in connection with sweepstakes, contests, and prize promotions within their respective products. *See* ARK. CODE ANN. § 4-102-101, *et seq.*

546.    Each Defendant has breached the duties owed to G.D.

547.    Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management,

maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.　Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including G.D.;

b.　Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.　Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including G.D.;

d.　Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including G.D.;

e.　Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including

100

Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.    Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including G.D.;

g.    Developing, patenting, and licensing unreasonably dangerous features and algorithms for video game products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, like G.D.;

h.    Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users;

i.    Maintaining platforms that house addictive technologies and patents and encouraging users, especially minors, to continue making purchases of such harmful and addictive products; and

j.    Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

101

548.    Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

      a.      Failing to design products and technology free from addictive features that provide significant risk of harm to users;

      b.      Failing to implement effective protocols to block users under the age of 13;

      c.      Failing to implement effective parental controls;

      d.      Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

      e.      Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

      f.      Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

      g.      Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

549. Each Defendant further breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

550. Each Defendant also breached its duty owed under ARK. CODE. ANN. § 4-88-107 *et seq.* not to engage in unconscionable or deceptive business acts or practices.

551. Each Defendant also breached its duty owed under ARK. CODE. ANN. § 4-102-101 *et seq.* not to mislead or act in a manner contrary to the public policy of the State of Arkansas in connection with prize promotion.

552. A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users like G.D.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

553. As a direct and proximate result of each Defendant's breach of one or more of its duties, G.D. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

554. Each Defendant's breach of one or more of its duties is a proximate cause of G.D.'s injuries and the damages sustained by Plaintiffs..

555.    As a direct and proximate result of each of the Defendant's breach of duties, G.D. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

556.    Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## OUTRAGE
### (Against All Defendants)

557.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

558.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play.

559.    As described herein, each of the Defendants intentionally designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

        a.    Epic Games designed the Fortnite games to be as addictive as possible and include numerous psychological tricks to ensnare users, including but not limited to a "near miss" effect, random rewards, bright and vibrate colors, and continual game-play variety;

        b.    Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, including but not limited to

feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds;

c.    Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, including but not limited to constantly changing game-play sessions and increasing difficulty to move up levels within the game;

d.    DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, including but not limited to increasing difficulty to move up levels within the game, daily and weekly challenges, and special event campaigns;

e.    Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features that include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

f.    Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

105

g.  Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform.

560.  Each Defendant intentionally designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.  Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

c.  Ubisoft Montreal and Ubisoft designed the Rainbow Six games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d.  DICE and EA designed the Battlefield games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

f.  Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction,

106

and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

g. Google designed the Google Play app in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

561. Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, like G.D., to use each Defendants' respective product and intended for users, like G.D., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

562. Each Defendant intentionally did not warn users, prospective users, or their parents/guardians of the addictive components of their games and gaming products.

563. Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was extreme and outrageous, is beyond all possible bounds of decency, and utterly intolerable in a civilized community.

564. Each Defendant knew or should have known users, like G.D., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users, including G.D., after initial purchase or download.

107

565.     Each Defendant knew or should have known that when users, like G.D., became addicted to Defendants' respective products due to the addictive and defective qualities thereof, that parents and families, like the Dunns, would be forced to deal with an uncontrollable video game addiction in their child and the harmful effects of such addiction.

566.     Each Defendant intended to inflict emotional distress *(e.g.*, addiction) on users, like G.D., and should have known users, like G.D. and their families, would suffer emotional distress as a result of Defendants' conduct.

567.     Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

568.     Such conduct in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

569.     No reasonable person would be expected to endure such emotional distress suffered by Plaintiffs as a result of each Defendant's conduct.

570.     As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, G.D. has experienced extreme emotional distress and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

571.     As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Casey Dunn has experienced extreme emotional distress, pain, suffering, and mental anguish, including having to witness his child suffer from addiction, pain, and mental distress caused by Defendants' outrageous conduct.

108

572.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Thomas Dunn has experienced extreme emotional distress, pain, suffering, and mental anguish, including having to witness his child suffer from addiction, pain, and mental distress caused by Defendants' outrageous conduct.

573.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

574.    Further, each Defendant's outrageous conduct, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT VIII
## VIOLATION OF DECEPTIVE TRADE PRACTICE ACT
### §§ 4-88-101 *et seq.*
### (Against All Defendants)

575.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

576.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming; Nintendo Switch, Nintendo eShop, and Google Play..

577.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

578.     Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

579.     It is unlawful for any Defendant to engage in deceptive and unconscionable trade practices, and such practices are prohibited by the Arkansas Deceptive Trade Practices Act ("ADTPA"), ARK. CODE ANN. § 4-88-101, et seq..

580.     Each Defendant engaged in deceptive and unconscionable trade practices in connection with the sale and advertisements of its gaming product, identified herein. Those violations include but are not limited to the following:

    a.     Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;

    b.     Advertising the goods or services with the intent not to sell them as advertised;

    c.     Employing bait-and-switch advertising consisting of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell;

    d.     Knowingly taking advantage of consumers who is reasonably unable to protect their interest because of their age;

    e.     Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

f.   Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like G.D., rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

g.   Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

i.   Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

ii.   Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

iii.   Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

111

iv. DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

v. Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

vi. Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm; and

vii. Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products posed significant risk of harm;

h. Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, specifically:

      i. Epic Games knew that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Epic Games marketed Fortnite as "educational" and for use in the classroom;

      ii. Activision, Infinity Ward, Treyarch, and Sledgehammer Games each knew that its Call of Duty games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by youth;

      iii. Ubisoft Montreal and Ubisoft each knew that its Rainbow Six games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by youth;

      iv. DICE and EA each knew that its Battlefield games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose

113

such harms anywhere and instead market its games for play by youth;

v.      Microsoft knew that its Xbox Game Pass Ultimate and Xbox Cloud Gaming platforms contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but does not disclose such harms anywhere and instead market its platforms for play by youth;

vi.     Nintendo knew that its Switch and Nintendo eShop platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but does not disclose such harms anywhere and instead market its console and platforms for play by youth; and

vii.    Google knew that its Google Play platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth.

581.    Each Defendant engaged in the aforementioned unconscionable or deceptive trade practices in the in the course of business and in connection with the sale of goods or services to Arkansas consumers, including Plaintiffs.

582.    Each Defendant also violated the ADTPA by offering misleading or deceptive prize promotions, including but not limited to

    a.    Representing directly or by implication that players, including G.D., will have an increased chance of receiving a prize by making multiple or duplicate purchases, payments, or donations, or by entering a game, drawing, sweepstakes, or other contest more than one time, unless the representation is true;

    b.    Representing directly or by implication that users, like G.D., are being notified a second or final time of the opportunity to receive or compete for a prize unless the representation is true; and

    c.    Representing directly or by implication that a prize notice is urgent, or otherwise convey an impression of the urgency by use of description, narrative copy, phrasing on an envelope, or similar method unless there is a limited time period in which the recipient must take some action to claim or be eligible to receive a prize, and the date by which such action is required appears in immediate proximity to each representation of urgency and in the same type size and boldness as each representation of urgency;

    d.    Failing to give the disclosures related to a prize promotion required by ARK. CODE ANN. § 1-102-106; and

    e.    Offering misleading or deceptive prize promotions through its respective games, including but not limited to, timed quests, battle passes or packs, and loot boxes, that encourage users like G.D. to continually keep making in-game purchases.

583.    Each Defendant also violated the ADTPA by failing to provide adequate notice to parents—including Casey and Thomas Dunn—about collecting personal information of children-

–like G.D.—under the age of 13, as required by the Children's Online Privacy Protection Act and accompanying regulations.

584.   Defendants' actions detailed herein constitute deceptive and unconscionable acts and trade practices in violation of the ADTPA.

585.   Plaintiffs relied to their detriment on each Defendant's deceptive and unconscionable acts, including Defendants' respective misrepresentations and deceptions, in deciding to use Defendants' gaming products.

586.   As a proximate result of each Defendant's deceptive and unconscionable trade practices, described above, Plaintiffs suffered actual financial loss. This loss includes but is not limited to, money spent on microtransactions and expenses Casey and Thomas Dunn have necessarily paid and/or have become liable to pay and will continue to pay and/or be liable to pay for medical aid, medical treatment, and medications of G.D.

587.   Had each Defendant not engaged in the respective unfair, deceptive, and abusive conduct described herein, G.D. would not have used each Defendant's respective products and Plaintiffs would not have suffered financial loss.

588.   Each Defendant violated the ADTPA in the manner described herein and, as a result of Defendants' countless violations of the ADTPA, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for their actual financial loss and reasonable attorney's fees incurred in connection with prosecuting this claim.

589.   Additionally, because Plaintiffs suffered pecuniary loss of more than $500 as a result of each Defendant's intentional, knowing, and willful violation of Arkansas's Prize Promotion Act, ARK. CODE ANN. § 4-102-101 *et seq.*, Plaintiffs are entitled to recover their costs, reasonable attorneys' fees, and twice the amount of their pecuniary loss.

590.    Each Defendant engaged in unconscionable and deceptive trade practices, as described above, which was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, outrageous, unlawful, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers. This misconduct warrants an award of punitive damages in an amount— imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

**COUNT IX**
**DECEIT/FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

591.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

592.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.—Fortnite, Call of Duty, Rainbow Six, Battlefield , Xbox Game Pass Ultimate, Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play..

593.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

594.    Each Defendant made representations of material facts about their respective products, while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

595.    These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

117

a.  Epic Games misrepresented Fortnite as safe for use by minors and young adults, including G.D., while knowing that abuse, addiction, and compulsive use by youth can lead to injury, and knowing that it had designed and developed Fortnite to be as addictive as possible;

b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games misrepresented the Call of Duty games as safe for use by minors and young adults, including G.D., while knowing that it had designed and developed the Call of Duty games with addictive features and that its products posed significant risk of harm, such as abuse, addiction, and compulsive use leading to physical injury;

c.  Ubisoft Montreal and Ubisoft misrepresented the Rainbow Six games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Rainbow Six more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Rainbow Six posed significant risk of harm to users, like G.D.;

d.  DICE and EA misrepresented the Battlefield game series as safe for use by minors and young adults, while knowing that it had been designed with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that the Battlefield game series posed significant risk of harm;

118

e.    Microsoft misrepresented that its Xbox Game Pass Ultimate and Xbox Cloud Gaming were safe for use by minors and young adults, while knowing that it was designed and developed with addictive features to keep users, like G.D., playing the games and spending money, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products posed significant risk of harm to users, like G.D.;

f.    Nintendo misrepresented that its Switch and Nintendo eShop were safe for use by minors and young adults, while knowing that they was designed and developed with addictive features to keep users, like G.D.., purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products posed significant risk of harm to users, like G.D.; and

g.    Google misrepresented that its Google Play app was safe for use by minors and young adults, while knowing that it was designed and developed with addictive features to keep users, like G.D.., purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products posed significant risk of harm to users, like G.D.

596.    Defendant knew their games posed risk to minors, like G.D., based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like G.D., to

119

purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

597. Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

> a.  Epic Games marketed Fortnite as "educational" and for use in the classroom despite knowing that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by G.D.;

> b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games marketed their Call of Duty games for play by youth and directed their misstatements to youth despite knowing that the Call of Duty games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by G.D.;

> c.  Ubisoft Montreal and Ubisoft marketed Rainbow Six for play by youth and directed their misstatements at youth, despite knowing that its Rainbow Six games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by G.D.;

> d.  DICE and EA marketed its games for play by youth and directed their misstatements at youth, despite knowing their Battlefield games contained

120

an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by G.D.;

e.      Microsoft knew that its Xbox Game Pass Ultimate and Xbox Cloud Gaming platforms, as well as Fortnite, the Call of Duty games, Rainbow Six, and the Battlefield games, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but intentionally marketed  its platforms for play by youth and directed its misstatements towards users of Fortnite games, the Call of Duty games, Rainbow Six games, the Battlefield games, and other games designed, developed and utilized the patents and technology described herein;

f.      Nintendo knew that its Switch, Nintendo eShop platform, and the Fortnite games available thereon, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but intentionally marketed  its platform for play by youth and directed its misstatements towards users of Fortnite and other games designed, developed and utilizing the patents and technology described herein; and

g.      Google knew that its Google Play platform, as well as the Call of Duty and Rainbow Six games available thereon, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but intentionally marketed  its platform for play by youth and directed its misstatements towards users of Call of Duty, Rainbow Six,, and other games designed, developed and utilizing the patents and technology described herein.

121

598.    By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

599.    Each Defendant knew that its misstatements and false representations, as identified herein, were material.

600.    The misrepresentations described herein were made to Plaintiffs—particularly to G.D.—prior to their purchase of each Defendant's product and to G.D. while he was using Defendants' products as intended.

601.    Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

602.    G.D. and their parents, Casey and Thomas Dunn, relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

603.    Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product was justifiable.

604.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.*, Defendants' deceit, Plaintiffs were not aware and could not have been

aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

605.   As a direct and proximate result of each of the Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs have been damaged. Such damage includes G.D.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; G.D.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to G.D.'s physical and mental injuries. G.D.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

606.   Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

607.   Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT X
## DECEIT/FRAUDULENT OMISSION OR NONDISCLOSURE
### (Against All Defendants)

608.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

609.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play.

610.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

611.    Each Defendant could have disclosed the defective condition of its respective products to the public and advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

612.    Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its respective products.

613.    Each Defendant intentionally omitted or knowingly did not disclose material facts about their respective products, or their collective use of patents designed to addict players to Defendants' products. For instance:

        a.    Epic Games did not inform the public, users, or parents, including Plaintiffs, that Fortnite posed significant risk of harm due to Defendants' decision to

124

design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury;

b.   Activision, Infinity Ward, Treyarch, and Sledgehammer Games did not inform the public that they designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury;

c.   Ubisoft Montreal and Ubisoft did not inform the public that they designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury;

d.   DICE and EA did not inform the public that the Battlefield game series posed a significant risk of harm to the public, including G.D., because it was designed with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, despite their knowing that abuse, addiction, and compulsive use by youth can lead to injury;

e.   Microsoft did not tell the public, including Plaintiffs, that it designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features, despite knowing that abuse, addiction, and compulsive use by youth can lead to injury;

f.   Nintendo did not inform the public that it designed the Switch and eShop with addictive features, or that these products could be used to download

125

addictive games and content, despite knowing that abuse, addiction, and compulsive use by youth can lead to injury; and

g.    Google did not inform the public that it designed the Google Play app with addictive features, or that this platform could be used to download addictive games and content, despite knowing that abuse, addiction, and compulsive use by youth can lead to injury.

614.    Each Defendant knew of the risks associated with their respective products based on internal research and external studies known to the industry and each Defendant; yet, intentionally omitted and failed to disclose those findings, to induce youth, including G.D., to continue using their respective products.

615.    Each Defendant knew that its omissions and nondisclosures were material.

616.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

617.    If Defendants had not omitted material facts regarding the safety of their products, Plaintiffs would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game content or in-game transactions in each Defendant's product.

618.    As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiffs had no reason to believe that each Defendant's products were unsafe for children to use.

619.    As a direct and proximate result of each Defendant's material omissions and nondisclosures, Plaintiffs have been damaged. More specifically, each Defendant engaged in

deceitful conduct through its fraudulent omissions and nondisclosure, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

620. Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

**COUNT XII**
**FRAUDULENT CONCEALMENT**
**(Against All Defendants)**

621. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

622. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate Xbox Cloud Gaming, Nintendo Switch, Nintendo eShop, and Google Play.

623. As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly minors and young adults.

624.  Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

      a.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

      b.  Activision, Infinity Ward, Treyarch, and Sledgehammer Games designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

      c.  Ubisoft Montreal and Ubisoft designed Rainbow Six games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

      d.  DICE and EA designed the Battlefield game series with psychologically addictive features and tactics to ensure players would keep coming back to the game and playing longer, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

      e.  Microsoft designed Xbox Game Pass Ultimate and Xbox Cloud Gaming with addictive features while knowing that abuse, addiction, and

128

compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

f.     Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiffs; and

g.     Google designed the Google Play app with addictive features and as a platform to house addictive gaming products, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiffs.

625.    Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce youth, including G.D., to continue using its respective products and avoid losing users and revenue,.

626.    Each Defendant knew that its concealment was material.

627.    Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

628.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the

use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

629.    If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the products had been designed to be addictive, then Plaintiffs would not have purchased, downloaded played, continued to use, and/or purchased downloadable game content or in-game transactions in each Defendant's product.

630.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

631.    As a direct and proximate result of each Defendant's concealment of material information, G.D. has been injured and Plaintiffs have sustained damages, as described herein.

632.    Each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying  an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore,  an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

633.    Defendants' fraudulent concealment tolls any applicable statute of limitations.

## COUNT XIII
## FRAUDULENT INDUCEMENT
### (Against All Defendants)

634.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

635.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by G.D.: Fortnite, Call of Duty, Rainbow Six, Battlefield, Xbox Game Pass Ultimate, Xbox Cloud Gaming, Nintendo Switch, and Google Play.

636.    Within these products, each Defendant included the ability for users, including Plaintiff, to purchase in-game downloadable content or microtransactions.

637.    Users of Defendants' products, including minors such as G.D., were induced into microtransactions by each Defendant to make such purchases through false representations and material misstatements built into each of the Defendants' products. Defendants' methods of fraudulent inducement include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like Plaintiff, that game-selected purchases would help them advance in the game or complete necessary missions.

638.    Defendants made these false representations and material nondisclosures with intent to induce G.D. into the microtransaction.

131

639.     At the time each Defendant utilized these technologies to induce G.D. to make in-game purchases, each Defendant knew that the representations made through the game were false and existed only to entice G.D. to continue spending.

640.     Each Defendant intended its fraudulent in-game content to induce G.D. to continue purchasing in-game downloadable content and/or in-game transactions within its respective product.

641.     At the same time, each Defendant knew that the inducements to make additional in-game purchases served only to increase users'—including G.D.'s—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

642.     G.D. reasonably relied on the enticements within each Defendant's product to make several in-game purchases that actually had little to no value to G.D. within the game.

643.     Had G.D. known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, G.D. never would have agreed to purchase in-game downloadable content or microtransactions.

644.     Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

645.     Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly concealed those findings to avoid losing revenue and to induce G.D. to continue using each Defendant's respective products.

132

646.    In conjunction with Defendants' acts of concealment, each Defendant knowingly and recklessly misled the public, users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

647.    Each Defendant intended its concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

648.    By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product..

649.    G.D. was induced into microtransactions resulting in over $3,000 spent on in-game purchases or microtransactions.

650.    Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like G.D., would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

651.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiffs justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

652.    As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

653.    As a direct and proximate result of each of the Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each of the Defendant's inducements to utilize their platforms, download and play their games, and/or continuously spend funds through its products.

654.    As a direct and proximate result of each Defendant's fraudulent inducement Plaintiffs have been damaged. More specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions and nondisclosure, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

655.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

**COUNT XIV**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

656.   Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

657.   A civil conspiracy occurs when two or more persons have combined to accomplish a purpose that is unlawful or oppressive, or to accomplish some purpose (that is not in itself unlawful, impressive, or immoral) by unlawful, oppressive, or immoral means to the injury of another. Such a conspiracy occurred here.

658.   Defendants conspired to addict users, like G.D., to Defendants' gaming products..

659.   As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like G.D., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by G.D. and other users.

660.   Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like G.D., addicted to Defendants' products.

661.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like G.D, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

662.   As described herein, Activision, Infinity Ward, Treyarch, and Sledgehammer Games knowingly conspired and otherwise acted in concert to violate the ADTPA, fraudulently

135

and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Call of Duty game series to addict minors and young adults.

663.    In particular, Activision, Infinity Ward, Treyarch, and Sledgehammer Games knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Call of Duty games that addicted and harmed G.D.

664.    As described herein, DICE and EA conspired and otherwise acted in concert to violate the ADTPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Battlefield game series to addict minors and young adults.

665.    In particular, DICE and EA knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Battlefield games that addicted and harmed G.D.

666.    As described herein, Ubisoft Montreal and Ubisoft conspired and otherwise acted in concert to violate the ADTPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Rainbow Six game series to addict minors and young adults.

667.    In particular, Ubisoft Montreal and Ubisoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to

fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Rainbow Six games that addicted and harmed G.D.

668.    As described herein, Microsoft conspired with and acted in concert with Activision, Infinity Ward, Treyarch, Sledgehammer Games, Epic Games, DICE, EA, Ubisoft Montreal, and Ubisoft to distribute, market, supply, and/or sell the Call of Duty, Fortnite, Battlefield, and Rainbow Six video games and all in-game downloadable content and in-game purchases contained therein through Xbox Game Pass in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

669.    As described herein, Nintendo conspired with and acted in concert with Epic Games to distribute, market, supply, and/or sell the [Fortnite video games and all in-game downloadable content and in-game purchases contained therein through Nintendo eShop in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

670.    As described herein, Google conspired with and acted in concert with Activision, Infinity Ward, Treyarch, Sledgehammer Games, Ubisoft Montreal, and Ubisoft  to distribute, market, supply, and/or sell the Call of Duty and Rainbow Six video games and all in-game downloadable content and in-game purchases contained therein through Google Play in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs

671.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including G.D., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

137

672.     Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harms in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including G.D.

673.     These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users, like Plaintiffs.

674.     Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

675.     The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

676.     The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, G.D. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective design and Defendants' failure to warn consumers, like G.D., about the addictive qualities and components of those products.

## COUNT XVII
## LOSS OF CONSORTIUM
### (Against All Defendants)

677.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

678.     Consortium may be generally defined as the comfort, society, affection, services, and other indefinable elements reasonably expected from the injured person.

679.     As a direct and proximate result of the aforesaid careless, intentional, negligent, deceptive, fraudulent, reckless, willful, immoral, and unlawful acts on the part of each Defendant,

138

and by reason of the personal injuries sustained by G.D., Casey Dunn has sustained damages—including great mental anguish and emotional distress—and may sustain such damages in the future by reason of her child's injuries and a resulting loss of her child's services, society, love, companionship, and familial relationship she once enjoyed with G.D.

680. As a direct and proximate result of the aforesaid careless, intentional, negligent, deceptive, fraudulent, reckless, willful, immoral, and unlawful acts on the part of each Defendant, and by reason of the personal injuries sustained by G.D., Thomas Dunn has sustained damages—including great mental anguish and emotional distress—and may sustain such damages in the future by reason of his child's injuries and a resulting loss of his child's services, society, love, companionship, and familial relationship she once enjoyed with G.D.

## VI.   **PRAYER FOR RELIEF**

639. Plaintiffs Casey Dunn, Individually and On Behalf Of G.D., a Minor, and Thomas Dunn respectfully request judgment in their favor and against each of the Defendants to the full extent of the law, as follows:

    a. For an award of compensatory damages for G.D. in an amount to be determined at trial on the following elements of damage:

        i. The nature, extent, duration, and permanency of G.D.'s injuries;

        ii. The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

        iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

    iv.  The pain, suffering, and mental anguish experienced in the past;

    v.  The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

    vi.  The present value of any loss of ability to earn in the future;

    vii.  Any scars, disfigurement, and visible results of G.D.'s injuries;

    viii.  The reasonable expense of any necessary help in G.D.'s home which has been required as a result of G.D.'s injuries;

    ix.  The present value of any necessary help in G.D.'s home reasonably certain to be required in the future;

    x.  G.D.'s inability to attend school;

    xi.  Actual financial loss; and

    xii.  Any other actual pecuniary loss or future financial loss proximately caused by Defendants.

b.  For an award of compensatory damages for Casey Dunn, in an amount to be determined at trial, to fairly compensate her for her pain, suffering, mental anguish, emotional distress, actual financial loss, and the reasonable value of any loss of the services, society, companionship, and familial relationship she once enjoyed with her child, G.D.;

c.  For an award of compensatory damages for Thomas Dunn, in an amount to be determined at trial, to fairly compensate him for his pain, suffering, mental anguish, emotional distress, actual financial loss, and the reasonable value of any loss of the services, society, companionship, and familial relationship of his child, G.D;

d. For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

e. For an award of statutory damages in an amount to be determined at trial;

f. For an award of punitive damages in an amount to be proven at trial;

g. For an award of costs and attorneys' fees, as allowable by law;

h. For pre-judgment and post-judgment interest, as allowable by law; and

i. For such other and further relief as this Court may deem just and proper.

## VII.    JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Plaintiffs Casey Dunn, Individually and on behalf of G.D., a minor, and Thomas Dunn



**BULLOCK WARD MASON LLC**
Breean Walas (AR2006077)
Tina Bullock*
Danielle Ward Mason*
Rachel Minder*
3350 Riverwood Pkwy., Suite 1900
Atlanta, GA 30339Tel:
(833) 296-5291
bwalas@bwmlaw.com
tina@bwmlaw.com
danielle@bwmlaw.com
rachel@bwmlaw.com

*Attorneys for Plaintiffs*

*\*motions to appear pro hac vice pending*

141

# EXHIBIT

# 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

| | | |
|---|---|---|
| CASEY DUNN, Individually and on | ) | |
| Behalf of G.D., a Minor; and | ) | |
| THOMAS DUNN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 3:23-cv-00224-JM |
| | ) | |
| ACTIVISION BLIZZARD, INC.; | ) | JURY TRIAL DEMANDED |
| INFINITY WARD, INC.; | ) | |
| TREYARCH CORP. | ) | |
| SLEDGEHAMMER GAMES, INC. | ) | |
| MICROSOFT CORPORATION; | ) | |
| EPIC GAMES, INC.; | ) | |
| EA DIGITAL ILLUSIONS CE AB | ) | |
| d/b/a DICE; ELECTRONIC ARTS, INC.; | ) | |
| UBISOFT DIVERTISSEMENTS, INC. | ) | |
| d/b/a UBISOFT MONTREAL; | ) | |
| UBISOFT ENTERTAINMENT; | ) | |
| NINTENDO OF AMERICA, INC. | ) | |
| GOOGLE LLC; and | ) | |
| JANE & JOHN DOE I-XX, | ) | |
| Defendants. | ) | |

## JOHN DOE AFFIDAVIT

I, Breean Walas, an attorney for Plaintiffs, hereby swears and affirms as follows to the best

of my knowledge, information, and memory:

1.      Jane and John Doe Defendants I-XX are individuals, corporations, and/or entities

who were engaged in the research, development, manufacture, design, testing, sale marketing

promotion of the gaming devices, products and transactions at issue, and introduced such products

into interstate commerce or promoted such products with knowledge and intent that such products

be sold in the State of Arkansas.

1

2. I hereby attest that Plaintiffs is unaware and/or uncertain of the identities of Jane and John Doe Defendants I-X and, upon information, believe that they may be proper parties to this action.

3. The potentially liable unknown parties have been identified as Jane and John Doe I-X in the Amended Complaint. To the extent that such John Doe tortfeasor(s) are liable for some or all of Plaintiffs' damages, the identity of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery in order to determine the identity of said tortfeasor(s). If a John Doe Tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint in accordance with Ark. Code Ann. 16-56-125.

FURTHER, AFFIANT SAYETH NOT.

_____
**BREEAN WALAS**

## ACKNOWLEDGMENT

State of _____ )
                         )
County of _____   )

On this day, appeared before me Breean Walas, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

WITNESS my hand and official seal, this 3rd day of November, 2023.

_____
NOTARY PUBLIC



2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

CASEY DUNN, Individually and on )
Behalf of G.D., a Minor; and )
THOMAS DUNN, )
                 )
         Plaintiffs )
                 )
         v. )    Case No.: 3:23-cv-00224-JM
                 )
ACTIVISION BLIZZARD, INC.; )
INFINITY WARD, INC.; )
TREYARCH CORP. )
SLEDGEHAMMER GAMES, INC. )
MICROSOFT CORPORATION; )
EPIC GAMES, INC.; )
ELECTRONIC ARTS, INC.; )
UBISOFT DIVERTISSEMENTS, INC. )
d/b/a UBISOFT MONTREAL; )
UBISOFT ENTERTAINMENT; )
NINTENDO OF AMERICA, INC. )
GOOGLE LLC; and )
JANE & JOHN DOES I-XX )
                 )
         Defendants )
                 )

## DEFENDANT ELECTRONIC ARTS INC.'S
## MOTION TO COMPEL ARBITRATION

Defendant Electronic Arts Inc. ("EA") moves the Court for an order to compel Plaintiffs

Casey Dunn and G.D. to arbitrate their claims pursuant to the Federal Arbitration Act, 9 U.S.C.

§ 3, and to stay Plaintiff Thomas Dunn's claims. For grounds, Defendant states the following:

       1.     Plaintiffs bring various causes of action based on G.D.'s use of video games in

EA's *Battlefield* franchise. In order to play any EA game, including any game in the *Battlefield*

franchise, a user must first accept EA's User Agreement, which contains a binding arbitration

provision and an agreement to delegate issues of arbitrability to an arbitrator.

1



2.      Both Plaintiff Casey Dunn and Plaintiff G.D.'s claims should be sent to arbitration.  EA's records suggest that Plaintiff Casey Dunn assented to EA's User Agreement, on behalf of herself and for Plaintiff G.D. as a third-party beneficiary.  In addition, EA's records suggest that Plaintiff G.D. himself accepted the User Agreement on multiple occasions over the following years, including after the filing of the Amended Complaint.

3.      Plaintiffs' claims, arising from G.D.'s use of EA services and EA's marketing of the *Battlefield* franchise, fall within the scope of the agreement to arbitrate, and any defenses as to arbitrability must also be decided by an arbitrator.  Therefore, the Court should compel Plaintiffs Casey Dunn and G.D. to arbitrate their claims against EA.  If the Court grants the motion to compel arbitration as to any Plaintiff, it should stay remaining claims (including, at minimum, Plaintiff Thomas Dunn's claims) until the conclusion of such arbitration.

4.      Defendants support this motion with the following:

a.      Declaration of L. Ashley Aull in Support of Defendant Electronic Arts Inc.'s Motion to Compel Arbitration, with accompanying exhibits;

b.      Declaration of Anand Nair in Support of Defendant Electronic Arts Inc.'s Motion to Compel Arbitration, with accompanying exhibits;

c.      A contemporaneously filed brief in support of this motion; and

d.      All other files and records in this case.

WHEREFORE, Defendant EA moves the Court to compel Plaintiffs Casey Dunn and G.D. to arbitrate their claims against EA and to stay Plaintiff Thomas Dunn's claims against EA pending said arbitration.

Respectfully submitted,

**WRIGHT, LINDSEY & JENNINGS LLP**
Gordon S. Rather, Jr. (68054)
Michael D. Barnes (88071)
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
Tel: (501) 371-0808
grather@wlj.com
mbarnes@wlj.com

and

**MUNGER, TOLLES, & OLSON LLP**
L. Ashley Aull*
Alexis D. Campbell*
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Tel:  (213) 683-9100
Ashley.Aull@mto.com
Alexis.Campbell@mto.com

Jonathan Blavin*
Raquel Dominguez*
Jing Jin*
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel:  (415) 512-4000
Jonathan.Blavin@mto.com
Raquel.Dominguez@mto.com
Jing.Jin@mto.com

*Attorneys for Defendant Electronic Arts Inc.*

*Motions for Admission *pro hac vice* pending

3

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

| | | |
|---|---|---|
| CASEY DUNN, Individually and on Behalf of G.D., a Minor; and THOMAS DUNN, | ) ) ) ) | |
| Plaintiffs | ) ) ) | |
| v. | ) ) | Case No.: 3:23-cv-00224-JM |
| ACTIVISION BLIZZARD, INC.; INFINITY WARD, INC.; TREYARCH CORP. SLEDGEHAMMER GAMES, INC. MICROSOFT CORPORATION; EPIC GAMES, INC.; ELECTRONIC ARTS, INC.; UBISOFT DIVERTISSEMENTS, INC. d/b/a UBISOFT MONTREAL; UBISOFT ENTERTAINMENT; NINTENDO OF AMERICA, INC. GOOGLE LLC; and JANE & JOHN DOES I-XX | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) ) ) ) | |

### DECLARATION OF L. ASHLEY AULL IN SUPPORT OF DEFENDANT ELECTRONIC ARTS INC.'S MOTION TO COMPEL ARBITRATION

### PUBLIC REDACTED VERSION

I, Ashley Aull, declare as follows:

1.      I am a partner at the law firm Munger, Tolles & Olson LLP, counsel for

Defendant Electronic Arts Inc. ("EA").  My *pro hac vice* application in the above-entitled action

is pending approval, and I make this declaration in support of EA's Motion to Compel

Arbitration.  I am over the age of eighteen years of age and am competent to testify to, and have

personal knowledge of, the matters set forth in this Declaration.

2.      On December 20, 2023, I contacted Plaintiffs' counsel to advise them that I

represent EA and had been notified that they had filed *Dunn, et al. v. Activision Blizzard, Inc., et

al.*, Case No. 3:23-cv-0224-JM, in the Eastern District of Arkansas.  In my letter, attached to this

Declaration as **Exhibit 1**, I advised Plaintiffs' counsel that EA needed to identify the account or

accounts minor G.D. was using to play EA games but could not do so based solely on the

information pleaded in the Complaint.  Specifically, I requested that Plaintiffs' counsel provide

the e-mail address, user-name, and/or gamertag associated with all accounts G.D. has used to

play EA games.

3.      On January 25, 2024, Plaintiffs' counsel sent a letter, attached as **Exhibit 2** to this

Declaration, providing the following information:

> E-mail: caseydunn█@█.com
>
> Account Name/Gamer Tag: Armor█
>
> Account Name/Gamer Tag: ARMOR█

4.      On February 2, 2024, I responded to Plaintiffs' counsel and included a request

regarding the allegation in the Amended Complaint that Thomas Dunn interacts with G.D. by

playing video games with him.  *See* Am. Compl. ¶ 243.  In my letter, attached to this Declaration

as **Exhibit 3**, I requested that Plaintiffs' counsel provide the e-mail address, username, and/or

gamertag for any EA account Mr. Dunn has used to play EA games. As of the date of this

Declaration, I have not received a response.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of February, 2024, at Novato, California.

_L. ashley aull_

L. Ashley Aull

**PUBLIC REDACTED VERSION**

# Exhibit 1

## MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.*
STEVEN M. PERRY
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. McDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
STUART N. SENATOR
MARTIN D. BERN
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
BRETT J. RODDA P.C.*
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.*
GINGER D. ANDERS P.C.*
MARGARET G. MARASCHINO

JOHN M. GILDERSLEEVE
ADAM B. WEISS
KELLY L. C. KRIEBS
JEREMY A. LAWRENCE
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS P.C.*
JOHN L. SCHWAB
EMILY C. CURRAN-HUBERTY
MATTHEW B. SCHONHOLZ
L. ASHLEY AULL
WESLEY T.L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
TYLER HILTON
VINCENT LING
LAUREN BELL P.C.*
VICTORIA A. DEGTYAREVA
JOHN B. MAJOR
RACHEL G. MILLER-ZIEGLER P.C.*
FAYE PAUL TELLER
NIKOLE KITSA ZOUMBERAKIS
JULIANA M. YEE
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
MAGGIE THOMPSON
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
STEPHANIE G. HERRERA
SARA A. McDERMOTT
J. MAX MOSEN
ANNE K. CONLEY
DAVID W. MORESHEAD
ANDRE W. BREWSTER III
ROWLEY J. RICE
USHA CHILUKURI VANCE
ZARA BARI
LAUREN E. ROSS*
BENJAMIN G. BAROKH
ABE DYK
MEGAN McCREADIE

RAQUEL E. DOMINGUEZ
ARIEL TESHUVA
SHANNON GALVIN AMINFAR
XIAONAN APRIL HU*
NATALIE KARL
ERINNA E. HAN
CARRIE C. LITTEN
RUBY J. GARRETT*
JAMES R. SALZMANN
ROBIN GRAY SCHWEITZER
JOSEPH MOSES
MICHAEL I. SELVIN
NATHANIEL F. SUSSMAN
OLIVER BROWN
PAUL E. MARTIN
ANDRA LIM*
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
AVI REJWAN OVED
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
LAUREN M. BECK
CALEB W. PEIFFER
GREGORY T. S. BISCHOPING*
JAMIE LUGURI
STEVEN B. R. LEVICK
JAKELLE KRUMMEN
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER
ROSIO FLORES ARRIAGA
JESSICA O. LAIRD
ERICA C. TOOCH
SARAH E. WEINER*
LEONARDO MANGAT*
EVAN MANN
ANDREW T. NGUYEN
RACHEL M. SCHIFF
MIRANDA E. REHAUT
TIARA S. BAHERI
STEPHANY REAVES*
LAUREN E. KUHN
J. KAIN DAY*
GARRETT SOLBERG
TED KANG
ADAM W. KWON
JOSEPH N. GLYNN
SIMON K. ZHEH
CARSON J. SCOTT
AVERY P. HITCHCOCK

ELISSA WALTER
CHRISTOPHER B. CRUZ
JARED T. KOCH
MATTHEW W. LINSLEY
BRIANNE HOLLAND-STERGAR
NICHOLAS NEUTEUFEL
JIMMY BIBLARZ
ADEEL MOHAMMADI
TAYLOR L. BENNINGER
LORRAINE L. ABDULAHAD
CLARE KANE
SIDNEY MOSKOWITZ
HELEN ELIZABETH WHITE*
KATHLEEN FOLEY*
ALISON A. DOYLE
FELIPE DE JESÚS HERNÁNDEZ
PHILLIP H. C. WILKINSON
JASON D. WEISS
MILES W. UNTERREINER
HENRY D. SHREFFLER
ANDREW DELAPLANE
ARIELLA PARK
LAURA R. PERRY
NATASHA GIDLING
JOSEPH MANTEGANI
GRAHAM J. WYATT
WESLEY P. DEVOLL
LAUREN A. BILOW
ROMAN LEAL

OF COUNSEL
ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
BRADLEY R. SCHNEIDER
AIMEE FEINBERG
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
ADAM R. LAWTON
MICHAEL E. GREANEY
SARAH J. COLE

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN DC.
ALL OTHERS ADMITTED IN CA

350 SOUTH GRAND AVENUE

FIFTIETH FLOOR

LOS ANGELES, CALIFORNIA 90071-3426

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

———

560 MISSION STREET

TWENTY-SEVENTH FLOOR

SAN FRANCISCO, CALIFORNIA 94105-3089

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

———

601 MASSACHUSETTS AVENUE NW

SUITE 500E

WASHINGTON, D.C. 20001-5369

TELEPHONE (202) 220-1100

FACSIMILE (202) 220-2300

December 20, 2023

Writer's Direct Contact
(213) 683-9502
(213) 683-9502 FAX
Ashley.Aull@mto.com

Tina Bullock
Bullock Ward Mason LLC
3350 Riverwood Pkwy., Suite 1900
Atlanta, GA 30339

Re:   *Casey Dunn, et al. v. Activision Blizzard, Inc., et al.*, Case No. 3:23-cv-0224-JM

Dear Ms. Bullock:

I represent Electronic Arts Inc. and EA Digital Illusions CE AB in relation to the above-referenced matter. I understand that you represent Casey Dunn, Thomas Dunn, and G.D., a minor, who have named my clients as defendants in Case No. 3:23-cv-0224-JM, filed in the Eastern District of Arkansas.

I would appreciate the opportunity to discuss a few preliminary matters with you. My clients have not yet been served, and, in the interest of starting a fruitful dialogue, we are amenable to waiving service. However, we need immediate access to minor G.D.'s user-account information—including the e-mail address and/or user-name/gamertag associated with all accounts he has used to play EA games. As I am sure you are aware, my clients need that account information in order to ensure that relevant information is properly preserved.

We are sensitive to the allegations in the Complaint that Plaintiff G.D. has become addicted to various video games. We are willing to discuss an agreement not to deactivate Plaintiffs' account(s) as a result of their decision to file this lawsuit, without providing prior notice. Plaintiffs would need to represent in writing, however, that they will not seek

MUNGER, TOLLES & OLSON LLP

Tina Bullock
December 20, 2023
Page 2

damages for alleged future harm stemming from continued use of the account(s) or argue that my
clients failed to mitigate damages as to the Plaintiffs after the Complaint was filed.  We reserve
the right to terminate services for other reasons, including for any violation of the EA User
Agreement or any other applicable terms of service.  We also reserve the right to seek a formal
declaration by the Court recognizing any agreement we reach to limit claims for ongoing
damages, and would expect the Plaintiffs' consent to any such future filing.

Please let me know your availability this week to discuss these matters.

Very truly yours,

L. Ashley Aull

# Exhibit 2

## PUBLIC REDACTED VERSION

# BULLOCK WARD MASON

BECAUSE WE MOVE MOUNTAINS FOR YOU

January 25, 2024

*Sent via electronic mail*

Ashley Aull
Munger, Tolles & Olson LLP
350 South Grand Avenue
Los Angeles, CA 90071
**ashley.aull@mto.com**

**RE:** **Preservation of Documents and Electronic Records to Electronic Arts, Inc.**
**Casey Dunn, Individually and on behalf of G.D., a Minor; and Thomas Dunn v.**
**Activision Blizzard, Inc.; et al.**
**United States District Court, E.D. Ark. Case No. 3:23-cv-00224-JM**

Dear Ashley,

Our firm represents Casey Dunn, Individually and on behalf of G.D., a Minor and Thomas Dunn (sometimes "Plaintiffs"), who seek a claim for damages and/or other relief as outlined in the above-referenced matter (hereinafter "this cause"). **This preservation letter is to give notice to Electronic Arts, Inc.** ("EA") to not destroy, conceal or alter in any manner whatsoever any or all evidence, documents, information, meta data, paper, video from the EA products, systems and/or platforms, or other electronic data and/or tangible items pertaining to or relevant to the above referenced lawsuit.

**You should anticipate that much of the information subject to disclosure or that may prove responsive to discovery in this cause is stored on your current and former computer systems, phones and tablets, in online repositories and within other storage media and sources (including your voice- and video recording systems, cloud services and social networking accounts).** As used in this document "you" and "your" refers to EA and its predecessors, successors, parents, subsidiaries, division and affiliates, officers, directors, agents, attorneys, accountants, employees, partners, assigns and/or other persons occupying similar positions or performing similar functions.

We demand that you preserve documents, tangible things, and electronically stored information potentially relevant to the issues and defenses in this cause.

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible meaning and includes (*by way of example and not as an exclusive list*) potentially relevant information electronically, magnetically, optically, or otherwise stored as:

- **Digital communications** (*e.g.*, e-mail, voice mail, text messaging, Microsoft Teams, WhatsApp, SIM cards)

**PUBLIC REDACTED VERSION**

Preservation/Spoliation Letter to Electronic Arts, Inc.
January 25, 2024
Page 2

- **E-Mail Servers** (*e.g.,* Microsoft 365, Gmail, and Microsoft Exchange databases)
- **Word processed documents** (*e.g.,* Microsoft Word, Apple Pages or Google Docs files and drafts)
- **Spreadsheets and tables** (*e.g.,* Microsoft Excel, Google Sheets, Apple Numbers)
- **Presentations** (*e.g.,* Microsoft PowerPoint, Apple Keynote, Prezi)
- **Social Networking Sites** (*e.g.,* Facebook, Twitter, Instagram, LinkedIn, Reddit, Slack, TikTok)
- **Online ("Cloud") Repositories** (*e.g.,* Drive, OneDrive, Box, Dropbox, AWS, Azure, Sharefile)
- **Online Banking, Credit Card, Retail and other Relevant Account Records**
- **Accounting Application Data** (*e.g.,* QuickBooks, NetSuite, Sage)
- **Image and Facsimile Files** (*e.g.,* .PDF, .TIFF, .PNG, .JPG, .GIF., HEIC images)
- **Sound Recordings** (*e.g.,* .WAV and .MP3 files)
- **Video and Animation** (*e.g.,* Security camera footage, .AVI, .MOV, .MP4 files)
- **Databases** (*e.g.,* Access, Oracle, SQL Server data, SAP)
- **Contact and Customer Relationship Management Data** (*e.g.,* Salesforce, Outlook, MS Dynamics)
- **Calendar, Journaling and Diary Application Data** (*e.g.,* Outlook PST, Google Calendar, blog posts)
- **Backup and Archival Files** (*e.g.,* Veritas, Zip, Acronis, Carbonite)
- **Project Management Application Data**
- **Internet of Things (IoT) Devices and Apps** (*e.g.,* Amazon Echo/Alexa, Google Home, Fitbit)
- **Computer Aided Design/Drawing Files**
- **Online Access Data** (e.g., Temporary Internet Files, Web cache, Google History, Cookies)
- **Network Access and Server Activity Logs**

ESI resides not only in areas of electronic, magnetic, and optical storage media reasonably accessible to you, but also in areas you may deem *not* reasonably accessible. You are obliged to *preserve* potentially relevant evidence from *both* sources of ESI, even if you do not anticipate *producing* such ESI or intend to claim it is confidential or privileged from disclosure. The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to the applicable rules of civil procedure, you must identify all sources of ESI you decline to produce and demonstrate to the Court why such sources are not reasonably accessible. For good cause shown, the Court may order production of the ESI, even if it is not reasonably accessible. Accordingly, you must preserve ESI that you deem inaccessible so as not to preempt the Court's authority.

**Preservation Requires Immediate Intervention**. You must act immediately to preserve potentially relevant ESI, including, without limitation, information with the *earlier* of a Created or Last Modified date on or after January 1, 2015, through the date of this demand and continuing thereafter, concerning:

1. The events and causes of action described in the filed stamped Complaint;
2. ESI you may use to support claims or defenses in this case;

**PUBLIC REDACTED VERSION**

Preservation/Spoliation Letter to Electronic Arts, Inc.
January 25, 2024
Page 3

3. Any relevant material sent to an agent or third-party application, vendor, or consultant(s), including but not limited to Entertainment Software Ratings Board ("ESRB"), Blizzard Entertainment, Inc., Blizzard Entertainment International B.V., King.com, Ltd., Call of Duty League, LLC, The Overwatch League, LLC, Major League Gaming Corp;

4. All personal information you collected, maintain, and/or have access to regarding Plaintiffs' use of your product(s) and/or gaming device(s) including but not limited to:
   a. Plaintiffs' contact information including name, username, date of birth, email address and phone number collected by you or your agent(s);
   b. Websites visited before and after use of gaming device;
   c. Browser type and language;
   d. IP address;
   e. Hardware and software information;
   f. Communications including chat, text, and voice;
   g. Usage data;
   h. Mobile advertising IDs, non-personal identifiers, and other information collected during Plaintiffs' use of your product(s) on their mobile device;
   i. All information collected about Plaintiffs' device including information about programs running alongside the game;
   j. Plaintiffs' purchase of goods and services in games;
   k. Player Match-Up data;
   l. Message boards and forums;
   m. eCards or recruit-a-friend emails;
   n. Contest registrations;
   o. Newsletters and promotions;
   p. Mobile notifications.

**For preservation purposes only,[1] Plaintiffs provide the following information to you related to the use of your product(s):**

**Name: G.D.**
**Account Name/Gamer Tag: Armor███████**
**Account Name/Gamer Tag: ARMOR██████**
**Email: caseydunn██@████.com**

**Preservation requires action.** Adequate preservation of ESI requires more than simply refraining from efforts to delete, destroy or dispose of such evidence. You must intervene to prevent loss due to routine operations or active deletion by employing proper techniques and protocols to preserve ESI. *Many routine activities serve to irretrievably alter evidence and constitute unlawful spoliation of evidence.*

Nothing in this demand for preservation of ESI should be read to limit or diminish your concurrent common law and statutory obligations to preserve documents, tangible things, and

---

[1] EA does not have permission to utilize this information to cut off or restrict Plaintiffs' access to their Battlefield game and/or account, and affirmatively state further that doing so would cause serious harm to G.D.'s physical and mental health. It is Plaintiffs' position this would need to be done pursuant to medical supervision.

PUBLIC REDACTED VERSION

Preservation/Spoliation Letter to Electronic Arts, Inc.
January 25, 2024
Page 4

other potentially relevant evidence.

**Suspension of Routine Destruction**. You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents, and tangible things and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations may include but are not limited to:

- Purging the contents of e-mail and messaging repositories by age, quota, or other criteria
- Using data or media wiping, disposal, erasure or encryption utilities or devices
- Overwriting, erasing, destroying, or discarding backup media
- Re-assigning, re-imaging or disposing of systems, servers, devices or media
- Running "cleaner" or other programs effecting wholesale metadata alteration
- Releasing or purging online storage repositories or non-renewal of online accounts
- Using metadata stripper utilities

**Guard Against Deletion**. You should anticipate the potential that your officers, employees, or others may seek to hide, destroy, or alter ESI. You must act to prevent and guard against such actions, particularly where company machines were used for Internet access or personal communications, you should anticipate that users may seek to delete or destroy information they regard as personal, confidential, incriminating or embarrassing, and in so doing, they may also delete or destroy potentially relevant ESI. You must take reasonable and appropriate steps to prevent the deletion of potentially relevant ESI.

**Preservation of Backup Media**. You are directed to preserve complete backup media sets (including differentials and incremental backups) that may contain unique communications and ESI for all dates during the below-listed intervals:

**January 1, 2015 to present**

**Act to Prevent Spoliation**. You should take affirmative steps to prevent anyone with access to your data, systems, accounts, and archives from seeking to modify, destroy or hide potentially relevant ESI wherever it resides (such as by deleting or overwriting files, using data shredding and erasure applications, re-imaging, damaging or replacing media, encryption, compression, steganography or the like).

**System Sequestration or Forensically Sound Imaging [When Implicated]**. As an appropriate and cost-effective means of preservation, you should keep a copy of the games and platforms securely intact played by G.D., without updated, deleted, or changed game data and relevant ESI of the following persons:

**Name: G.D.**
**Account Name/Gamer Tag: Armor**████
**Account Name/Gamer Tag: ARMOR**████

**PUBLIC REDACTED VERSION**

Preservation/Spoliation Letter to Electronic Arts, Inc.
January 25, 2024
Page 5

**Email: caseydunn█@█.com[2]**

In the event you deem it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices of those named above is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically significant areas of the media, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss. "Forensically sound ESI preservation" means duplication of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit- for-bit image of the original. The products of forensically sound duplication are called, *inter alia*, "bitstream images" of the evidence media. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including deleted evidence within "unallocated clusters" and "slack space."

***Be advised that a conventional copy or backup of a hard drive does not produce a forensically sound image because it captures only active data files and fails to preserve forensically significant data existing in, among other things, unallocated clusters and slack space.***

**Further Preservation by Imaging**. With respect to the hard drive, thumb drives, phones, tablets and storage devices of each of the persons named below and of each person acting in the capacity or holding the job title named below, demand is made that you immediately obtain, authenticate and preserve forensically sound images of the storage media in any computer system (including portable and personal computers, phones and tablets) used by that person during the period from January 1, 2015 to present, as well as recording and preserving the system time and date of each such computer. These persons are:

1. **Marketing Partnership Manager**
2. **Senior Data Analyst**
3. **Portfolio Lifecycle Manager**
4. **ASO Manager**
5. **Creative Intern**
6. **All EAX Team Job Roles**
7. **Software Engineer III - Rendering Testing & Dev Infrastructure (Frostbite)**
8. **Data Architect II**
9. **Machine Learning Ops/Engineer**
10. **C++ Software Engineer**
11. **Senior Software Engineer- Cloud Infrastructure**
12. **Software Engineer Integration**

---

[2] Again, EA does not have permission to utilize this information to cut off or restrict Plaintiffs' access to their Battlefield game and/or account, and affirmatively state further that doing so would cause serious harm to G.D.'s physical and mental health. It is Plaintiffs' position this would need to be done pursuant to medical supervision.

**PUBLIC REDACTED VERSION**

Preservation/Spoliation Letter to Electronic Arts, Inc.
January 25, 2024
Page 6

13. **Senior Experience Designer**
14. **Backend Software Engineer Gameplay Services**
15. **Design Manager**
16. **Data Engineer**
17. **Game Play Programmers**
18. **Internships**
19. **Psychologists, Psychiatrists, Neuro Psychologist and Other Game Consultants**
20. **Other named Defendants**
21. **Ad Campaigns including third-party apps**

Once obtained, each such forensically sound image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration and authenticated by hash value.

**Preservation in Native Forms**. You should anticipate that ESI, including but not limited to e-mail, documents, spreadsheets, presentations, and databases, will be sought in the form or forms in which it is ordinarily maintained (*i.e.,* native form). Accordingly, you should preserve ESI in such native forms, and you should not employ methods to preserve ESI that remove or degrade the ability to search the ESI by electronic means or that make it difficult or burdensome to access or use the information. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

**Metadata**. You should anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification. Application metadata is information automatically included or embedded in electronic files, but which may not be apparent to a user, including deleted content, draft language, commentary, tracked changes, speaker notes, collaboration and distribution data and dates of creation and printing. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC header fields.

*Metadata may be overwritten or corrupted by careless handling or improper preservation, including by carelessly copying, forwarding, or opening files.*

**Servers**. With respect to servers used to manage e-mail (*e.g.,* Microsoft 365, Microsoft Exchange, Lotus Domino) and network storage (often called a "network share"), the complete contents of each relevant custodian's network share and e-mail account should be preserved. There are several cost-effective ways to preserve the contents of a server without disrupting operations. If you are uncertain whether the preservation method you plan to employ is one that we will deem sufficient, please contact the undersigned.

**PUBLIC REDACTED VERSION**

Preservation/Spoliation Letter to Electronic Arts, Inc.
January 25, 2024
Page 7

 **Home Systems, Laptops, Phones, Tablets, Online Accounts, Messaging Accounts and Other ESI Sources**. Though we expect that you will act swiftly to preserve data on office workstations and servers, you should also determine if any home or portable systems or devices may contain potentially relevant data. To the extent that you have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from external storage drives, thumb drives, CD-R/DVD-R disks and the user's phone, tablet, voice mailbox or other forms of ESI storage.). Similarly, if you used online or browser-based e-mail and messaging accounts or services (such as Gmail, Yahoo Mail, Microsoft 365, Apple Messaging, WhatsApp or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes and messages should be preserved.

 **Ancillary Preservation**. You must preserve documents and other tangible items that may be required to access, interpret, or search potentially relevant ESI, including manuals, schema, logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters and the like.

 You must preserve passwords, keys and other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI.

 If needed to access or interpret media on which ESI is stored, you must also preserve cabling, drivers, and hardware. This includes tape drives, readers, DBMS, and other legacy or proprietary devices and mechanisms.

 **Paper Preservation of ESI is Inadequate**. *As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions.* If information exists in both electronic and paper forms, you should preserve both forms.

 **Agents, Attorneys and Third Parties**. Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian and contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

 **Do Not Delay Preservation**. We're available to discuss reasonable preservation steps; however, *you should not defer preservation steps pending such discussions if ESI may be lost or corrupted because of delay.* Should your failure to preserve potentially relevant evidence result in the corruption, loss, or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

 **Confirmation of Compliance**. Please confirm by February 16, 2024, that you have taken

**PUBLIC REDACTED VERSION**

Preservation/Spoliation Letter to Electronic Arts, Inc.
January 25, 2024
Page 8

the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence and what you will not do, otherwise, we will rely upon you to complete the preservation sought herein.

To assure that your obligation to preserve evidence will be met, please forward a copy of this letter to all persons and/or entities with custodial responsibilities for the items referred to herein.

Very truly yours,

*Tina Bullock*

Tina M. Bullock

cc:     Jonathan Blavin (*via electronic mail*)
        Raquel E. Dominguez (*via electronic mail*)
        Casey Dunn
        Thomas Dunn

+1 833 BWM-LAW1
3350 Riverwood Parkway Suite 1900
Atlanta, Georgia 30339
www.bwmlaw.com

**PUBLIC REDACTED VERSION**

Exhibit 3

## MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.
STEVEN M. PERRY
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. M'DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
STUART N. SENATOR
MARTIN D. BERN
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
BRETT J. RODDA P.C.
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.

GINGER D. ANDERS P.C.
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
KELLY L.C. KRIEBS
JEREMY A. LAWRENCE
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS P.C.
JOHN L. SCHWAB
EMILY C. CURRAN-HUBERTY
MATTHEW S. SCHONHOLZ
L. ASHLEY AULL
WESLEY T L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
TYLER HILTON
VINCENT LING
LAUREN BELL P.C.
VICTORIA A. DEGTYAREVA
JOHN B. MAJOR
RACHEL G. MILLER-ZIEGLER P.C
FAYE PAUL TELLER
NIKOLE KITSA ZOUMBERAKIS
STEPHANIE G. HERRERA
JULIANA M. YEE
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
MAGGIE THOMPSON
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
SARA A. McDERMOTT
J. MAX ROSEN
ANNE K. CONLEY
DAVID W. MORESHEAD
ROWLEY J. RICE
USHA CHILUKURI VANCE
ZARA BARR
LAUREN E. ROSS

350 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3426

TELEPHONE (213) 683-9100

———

560 MISSION STREET

SAN FRANCISCO, CALIFORNIA 94105-3089

TELEPHONE (415) 512-4000

———

601 MASSACHUSETTS AVENUE NW

SUITE 500E

WASHINGTON, D.C. 20001-5369

TELEPHONE (202) 220-1100

February 2, 2024

BENJAMIN G. BAROKH
ABE DYK
MEGAN McCREADIE
RAQUEL E. DOMINGUEZ
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
XIAONAN APRIL HU
NATALIE KARL
ERINMA E. MAN
CARRIE C. LITTEN
JAMES R. SALZMANN
ROBIN GRAY SCHWEITZER
JOSEPH MOSES
MICHAEL I. SELVIN
NATHANIEL F. SUSSMAN
OLIVER BROWN
ANDRA LIM
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
LAUREN H. BECK
CALEB W. PEFFER
GREGORY T. S. BISCHOPING
JAMIE LUGURI
STEVEN B. R. LEVICK
JANELLE KRUMMEN
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER
ROSIO FLORES ARRIAGA
JESSICA O. LAIRD
ERICA C. TOOCH
SARAH E. WEINER
LEONARDO MANGAT
EVAN MANN
ANDREW T. NGUYEN
RACHEL M. SCHIFF
MIRANDA E. REHAUT
TIANA S. BAHERI
STEPHANY REAVES
LAUREN E. KUHN
JI KAIN DAY
GARRETT SOLBERG
TED KANG
ADAM W. KWON
JOSEPH N. GLYNN
SIMON K. ZHEN

CARSON J. SCOTT
ELISSA WALTER
CHRISTOPHER B. CRUZ
JARED T. KOCH
MATTHEW W. LINSLEY
BRIANNE HOLLAND-STERGAR
NICHOLAS HEUTZ/FEL
JIMMY BIBLARZ
ADEEL MOHAMMADI
TAYLOR L. BENNINGER
LORRAINE L. ABDULAHAD
CLARE KANE
SIDNEY MOSKOWITZ
HELEN ELIZABETH WHITE
KATHLEEN FOLEY
ALISON A. DOYLE
FELIPE DE JESUS HERNÁNDEZ
PHILLIP H.C. WILKINSON
JASON D. WEISS
HENRY D. SHREFFLER
MILES W. UNTERREINER
MARIAH MASTRODIMOS
ANDREW DELAPLANE
ARIELLA PARK
LAURA R. PERRY
NATASHA GEILING
JOSEPH MANTEGANI
GRAHAM J. WYATT
WESLEY P. DEVOLL
LAUREN A. BILOW
ROMAN LEAL
KAYSIE GONZALEZ
ASHLEY KIM

———

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
BRADLEY R. SCHNEIDER
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
ADAM B. LAWTON
MICHAEL E. GREANEY
SARAH J. COLE

———

SEE MTO.COM FOR
JURISDICTIONS OF ADMISSION

Writer's Direct Contact
(213) 683-9502
(213) 683-9502 FAX
Ashley.Aull@mto.com

BW Walas
Tina Bullock
Bullock Ward Mason LLC
3350 Riverwood Pkwy., Suite 1900
Atlanta, GA 30339

Re:  *Casey Dunn, et al. v. Activision Blizzard, Inc., et al.*, Case No. 3:23-cv-0224-JM

Dear BW and Tina:

Electronic Arts Inc. ("EA") is in receipt of your preservation letters dated January 25, 2024, relating to *Dunn v. Activision Blizzard, Inc.*, Case No. 3:23-cv-00224 (E.D. Ark.).

As explained in my letter dated December 20, 2023, account information is critical to ensure that relevant information is properly preserved; it is also necessary for us to determine whether any arbitration agreement applies. Although your letters include information about one account for G.D., it is unclear whether there are additional accounts used by Plaintiffs to play EA games. For example, the Complaint alleges that Plaintiff Thomas Dunn interacts with G.D. "by playing video games with him." Compl. ¶ 237. If Mr. Dunn has a separate account he has used to play EA games with G.D., please immediately provide that account's information. If you do not provide additional account information, EA will understand that to be because Mr. Dunn and G.D. played games on the same account.

With respect to your preservation requests, EA objects to the breadth of the information identified in your letters and does not concede that any legal duty exists to preserve the full scope of records requested or that your letters create such sweeping obligations. EA is

MUNGER, TOLLES & OLSON LLP

February 2, 2024
Page 2

aware of its legal obligations concerning the preservation of evidence and has taken and is continuing to undertake reasonable and good-faith efforts to preserve relevant evidence, data, and documents.  EA reserves its rights to make any objection that may apply in response to any discovery request that your client may serve in the future, including but not limited to objections as to scope, form, privilege, confidentiality, burden, disproportionality, and relevance.


                                         Very truly yours,

                                         *L. ashley aul*

                                         L. Ashley Aull

51345086.2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

| | | |
|---|---|---|
| CASEY DUNN, Individually and on Behalf of G.D., a Minor; and THOMAS DUNN, | ) ) ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No.: 3:23-cv-00224-JM |
| | ) | |
| ACTIVISION BLIZZARD, INC.; INFINITY WARD, INC.; TREYARCH CORP. SLEDGEHAMMER GAMES, INC. MICROSOFT CORPORATION; EPIC GAMES, INC.; ELECTRONIC ARTS, INC.; UBISOFT DIVERTISSEMENTS, INC. d/b/a UBISOFT MONTREAL; UBISOFT ENTERTAINMENT; NINTENDO OF AMERICA, INC. GOOGLE LLC; and JANE & JOHN DOES I-XX | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| _____ | ) | |

**DECLARATION OF ANAND NAIR IN SUPPORT OF
DEFENDANT ELECTRONIC ARTS INC.'S MOTION TO COMPEL ARBITRATION**

**PUBLIC REDACTED VERSION**

I, Anand Nair, declare as follows:

1.      I am a Director of Product Management for Defendant Electronic Arts Inc. ("EA"). I submit this declaration in support of EA's Motion to Compel Arbitration in *Dunn et al. v. Activision Blizzard, Inc. et al.*, E.D. Ark. No. 3:23-cv-224-JM. The facts set forth in this declaration are based on my personal knowledge, based on my review of records kept in the ordinary course of EA's business, and based on reasonable inquiry under the circumstances. If called and sworn as a witness, I could and would testify competently thereto under oath.

2.      EA is a global leader in digital interactive entertainment based in Redwood City, California. Among other things, EA develops and publishes games, content, and online services for gaming consoles (including Microsoft's Xbox), personal computers, and mobile devices.

**I.    *Battlefield* and Age-Based User Restrictions**

3.      I have reviewed the Amended Complaint in this matter, which alleges that Plaintiff G.D. plays EA's *Battlefield* video games. The Amended Complaint alleges that G.D. was 13 years old as of the date of filing (November 3, 2023). It identifies G.D.'s parents as Plaintiffs Casey Dunn and Thomas Dunn.

4.      The *Battlefield* franchise is a series of different video games—among many that EA publishes. The first *Battlefield* game was a first-person shooter released in 2002. In the following years, many different *Battlefield* games have been released—most recently *Battlefield 2042*, which was released in November 2021.

5.      All games in the *Battlefield* series released since 2010 are rated "M" (for "Mature") by the Entertainment Software Ratings Board.

6.      EA requires users under 13 to use a dedicated "child" account; a "child" account must use an adult parent's e-mail address that approves the child account creation.

**PUBLIC REDACTED VERSION**

7.      EA does not allow a child account to access online play for M-rated games in the *Battlefield* franchise on Xbox without parental authorization.  Unless a parent has chosen to set a child's account on Xbox to be completely unrestricted, EA by default prohibits children under 13 from playing *Battlefield* games online.

## II.      The Accounts at Issue in This Case

8.      I have received information from EA's counsel reflecting the e-mail address and usernames associated with the accounts G.D. used to play *Battlefield* games: the e-mail address "caseydunn█@█.com" and the Xbox usernames (also known as "Gamertags") "Armo█████" and "ARMOR█." I understand that EA's counsel received this information from Plaintiffs' counsel in this action.  Based on that information, EA is aware from records kept in the ordinary course of EA's business of the EA accounts' activity—including the dates on which the user(s) logged in to their EA accounts, the games they played while logged in, and instances in which the user(s) accepted EA's User Agreement.

9.      The account information provided by Plaintiffs is associated with two different EA accounts: (1) an account created in August 2021, which is registered to caseydunn█@█.com and associated with the Gamertag "Armo█████," and (2) an account created in May 2023, which is registered to g█smommy█@█.com and associated with the Gamertag "ARMOR█."

10.      Using the information provided by counsel, I was able to review information about the identified accounts—including the date and time when the accounts were created; the dates and times when the EA User Agreement was accepted; the platform the user was using when he or she accepted the EA User Agreement (from which we can infer through what platform the accounts were created); versions of the EA User Agreement accepted by the person

2

operating the accounts, both when initially creating the account and later; and information
entered by the person or persons creating the accounts.

11.     EA keeps this type of account information in the regular course of its business,
storing it automatically at the time it is entered or generated by a user.

**A.      The CaseyDunn█@█.com Account**

12.     As noted above, one account G.D. uses (according to Plaintiffs) is registered to
caseydunn█@█.com.  Records kept in the usual course of EA's business reflect that the
caseydunn█@█.com account was created and the EA User Agreement was accepted on
August 23, 2021.  Records indicate that the user was using an Xbox at the time that they
accepted the User Agreement.

13.     EA's records reflect the date of birth of the user as █, 1989.  That date
would have made the user 34 years old at the time the Amended Complaint was filed in
November 2023.  It also means that EA treats the account as an "adult" account, which is not
subject to any parental controls and by default has access to online play for M-rated *Battlefield*
games.

**B.      The G█sMommy█@█.com Account**

14.     As noted above, another account G.D. uses (according to Plaintiffs) is registered
to g█smommy█@█.com.  Records kept in the usual course of EA's business reflect
that the g█smommy█@█.com account was created and the EA User Agreement was
accepted on May 13, 2023.  Records indicate that the user was using an Xbox at the time that
they accepted the User Agreement.

15.     EA's records reflect the date of birth of the user as █ 1989.  That date
would have made the user 33 years old at the time the Amended Complaint was filed in
November 2023.  It also means that EA treats the account as an "adult" account, which is not

3

**PUBLIC REDACTED VERSION**

subject to any parental controls and by default has access to online play for M-rated *Battlefield*
games.

16.     As set forth in more detail below, the person or persons who created these
accounts was required to agree to EA's User Agreement at the time of the accounts' creation—a
User Agreement that included an arbitration provision.  Because the caseydunn███@███.com
account was created first in August 2021, I have used it as a basis for my discussion below;
however, the person creating the g██smommy███@███.com account would have been
required to follow the exact same steps when creating that account in May 2023.

## III.    EA Account Creation

17.     EA requires that users have an EA account in order to play EA games online on a
PC or console.  As a result, the person using the EA account linked to caseydunn███@███.com
would have been prompted to create the account the first time they attempted to play an EA
game.

18.     In this case, as noted above, EA's records suggest that the EA account associated
with the e-mail caseydunn███@███.com was created on an Xbox console—because the user
was on an Xbox console when they accepted the EA User Agreement for the first time.  Users
can install EA games on an Xbox by downloading the games online or by purchasing a physical
disc.

19.     Upon opening an EA game for the first time on an Xbox console, Xbox provides
EA with limited information about the Xbox account accessing the game—including the date of
birth associated with the Xbox account.  EA uses this information to determine whether a child
(under 13), teen (between 13 and 18), or adult (over 18) is using the Xbox account.

20.     If, during account creation, Xbox provides a date of birth indicating that a child is
using the account, EA will automatically treat the user as a child—requiring parental consent to

4

create a child EA account, requiring a parental e-mail address, and requiring the parent's

acceptance of the User Agreement. An example of a screen requiring parental permission for a

newly created child account—and the parent's acceptance of the User Agreement regarding a

child's use of EA's services—is below:



21.    Because it appears that the EA accounts linked to caseydunn███@███.com and

g███smommy███@███.com were registered as adult accounts with Xbox (with DOBs in

1989 provided to EA during registration), the following reflects the registration flow for an adult

EA account.

22.    Upon opening an EA game for the first time on an Xbox console, an adult user

must affirmatively agree to the EA User Agreement and create an EA account. A user may not

access the full version of an EA game without taking these steps. (For some games, it is possible

to access and play an offline demonstration of the game before consenting to EA's User

5

Agreement or creating an account.) This process has not changed since August 2021, when the EA account linked to caseydunn█@█.com was created.

23.     EA's records indicate that the first game the caseydunn█@█.com account played in August 2021 was *Apex Legends*. As a result, I have used *Apex Legends* as an example below.

24.     If a user installed *Apex Legends* for the first time on an Xbox console, she would first encounter the screen below. (Note that information identifying the test account that was used to generate these screen shots has been redacted.)



25.     After pressing the "A" button on the controller, the user is directed to a page to review and accept the then-current version of EA's User Agreement.

**PUBLIC REDACTED VERSION**

26.     The user must select a checkbox to acknowledge that they "have read and accept the **User Agreement** and **EA's Privacy and Cookie Policy**" before proceeding further—and before playing the game.  The EA account linked to caseydunn██@███.com could not have played *Battlefield* games, *Apex Legends*, or any other EA games online without accepting the User Agreement.





27.     In order to accept the User Agreement, a user must review instructions at the bottom of the screen that explain what buttons to push.  Those instructions explain that pressing "A" on the controller allows the user to select the check box; pressing "B" allows the user to go to the previous screen and therefore not play the game; pressing "X" allows the user to "Read User Agreement," and leads to the full text of the User Agreement; and pressing "Y" allows the user to "View Privacy and Cookie Policy."

7

28.     Below is a screenshot of what appears when a user presses "X" to review the User

Agreement: a full-text copy of the EA User Agreement then in effect, which a user can scroll

through using the controller.



29.     Once the user checks the box indicating agreement to the User Agreement and

Privacy and Cookie Policy, the user can select "Next" to proceed to the next screen.  If the user

does not agree to the terms and check the box, the user cannot proceed.

**PUBLIC REDACTED VERSION**

31.     After the user agrees to the User Agreement, he or she must enter information to create a new EA account or access an existing one. This initially requires providing an e-mail address, as shown below. In this instance, the user submitted the e-mail address caseydunn▮▮@▮▮.com when first creating an account in August 2021.





32.     After entering an e-mail account, a new user will be prompted to create an EA account—requiring her to choose a password and a public identifier, as shown below. Here, the caseydunn▮▮@▮▮.com user must have entered a password and chosen a Public ID.

33.     On the next screen, the user is asked whether they would like to receive e-mails from EA about products, news, events, and promotions. In this case, records kept in EA's usual course of business indicate that the caseydunn▮▮@▮▮.com user opted in to receiving marketing e-mails from EA.

34.    The following screen then prompts the user to link their new EA account with their existing Xbox account.





35.    After this process, EA sends a confirmation e-mail to the address the user entered. Specifically, in August 2021, EA would have sent a welcome e-mail to caseydunn███@███.com—confirming the opening of the EA account and providing links to related resources.  An example of such an e-mail is below.

10

PUBLIC REDACTED VERSION



36.     After going through this process, the user would be returned to *Apex Legends* to play the game for the first time.

37.     As part of the initial boot process for a game, a user would again be prompted to review and accept EA's User Agreement. An example of the screen the user would see, when playing *Apex Legends* for the first time, is below. It automatically displays the full, scrollable text of the User Agreement, with a prompt for the user either to accept (by pressing A) or deny (by pressing B) the agreement. (The view of the screen has been cropped to make the text more legible in this format.)

38.     The user must "accept" the User Agreement in order to play any game for the first time.  As a result, each time the account at issue accessed a new EA game, the user would be required again to review and accept EA's User Agreement.



39.     This process would have been materially identical for the person creating the g██smommy███@███.com account in May 2023: requiring acceptance of the User Agreement both upon creation of the account and again when booting any game for the first time.

## IV.    The Relevant EA User Agreements

40.     Records kept in the usual course of EA's business indicate that the person who created the EA account linked to caseydunn██@███.com initially accepted EA's User Agreement on August 23, 2021.  The user accepted the EA User Agreement again on several later occasions, at least on October 30, 2021; April 4, 2022; April 4, 2023; June 19, 2023; October 24, 2023; and November 29, 2023.  Attached as **Exhibit A** is a "Record of User

Acceptance" for the account linked to caseydunn█@█.com, which EA regularly maintains in the usual course of its business. (Not all acceptances of the User Agreement would be logged in EA's systems, because the User Agreement-acceptance flow is hard-coded into games themselves. As a result, EA's records of every time an account has accepted the User Agreement are underinclusive.)

41. Similarly, records kept in the usual course of EA's business indicate that the person who created the EA account linked to g█smommy█@█.com initially accepted EA's User Agreement on May 13, 2023. Attached as **Exhibit B** is a "Record of User Acceptance" for the account linked to g█smommy█@█.com, which EA regularly maintains in the usual course of its business.

42. Each time, the users of these accounts would have had to follow a process similar to that set forth above, to review and accept the EA User Agreement. For example, when booting *Battlefield 2042* for the first time, the user would first encounter a welcome screen, as shown below.

**PUBLIC REDACTED VERSION**



43.   After pressing "A," the user would encounter the following screen—prompting her to review and accept the EA User Agreement before proceeding.



**PUBLIC REDACTED VERSION**

44. EA regularly maintains current and past versions of its User Agreement in the regular course of its business. Current and past versions of the EA User Agreement are publicly available on EA's website at www.ea.com. No account is necessary to access these User Agreements. The same User Agreement applies to all EA games.

45. Attached hereto as **Exhibit C** is a true and correct copy of the EA User Agreement that the caseydunn█@█.com user consented to when they created an EA account on August 23, 2021.

46. Exhibit C states that the User Agreement:

> governs your access and use of products, content and services offered by EA and its subsidiaries ("EA"), such as game software and related updates, upgrades and features, and all online and mobile services, platforms, websites, and live events hosted by or associated with EA (collectively "EA Services").

Exhibit C at § 1.

47. In a section titled "EA Account," the User Agreement states:

> To create an EA Account, you must have a valid email address, and provide truthful and accurate information . . . .
>
> You must be at least 13 years of age (or the minimum age of your country of residence) to create an EA Account. If your age is between the relevant minimum age and 18 (or the age of majority where you live), you and your parent or guardian must review this Agreement together. Parents and guardians are responsible for the acts of children under 18 years of age when using EA Services. EA recommends that parents and guardians familiarize themselves with parental controls on devices they provide their child.
>
> You are responsible for the activity on your EA Account. Your EA Account may be suspended or terminated if someone else uses it to engage in activity that violates this Agreement.

Exhibit C § 1. Later versions of the User Agreement include the same text. On June 30, 2022, EA's operative User Agreement was updated to include the phrase "it's yours, don't share it" after "You are responsible for the activity on your EA Account." Exhibit F § 1.

48. The EA User Agreement is updated periodically, as reflected in Exhibits C–F.

49.     At all times since August 2021, the effective User Agreement has included substantially the same arbitration provision and class-action waiver, albeit with some modifications.  The relevant language of the arbitration provision in Exhibit C—from the section titled "Dispute Resolutions by Binding Arbitration"—is produced below:

> **THIS SECTION APPLIES TO ALL CONSUMERS AND PEOPLE WHO ACCEPTED THE TERMS OF THIS AGREEMENT.  IT EXCLUDES RESIDENTS OF QUEBEC, RUSSIA, SWITZERLAND, BRAZIL, MEXICO, THE MEMBER STATES OF THE EEA, UNITED KINGDOM AND THE REPUBLIC OF KOREA.  BY ACCEPTING THE TERMS OF THIS AGREEMENT, YOU AND EA EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION.**
>
> This Section 15 offers a streamlined way to resolve disputes between us if they arise.  Most of your concerns can be resolved quickly and satisfactorily by logging into the EA customer support interface with your Account at help.ea.com.  If EA cannot resolve your concern, you and EA agree to be bound by the procedure set forth in this Section to resolve any and all disputes between us.
>
> This Section 15 is an agreement between you and EA, and applies to our respective agents, employees, subsidiaries, predecessors, successors, beneficiaries and assigns.  This agreement to arbitrate evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 15 and any arbitration carried out under this Section.  This Section 15 shall be interpreted broadly and shall survive termination of this Agreement.
>
> **A.      Claims Covered by Arbitration**
>
> All disputes, claims or controversies arising out of or relating to this Agreement, any EA Service and its marketing, or the relationship between you and EA, including the validity, enforceability, and scope of this Section 15 ("Disputes"), shall be determined exclusively by binding arbitration.  This includes claims that accrued before you entered into this Agreement.  The only Disputes not covered by this Section 15 are claims (i) regarding the infringement, protection or validity of your, EA's or EA's licensors' trade secrets, copyright, trademark or patent rights; (ii) if you reside in Australia, to enforce a statutory consumer right under Australian consumer law; and (iii) brought in small claims court.
>
> . . .

PUBLIC REDACTED VERSION

**B.    Informal Negotiations**

You and EA shall first attempt to resolve any Dispute informally for at least 30 days before initiating arbitration . . . .

**C.    Binding Arbitration**

If you and EA cannot resolve a Dispute informally, you or EA may elect to have the Dispute finally and exclusively resolved by binding arbitration. Any election to arbitrate by one party shall be final and binding on the other. The arbitration shall be administered by the American Arbitration Association under its Consumer Arbitration Rules ("AAA Consumer Rules"), with the following modifications:

      1.     Arbitration fees and costs shall be governed by the AAA Consumer Rules. If such costs are determined by the arbitrator to be excessive, or if you send EA a notice to the Notice of Dispute address above indicating that you are unable to pay the administrative fees required to initiate an arbitration, EA will pay all AAA administrative fees.

      2.     If the Dispute does not exceed $25,000, the arbitration will be conducted solely on the basis of written submissions.

      3.     The parties may bring any dispositive motion or motions during the course of the proceedings.

      4.     The arbitrator shall make a decision in writing, which will include the findings and conclusions on which the decision is based. The arbitrator has the authority to issue any relief allowed by applicable law, but may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

The arbitrator must follow applicable law, and any award may be challenged if the arbitrator fails to do so. You and EA may litigate in court to compel arbitration, to stay proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

**D.    Limitations**

**YOU AND EA AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING AS TO ALL DISPUTES.** The arbitrator shall not consolidate another person's claims with your claims, and shall not preside over any type of representative or class proceeding. If this

paragraph D is found to be unenforceable, then the entirety of this agreement to arbitrate shall be null and void.

Exhibit C § 15.

50.     Records kept in the usual course of EA's business indicate that the

caseydunn█@█.com user assented to three additional versions of the User Agreement.

Attached hereto as **Exhibit D** is the User Agreement updated on August 25, 2021; **Exhibit E** is

the User Agreement updated on January 19, 2022; and **Exhibit F** is the User Agreement updated

on June 30, 2022.  Similarly, the g█smommy█@█.com user assented to the version

of the User Agreement attached as Exhibit F.

## V.     Recent Usage of the Accounts at Issue

51.     As noted above, records kept in the usual course of EA's business reflect when a

particular account logs into their EA account and plays particular EA games.

52.     Records kept in the usual course of EA's business indicate that the accounts

linked to caseydunn█@█.com and g█smommy█@█.com have logged into their

EA accounts to play EA games repeatedly since the filing of the Amended Complaint on

November 3, 2023.  As of the last date I reviewed the data, the caseydunn█@█.com

account had logged in to play *Battlefield 2042* as recently as today (February 22, 2024).  The

g█smommy█@█.com had logged in as recently as December 16, 2023.

I declare under penalty of perjury that the foregoing is true and correct and that this

declaration was executed on February 22, 2024, at Johns Creek, Georgia.

*Anand Nair*

_____

Anand Nair

PUBLIC REDACTED VERSION

Exhibit A

```
{
    "tos" : [ {
        "tosAccepted" : "webterms/us/en/xone/default/09082020/12082020",
        "dateAccepted" : "2021-08-23T3:3Z"
    }, {
        "tosAccepted" : "webprivacy/us/en/xone/default/08202020/08202020",
        "dateAccepted" : "2021-08-23T3:3Z"
    }, {
        "tosAccepted" : "tos/us/en/xbox360/default/26273_7/26273_7",
        "dateAccepted" : "2022-04-04T3:0Z"
    }, {
        "tosAccepted" : "webterms/us/en/xone/default/11072022/11072022",
        "dateAccepted" : "2023-04-04T13:50Z"
    }, {
        "tosAccepted" : "webprivacy/us/en/xone/default/08202020/01112023",
        "dateAccepted" : "2023-04-04T13:50Z"
    }, {
        "tosAccepted" : "webterms/us/en/xbox360/default/11072022/11072022",
        "dateAccepted" : "2023-10-24T4:42Z"
    }, {
        "tosAccepted" : "webprivacy/us/en/xbox360/default/10102023/10102023",
        "dateAccepted" : "2023-10-24T4:42Z"
    }, {
        "tosAccepted" : "/tos/US/en/XBOX360/ODS:70503.110.Frontline/26273_7/26273_7",
        "dateAccepted" : "2023-11-29T22:16Z"
    }, {
        "tosAccepted" : "/tos/US/en/XBOX360/ODS:15671.110.Base
Product/26273_7/26273_7",
        "dateAccepted" : "2021-10-30T0:54Z"
    }, {
        "tosAccepted" : "webterms/us/en/nx/default/11072022/11072022",
        "dateAccepted" : "2023-06-19T0:55Z"
    }, {
        "tosAccepted" : "webprivacy/us/en/nx/default/08202020/01112023",
        "dateAccepted" : "2023-06-19T0:55Z"
    } ]
}
```

Exhibit B

```
{
  "tosUris" : {
    "tos" : [ {
      "tosAccepted" : "webterms/us/en/xone/default/11072022/11072022",
      "dateAccepted" : "2023-05-13T22:6Z"
    }, {
      "tosAccepted" : "webprivacy/us/en/xone/default/08202020/01112023",
      "dateAccepted" : "2023-05-13T22:6Z"
    } ]
  }
}
```

# Exhibit C

# ELECTRONIC ARTS
# USER AGREEMENT

**Last Updated: September 8, 2020**

Welcome to EA. This Agreement governs your access and use of products, content and services offered by EA and its subsidiaries ("EA"), such as game software and related updates, upgrades and features, and all online and mobile services, platforms, websites, and live events hosted by or associated with EA (collectively "EA Services"). This Agreement is between you and the EA entity listed in Section 13B below.

BY USING EA SERVICES, YOU AGREE TO THESE TERMS. IF YOU DO NOT AGREE, DO NOT INSTALL OR USE THE EA SERVICES. FOR RESIDENTS OF CERTAIN COUNTRIES, YOU AGREE TO THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER DESCRIBED IN SECTION 15 TO RESOLVE ANY DISPUTES WITH EA.

## TABLE OF CONTENTS

1. EA Account
2. License
3. Content and Entitlements
4. Availability of EA Services and Updates
5. Your UGC
6. Rules of Conduct
7. Games
8. Termination and Other Sanctions
9. Use of Data
10. Other Software, Utilities and Tools
11. Third Parties
12. Warranties; Limitation of Liability
13. General Terms
14. Changes to this Agreement
15. Dispute Resolution by Binding Arbitration
16. Supplemental Terms for PlayStation®

## 1. EA Account

You need an EA Account to access and use many EA Services, including to play online.

To create an EA Account, you must have a valid email address, and provide truthful and accurate information. You must be eligible to use the EA Service for which you are registering and must be a resident of a country where use of EA Services is permitted.

You must be at least 13 years of age (or the minimum age of your country of residence) to create an EA Account. If your age is between the relevant minimum age and 18 (or the age of majority where you live), you and your parent or guardian must review this Agreement together. Parents and guardians are responsible for the acts of children under 18 years of age when using EA Services. EA recommends that parents and guardians familiarize themselves with parental controls on devices they provide their child.

You are responsible for the activity on your EA Account. Your EA Account may be suspended or terminated if someone else uses it to engage in activity that violates this Agreement.

You may cancel your EA Account or a subscription to an EA Service at any time by contacting EA's Customer Service Department at help.ea.com. To complete your request, EA may collect fees or costs incurred, if allowed by law, and any amounts owed to third-party vendors or content providers.

## 2. License

The EA Services are licensed to you, not sold. EA grants you a personal, limited, non-transferable, revocable and non-exclusive license to use the EA Services to which you have access for your non-commercial use, subject to your compliance with this Agreement. You may not access, copy, modify or distribute any EA Service, Content or Entitlements (as those terms are defined below), unless expressly authorized by EA or permitted by law. You may not reverse engineer or attempt to extract or otherwise use source code or other data from EA Services, unless expressly authorized by EA or permitted by law. EA or its licensors own and reserve all other rights, including all right, title and interest in the EA Services and associated intellectual property rights.

## 3. Content and Entitlements

The EA Services include Content and Entitlements. Content is the software, technology, text, forum posts, chat posts, profiles, widgets, messages, links, emails, music, sound, graphics, pictures, video, code, and all audio visual or other material appearing on or coming from EA Services, as well as the design and appearance of our websites. Content also includes user-generated Content ("UGC"). UGC includes EA Account personas, forum posts, profile content and other Content contributed by users to EA Services. All Content is either owned by EA or its licensors, or is licensed to EA and its licensors pursuant to Section 5 below.

Entitlements are rights that EA licenses to you to access or use the online or off-line elements of EA Services. Examples of Entitlements include access to digital or unlockable Content; additional or enhanced functionality (including multiplayer services); subscriptions; virtual assets; unlock keys or codes, serial codes or online authentication; in-game achievements; and virtual points, coins, or currencies.

We refer to these virtual points, coins or currencies as "EA Virtual Currency". When you obtain EA Virtual Currency from us or our authorized partners, you receive a personal, limited, non-assignable, non-exclusive, revocable license to access and select the Entitlements that EA expressly makes available to you.

EA Virtual Currency has no monetary value and has no value outside of our products and services. EA Virtual Currency cannot be sold, traded, transferred, or exchanged for cash; it only may be redeemed for Entitlements available for the EA Service. EA Virtual Currency is non-refundable, and you are not entitled to a refund for any unused EA Virtual Currency. Once you redeem EA Virtual Currency for an Entitlement, that Entitlement is not returnable, exchangeable, or refundable. If you live in Japan, you agree to use any EA Virtual Currency within 180 days from the date of purchase.

You will provide at your own expense the equipment, Internet connection and charges required to access and use EA Services.

## 4. Availability of EA Services and Updates

We do not guarantee that any EA Service, Content or Entitlement will be available at all times, in all locations, or at any given time or that we will continue to offer a particular EA Service, Content or Entitlements for any particular length of time. EA does not guarantee that EA Services can be accessed on all devices, by means of a specific Internet or connection provider, or in all geographic locations.

From time to time, EA may update, change or modify an EA Service, Content or Entitlements, without notice to you. These updates and modifications may be required in order to continue to use EA Services.

EA may need to update, or reset certain parameters to balance game play and usage of EA Services. These updates and "resets" may cause you setbacks within the relevant game world and may affect characters, games, groups or other Entitlements under your control.

## 5. Your UGC

You are responsible for your UGC. You may not upload UGC that infringes a third party's intellectual property rights or that violates the law, this Agreement or a third party's right of privacy or right of publicity.

EA may, in its sole discretion, remove, edit or disable UGC for any reason, including if EA reasonably determines that UGC violates this Agreement. EA does not assume any responsibility or liability for UGC, for removing it, or not removing it or other Content. EA does not pre-screen all UGC and does not endorse or approve any UGC available on EA Services.

When you contribute UGC, you grant to EA, its licensors and licensees a non-exclusive, perpetual, transferable, worldwide, sublicensable license to use, host, store, reproduce, modify, create derivative works, publicly perform, publicly display or otherwise transmit and communicate the UGC, or any portion of it, in any manner or form and in any medium or forum, whether now known or later devised, without notice, payment or attribution of any kind to you or any third party. You also grant to all other users who can access and use your UGC on an EA Service the right to use, copy, modify, display, perform, create derivative works from, and otherwise communicate and distribute your UGC on or through the relevant EA Service without further notice, attribution or compensation to you.

## 6. Rules of Conduct

When you access or use an EA Service, you agree that you will not:

- Violate any law, rule or regulation.
- Interfere with or disrupt any EA Service or any server or network used to support or provide an EA Service, including any hacking or cracking into an EA Service.
- Use any software or program that damages, interferes with or disrupts an EA Service or another's computer or property, such as denial of service attacks, spamming, hacking, or uploading computer viruses, worms, Trojan horses, cancelbots, spyware, corrupted files and time bombs.
- Interfere with or disrupt another player's use of an EA Service. This includes disrupting the normal flow of game play, chat or dialogue within an EA Service by, for example, using vulgar or harassing language, being abusive, excessive shouting (all caps), spamming, flooding or hitting the return key repeatedly.
- Harass, threaten, bully, embarrass, spam or do anything else to another player that is unwanted, such as repeatedly sending unwanted messages or making personal attacks or statements about race, sexual orientation, religion, heritage, etc. Hate speech is not tolerated.
- Contribute UGC or organize or participate in any activity, group or guild that is inappropriate, abusive, harassing, profane, threatening, hateful, offensive, vulgar, obscene, sexually explicit, defamatory, infringing, invades another's privacy, or is otherwise reasonably objectionable.
- Publish, post, upload or distribute UGC or content that is illegal or that you don't have permission to freely distribute.
- Publish, post, upload or distribute any content, such as a topic, name, screen name, avatar, persona, or other material or information, that EA (acting reasonably and objectively) determines is inappropriate, abusive, hateful, harassing, profane, defamatory, threatening, obscene, sexually explicit, infringing, privacy-invasive, vulgar, offensive, indecent or unlawful.
- Post a message for any purpose other than personal communication. Prohibited messages include advertising, spam, chain letters, pyramid schemes and other types of solicitation or commercial activities.
- Impersonate another person or falsely imply that you are an EA employee or representative.
- Improperly use in-game support or complaint buttons or make false reports to EA staff.
- Attempt to obtain, or phish for, a password, account information, or other private information from anyone else on EA Services.
- Make use of any payment methods to access or purchase EA Services for fraudulent purposes, without permission of the authorized owner, or otherwise concerning a criminal offence or other unlawful activity.
- Use any robot, spider or other automated device or process to access EA Services for any purpose such as scraping data or copying material.
- Modify any file or any other part of the EA Service that EA does not specifically authorize you to modify.
- Use or distribute unauthorized software programs or tools (such as "auto", "macro", hack or cheat software), or use exploits, bugs or problems in an EA Service to gain unfair advantage.
- Engage or assist in cheating or other anticompetitive behavior (such as boosting, collusion, and match or matchmaking manipulation).
- Use or distribute counterfeit software or EA Content, including EA Virtual Currency.
- Attempt to use an EA Service on or through any service that is not controlled or authorized by EA.
- Sell, buy, trade or otherwise transfer or offer to transfer your EA Account, any personal access to EA Services, or any EA Content associated with your EA Account, including EA Virtual Currency and other Entitlements, either within an EA Service or on a third-party website, or in connection with any out-of-game transaction, unless expressly authorized by EA.

- Use an EA Service in a country in which EA is prohibited from offering such services under applicable export control laws.
- If an EA Service requires you to create a "username" or a "persona" to represent yourself in-game and online, you should not use your real name and may not use a username or persona that is used by someone else or that EA determines is vulgar or offensive or violates someone else's rights.
- Engage in any other activity that significantly disturbs the peaceful, fair and respectful gaming environment of an EA Service.
- Use information about users publicly available in any EA Service (e.g. on a leaderboard) for any purpose unrelated to the Service, including to attempt to identify such users in the real world.
- Promote, encourage or take part in any prohibited activity described above.

If you or someone using your EA Account violates these rules and fails to remedy this violation after a warning, EA may take action against you, including revoking access to certain or all EA Services, Content or Entitlements, or terminating your EA Account as described in Section 8. In case of severe violations, EA may take these actions without issuing a prior warning. Some examples of severe violations include, but are not limited to: promoting, encouraging or engaging in hacking, selling EA accounts or entitlements (including virtual currencies and items) without EA's permission, extreme harassment, or threatening illegal activities. When practical, EA will notify you of the action it will take in response to violations of these rules or breach of this Agreement.

Specific EA Services may post additional rules that apply to your conduct on those services.

If you encounter another user who is violating any of these rules, please report this activity to EA using the "Help" or "Report Abuse" functions in the relevant EA Service, if available, or contact Customer Support at help.ea.com.

EA may, in its discretion, monitor or record online activity or Content on EA Services and may remove any Content from any EA Service at its discretion. Remember that your communications and your UGC in an EA Service are public and will be seen by others.

Your use of EA Services is subject to EA's Privacy and Cookie Policy at privacy.ea.com, which is incorporated by reference into this Agreement.

## 7. Games

This Section applies to EA's games and game subscriptions ("EA Games"), including EA Games that run on a Personal Computer ("EA PC Games"), and the EA-owned client application and related services that distributes EA PC Games (the "EA Desktop" currently https://www.origin.com/en-us/about).

### A. Technical and Content Protection Measures

EA utilizes technical or content protection measures, developed by EA or third-party partners, for EA Services in order to prevent piracy and the unauthorized copying or use of EA Games. Attempting to circumvent, disable or tamper with these measures shall terminate this license.

### B. EA Desktop

To play EA PC Games, EA may require you to install and use the EA Desktop client application or successor application. An EA Account, your acceptance of this Agreement, and an Internet connection are required for the EA Desktop to authenticate and verify your license to the EA PC Game ("Authenticate" or "Authentication").

To access and use EA Services associated with an EA PC Game, you may first need to register with the serial code enclosed with an EA PC Game. The serial code provided with the EA PC Game will be verified during Authentication. Authentication is limited to one EA Account per serial code, which means the EA PC Game is not transferable. You may only launch and access an EA PC Game on no more than five unique machines in any rolling 24-hour period.

The EA Desktop and EA PC Games may download and install updates, upgrades and additional features that EA deems reasonable, beneficial to you, and/or reasonably necessary, with or without notice. You agree that EA has no

obligation to support previous version(s) of the EA Desktop upon the availability of an update, upgrade and/or implementation of additional features. EA may provide you with the option to download, install and use an alpha or beta version of the EA Desktop under these same terms.

Instructions to uninstall the EA Desktop client can be found on EA's help website, help.ea.com.

You may uninstall EA PC Games at any time using the EA Desktop interface and deleting any remaining locally saved files. Punkbuster may remain on your computer after uninstall. To uninstall Punkbuster, run the executable at https://www.evenbalance.com/downloads/pbsvc/pbsvc.exe.

### C. Monitoring and Anti-Cheat Measures

EA utilizes technologies to detect and prevent cheating in the use of EA Services, and in particular, EA Games. These technologies may be developed by EA or a third party.

When you launch an online-capable game, these technologies may activate using kernel, admin or user privileges, and monitor your gameplay and device's RAM, processes, communications, and file storage for the purposes of detecting violations of, and enforcing, the Code of Conduct in Section 6, including the use of Unauthorized Third-Party Programs. An Unauthorized Third-Party Program is a third-party program or file (such as a "add-on", "mod", "hack", "trainer", or "cheat") that EA believes (i) enables or facilitates cheating of any type; (ii) allows users to modify or hack the game interface, environment, and/or experience in any way not expressly authorized by EA; or (iii) intercepts, "mines", or otherwise collects information from or through the game.

EA may collect relevant information needed for our investigation and enforcement purposes such as your account information, details related to an Unauthorized Third-Party Program, any EA PC Game files that were modified, and times cheating was detected. We also may terminate your License and your EA Account if we determine you have been cheating.

When you exit an online-capable game, these anti-cheat technologies will be deactivated.

## 8. Termination and Other Sanctions

This Agreement is effective until terminated by you or EA. EA may terminate your access and use of any EA Services or your EA Account if EA determines that you have violated this Agreement or that there has been otherwise unlawful, improper or fraudulent use of EA Services on your EA Account. When practical, EA will notify you of the termination. You may lose your username and persona as a result of an EA Account termination. If you have more than one EA Account, depending on the type of violation or misuse, EA may terminate all of your EA Accounts and all related Entitlements. If your EA Account is terminated, you will not have access to your EA Account or Entitlements and may be barred from accessing or using any EA Service again. Upon termination, your license under this Agreement also shall terminate.

Instead of termination and prior to any termination, EA may issue you a warning, suspend or alter your access to a particular EA Service or your EA Account, remove or revoke Entitlements at an EA Account or device level, remove or delete any Content which is in violation with this Agreement, or ban your device or machine from accessing specific EA Services. If EA takes any action described in this Section, you will not be entitled to a refund (subject to any statutory refund rights) and no Entitlements will be credited to you or converted to cash or other forms of reimbursement.

EA may terminate any EA Service at any time by giving at least thirty days' notice either via email (if available), within the affected EA Service, or on the service updates page of EA's website (https://www.ea.com/service-updates). After online service termination, no software updates will be applied to our games and we can't guarantee our games will continue to function on newer or updated operating systems or be available for download via application distribution services such as the iOS App Store and the Google Play Store. Any games available via such application distribution services after online service termination may be removed without further notice to you.

If you believe that any action has been taken against your Account or device in error, please contact Customer Support at help.ea.com.

If you terminate this agreement, you agree to cease all use of EA Services.

Sections 5, 8-9, 11-15 of this Agreement survive termination of this Agreement.

## 9. Use of Data

When you use an EA Service, EA may collect and store data from your computer or device, including information about your computer or device, hardware, installed software, and operating system (such as IP Address and device ID), information about your EA Service usage, gameplay and usage statistics, system interactions and peripheral hardware. If you play an EA Service offline, this data will be stored on your device and transmitted to EA when your device connects to the Internet. EA uses this information to operate its business, improve its products and services, provide services to and communicate with you (including for marketing purposes), provide software updates, dynamically serve content and software support, enforce this Agreement, and trouble-shoot bugs or otherwise enhance your experience. If you participate in online services, EA also may collect, use, store, transmit and publicly display statistical data regarding game play (including scores, rankings and achievements), or identify content that is created and shared by you with other players.

Your data is collected, used, stored and transmitted by EA Inc. in the United States, in accordance with EA's Privacy and Cookie Policy at privacy.ea.com.

You can manage certain data collection preferences in the Settings tab of the EA PC Game client.

## 10. Other Software, Utilities and Tools

EA Services may require or allow you to download software, software updates or patches, or other utilities and tools from EA or its licensors onto your computer, entertainment system or device. These technologies may be different across platforms, and the performance of EA Services may vary depending on your computer and other equipment. You understand that certain updates to these technologies may be required in order to continue use of an EA Services. Some of these updates may contain locked features or content that require you to pay an additional fee to access them. You consent to EA automatically installing any available updates for EA Services. Failure to install available updates may render EA Services, including EA PC Games, unplayable.

## 11. Third Parties

Some EA Services may give you the option of playing on servers not owned or controlled by EA. EA does not control those services and is not responsible for your use of the EA Service on or through them. These third-party services may subject you to additional or different terms and restrictions.

EA Services may include hyperlinks to third-party websites. Those sites may collect data or solicit personal information from you. EA does not control those sites and is not responsible for their content or for their collection, use or disclosure of personal information.

## 12. Warranties; Limitation of Liability

IF YOU LIVE IN THE EUROPEAN ECONOMIC AREA (EEA), UNITED KINGDOM OR SWITZERLAND, THE EA SERVICES WILL BE PROVIDED WITH REASONABLE CARE AND SKILL AND NO OTHER PROMISES OR WARRANTIES ABOUT THE EA SERVICES ARE MADE. IF YOU LIVE OUTSIDE THE EEA, UNITED KINGDOM AND SWITZERLAND, EA SERVICES ARE LICENSED AND PROVIDED "AS IS." YOU USE THEM AT YOUR OWN RISK. TO THE FULL EXTENT PERMITTED UNDER APPLICABLE LAW, EA GIVES NO EXPRESS, IMPLIED OR STATUTORY WARRANTIES, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS, AND WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR PRACTICE. EA DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE PRODUCT OR EA SERVICE; THAT THE EA SERVICE WILL MEET YOUR REQUIREMENTS; THAT OPERATION OF THE EA SERVICE WILL BE UNINTERRUPTED OR FREE FROM ERRORS, BUGS, CORRUPTION, LOSS, INTERFERENCE, HACKING OR VIRUSES, OR THAT EA SERVICES WILL INTEROPERATE OR BE COMPATIBLE WITH ANY OTHER SOFTWARE. EA DOES NOT WARRANT OR GUARANTEE ANY THIRD-PARTY PRODUCT OR SERVICE OFFERED VIA THE EA DESKTOP STORE. SEE https://help.ea.com/en-us/help/account/electronic-arts-warranty-policy/ FOR MORE INFORMATION ON STATUTORY WARRANTY AND OTHER STATUTORY CONSUMER RIGHTS IN YOUR TERRITORY, AND https://help.ea.com/en-

au/help/account/electronic-arts-warranty-policy/ FOR RIGHTS AVAILABLE TO AUSTRALIAN CONSUMERS.

IF YOU LIVE IN THE EEA, UNITED KINGDOM OR SWITZERLAND, EA AND ITS EMPLOYEES, LICENSORS AND BUSINESS PARTNERS WILL NOT BE LIABLE TO YOU FOR ANY LOSSES OR DAMAGES ARISING FROM YOUR ACTIONS OR BREACH OF THIS AGREEMENT, OR WHICH ARISE AS A RESULT OF A THIRD PARTY'S (OR ANY OTHER) ACTS OR OMISSIONS BEYOND OUR CONTROL. IF YOU LIVE OUTSIDE THE EEA, UNITED KINGDOM AND SWITZERLAND, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, EA AND ITS EMPLOYEES, LICENSORS AND BUSINESS PARTNERS SHALL NOT BE LIABLE TO YOU FOR ANY LOSSES THAT WERE NOT CAUSED BY EA'S BREACH OF THIS AGREEMENT, OR INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES. THE TYPES OF EXCLUDED DAMAGES INCLUDE, FOR EXAMPLE, FINANCIAL LOSS (SUCH AS LOSS INCOME OR PROFITS), COST OF SUBSTITUTE GOODS OR SERVICES, BUSINESS INTERRUPTION OR STOPPAGE, LOSS OF DATA, LOSS OF GOODWILL, AND COMPUTER FAILURE OR MALFUNCTION. THIS LIMITATION APPLIES TO ANY CLAIM ARISING OUT OF OR RELATED TO THIS LICENSE OR EA SERVICE, WHETHER BASED IN CONTRACT, TORT, STATUTE, STRICT LIABILITY OR OTHERWISE. IT ALSO APPLIES EVEN IF EA KNEW OR SHOULD HAVE KNOWN ABOUT THE POSSIBILITY OF SUCH DAMAGE. YOU MAY RECOVER ONLY DIRECT DAMAGES IN ANY AMOUNT NO GREATER THAN WHAT YOU ACTUALLY PAID FOR THE APPLICABLE EA SERVICE. EA DOES NOT LIMIT ITS LIABILITY FOR FRAUD, GROSS NEGLIGENCE, WILFUL MISCONDUCT, OR FOR DEATH OR PERSONAL INJURY. SOME JURISDICTIONS DO NOT ALLOW THE ABOVE EXCLUSIONS AND LIMITATIONS, SO SOME OR ALL OF THEM MAY NOT APPLY TO YOU.

If you purchased a physical copy of an EA Service from a physical retail store in the United States and you do not agree to the terms of this Agreement and have not installed or used the EA Service, you may return it for a refund or exchange within thirty (30) days from the date of purchase to the original place of purchase by following the instructions for return available at https://warrantyinfo.ea.com.

## 13. General Terms

### A. Entire Agreement

This Agreement, together with any other EA terms that govern your use of EA Services, constitutes the entire agreement between you and EA. The Agreement may not be amended or modified unless made in writing and signed by EA. The failure of EA to exercise any right under this Agreement shall not constitute a waiver of the right or any other right. If any part of this Agreement is held to be unenforceable, all other parts of this Agreement shall continue in full force and effect.

### B. Governing Law

**If you live in the EEA, United Kingdom, Switzerland, Brazil, Hong Kong, Mexico or Russia,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of your country of residence govern this Agreement and your use of EA Services; and (iii) you expressly agree that exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the courts of your country of residence.

**If you live in the Republic of Korea,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of Korea, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the courts of Korea.

**If you live in the United States, Canada or Japan,** (i) this Agreement is between you and Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City, CA 94065, USA; (ii) the laws of the State of California, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that for claims and disputes not subject to the arbitration agreement below, exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the federal or state courts that govern San Mateo County, California, and you expressly consent to the exercise of personal jurisdiction of such courts.

**If you in live in any other country,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du

Molard, 1204 Geneva, Switzerland; (ii) the laws of the State of California, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that for claims and disputes not subject to the arbitration agreement below, exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the federal or state courts that govern San Mateo County, California, and you expressly consent to the exercise of personal jurisdiction of such courts.

The UN Convention on Contracts for the International Sale of Goods (Vienna, 1980) shall not apply to this Agreement or to any dispute arising out of or relating to this Agreement.

### C. Export

You agree to follow U.S. and other export control laws and agree not to transfer an EA Service to a foreign national, or national destination, that is prohibited by such laws. You also acknowledge you are not a person with whom EA is prohibited from doing business under these export control laws.

## 14. Changes to this Agreement

EA may modify this Agreement from time to time, so please review it frequently. For EA players who accepted a previous version of this Agreement, the revisions will become effective 30 days after posting at terms.ea.com. Your continued use of EA Services means you accept the changes. Once you accept a version of the Agreement, we will not enforce future material changes without your express agreement to them. If you are asked to accept material changes to this Agreement and you decline to do so, you may not be able to continue to use the EA Service provided.

## 15. Dispute Resolutions by Binding Arbitration

**THIS SECTION APPLIES TO ALL CONSUMERS AND PEOPLE WHO ACCEPTED THE TERMS OF THIS AGREEMENT. IT EXCLUDES RESIDENTS OF QUEBEC, RUSSIA, SWITZERLAND, BRAZIL, MEXICO, THE MEMBER STATES OF THE EEA, UNITED KINGDOM AND THE REPUBLIC OF KOREA. BY ACCEPTING THE TERMS OF THIS AGREEMENT, YOU AND EA EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION.**

This Section 15 offers a streamlined way to resolve disputes between us if they arise. Most of your concerns can be resolved quickly and satisfactorily by logging into the EA customer support interface with your Account at help.ea.com. If EA cannot resolve your concern, you and EA agree to be bound by the procedure set forth in this Section to resolve any and all disputes between us.

This Section 15 is an agreement between you and EA, and applies to our respective agents, employees, subsidiaries, predecessors, successors, beneficiaries and assigns. This agreement to arbitrate evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 15 and any arbitration carried out under this Section. This Section 15 shall be interpreted broadly and shall survive termination of this Agreement.

### A. Claims Covered by Arbitration

All disputes, claims or controversies arising out of or relating to this Agreement, any EA Service and its marketing, or the relationship between you and EA, including the validity, enforceability, and scope of this Section 15 ("Disputes"), shall be determined exclusively by binding arbitration. This includes claims that accrued before you entered into this Agreement. The only Disputes not covered by this Section 15 are claims (i) regarding the infringement, protection or validity of your, EA's or EA's licensors' trade secrets, copyright, trademark or patent rights; (ii) if you reside in Australia, to enforce a statutory consumer right under Australian consumer law; and (iii) brought in small claims court.

### B. Informal Negotiations

You and EA shall first attempt to resolve any Dispute informally for at least 30 days before initiating arbitration. The informal negotiations begin upon receipt of written notice from one party to the other ("Notice of Dispute"). The Notice of Dispute must: (a) include the full name and contact information of the complaining party; (b) describe the nature and basis of the claim or dispute; and (c) set forth the specific relief sought. EA will send its Notice of Dispute to your billing or email address. You will send your Notice of Dispute to: Electronic Arts Inc., 209 Redwood Shores

Parkway, Redwood City CA 94065, ATTENTION: Legal Department.

### C. Binding Arbitration

If you and EA cannot resolve a Dispute informally, you or EA may elect to have the Dispute finally and exclusively resolved by binding arbitration. Any election to arbitrate by one party shall be final and binding on the other. The arbitration shall be administered by the American Arbitration Association under its Consumer Arbitration Rules ("AAA Consumer Rules"), with the following modifications:

1. Arbitration fees and costs shall be governed by the AAA Consumer Rules. If such costs are determined by the arbitrator to be excessive, or if you send EA a notice to the Notice of Dispute address above indicating that you are unable to pay the administrative fees required to initiate an arbitration, EA will pay all AAA administrative fees.

2. If the Dispute does not exceed $25,000, the arbitration will be conducted solely on the basis of written submissions.

3. The parties may bring any dispositive motion or motions during the course of the proceedings.

4. The arbitrator shall make a decision in writing, which will include the findings and conclusions on which the decision is based. The arbitrator has the authority to issue any relief allowed by applicable law, but may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

The arbitrator must follow applicable law, and any award may be challenged if the arbitrator fails to do so. You and EA may litigate in court to compel arbitration, to stay proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

### D. Limitations

**YOU AND EA AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING AS TO ALL DISPUTES.** The arbitrator shall not consolidate another person's claims with your claims, and shall not preside over any type of representative or class proceeding. If this paragraph D is found to be unenforceable, then the entirety of this agreement to arbitrate shall be null and void.

### E. Location

If you live in the United States, arbitration will take place in the county in which you reside. For residents outside the United States, arbitration shall be initiated in the County of San Mateo, State of California, United States of America, and you and EA agree to submit to the personal jurisdiction of that court, in order to compel arbitration, to stay the proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

### F. Recovery

If the arbitrator rules in your favor on the merits of any claim you bring against EA and issues you an award that is greater in monetary value than EA's last written settlement offer made before EA makes its final written submissions to the arbitrator, then EA will:

1. Pay you 150% of your arbitration award, up to $5,000 USD over and above your arbitration award; and
2. Reimburse the arbitration fees that you paid to the AAA.

### G. Changes to this Arbitration Agreement

EA will not enforce material changes to this agreement to arbitrate, unless you expressly agree to the changes.

**H. Severability**

If any clause within this Section 15 (other than the Class Action Waiver clause set forth in paragraph D above) is found to be unenforceable, that clause will be severed from this Section 15 and the remainder of this Section 15 will remain in full force and effect.

## 16. Supplemental Terms for PlayStation®

### A. For Purchases in PlayStation™Store in North America

Purchase and use of items are subject to the Network Terms of Service and User Agreement. This online service has been sublicensed to you by Sony Interactive Entertainment America.

### B. For Purchases in PlayStation™Store in Europe

Any content purchased in an in-game store will be purchased from Sony Interactive Entertainment Network Europe Limited ("SIENE") and be subject to PlayStation™Network Terms of Service and User Agreement which is available on the PlayStation™Store. Please check usage rights for each purchase as these may differ from item to item. Unless otherwise shown, content available in any in-game store has the same age rating as the game.

Current User Agreement

Exhibit D

# ELECTRONIC ARTS
# USER AGREEMENT

> ⓘ    You agree to these terms when you use our games or any of our services.

Welcome to EA. This Agreement governs your access and use of products, content and services offered by EA and its subsidiaries ("EA"), such as game software and related updates, upgrades and features, and all online and mobile services, platforms, websites, and live events hosted by or associated with EA (collectively "EA Services"). This Agreement is between you and the EA entity listed in Section 13B below.

> ⓘ    If you don't agree, please don't install or use our games or services.

BY USING EA SERVICES, YOU AGREE TO THESE TERMS. IF YOU DO NOT AGREE, DO NOT INSTALL OR USE THE EA SERVICES. FOR RESIDENTS OF CERTAIN COUNTRIES, YOU AGREE TO THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER DESCRIBED IN SECTION 15 TO RESOLVE ANY DISPUTES WITH EA.

## TABLE OF CONTENTS

1. EA Account
2. License
3. Content and Entitlements
4. Availability of EA Services and Updates
5. Your UGC
6. Rules of Conduct
7. Games
8. Termination and Other Sanctions
9. Use of Data
10. Other Software, Utilities and Tools
11. Third Parties
12. Warranties; Limitation of Liability
13. General Terms
14. Changes to this Agreement
15. Dispute Resolutions by Binding Arbitration
16. Supplemental Terms for PlayStation®

## 1. EA Account

> ⓘ    You need an EA Account to play most EA games. To create one, you must be at least the minimum age and your parents must read and agree to these terms if you are a minor. EA can suspend or terminate your account if you break this agreement. You may cancel your EA Account or any EA subscriptions at any time.

You need an EA Account to access and use many EA Services, including to play online.

To create an EA Account, you must have a valid email address, and provide truthful and accurate information. You must be eligible to use the EA Service for which you are registering and must be a resident of a country where use of EA Services is permitted.

You must be at least 13 years of age (or the minimum age of your country of residence) to create an EA Account. If your age is between the relevant minimum age and 18 (or the age of majority where you live), you and your parent or guardian must review and agree to this Agreement together. Parents and guardians are responsible for the acts of children under 18 years of age when using EA Services. EA recommends that parents and guardians familiarize themselves with parental controls on devices they provide their child.

You are responsible for the activity on your EA Account. Your EA Account may be suspended or terminated if someone else uses it to engage in activity that violates this Agreement.

You may cancel your EA Account or a subscription to an EA Service at any time by contacting EA's Customer Service Department at help.ea.com. To complete your request, EA may collect fees or costs incurred, if allowed by law, and any amounts owed to third-party vendors or content providers.

## 2. License

> ⓘ  EA grants you access to our games and services to you for your personal enjoyment.

The EA Services are licensed to you, not sold. EA grants you a personal, limited, non-transferable, revocable and non-exclusive license to use the EA Services to which you have access for your non-commercial use, subject to your compliance with this Agreement. You may not access, copy, modify or distribute any EA Service, Content or Entitlements (as those terms are defined below), unless expressly authorized by EA or permitted by law. You may not reverse engineer or attempt to extract or otherwise use source code or other data from EA Services, unless expressly authorized by EA or permitted by law. EA or its licensors own and reserve all other rights, including all right, title and interest in the EA Services and associated intellectual property rights.

## 3. Content and Entitlements

> ⓘ  EA provides games, features and content through a series of entitlements. Some entitlements are unlocked using virtual currency that has no value outside of our games.

The EA Services include Content and Entitlements. Content is the software, technology, text, forum posts, chat posts, profiles, widgets, messages, links, emails, music, sound, graphics, pictures, video, code, and all audio visual or other material appearing on or coming from EA Services, as well as the design and appearance of our websites. Content also includes user-generated Content ("UGC"). UGC includes EA Account personas, forum posts, profile content and other Content contributed by users to EA Services. All Content is either owned by EA or its licensors, or is licensed to EA and its licensors pursuant to Section 5 below.

Entitlements are rights that EA licenses to you to access or use the online or off-line elements of EA Services. Examples of Entitlements include access to digital or unlockable Content; additional or enhanced functionality (including multiplayer services); subscriptions; virtual assets; unlock keys or codes, serial codes or online authentication; in-game accomplishments; and virtual points, coins, or currencies.

We refer to these virtual points, coins or currencies as "EA Virtual Currency". When you obtain EA Virtual Currency from us or our authorized partners, you receive a personal, limited, non-assignable, non-exclusive, revocable license to access and select the Entitlements that EA expressly makes available to you.

EA Virtual Currency has no monetary value and has no value outside of our products and services. EA Virtual Currency cannot be sold, traded, transferred, or exchanged for cash; it only may be redeemed for Entitlements available for the EA Service. EA Virtual Currency is non-refundable, and you are not entitled to a refund for any unused EA Virtual Currency.

Once you redeem EA Virtual Currency for an Entitlement, that Entitlement is not returnable, exchangeable, or refundable. If you live in Japan, you agree to use any EA Virtual Currency within 180 days from the date of purchase.

You will provide at your own expense the equipment, Internet connection and charges required to access and use EA Services.

# 4. Availability of EA Services and Updates

ⓘ   Our games and services may not always be available or operate on all devices. We also may make updates or changes to our games and services, which might impact your use or game progress.

We do not guarantee that any EA Service, Content or Entitlement will be available at all times, in all locations, or at any given time or that we will continue to offer a particular EA Service, Content or Entitlements for any particular length of time. EA does not guarantee that EA Services can be accessed on all devices, by means of a specific Internet or connection provider, or in all geographic locations.

From time to time, EA may update, change or modify an EA Service, Content or Entitlements, without notice to you. These updates and modifications may be required in order to continue to use EA Services.

EA may need to update, or reset certain parameters to balance game play and usage of EA Services. These updates or "resets" may cause you setbacks within the relevant game world and may affect characters, games, groups or other Entitlements under your control.

EA may also take actions on your EA Account and Entitlements without notice to you to protect you or EA, such as preventing unauthorized access, resetting EA Account passwords, suspending EA Account access, deleting data or removing EA Accounts from EA Services. Your availability to EA Services may also be affected in response to actual or suspected Rules of Conduct violations, as further described in Section 6.

# 5. Your UGC

ⓘ   You allow EA and our players to use anything you upload or create (UGC) for free within our games and services. You are responsible for your UGC, it must be your own content or content you're allowed to use.

You are responsible for your UGC. You may not upload UGC that infringes a third party's intellectual property rights or that violates the law, this Agreement or a third party's right of privacy or right of publicity.

EA may, in its sole discretion, remove, edit or disable UGC for any reason, including if EA reasonably determines that UGC violates this Agreement. EA does not assume any responsibility or liability for UGC, for removing it, or not removing it or other Content. EA does not pre-screen all UGC and does not endorse or approve any UGC available on EA Services.

When you contribute UGC, you grant to EA, its licensors and licensees a non-exclusive, perpetual, transferable, worldwide, sublicensable license to use, host, store, reproduce, modify, create derivative works, publicly perform, publicly display or otherwise transmit and communicate the UGC, or any portion of it, in any manner or form and in any medium or forum, whether now known or later devised, without notice, payment or attribution of any kind to you or any third party. You also grant to all other users who can access and use your UGC on an EA Service the right to use, copy, modify, display, perform, create derivative works from, and otherwise communicate and distribute your UGC on or through the relevant EA Service without further notice, attribution or compensation to you.

# 6. Rules of Conduct

ⓘ     We want you to have a good time playing our games. So we expect you, like all players, to respect EA and your fellow players. This means, for example, obey the law, don't cheat, don't be offensive, don't hack our software, don't spam or bot, don't lie to EA or our players. Those are the highlights. Read the full list of what not to do in the Rules of Conduct.

When you access or use an EA Service, you agree that you will not:

- Violate any law, rule or regulation.
- Interfere with or disrupt any EA Service or any server or network used to support or provide an EA Service, including any hacking or cracking into an EA Service.
- Use any software or program that damages, interferes with or disrupts an EA Service or another's computer or property, such as denial of service attacks, spamming, hacking, or uploading computer viruses, worms, Trojan horses, cancelbots, spyware, corrupted files and time bombs.
- Interfere with or disrupt another player's use of an EA Service. This includes disrupting the normal flow of game play, chat or dialogue within an EA Service by, for example, using vulgar or harassing language, being abusive, excessive shouting (all caps), spamming, flooding or hitting the return key repeatedly.
- Harass, threaten, bully, embarrass, spam or do anything else to another player that is unwanted, such as repeatedly sending unwanted messages or making personal attacks or statements about race, sexual orientation, religion, heritage, etc. Hate speech is not tolerated.
- Contribute UGC or organize or participate in any activity, group or guild that is inappropriate, abusive, harassing, profane, threatening, hateful, offensive, vulgar, obscene, sexually explicit, defamatory, infringing, invades another's privacy, or is otherwise reasonably objectionable.
- Publish, post, upload or distribute UGC or content that is illegal or that you don't have permission to freely distribute.
- Publish, post, upload or distribute any content, such as a topic, name, screen name, avatar, persona, or other material or information, that EA (acting reasonably and objectively) determines is inappropriate, abusive, hateful, harassing, profane, defamatory, threatening, obscene, sexually explicit, infringing, privacy-invasive, vulgar, offensive, indecent or unlawful.
- Post a message for any purpose other than personal communication. Prohibited messages include advertising, spam, chain letters, pyramid schemes and other types of solicitation or commercial activities.
- Impersonate another person or falsely imply that you are an EA employee or representative.
- Improperly use in-game support or complaint buttons or make false reports to EA staff.
- Attempt to obtain, or phish for, a password, account information, or other private information from anyone else on EA Services.
- Make use of any payment methods or refund systems to access, purchase or refund EA Services for fraudulent purposes, or without permission of the authorized owner, or otherwise concerning a criminal offence or other unlawful activity.
- Use any robot, spider or other automated device or process to access EA Services for any purpose such as scraping data, abuse EA Services, account creation, or copying material.
- Modify any file or any other part of the EA Service that EA does not specifically authorize you to modify.
- Use or distribute unauthorized software programs or tools (such as "auto", "macro", hack or cheat software), or use exploits, bugs or problems in an EA Service to gain unfair advantage.
- Engage or assist in cheating or other anticompetitive behavior (such as boosting, collusion, and match or matchmaking manipulation).
- Use or distribute counterfeit software or EA Content, including EA Virtual Currency.
- Attempt to use an EA Service on or through any service that is not controlled or authorized by EA, or otherwise intentionally obfuscate your network connection or location or other metadata to gain access to an EA Service, make purchases, or otherwise access an EA Service.
- Sell, buy, trade or otherwise transfer or offer to transfer your EA Account, any personal access to EA Services, or any EA Content associated with your EA Account, including EA Virtual Currency and other Entitlements, either within an EA Service or on a third-party website, or in connection with any out-of-game transaction, unless expressly authorized by EA.
- Use an EA Service in a country in which EA is prohibited from offering such services under applicable export control laws.

- If an EA Service requires you to create a "username" or a "persona" to represent yourself in-game and online, you should not use your real name and may not use a username or persona that is used by someone else or that EA determines is vulgar or offensive or violates someone else's rights.
- Engage in any other activity that significantly disturbs the peaceful, fair and respectful gaming environment of an EA Service.
- Use information about users publicly available in any EA Service (e.g. on a leaderboard) for any purpose unrelated to the Service, including to attempt to identify such users in the real world.
- Promote, encourage or take part in any prohibited activity described above.

> ⓘ     To enforce these rules, we may monitor your activity and remove any UGC. If you don't follow these rules, we may warn you, suspend you, or ban you permanently from playing our games.

If you or someone using your EA Account violates these rules and fails to remedy this violation after a warning, EA may take action against you, including revoking access to certain or all EA Services, Content or Entitlements, or terminating your EA Account as described in Section 8. In case of severe violations, EA may take these actions without issuing a prior warning. Some examples of severe violations include, but are not limited to: promoting, encouraging or engaging in hacking, selling EA accounts or entitlements (including virtual currencies and items) without EA's permission, extreme harassment, or threatening illegal activities. When practical, EA will notify you of the action it will take in response to violations of these rules or breach of this Agreement.

Specific EA Services may post additional rules that apply to your conduct on those services.

If you encounter another user who is violating any of these rules, please report this activity to EA using the "Help" or "Report Abuse" functions in the relevant EA Service, if available, or contact Customer Support at help.ea.com.

EA may, in its discretion, monitor or record online activity or Content on EA Services and may remove any Content from any EA Service at its discretion. Remember that your communications and your UGC in an EA Service are public and will be seen by others.

Your use of EA Services is subject to EA's Privacy and Cookie Policy at privacy.ea.com, which is incorporated by reference into this Agreement.

# 7. Games

> ⓘ     This section applies to our games, in particular PC games, and EA-owned game platforms like the EA app or Origin.

This Section applies to EA's games and game subscriptions ("EA Games"), including EA Games that run on a Personal Computer ("EA PC Games"), and the EA-owned client application and related services that distributes EA PC Games (the "EA app" currently https://www.origin.com/en-us/about).

## A. Technical and Content Protection Measures

> ⓘ     We use specific security software to combat piracy and cheating, and tampering with it can result in losing access to our games.

EA utilizes technical or content protection measures, developed by EA or third-party partners, for EA Services in order to prevent piracy and the unauthorized copying or use of EA Games. Attempting to circumvent, disable or tamper with these measures shall terminate this license.

## B. EA app

> ⓘ   To play our PC games, you may need to install our PC distribution platform software. We may automatically update the software. We provide instructions so you can uninstall our games and software.

To play EA PC Games, EA may require you to install and use the EA app client application or successor application. An EA Account, your acceptance of this Agreement, and an Internet connection are required for the EA app to authenticate and verify your license to the EA PC Game ("Authenticate" or "Authentication").

To access and use EA Services associated with an EA PC Game, you may first need to register with the serial code enclosed with an EA PC Game. The serial code provided with the EA PC Game will be verified during Authentication. Authentication is limited to one EA Account per serial code, which means the EA PC Game is not transferable. You may only launch and access an EA PC Game on no more than five unique machines in any rolling 24-hour period.

The EA app and EA PC Games may download and install updates, upgrades and additional features. You agree that EA has no obligation to support previous version(s) of the EA app upon the availability of an update, upgrade and/or implementation of additional features. EA may provide you with the option to download, install and use an alpha or beta version of the EA app under these same terms.

Instructions to uninstall the EA app client can be found on EA's help website, help.ea.com.

You may uninstall EA PC Games at any time using the EA app interface and deleting any remaining locally saved files. Punkbuster may remain on your computer after uninstall. To uninstall Punkbuster, run the executable at https://www.evenbalance.com/downloads/pbsvc/pbsvc.exe.

## C. Monitoring and Anti-Cheat Measures

> ⓘ   EA installs software to detect cheating or hacking. These programs send data on your computer to EA.

EA utilizes technologies to detect and prevent cheating in the use of EA Services, and in particular, EA Games. These technologies may be developed by EA or a third party.

When you launch an online-capable game, these technologies may activate using kernel, admin or user privileges, and monitor your gameplay and device's RAM, processes, communications, and file storage for the purposes of detecting violations of, and enforcing, the Code of Conduct in Section 6, including the use of Unauthorized Third-Party Programs. An Unauthorized Third-Party Program is a third-party program or file (such as a "add-on", "mod", "hack", "trainer", or "cheat") that EA believes (i) enables or facilitates cheating of any type; (ii) allows users to modify or hack the game interface, environment, and/or experience in any way not expressly authorized by EA; or (iii) intercepts, "mines", or otherwise collects information from or through the game.

EA may collect relevant information needed for our investigation and enforcement purposes such as your account information, details related to an Unauthorized Third-Party Program, any EA PC Game files that were modified, and times cheating was detected. We also may terminate your License and your EA Account if we determine you have been cheating.

When you exit an online-capable game, these anti-cheat technologies will be deactivated.

# 8. Termination and Other Sanctions

> ⓘ   If you break this agreement or the law, EA may suspend or terminate your use of our games and services, without refunds.
>
> If we decide to shut down a game or a service, we will tell you at least 30 days in advance.

This Agreement is effective until terminated by you or EA. EA may terminate your access and use of any EA Services or your EA Account if EA determines that you have violated this Agreement or that there has been otherwise unlawful, improper or fraudulent use of EA Services on your EA Account. When practical, EA will notify you of the termination. You may lose your username and persona as a result of an EA Account termination. If you have more than one EA Account, depending on the type of violation or misuse, EA may terminate all of your EA Accounts and all related Entitlements. If your EA Account is terminated, you will not have access to your EA Account or Entitlements and may be barred from accessing or using any EA Service again. Upon termination, your license under this Agreement also shall terminate.

Instead of termination and prior to any termination, EA may issue you a warning, suspend or alter your access to a particular EA Service or your EA Account, remove or revoke Entitlements at an EA Account or device level, remove or delete any Content which is in violation with this Agreement, or ban your device or machine from accessing specific EA Services. If EA takes any action described in this Section, you will not be entitled to a refund (subject to any statutory refund rights) and no Entitlements will be credited to you or converted to cash or other forms of reimbursement.

EA may terminate any EA Service at any time by giving at least thirty days' notice either via email (if available), within the affected EA Service, or on the service updates page of EA's website (https://www.ea.com/service-updates). After online service termination, no software updates will be applied to our games and we can't guarantee our games will continue to function on newer or updated operating systems or be available for download via application distribution services such as the iOS App Store and the Google Play Store. Any games available via such application distribution services after online service termination may be removed without further notice to you.

If you believe that any action has been taken against your Account or device in error, please contact Customer Support at help.ea.com.

If you terminate this agreement, you agree to cease all use of EA Services.

Sections 5, 8-9, 11-15 of this Agreement survive termination of this Agreement.

# 9. Use of Data

> ⓘ    EA collects various information when you play our games (even offline) to operate our business, improve our products and services, enforce our rules and communicate with you. We encourage you to read EA's Privacy and Cookie Policy at privacy.ea.com.

When you use an EA Service, EA may collect and store data from your computer or device, including information about your computer or device, hardware, installed software, and operating system (such as IP Address and device ID), information about your EA Service usage, gameplay and usage statistics, system interactions and peripheral hardware. If you play an EA Service offline, this data will be stored on your device and transmitted to EA when your device connects to the Internet. EA uses this information to operate its business, improve its products and services, provide services to and communicate with you (including for marketing purposes), provide software updates, dynamically serve content and software support, enforce this Agreement, and trouble-shoot bugs or otherwise enhance your experience. If you participate in online services, EA also may collect, use, store, transmit and publicly display statistical data regarding game play (including scores, rankings and accomplishments), or identify content that is created and shared by you with other players.

Your data is collected, used, stored and transmitted by EA Inc. in the United States, in accordance with EA's Privacy and Cookie Policy at privacy.ea.com.

You can manage certain data collection preferences in the Settings tab of the EA PC Game client.

# 10. Other Software, Utilities and Tools

> ⓘ    If we update our games, you may need new software to keep playing our games.

EA Services may require or allow you to download software, software updates or patches, or other utilities and tools from EA or its licensors onto your computer, entertainment system or device. These technologies may be different across platforms, and the performance of EA Services may vary depending on your computer and other equipment. You understand that certain updates to these technologies may be required in order to continue use of an EA Services. Some of these updates may contain locked features or content that require you to pay an additional fee to access them. You consent to EA automatically installing any available updates for EA Services. Failure to install available updates may render EA Services, including EA PC Games, unplayable.

## 11. Third Parties

> ⓘ    You are responsible for your use of game servers and services not owned by EA.

Some EA Services may give you the option of playing on servers not owned or controlled by EA. EA does not control those services and is not responsible for your use of the EA Service on or through them. These third-party services may subject you to additional or different terms and restrictions.

EA Services may include hyperlinks to third-party websites. Those sites may collect data or solicit personal information from you. EA does not control those sites and is not responsible for their content or for their collection, use or disclosure of personal information.

## 12. Warranties; Limitation of Liability

> ⓘ    EA does not make any promises about our software, but the local law in your country may include certain warranties. The damages you can recover for legal claims are limited.

IF YOU LIVE IN THE EUROPEAN ECONOMIC AREA (EEA), UNITED KINGDOM OR SWITZERLAND, THE EA SERVICES WILL BE PROVIDED WITH REASONABLE CARE AND SKILL AND NO OTHER PROMISES OR WARRANTIES ABOUT THE EA SERVICES ARE MADE. IF YOU LIVE OUTSIDE THE EEA, UNITED KINGDOM AND SWITZERLAND, EA SERVICES ARE LICENSED AND PROVIDED "AS IS." YOU USE THEM AT YOUR OWN RISK. TO THE FULL EXTENT PERMITTED UNDER APPLICABLE LAW, EA GIVES NO EXPRESS, IMPLIED OR STATUTORY WARRANTIES, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS, AND WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR PRACTICE. EA DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE PRODUCT OR EA SERVICE; THAT THE EA SERVICE WILL MEET YOUR REQUIREMENTS; THAT OPERATION OF THE EA SERVICE WILL BE UNINTERRUPTED OR FREE FROM ERRORS, BUGS, CORRUPTION, LOSS, INTERFERENCE, HACKING OR VIRUSES, OR THAT EA SERVICES WILL INTEROPERATE OR BE COMPATIBLE WITH ANY OTHER SOFTWARE. EA DOES NOT WARRANT OR GUARANTEE ANY THIRD-PARTY PRODUCT OR SERVICE OFFERED VIA THE EA APP STORE. SEE https://help.ea.com/en-us/help/account/electronic-arts-warranty-policy/ FOR MORE INFORMATION ON STATUTORY WARRANTY AND OTHER STATUTORY CONSUMER RIGHTS IN YOUR TERRITORY, AND https://help.ea.com/en-au/help/account/electronic-arts-warranty-policy/ FOR RIGHTS AVAILABLE TO AUSTRALIAN CONSUMERS.

IF YOU LIVE IN THE EEA, UNITED KINGDOM OR SWITZERLAND, EA AND ITS EMPLOYEES, LICENSORS AND BUSINESS PARTNERS WILL NOT BE LIABLE TO YOU FOR ANY LOSSES OR DAMAGES ARISING FROM YOUR ACTIONS OR BREACH OF THIS AGREEMENT, OR WHICH ARISE AS A RESULT OF A THIRD PARTY'S (OR ANY OTHER) ACTS OR OMISSIONS BEYOND OUR CONTROL. IF YOU LIVE OUTSIDE THE EEA, UNITED KINGDOM AND SWITZERLAND, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, EA AND ITS EMPLOYEES, LICENSORS AND BUSINESS PARTNERS SHALL NOT BE LIABLE TO YOU FOR ANY LOSSES THAT WERE NOT CAUSED BY EA'S BREACH OF THIS AGREEMENT, OR INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES. THE TYPES OF EXCLUDED DAMAGES INCLUDE, FOR EXAMPLE, FINANCIAL LOSS (SUCH AS LOSS INCOME OR PROFITS), COST OF SUBSTITUTE GOODS OR SERVICES, BUSINESS INTERRUPTION OR STOPPAGE, LOSS OF DATA, LOSS OF GOODWILL, AND COMPUTER FAILURE OR MALFUNCTION. THIS LIMITATION APPLIES TO ANY CLAIM ARISING OUT OF OR RELATED TO THIS LICENSE OR EA SERVICE, WHETHER BASED IN CONTRACT, TORT, STATUTE, STRICT LIABILITY OR OTHERWISE. IT ALSO APPLIES EVEN IF EA KNEW OR SHOULD HAVE KNOWN ABOUT THE POSSIBILITY OF SUCH DAMAGE. YOU MAY RECOVER ONLY DIRECT DAMAGES IN ANY AMOUNT NO GREATER THAN WHAT YOU ACTUALLY PAID FOR THE APPLICABLE EA SERVICE. EA DOES NOT LIMIT ITS LIABILITY FOR FRAUD, GROSS NEGLIGENCE, WILFUL MISCONDUCT, OR

FOR DEATH OR PERSONAL INJURY. SOME JURISDICTIONS DO NOT ALLOW THE ABOVE EXCLUSIONS AND LIMITATIONS, SO SOME OR ALL OF THEM MAY NOT APPLY TO YOU.

If you purchased a physical copy of an EA Service from a physical retail store in the United States and you do not agree to the terms of this Agreement and have not installed or used the EA Service, you may return it for a refund or exchange within thirty (30) days from the date of purchase to the original place of purchase by following the instructions for return available at https://warrantyinfo.ea.com.

# 13. General Terms

## A. Entire Agreement

ⓘ   This agreement can be changed only in writing signed by EA.

This Agreement, together with any other EA terms that govern your use of EA Services, constitutes the entire agreement between you and EA. The Agreement may not be amended or modified unless made in writing and signed by EA. The failure of EA to exercise any right under this Agreement shall not constitute a waiver of the right or any other right. If any part of this Agreement is held to be unenforceable, all other parts of this Agreement shall continue in full force and effect.

## B. Governing Law

ⓘ   If you live in the United States, Canada or Japan, this agreement is between you and Electronic Arts Inc. If you live in any other country, this agreement is between you and EA Swiss Sàrl.

**If you live in the EEA, United Kingdom, Switzerland, Brazil, Hong Kong, Mexico or Russia,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of your country of residence govern this Agreement and your use of EA Services; and (iii) you expressly agree that exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the courts of your country of residence.

**If you live in the Republic of Korea,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of Korea, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the courts of Korea.

**If you live in the United States, Canada or Japan,** (i) this Agreement is between you and Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City, CA 94065, USA; (ii) the laws of the State of California, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that for claims and disputes not subject to the arbitration agreement below, exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the federal or state courts that govern San Mateo County, California, and you expressly consent to the exercise of personal jurisdiction of such courts.

**If you in live in any other country,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of the State of California, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that for claims and disputes not subject to the arbitration agreement below, exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the federal or state courts that govern San Mateo County, California, and you expressly consent to the exercise of personal jurisdiction of such courts.

The UN Convention on Contracts for the International Sale of Goods (Vienna, 1980) shall not apply to this Agreement or to any dispute arising out of or relating to this Agreement.

**C. Export**

> ⓘ   You must follow all export laws, and you agree you are not a prohibited person under export laws.

You agree to follow U.S. and other export control laws and agree not to transfer an EA Service to a foreign national, or national destination, that is prohibited by such laws. You also acknowledge you are not a person with whom EA is prohibited from doing business under these export control laws.

# 14. Changes to this Agreement

> ⓘ   This agreement can be updated by EA at any time. If you do not agree to certain meaningful changes, you may not be able to play our games.

EA may modify this Agreement from time to time, so please review it frequently. For EA players who accepted a previous version of this Agreement, the revisions will become effective 30 days after posting at terms.ea.com. Your continued use of EA Services means you accept the changes. Once you accept a version of the Agreement, we will not enforce future material changes without your express agreement to them. If you are asked to accept material changes to this Agreement and you decline to do so, you may not be able to continue to use the EA Service provided.

# 15. Dispute Resolutions by Binding Arbitration

> ⓘ   This section only applies if you live outside of Quebec, Russia, Switzerland, Brazil, Mexico, the member states of the EEA, United Kingdom and the Republic of Korea.
>
> If you have a dispute, you agree to send details in writing to EA, and then arbitrate. You agree that any claim you bring against EA is in your individual capacity, and not as a class member, class representative, or as part of a class action.

**THIS SECTION APPLIES TO ALL CONSUMERS AND PEOPLE WHO ACCEPTED THE TERMS OF THIS AGREEMENT. IT EXCLUDES RESIDENTS OF QUEBEC, RUSSIA, SWITZERLAND, BRAZIL, MEXICO, THE MEMBER STATES OF THE EEA, UNITED KINGDOM AND THE REPUBLIC OF KOREA. BY ACCEPTING THE TERMS OF THIS AGREEMENT, YOU AND EA EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION.**

This Section 15 offers a streamlined way to resolve disputes between us if they arise. Most of your concerns can be resolved quickly and satisfactorily by logging into the EA customer support interface with your Account at help.ea.com. If EA cannot resolve your concern, you and EA agree to be bound by the procedure set forth in this Section to resolve any and all disputes between us.

This Section 15 is an agreement between you and EA, and applies to our respective agents, employees, subsidiaries, predecessors, successors, beneficiaries and assigns. This agreement to arbitrate evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 15 and any arbitration carried out under this Section. This Section 15 shall be interpreted broadly and shall survive termination of this Agreement.

## A. Claims Covered by Arbitration

All disputes, claims or controversies arising out of or relating to this Agreement, any EA Service and its marketing, or the relationship between you and EA, including the validity, enforceability, and scope of this Section 15 ("Disputes"), shall be determined exclusively by binding arbitration. This includes claims that accrued before you entered into this Agreement. The only Disputes not covered by this Section 15 are claims (i) regarding the infringement, protection or validity of your,

EA's or EA's licensors' trade secrets, copyright, trademark or patent rights; (ii) if you reside in Australia, to enforce a statutory consumer right under Australian consumer law; and (iii) brought in small claims court.

## B. Informal Negotiations

You and EA shall first attempt to resolve any Dispute informally for at least 30 days before initiating arbitration. The informal negotiations begin upon receipt of written notice from one party to the other ("Notice of Dispute"). The Notice of Dispute must: (a) include the full name and contact information of the complaining party; (b) describe the nature and basis of the claim or dispute; and (c) set forth the specific relief sought. EA will send its Notice of Dispute to your billing or email address. You will send your Notice of Dispute to: Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City CA 94065, ATTENTION: Legal Department.

## C. Binding Arbitration

If you and EA cannot resolve a Dispute informally, you or EA may elect to have the Dispute finally and exclusively resolved by binding arbitration. Any election to arbitrate by one party shall be final and binding on the other. The arbitration shall be administered by the American Arbitration Association under its Consumer Arbitration Rules ("AAA Consumer Rules"), which are available at www.adr.org or by calling 1-800-778-7879, with the following modifications:

1. Arbitration fees and costs shall be governed by the AAA Consumer Rules. If such costs are determined by the arbitrator to be excessive, or if you send EA a notice to the Notice of Dispute address above indicating that you are unable to pay the administrative fees required to initiate an arbitration, EA will pay all AAA administrative fees.

2. If the Dispute does not exceed $25,000, the arbitration will be conducted solely on the basis of written submissions.

3. The parties may bring any dispositive motion or motions during the course of the proceedings.

4. The arbitrator shall make a decision in writing, which will include the findings and conclusions on which the decision is based. The arbitrator has the authority to issue any relief allowed by applicable law, but the arbitrator shall have no authority to issue any relief on any basis other than an individual basis. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

The arbitrator must follow applicable law, and any award may be challenged if the arbitrator fails to do so. You and EA may litigate in court to compel arbitration, to stay proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

## D. Limitations

**YOU AND EA AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING AS TO ALL DISPUTES.** The arbitrator shall not consolidate another person's claims with your claims, and shall not preside over any type of representative or class proceeding. If this paragraph D is found to be unenforceable, then the entirety of this agreement to arbitrate shall be null and void.

## E. Location

If you live in the United States, arbitration will take place in the county in which you reside. For residents outside the United States, arbitration shall be initiated in the County of San Mateo, State of California, United States of America, and you and EA agree to submit to the personal jurisdiction of that court, in order to compel arbitration, to stay the proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

## F. Recovery

If the arbitrator rules in your favor on the merits of any claim you bring against EA and issues you an award that is greater in monetary value than EA's last written settlement offer made before EA makes its final written submissions to the arbitrator, then EA will:

1. Pay you 150% of your arbitration award, up to $5,000 USD over and above your arbitration award; and

2. Reimburse the arbitration fees that you paid to the AAA.

## G. Changes to this Arbitration Agreement

EA will not enforce material changes to this agreement to arbitrate, unless you expressly agree to the changes.

## H. Severability

If any clause within this Section 15 (other than the Class Action Waiver clause in paragraph D above) is found to be unenforceable because it would preclude a particular claim or remedy (such as public injunctive relief), that claim or remedy (and only that claim or remedy) must be severed from arbitration and may be brought in court, while any remaining claims or remedies will be resolved through arbitration. If any clause within this Section 15 (other than the Class Action Waiver clause set forth in paragraph D above) is found to be unenforceable for any other reason, that clause will be severed from this Section 15 and the remainder of this Section 15 will remain in full force and effect.

# 16. Supplemental Terms for PlayStation®

ⓘ   Additional terms apply to PlayStation™Store purchases.

### A. For Purchases in PlayStation™Store in North America

Purchase and use of items are subject to the Network Terms of Service and User Agreement. This online service has been sublicensed to you by Sony Interactive Entertainment America.

### B. For Purchases in PlayStation™Store in Europe

Any content purchased in an in-game store will be purchased from Sony Interactive Entertainment Network Europe Limited ("SIENE") and be subject to PlayStation™Network Terms of Service and User Agreement which is available on the PlayStation™Store. Please check usage rights for each purchase as these may differ from item to item. Unless otherwise shown, content available in any in-game store has the same age rating as the game.

**Last Updated: August 25, 2021**

Current Terms of Service/User Agreement

Exhibit E

Pour obtenir la version localisée du Contrat Utilisateur, veuillez sélectionner votre langue :

العربية | Čeština | 简体中文 | 繁體中文 | Dansk | Deutsch | English | Español (España) | Español (México) | Français | Ελληνικά | हिन्दी | Indonesian | Italiano | 日本語 | 한국어 | Magyar | Malay | Nederlands | Norsk | Pilipino | Polski | Português (Brasil) | Português (Portugal) | Română | Русский | Slovenčina | Suomi | Svenska | עברית | ไทย | Tiếng Việt | Türkçe | Українська

# ELECTRONIC ARTS
# USER AGREEMENT

 You agree to these terms when you use our games or any of our services.

Welcome to EA. This Agreement governs your access and use of products, content and services offered by EA and its subsidiaries ("EA"), such as game software and related updates, upgrades and features, and all online and mobile services, platforms, websites, and live events hosted by or associated with EA (collectively "EA Services"). This Agreement is between you and the EA entity listed in Section 13B below.

 If you don't agree, please don't install or use our games or services.

BY USING EA SERVICES, YOU AGREE TO THESE TERMS. IF YOU DO NOT AGREE, DO NOT INSTALL OR USE THE EA SERVICES. FOR RESIDENTS OF CERTAIN COUNTRIES, YOU AGREE TO THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER DESCRIBED IN SECTION 15 TO RESOLVE ANY DISPUTES WITH EA.

# TABLE OF CONTENTS

1. EA Account
2. License
3. Content and Entitlements
4. Availability of EA Services and Updates
5. Your UGC
6. Rules of Conduct
7. Games
8. Termination and Other Sanctions
9. Use of Data
10. Other Software, Utilities and Tools
11. Third Parties
12. Warranties; Limitation of Liability
13. General Terms
14. Changes to this Agreement
15. Dispute Resolutions by Binding Arbitration
16. Supplemental Terms for PlayStation®
17. Supplemental Terms Applicable to Purchases for Mobile Devices

# 1. EA Account

> (i)   You need an EA Account to play most EA games. To create one, you must be at least the <u>minimum age</u> and your parents must read and agree to these terms if you are a minor. EA can suspend or terminate your account if you break this agreement. You may cancel your EA Account or any EA subscriptions at any time.

You need an EA Account to access and use many EA Services, including to play online.

To create an EA Account, you must have a valid email address, and provide truthful and accurate information. You must be eligible to use the EA Service for which you are registering and must be a resident of a country where use of EA Services is permitted.

You must be at least 13 years of age (or the minimum age of your country of residence) to create an EA Account. If your age is between the relevant minimum age and 18 (or the age of majority where you live), you and your parent or guardian must review and agree to this Agreement together. Parents and guardians are responsible for the acts of children under 18 years of age when using EA Services. EA recommends that parents and guardians familiarize themselves with parental controls on devices they provide their child.

You are responsible for the activity on your EA Account. Your EA Account may be suspended or terminated if someone else uses it to engage in activity that violates this Agreement.

You may cancel your EA Account or a subscription to an EA Service at any time by contacting EA's Customer Service Department at help.ea.com. To complete your request, EA may collect fees or costs incurred, if allowed by law, and any amounts owed to third-party vendors or content providers.

## 2. License

> (i)   EA grants you access to our games and services to you for your personal enjoyment.

The EA Services are licensed to you, not sold. EA grants you a personal, limited, non-transferable, revocable and non-exclusive license to use the EA Services to which you have access for your non-commercial use, subject to your compliance with this Agreement. You may not access, copy, modify or distribute any EA Service, Content or Entitlements (as those terms are defined below), unless expressly authorized by EA or permitted by law. You may not reverse engineer or attempt to extract or otherwise use source code or other data from EA Services, unless expressly authorized by EA or permitted by law. EA or its licensors own and reserve all other rights, including all right, title and interest in the EA Services and associated intellectual property rights.

## 3. Content and Entitlements

> (i)   EA provides games, features and content through a series of entitlements. Some entitlements are unlocked using virtual currency that has no value outside of our games.

The EA Services include Content and Entitlements. Content is the software, technology, text, forum posts, chat posts, profiles, widgets, messages, links, emails, music, sound, graphics, pictures, video, code, and all audio visual or other material appearing on or coming from EA Services, as well as the design and appearance of our websites. Content also includes user-generated Content ("UGC"). UGC includes EA Account personas, forum posts, profile content and other Content contributed by users to EA Services. All Content is either owned by EA or its licensors, or is licensed to EA and its licensors pursuant to Section 5 below.

Entitlements are rights that EA licenses to you to access or use the online or off-line elements of EA Services. Examples of Entitlements include access to digital or unlockable Content; additional or enhanced functionality (including multiplayer services); subscriptions; virtual assets; unlock keys or codes, serial codes or online authentication; in-game accomplishments; and virtual points, coins, or currencies.

We refer to these virtual points, coins or currencies as "EA Virtual Currency". When you obtain EA Virtual Currency from us or our authorized partners, you receive a personal, limited, non-assignable, non-exclusive, revocable license to access and select the Entitlements that EA expressly makes available to you.

EA Virtual Currency has no monetary value and has no value outside of our products and services. EA Virtual Currency cannot be sold, traded, transferred, or exchanged for cash; it only may be redeemed for Entitlements available for the EA Service. EA Virtual Currency is non-refundable, and you are not entitled to a refund for any unused EA Virtual Currency. Once you redeem EA Virtual Currency for an Entitlement, that Entitlement is not returnable, exchangeable, or refundable. If you live in Japan, you agree to use any EA Virtual Currency within 180 days from the date of purchase.

You will provide at your own expense the equipment, Internet connection and charges required to access and use EA Services.

## 4. Availability of EA Services and Updates

ⓘ   Our games and services may not always be available or operate on all devices. We also may make updates or changes to our games and services, which might impact your use or game progress.

We do not guarantee that any EA Service, Content or Entitlement will be available at all times, in all locations, or at any given time or that we will continue to offer a particular EA Service, Content or Entitlements for any particular length of time. EA does not guarantee that EA Services can be accessed on all devices, by means of a specific Internet or connection provider, or in all geographic locations.

From time to time, EA may update, change or modify an EA Service, Content or Entitlements, without notice to you. These updates and modifications may be required in order to continue to use EA Services.

EA may need to update, or reset certain parameters to balance game play and usage of EA Services. These updates or "resets" may cause you setbacks within the relevant game world and may affect characters, games, groups or other Entitlements under your control.

EA may also take actions on your EA Account and Entitlements without notice to you to protect you or EA, such as preventing unauthorized access, resetting EA Account passwords, suspending EA Account access, deleting data or removing EA Accounts from EA Services. Your availability to EA Services may also be affected in response to actual or suspected Rules of Conduct violations, as further described in Section 6.

## 5. Your UGC

ⓘ   You allow EA and our players to use anything you upload or create (UGC) for free within our games and services. You are responsible for your UGC, it must be your own content or content you're allowed to use.

You are responsible for your UGC. You may not upload UGC that infringes a third party's intellectual property rights or that violates the law, this Agreement or a third party's right of privacy or right of publicity.

EA may, in its sole discretion, remove, edit or disable UGC for any reason, including if EA reasonably determines that UGC violates this Agreement. EA does not assume any responsibility or liability for UGC, for removing it, or not removing it or other Content. EA does not pre-screen all UGC and does not endorse or approve any UGC available on EA Services.

When you contribute UGC, you grant to EA, its licensors and licensees a non-exclusive, perpetual, transferable, worldwide, sublicensable license to use, host, store, reproduce, modify, create derivative works, publicly perform, publicly display or otherwise transmit and communicate the UGC, or any portion of it, in any manner or form and in any medium or forum, whether now known or later devised, without notice, payment or attribution of any kind to you or any third party. You also grant to all other users who can access and use your UGC on an EA Service the right to use, copy, modify, display, perform, create derivative works from, and otherwise communicate and distribute your UGC on or through the relevant EA Service without further notice, attribution or compensation to you.

# 6. Rules of Conduct

> (i)    We want you to have a good time playing our games. So we expect you, like all players, to respect EA and your fellow players. This means, for example, obey the law, don't cheat, don't be offensive, don't hack our software, don't spam or bot, don't lie to EA or our players. Those are the highlights. Read the full list of what not to do in the Rules of Conduct.

When you access or use an EA Service, you agree that you will not:

- Violate any law, rule or regulation.
- Interfere with or disrupt any EA Service or any server or network used to support or provide an EA Service, including any hacking or cracking into an EA Service.
- Use any software or program that damages, interferes with or disrupts an EA Service or another's computer or property, such as denial of service attacks, spamming, hacking, or uploading computer viruses, worms, Trojan horses, cancelbots, spyware, corrupted files and time bombs.
- Interfere with or disrupt another player's use of an EA Service. This includes disrupting the normal flow of game play, chat or dialogue within an EA Service by, for example, using vulgar or harassing language, being abusive, excessive shouting (all caps), spamming, flooding or hitting the return key repeatedly.
- Harass, threaten, bully, embarrass, spam or do anything else to another player that is unwanted, such as repeatedly sending unwanted messages or making personal attacks or statements about race, sexual orientation, religion, heritage, etc. Hate speech is not tolerated.
- Contribute UGC or organize or participate in any activity, group or guild that is inappropriate, abusive, harassing, profane, threatening, hateful, offensive, vulgar, obscene, sexually explicit, defamatory, infringing, invades another's privacy, or is otherwise reasonably objectionable.
- Publish, post, upload or distribute UGC or content that is illegal or that you don't have permission to freely distribute.
- Publish, post, upload or distribute any content, such as a topic, name, screen name, avatar, persona, or other material or information, that EA (acting reasonably and objectively) determines is inappropriate, abusive, hateful, harassing, profane, defamatory, threatening, obscene, sexually explicit, infringing, privacy-invasive, vulgar, offensive, indecent or unlawful.
- Post a message for any purpose other than personal communication. Prohibited messages include advertising, spam, chain letters, pyramid schemes and other types of solicitation or commercial activities.
- Impersonate another person or falsely imply that you are an EA employee or representative.
- Improperly use in-game support or complaint buttons or make false reports to EA staff.
- Attempt to obtain, or phish for, a password, account information, or other private information from anyone else on EA Services.
- Make use of any payment methods or refund systems to access, purchase or refund EA Services for fraudulent purposes, or without permission of the authorized owner, or otherwise concerning a criminal offence or other unlawful activity.
- Use any robot, spider or other automated device or process to access EA Services for any purpose such as scraping data, abuse EA Services, account creation, or copying material.
- Modify any file or any other part of the EA Service that EA does not specifically authorize you to modify.
- Use or distribute unauthorized software programs or tools (such as "auto", "macro", hack or cheat software), or use exploits, bugs or problems in an EA Service to gain unfair advantage.
- Engage or assist in cheating or other anticompetitive behavior (such as boosting, collusion, and match or matchmaking manipulation).
- Use or distribute counterfeit software or EA Content, including EA Virtual Currency.
- Attempt to use an EA Service on or through any service that is not controlled or authorized by EA, or otherwise intentionally obfuscate your network connection or location or other metadata to gain access to an EA Service, make purchases, or otherwise access an EA Service.
- Sell, buy, trade or otherwise transfer or offer to transfer your EA Account, any personal access to EA Services, or any EA Content associated with your EA Account, including EA Virtual Currency and other Entitlements, either within an EA Service or on a third-party website, or in connection with any out-of-game transaction, unless expressly authorized by EA.

- Use an EA Service in a country in which EA is prohibited from offering such services under applicable export control laws.
- If an EA Service requires you to create a "username" or a "persona" to represent yourself in-game and online, you should not use your real name and may not use a username or persona that is used by someone else or that EA determines is vulgar or offensive or violates someone else's rights.
- Engage in any other activity that significantly disturbs the peaceful, fair and respectful gaming environment of an EA Service.
- Use information about users publicly available in any EA Service (e.g. on a leaderboard) for any purpose unrelated to the Service, including to attempt to identify such users in the real world.
- Promote, encourage or take part in any prohibited activity described above.

> ⓘ  To enforce these rules, we may monitor your activity and remove any UGC. If you don't follow these rules, we may warn you, suspend you, or ban you permanently from playing our games.

If you or someone using your EA Account violates these rules and fails to remedy this violation after a warning, EA may take action against you, including revoking access to certain or all EA Services, Content or Entitlements, or terminating your EA Account as described in Section 8. In case of severe violations, EA may take these actions without issuing a prior warning. Some examples of severe violations include, but are not limited to: promoting, encouraging or engaging in hacking, selling EA accounts or entitlements (including virtual currencies and items) without EA's permission, extreme harassment, or threatening illegal activities. When practical, EA will notify you of the action it will take in response to violations of these rules or breach of this Agreement.

Specific EA Services may post additional rules that apply to your conduct on those services.

If you encounter another user who is violating any of these rules, please report this activity to EA using the "Help" or "Report Abuse" functions in the relevant EA Service, if available, or contact Customer Support at help.ea.com.

EA may, in its discretion, monitor or record online activity or Content on EA Services and may remove any Content from any EA Service at its discretion. Remember that your communications and your UGC in an EA Service are public and will be seen by others.

Your use of EA Services is subject to EA's Privacy and Cookie Policy at privacy.ea.com, which is incorporated by reference into this Agreement.

# 7. Games

> ⓘ  This section applies to our games, in particular PC games, and EA-owned game platforms like the EA app or Origin.

This Section applies to EA's games and game subscriptions ("EA Games"), including EA Games that run on a Personal Computer ("EA PC Games"), and the EA-owned client application and related services that distributes EA PC Games (the "EA app" currently https://www.origin.com/en-us/about).

## A. Technical and Content Protection Measures

> ⓘ  We use specific security software to combat piracy and cheating, and tampering with it can result in losing access to our games.

EA utilizes technical or content protection measures, developed by EA or third-party partners, for EA Services in order to prevent piracy and the unauthorized copying or use of EA Games. Attempting to circumvent, disable or tamper with these measures shall terminate this license.

## B. EA app

> (i)   To play our PC games, you may need to install our PC distribution platform software. We may automatically update the software. We provide instructions so you can uninstall our games and software.

To play EA PC Games, EA may require you to install and use the EA app client application or successor application. An EA Account, your acceptance of this Agreement, and an Internet connection are required for the EA app to authenticate and verify your license to the EA PC Game ("Authenticate" or "Authentication").

To access and use EA Services associated with an EA PC Game, you may first need to register with the serial code enclosed with an EA PC Game. The serial code provided with the EA PC Game will be verified during Authentication. Authentication is limited to one EA Account per serial code, which means the EA PC Game is not transferable. You may only launch and access an EA PC Game on no more than five unique machines in any rolling 24-hour period.

The EA app and EA PC Games may download and install updates, upgrades and additional features. You agree that EA has no obligation to support previous version(s) of the EA app upon the availability of an update, upgrade and/or implementation of additional features. EA may provide you with the option to download, install and use an alpha or beta version of the EA app under these same terms.

Instructions to uninstall the EA app client can be found on EA's help website, help.ea.com.

You may uninstall EA PC Games at any time using the EA app interface and deleting any remaining locally saved files. Punkbuster may remain on your computer after uninstall. To uninstall Punkbuster, run the executable at https://www.evenbalance.com/downloads/pbsvc/pbsvc.exe.

## C. Monitoring and Anti-Cheat Measures

>    EA installs software to detect cheating or hacking. These programs send data on your computer to EA.

EA utilizes technologies to detect and prevent cheating in the use of EA Services, and in particular, EA Games. These technologies may be developed by EA or a third party.

When you launch an online-capable game, these technologies may activate using kernel, admin or user privileges, and monitor your gameplay and device's RAM, processes, communications, and file storage for the purposes of detecting violations of, and enforcing, the Code of Conduct in Section 6, including the use of Unauthorized Third-Party Programs. An Unauthorized Third-Party Program is a third-party program or file (such as a "add-on", "mod", "hack", "trainer", or "cheat") that EA believes (i) enables or facilitates cheating of any type; (ii) allows users to modify or hack the game interface, environment, and/or experience in any way not expressly authorized by EA; or (iii) intercepts, "mines", or otherwise collects information from or through the game.

EA may collect relevant information needed for our investigation and enforcement purposes such as your account information, details related to an Unauthorized Third-Party Program, any EA PC Game files that were modified, and times cheating was detected. We also may terminate your License and your EA Account if we determine you have been cheating.

When you exit an online-capable game, these anti-cheat technologies will be deactivated.

# 8. Termination and Other Sanctions

> (i)   If you break this agreement or the law, EA may suspend or terminate your use of our games and services, without refunds.
>
> If we decide to shut down a game or a service, we will tell you at least 30 days in advance.

This Agreement is effective until terminated by you or EA. EA may terminate your access and use of any EA Services or your EA Account if EA determines that you have violated this Agreement or that there has been otherwise unlawful, improper or fraudulent use of EA Services on your EA Account. When practical, EA will notify you of the termination. You may lose your username and persona as a result of an EA Account termination. If you have more than one EA Account, depending on the type of violation or misuse, EA may terminate all of your EA Accounts and all related Entitlements. If your EA Account is terminated, you will not have access to your EA Account or Entitlements and may be barred from accessing or using any EA Service again. Upon termination, your license under this Agreement also shall terminate.

Instead of termination and prior to any termination, EA may issue you a warning, suspend or alter your access to a particular EA Service or your EA Account, remove or revoke Entitlements at an EA Account or device level, remove or delete any Content which is in violation with this Agreement, or ban your device or machine from accessing specific EA Services. If EA takes any action described in this Section, you will not be entitled to a refund (subject to any statutory refund rights) and no Entitlements will be credited to you or converted to cash or other forms of reimbursement.

EA may terminate any EA Service at any time by giving at least thirty days' notice either via email (if available), within the affected EA Service, or on the service updates page of EA's website (https://www.ea.com/service-updates). After online service termination, no software updates will be applied to our games and we can't guarantee our games will continue to function on newer or updated operating systems or be available for download via application distribution services such as the iOS App Store and the Google Play Store. Any games available via such application distribution services after online service termination may be removed without further notice to you.

If you believe that any action has been taken against your Account or device in error, please contact Customer Support at help.ea.com.

If you terminate this agreement, you agree to cease all use of EA Services.

Sections 5, 8-9, 11-15 of this Agreement survive termination of this Agreement.

# 9. Use of Data

ⓘ   EA collects various information when you play our games (even offline) to operate our business, improve our products and services, enforce our rules and communicate with you. We encourage you to read EA's Privacy and Cookie Policy at privacy.ea.com.

When you use an EA Service, EA may collect and store data from your computer or device, including information about your computer or device, hardware, installed software, and operating system (such as IP Address and device ID), information about your EA Service usage, gameplay and usage statistics, system interactions and peripheral hardware. If you play an EA Service offline, this data will be stored on your device and transmitted to EA when your device connects to the Internet. EA uses this information to operate its business, improve its products and services, provide services to and communicate with you (including for marketing purposes), provide software updates, dynamically serve content and software support, enforce this Agreement, and trouble-shoot bugs or otherwise enhance your experience. If you participate in online services, EA also may collect, use, store, transmit and publicly display statistical data regarding game play (including scores, rankings and accomplishments), or identify content that is created and shared by you with other players.

Your data is collected, used, stored and transmitted by EA Inc. in the United States, in accordance with EA's Privacy and Cookie Policy at privacy.ea.com.

You can manage certain data collection preferences in the Settings tab of the EA PC Game client.

# 10. Other Software, Utilities and Tools

ⓘ   If we update our games, you may need new software to keep playing our games.

EA Services may require or allow you to download software, software updates or patches, or other utilities and tools from EA or its licensors onto your computer, entertainment system or device. These technologies may be different across platforms, and the performance of EA Services may vary depending on your computer and other equipment. You understand that certain updates to these technologies may be required in order to continue use of an EA Services. Some of these updates may contain locked features or content that require you to pay an additional fee to access them. You consent to EA automatically installing any available updates for EA Services. Failure to install available updates may render EA Services, including EA PC Games, unplayable.

## 11. Third Parties

 You are responsible for your use of game servers and services not owned by EA.

Some EA Services may give you the option of playing on servers not owned or controlled by EA. EA does not control those services and is not responsible for your use of the EA Service on or through them. These third-party services may subject you to additional or different terms and restrictions.

EA Services may include hyperlinks to third-party websites. Those sites may collect data or solicit personal information from you. EA does not control those sites and is not responsible for their content or for their collection, use or disclosure of personal information.

## 12. Warranties; Limitation of Liability

 EA does not make any promises about our software, but the local law in your country may include certain warranties. The damages you can recover for legal claims are limited.

IF YOU LIVE IN THE EUROPEAN ECONOMIC AREA (EEA), UNITED KINGDOM OR SWITZERLAND, THE EA SERVICES WILL BE PROVIDED WITH REASONABLE CARE AND SKILL AND NO OTHER PROMISES OR WARRANTIES ABOUT THE EA SERVICES ARE MADE. IF YOU LIVE OUTSIDE THE EEA, UNITED KINGDOM AND SWITZERLAND, EA SERVICES ARE LICENSED AND PROVIDED "AS IS." YOU USE THEM AT YOUR OWN RISK. TO THE FULL EXTENT PERMITTED UNDER APPLICABLE LAW, EA GIVES NO EXPRESS, IMPLIED OR STATUTORY WARRANTIES, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS, AND WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR PRACTICE. EA DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE PRODUCT OR EA SERVICE; THAT THE EA SERVICE WILL MEET YOUR REQUIREMENTS; THAT OPERATION OF THE EA SERVICE WILL BE UNINTERRUPTED OR FREE FROM ERRORS, BUGS, CORRUPTION, LOSS, INTERFERENCE, HACKING OR VIRUSES, OR THAT EA SERVICES WILL INTEROPERATE OR BE COMPATIBLE WITH ANY OTHER SOFTWARE. EA DOES NOT WARRANT OR GUARANTEE ANY THIRD-PARTY PRODUCT OR SERVICE OFFERED VIA THE EA APP STORE. SEE https://help.ea.com/en-us/help/account/electronic-arts-warranty-policy/ FOR MORE INFORMATION ON STATUTORY WARRANTY AND OTHER STATUTORY CONSUMER RIGHTS IN YOUR TERRITORY, AND https://help.ea.com/en-au/help/account/electronic-arts-warranty-policy/ FOR RIGHTS AVAILABLE TO AUSTRALIAN CONSUMERS.

IF YOU LIVE IN THE EEA, UNITED KINGDOM OR SWITZERLAND, EA AND ITS EMPLOYEES, LICENSORS AND BUSINESS PARTNERS WILL NOT BE LIABLE TO YOU FOR ANY LOSSES OR DAMAGES ARISING FROM YOUR ACTIONS OR BREACH OF THIS AGREEMENT, OR WHICH ARISE AS A RESULT OF A THIRD PARTY'S (OR ANY OTHER) ACTS OR OMISSIONS BEYOND OUR CONTROL. IF YOU LIVE OUTSIDE THE EEA, UNITED KINGDOM AND SWITZERLAND, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, EA AND ITS EMPLOYEES, LICENSORS AND BUSINESS PARTNERS SHALL NOT BE LIABLE TO YOU FOR ANY LOSSES THAT WERE NOT CAUSED BY EA'S BREACH OF THIS AGREEMENT, OR INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES. THE TYPES OF EXCLUDED DAMAGES INCLUDE, FOR EXAMPLE, FINANCIAL LOSS (SUCH AS LOSS INCOME OR PROFITS), COST OF SUBSTITUTE GOODS OR SERVICES, BUSINESS INTERRUPTION OR STOPPAGE, LOSS OF DATA, LOSS OF GOODWILL, AND COMPUTER FAILURE OR MALFUNCTION. THIS LIMITATION APPLIES TO ANY CLAIM ARISING OUT OF OR RELATED TO THIS LICENSE OR EA SERVICE, WHETHER BASED IN CONTRACT, TORT, STATUTE, STRICT LIABILITY OR OTHERWISE. IT ALSO APPLIES EVEN IF EA KNEW OR SHOULD HAVE KNOWN ABOUT THE POSSIBILITY OF SUCH DAMAGE. YOU MAY RECOVER ONLY DIRECT DAMAGES IN ANY AMOUNT NO GREATER THAN WHAT YOU ACTUALLY PAID FOR THE APPLICABLE EA SERVICE. EA DOES NOT LIMIT ITS LIABILITY FOR FRAUD, GROSS NEGLIGENCE, WILFUL MISCONDUCT, OR

FOR DEATH OR PERSONAL INJURY. SOME JURISDICTIONS DO NOT ALLOW THE ABOVE EXCLUSIONS AND LIMITATIONS, SO SOME OR ALL OF THEM MAY NOT APPLY TO YOU.

If you purchased a physical copy of an EA Service from a physical retail store in the United States and you do not agree to the terms of this Agreement and have not installed or used the EA Service, you may return it for a refund or exchange within thirty (30) days from the date of purchase to the original place of purchase by following the instructions for return available at https://warrantyinfo.ea.com.

# 13. General Terms

## A. Entire Agreement

 This agreement can be changed only in writing signed by EA.

This Agreement, together with any other EA terms that govern your use of EA Services, constitutes the entire agreement between you and EA. The Agreement may not be amended or modified unless made in writing and signed by EA. The failure of EA to exercise any right under this Agreement shall not constitute a waiver of the right or any other right. If any part of this Agreement is held to be unenforceable, all other parts of this Agreement shall continue in full force and effect.

## B. Governing Law

(i) If you live in the United States, Canada or Japan, this agreement is between you and Electronic Arts Inc. If you live in any other country, this agreement is between you and EA Swiss Sàrl.

**If you live in the EEA, United Kingdom, Switzerland, Brazil, Hong Kong, Mexico or Russia,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of your country of residence govern this Agreement and your use of EA Services; and (iii) you expressly agree that exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the courts of your country of residence.

**If you live in the Republic of Korea,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of Korea, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the courts of Korea.

**If you live in the United States, Canada or Japan,** (i) this Agreement is between you and Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City, CA 94065, USA; (ii) the laws of the State of California, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that for claims and disputes not subject to the arbitration agreement below, exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the federal or state courts that govern San Mateo County, California, and you expressly consent to the exercise of personal jurisdiction of such courts.

**If you in live in any other country,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of the State of California, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that for claims and disputes not subject to the arbitration agreement below, exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the federal or state courts that govern San Mateo County, California, and you expressly consent to the exercise of personal jurisdiction of such courts.

The UN Convention on Contracts for the International Sale of Goods (Vienna, 1980) shall not apply to this Agreement or to any dispute arising out of or relating to this Agreement.

## C. Export

 You must follow all export laws, and you agree you are not a prohibited person under export laws.

You agree to follow U.S. and other export control laws and agree not to transfer an EA Service to a foreign national, or national destination, that is prohibited by such laws. You also acknowledge you are not a person with whom EA is prohibited from doing business under these export control laws.

# 14. Changes to this Agreement

This agreement can be updated by EA at any time. If you do not agree to certain meaningful changes, you may not be able to play our games.

EA may modify this Agreement from time to time, so please review it frequently. For EA players who accepted a previous version of this Agreement, the revisions will become effective 30 days after posting at terms.ea.com. Your continued use of EA Services means you accept the changes. Once you accept a version of the Agreement, we will not enforce future material changes without your express agreement to them. If you are asked to accept material changes to this Agreement and you decline to do so, you may not be able to continue to use the EA Service provided.

# 15. Dispute Resolutions by Binding Arbitration

This section only applies if you live outside of Quebec, Russia, Switzerland, Brazil, Mexico, the member states of the EEA, United Kingdom and the Republic of Korea.

If you have a dispute, you agree to send details in writing to EA, and then arbitrate. You agree that any claim you bring against EA is in your individual capacity, and not as a class member, class representative, or as part of a class action.

**THIS SECTION APPLIES TO ALL CONSUMERS AND PEOPLE WHO ACCEPTED THE TERMS OF THIS AGREEMENT. IT EXCLUDES RESIDENTS OF QUEBEC, RUSSIA, SWITZERLAND, BRAZIL, MEXICO, THE MEMBER STATES OF THE EEA, UNITED KINGDOM AND THE REPUBLIC OF KOREA. BY ACCEPTING THE TERMS OF THIS AGREEMENT, YOU AND EA EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION.**

This Section 15 offers a streamlined way to resolve disputes between us if they arise. Most of your concerns can be resolved quickly and satisfactorily by logging into the EA customer support interface with your Account at help.ea.com. If EA cannot resolve your concern, you and EA agree to be bound by the procedure set forth in this Section to resolve any and all disputes between us.

This Section 15 is an agreement between you and EA, and applies to our respective agents, employees, subsidiaries, predecessors, successors, beneficiaries and assigns. This agreement to arbitrate evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 15 and any arbitration carried out under this Section. This Section 15 shall be interpreted broadly and shall survive termination of this Agreement.

## A. Claims Covered by Arbitration

All disputes, claims or controversies arising out of or relating to this Agreement, any EA Service and its marketing, or the relationship between you and EA, including the validity, enforceability, and scope of this Section 15 ("Disputes"), shall be determined exclusively by binding arbitration. This includes claims that accrued before you entered into this Agreement. The only Disputes not covered by this Section 15 are claims (i) regarding the infringement, protection or validity of your,

EA's or EA's licensors' trade secrets, copyright, trademark or patent rights; (ii) if you reside in Australia, to enforce a statutory consumer right under Australian consumer law; and (iii) brought in small claims court.

## B. Informal Negotiations

You and EA shall first attempt to resolve any Dispute informally for at least 30 days before initiating arbitration. The informal negotiations begin upon receipt of written notice from one party to the other ("Notice of Dispute"). The Notice of Dispute must: (a) include the full name and contact information of the complaining party; (b) describe the nature and basis of the claim or dispute; and (c) set forth the specific relief sought. EA will send its Notice of Dispute to your billing or email address. You will send your Notice of Dispute to: Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City CA 94065, ATTENTION: Legal Department.

## C. Binding Arbitration

If you and EA cannot resolve a Dispute informally, you or EA may elect to have the Dispute finally and exclusively resolved by binding arbitration. Any election to arbitrate by one party shall be final and binding on the other. The arbitration shall be administered by the American Arbitration Association under its Consumer Arbitration Rules ("AAA Consumer Rules"), which are available at www.adr.org or by calling 1-800-778-7879, with the following modifications:

1. Arbitration fees and costs shall be governed by the AAA Consumer Rules. If such costs are determined by the arbitrator to be excessive, or if you send EA a notice to the Notice of Dispute address above indicating that you are unable to pay the administrative fees required to initiate an arbitration, EA will pay all AAA administrative fees.

2. If the Dispute does not exceed $25,000, the arbitration will be conducted solely on the basis of written submissions.

3. The parties may bring any dispositive motion or motions during the course of the proceedings.

4. The arbitrator shall make a decision in writing, which will include the findings and conclusions on which the decision is based. The arbitrator has the authority to issue any relief allowed by applicable law, but the arbitrator shall have no authority to issue any relief on any basis other than an individual basis. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

The arbitrator must follow applicable law, and any award may be challenged if the arbitrator fails to do so. You and EA may litigate in court to compel arbitration, to stay proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

## D. Limitations

**YOU AND EA AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING AS TO ALL DISPUTES.** The arbitrator shall not consolidate another person's claims with your claims, and shall not preside over any type of representative or class proceeding. If this paragraph D is found to be unenforceable, then the entirety of this agreement to arbitrate shall be null and void.

## E. Location

If you live in the United States, arbitration will take place in the county in which you reside. For residents outside the United States, arbitration shall be initiated in the County of San Mateo, State of California, United States of America, and you and EA agree to submit to the personal jurisdiction of that court, in order to compel arbitration, to stay the proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

## F. Recovery

If the arbitrator rules in your favor on the merits of any claim you bring against EA and issues you an award that is greater in monetary value than EA's last written settlement offer made before EA makes its final written submissions to the arbitrator, then EA will:

1. Pay you 150% of your arbitration award, up to $5,000 USD over and above your arbitration award; and

2. Reimburse the arbitration fees that you paid to the AAA.

### G. Changes to this Arbitration Agreement

EA will not enforce material changes to this agreement to arbitrate, unless you expressly agree to the changes.

### H. Severability

If any clause within this Section 15 (other than the Class Action Waiver clause in paragraph D above) is found to be unenforceable because it would preclude a particular claim or remedy (such as public injunctive relief), that claim or remedy (and only that claim or remedy) must be severed from arbitration and may be brought in court, while any remaining claims or remedies will be resolved through arbitration. If any clause within this Section 15 (other than the Class Action Waiver clause set forth in paragraph D above) is found to be unenforceable for any other reason, that clause will be severed from this Section 15 and the remainder of this Section 15 will remain in full force and effect.

## 16. Supplemental Terms for PlayStation®

 Additional terms apply to PlayStation™Store purchases.

#### A. For Purchases in PlayStation™Store in North America

Purchase and use of items are subject to the Network Terms of Service and User Agreement. This online service has been sublicensed to you by Sony Interactive Entertainment America.

#### B. For Purchases in PlayStation™Store in Europe

Any content purchased in an in-game store will be purchased from Sony Interactive Entertainment Network Europe Limited ("SIENE") and be subject to PlayStation™Network Terms of Service and User Agreement which is available on the PlayStation™Store. Please check usage rights for each purchase as these may differ from item to item. Unless otherwise shown, content available in any in-game store has the same age rating as the game.

## 17. Supplemental Terms Applicable to Purchases for Mobile Devices

 Additional terms apply to mobile device purchases.

If you live in the United States, Canada or Japan, the seller of Content and Entitlements purchased from EA for use on a mobile device is Electronic Arts Inc. If you live in any other country, the seller of such Content and Entitlements purchased from EA is EA Swiss Sàrl. Any EA subsidiary identified as the seller of the Content and Entitlements on the mobile app store is acting in its capacity as agent of either Electronic Arts Inc. or EA Swiss Sàrl.

**Last Updated: January 19, 2022**

Current Terms of Service/User Agreement

Exhibit F

Pour obtenir la version localisée du Contrat Utilisateur, veuillez sélectionner votre langue :

العربية | Čeština | 简体中文 | 繁體中文 | Dansk | Deutsch | English | Español (España) | Español (México) | Français | Ελληνικά | हिन्दी | Indonesian | Italiano | 日本語 | 한국어 | Magyar | Malay | Nederlands | Norsk | Pilipino | Polski | Português (Brasil) | Português (Portugal) | Română | Русский | Slovenčina | Suomi | Svenska | **ภาษาไทย** | Tiếng Việt | Türkçe | Українська

# ELECTRONIC ARTS
# USER AGREEMENT

> You agree to these terms when you use our games or any of our services.

Welcome to EA. This Agreement governs your access and use of products, content and services offered by EA and its subsidiaries ("EA"), such as game software and related updates, upgrades and features, and all online and mobile services, platforms, websites, and live events hosted by or associated with EA (collectively "EA Services"). This Agreement is between you and the EA entity listed in Section 13B below.

> If you don't agree, please don't install or use our games or services.

BY USING EA SERVICES, YOU AGREE TO THESE TERMS. IF YOU DO NOT AGREE, DO NOT INSTALL OR USE THE EA SERVICES. FOR RESIDENTS OF CERTAIN COUNTRIES, YOU AGREE TO THE ARBITRATION AGREEMENT AND CLASS ACTION WAIVER DESCRIBED IN SECTION 15 TO RESOLVE ANY DISPUTES WITH EA.

## TABLE OF CONTENTS

1. EA Account
2. License
3. Content and Entitlements
4. Availability of EA Services and Updates
5. Your UGC
6. Rules of Conduct
7. Games
8. Termination and Other Sanctions
9. Use of Data
10. Other Software, Utilities and Tools
11. Third Parties

12. Warranties; Limitation of Liability
13. General Terms
14. Changes to this Agreement
15. Dispute Resolutions by Binding Arbitration
16. Supplemental Terms for PlayStation®
17. Supplemental Terms Applicable to Purchases for Mobile Devices

# 1. EA Account

You need an EA Account to play most EA games. To create one, you must be at least the minimum age and your parents must read and agree to these terms if you are a minor. EA can suspend or terminate your account if you break this agreement. You may cancel your EA Account or any EA subscriptions at any time.

You need an EA Account to access and use many EA Services, including to play online.

To create an EA Account, you must have a valid email address, and provide truthful and accurate information. You must be eligible to use the EA Service for which you are registering and must be a resident of a country where use of EA Services is permitted.

You must be at least 13 years of age (or the minimum age of your country of residence) to create an EA Account. If your age is between the relevant minimum age and 18 (or the age of majority where you live), you and your parent or guardian must review and agree to this Agreement together. Parents and guardians are responsible for the acts of children under 18 years of age when using EA Services. EA recommends that parents and guardians familiarize themselves with parental controls on devices they provide their child.

You are responsible for the activity on your EA Account; it's yours, don't share it. Your EA Account may be suspended or terminated if someone else uses it to engage in activity that violates this Agreement.

You may cancel your EA Account or a subscription to an EA Service at any time by contacting EA's Customer Service Department at help.ea.com. To complete your request, EA may collect fees or costs incurred, if allowed by law, and any amounts owed to third-party vendors or content providers.

# 2. License

EA grants you access to our games and services to you for your personal enjoyment.

The EA Services are licensed to you, not sold. EA grants you a personal, limited, non-transferable (i.e., not for sharing), revocable and non-exclusive license to use the EA Services to which you have access for your non-commercial use, subject to your compliance with this Agreement. You may not access, copy, modify or distribute any EA Service, Content or Entitlements (as those terms are defined below), unless expressly authorized by EA or permitted by law.

You may not reverse engineer or attempt to extract or otherwise use source code or other data from EA Services, unless expressly authorized by EA or permitted by law. EA or its licensors own and reserve all other rights, including all right, title and interest in the EA Services and associated intellectual property rights.

# 3. Content and Entitlements

EA provides games, features and content through a series of entitlements. Some entitlements are unlocked using virtual currency that has no value outside of our games.

The EA Services include Content and Entitlements. Content is the software, technology, text, forum posts, chat posts, profiles, widgets, messages, links, emails, music, sound, graphics, pictures, video, code, and all audio visual or other material appearing on or coming from EA Services, as well as the design and appearance of our websites. Content also includes user-generated Content ("UGC"). UGC includes EA Account personas, forum posts, profile content and other Content contributed by users to EA Services. All Content is either owned by EA or its licensors, or is licensed to EA and its licensors pursuant to Section 5 below.

Entitlements are rights that EA licenses to you to access or use the online or off-line elements of EA Services. Examples of Entitlements include access to digital or unlockable Content; additional or enhanced functionality (including multiplayer services); subscriptions; virtual assets; unlock keys or codes, serial codes or online authentication; in-game accomplishments; and virtual points, coins, or currencies.

We refer to these virtual points, coins or currencies as "EA Virtual Currency". When you obtain EA Virtual Currency from us or our authorized partners, you receive a personal, limited, non-assignable, non-exclusive, revocable license to access and select the Entitlements that EA expressly makes available to you.

EA Virtual Currency has no monetary value and has no value outside of our products and services. EA Virtual Currency cannot be sold, traded, transferred, or exchanged for cash; it only may be redeemed for Entitlements available for the EA Service. EA Virtual Currency is non-refundable, and you are not entitled to a refund for any unused EA Virtual Currency. Once you redeem EA Virtual Currency for an Entitlement, that Entitlement is not returnable, exchangeable, or refundable. If you live in Japan, you agree to use any EA Virtual Currency within 180 days from the date of purchase.

You will provide at your own expense the equipment, Internet connection and charges required to access and use EA Services.

# 4. Availability of EA Services and Updates

Our games and services may not always be available or operate on all devices. We also may make updates or changes to our games and services, which might impact your use or game progress.

We do not guarantee that any EA Service, Content or Entitlement will be available at all times, in all locations, or at any given time or that we will continue to offer a particular EA Service, Content or Entitlements for any particular length of time. EA does not guarantee that EA Services can be accessed on all devices, by means of a specific Internet or

connection provider, or in all geographic locations.

From time to time, EA may update, change or modify an EA Service, Content or Entitlements, without notice to you. These updates and modifications may be required in order to continue to use EA Services.

EA may need to update, or reset certain parameters to balance game play and usage of EA Services. These updates or "resets" may cause you setbacks within the relevant game world and may affect characters, games, groups or other Entitlements under your control.

EA may also take actions on your EA Account and Entitlements without notice to you to protect you or EA, such as preventing unauthorized access, resetting EA Account passwords, suspending EA Account access, deleting data or removing EA Accounts from EA Services. Your availability to EA Services may also be affected in response to actual or suspected Rules of Conduct violations, as further described in Section 6.

# 5. Your UGC

You allow EA and our players to use anything you upload or create (UGC) for free within our games and services. You are responsible for your UGC, it must be your own content or content you're allowed to use.

You are responsible for your UGC. You may not upload UGC that infringes a third party's intellectual property rights or that violates the law, this Agreement or a third party's right of privacy or right of publicity.

EA may, in its sole discretion, remove, edit or disable UGC for any reason, including if EA reasonably determines that UGC violates this Agreement. EA does not assume any responsibility or liability for UGC, for removing it, or not removing it or other Content. EA does not pre-screen all UGC and does not endorse or approve any UGC available on EA Services.

When you contribute UGC, you grant to EA, its licensors and licensees a non-exclusive, perpetual, transferable, worldwide, sublicensable license to use, host, store, reproduce, modify, create derivative works, publicly perform, publicly display or otherwise transmit and communicate the UGC, or any portion of it, in any manner or form and in any medium or forum, whether now known or later devised, without notice, payment or attribution of any kind to you or any third party. You also grant to all other users who can access and use your UGC on an EA Service the right to use, copy, modify, display, perform, create derivative works from, and otherwise communicate and distribute your UGC on or through the relevant EA Service without further notice, attribution or compensation to you.

# 6. Rules of Conduct

We want you to have a good time playing our games. So we expect you, like all players, to respect EA and your fellow players. This means, for example, obey the law, don't cheat, don't be offensive, don't hack our software, don't spam or bot, don't lie to EA or our players. Those are the highlights. Read the full list of what not to do in the Rules of Conduct.

When you access or use an EA Service, you agree that you will not:

- Violate any law, rule or regulation.
- Interfere with or disrupt any EA Service or any server or network used to support or provide an EA Service, including any hacking or cracking into an EA Service.
- Use any software or program that damages, interferes with or disrupts an EA Service or another's computer or property, such as denial of service attacks, spamming, hacking, or uploading computer viruses, worms, Trojan horses, cancelbots, spyware, corrupted files and time bombs.
- Interfere with or disrupt another player's use of an EA Service. This includes disrupting the normal flow of game play, chat or dialogue within an EA Service by, for example, using vulgar or harassing language, being abusive, excessive shouting (all caps), spamming, flooding or hitting the return key repeatedly.
- Harass, threaten, bully, embarrass, spam or do anything else to another player that is unwanted, such as repeatedly sending unwanted messages or making personal attacks or statements about race, sexual orientation, religion, heritage, etc. Hate speech is not tolerated.
- Contribute UGC or organize or participate in any activity, group or guild that is inappropriate, abusive, harassing, profane, threatening, hateful, offensive, vulgar, obscene, sexually explicit, defamatory, infringing, invades another's privacy, or is otherwise reasonably objectionable.
- Publish, post, upload or distribute UGC or content that is illegal or that you don't have permission to freely distribute.
- Publish, post, upload or distribute any content, such as a topic, name, screen name, avatar, persona, or other material or information, that EA (acting reasonably and objectively) determines is inappropriate, abusive, hateful, harassing, profane, defamatory, threatening, obscene, sexually explicit, infringing, privacy-invasive, vulgar, offensive, indecent or unlawful.
- Post a message for any purpose other than personal communication. Prohibited messages include advertising, spam, chain letters, pyramid schemes and other types of solicitation or commercial activities.
- Impersonate another person or falsely imply that you are an EA employee or representative.
- Improperly use in-game support or complaint buttons or make false reports to EA staff.
- Attempt to obtain, or phish for, a password, account information, or other private information from anyone else on EA Services.
- Make use of any payment methods or refund systems to access, purchase or refund EA Services for fraudulent purposes, or without permission of the authorized owner, or otherwise concerning a criminal offence or other unlawful activity.
- Use any robot, spider or other automated device or process to access EA Services for any purpose such as scraping data, abuse EA Services, account creation, or copying material.
- Modify any file or any other part of the EA Service that EA does not specifically authorize you to modify.
- Use or distribute unauthorized software programs or tools (such as "auto", "macro", hack or cheat software), or use exploits, bugs or problems in an EA Service to gain unfair advantage.
- Engage or assist in cheating or other anticompetitive behavior (such as boosting, collusion, and match or matchmaking manipulation).
- Use or distribute counterfeit software or EA Content, including EA Virtual Currency.
- Attempt to use an EA Service on or through any service that is not controlled or authorized by EA, or otherwise intentionally obfuscate your network connection or location or other metadata to gain access to an EA Service, make purchases, or otherwise access an EA Service.
- Sell, buy, share, trade or otherwise transfer or offer to transfer your EA Account, any personal access to EA

Services, or any EA Content associated with your EA Account, including EA Virtual Currency and other Entitlements, either within an EA Service or on a third-party website, or in connection with any out-of-game transaction, unless expressly authorized by EA.

- Use an EA Service in a country in which EA is prohibited from offering such services under applicable export control laws.
- If an EA Service requires you to create a "username" or a "persona" to represent yourself in-game and online, you should not use your real name and may not use a username or persona that is used by someone else or that EA determines is vulgar or offensive or violates someone else's rights.
- Engage in any other activity that significantly disturbs the peaceful, fair and respectful gaming environment of an EA Service.
- Use information about users publicly available in any EA Service (e.g. on a leaderboard) for any purpose unrelated to the Service, including to attempt to identify such users in the real world.
- Promote, encourage or take part in any prohibited activity described above.

To enforce these rules, we may monitor your activity and remove any UGC. If you don't follow these rules, we may warn you, suspend you, ban you permanently or place other restrictions on your EA Account, games, or related services.

If you or someone using your EA Account violates these rules and fails to remedy this violation after a warning, EA may take action against you, including revoking access to certain or all EA Services, Content or Entitlements, or terminating your EA Account as described in Section 8. In case of severe violations, EA may take these actions without issuing a prior warning. Some examples of severe violations include, but are not limited to: promoting, encouraging or engaging in hacking, selling EA accounts or entitlements (including virtual currencies and items) without EA's permission, extreme harassment, or threatening illegal activities. When practical, EA will notify you of the action it will take in response to violations of these rules or breach of this Agreement.

Specific EA Services may post additional rules that apply to your conduct on those services.

If you encounter another user who is violating any of these rules, please report this activity to EA using the "Help" or "Report Abuse" functions in the relevant EA Service, if available, or contact Customer Support at help.ea.com.

EA may, in its discretion, monitor or record online activity or Content on EA Services and may remove any Content from any EA Service at its discretion. Remember that your communications and your UGC in an EA Service are public and will be seen by others.

Your use of EA Services is subject to EA's Privacy and Cookie Policy at privacy.ea.com, which is incorporated by reference into this Agreement.

# 7. Games

This section applies to our games, in particular PC games, and EA-owned game platforms like the EA app or Origin.

This Section applies to EA's games and game subscriptions ("EA Games"), including EA Games that run on a Personal Computer ("EA PC Games"), and the EA-owned client application and related services that distributes EA PC Games (the "EA app" currently https://www.origin.com/en-us/about).

## A. Technical and Content Protection Measures

> We use specific security software to combat piracy and cheating, and tampering with it can result in losing access to our games.

EA utilizes technical or content protection measures, developed by EA or third-party partners, for EA Services in order to prevent piracy and the unauthorized copying or use of EA Games. Attempting to circumvent, disable or tamper with these measures shall terminate this license.

## B. EA app

> To play our PC games, you may need to install our PC distribution platform software. We may automatically update the software. We provide instructions so you can uninstall our games and software.

To play EA PC Games, EA may require you to install and use the EA app client application or successor application. An EA Account, your acceptance of this Agreement, and an Internet connection are required for the EA app to authenticate and verify your license to the EA PC Game ("Authenticate" or "Authentication").

To access and use EA Services associated with an EA PC Game, you may first need to register with the serial code enclosed with an EA PC Game. The serial code provided with the EA PC Game will be verified during Authentication. Authentication is limited to one EA Account per serial code, which means the EA PC Game is not transferable. You may only launch and access an EA PC Game on no more than five unique machines in any rolling 24-hour period.

The EA app and EA PC Games may download and install updates, upgrades and additional features. You agree that EA has no obligation to support previous version(s) of the EA app upon the availability of an update, upgrade and/or implementation of additional features. EA may provide you with the option to download, install and use an alpha or beta version of the EA app under these same terms.

Instructions to uninstall the EA app client can be found on EA's help website, help.ea.com.

You may uninstall EA PC Games at any time using the EA app interface and deleting any remaining locally saved files. Punkbuster may remain on your computer after uninstall. To uninstall Punkbuster, run the executable at https://www.evenbalance.com/downloads/pbsvc/pbsvc.exe.

## C. Monitoring and Anti-Cheat Measures

> EA installs software to detect cheating or hacking. These programs send data on your computer to EA.

EA utilizes technologies to detect and prevent cheating in the use of EA Services, and in particular, EA Games. These technologies may be developed by EA or a third party.

When you launch an online-capable game, these technologies may activate using kernel, admin or user privileges, and monitor your gameplay and device's RAM, processes, communications, and file storage for the purposes of detecting violations of, and enforcing, the Code of Conduct in Section 6, including the use of Unauthorized Third-Party Programs. An Unauthorized Third-Party Program is a third-party program or file (such as a "add-on", "mod", "hack", "trainer", or "cheat") that EA believes (i) enables or facilitates cheating of any type; (ii) allows users to modify or hack the game interface, environment, and/or experience in any way not expressly authorized by EA; or (iii) intercepts, "mines", or otherwise collects information from or through the game.

EA may collect relevant information needed for our investigation and enforcement purposes such as your account information, details related to an Unauthorized Third-Party Program, any EA PC Game files that were modified, and times cheating was detected. We also may terminate your License and your EA Account if we determine you have been cheating.

When you exit an online-capable game, these anti-cheat technologies will be deactivated.

# 8. Termination and Other Sanctions

> If you break this agreement or the law, EA may suspend or terminate your use of our games and services, without refunds.
>
> If we decide to shut down a game or a service, we will tell you at least 30 days in advance.

This Agreement is effective until terminated by you or EA. EA may terminate your access and use of any EA Services or your EA Account if EA determines that you have violated this Agreement or that there has been otherwise unlawful, improper or fraudulent use of EA Services on your EA Account. When practical, EA will notify you of the termination. You may lose your username and persona as a result of an EA Account termination. If you have more than one EA Account, depending on the type of violation or misuse, EA may terminate all of your EA Accounts and all related Entitlements. If your EA Account is terminated, you will not have access to your EA Account or Entitlements and may be barred from accessing or using any EA Service again. Upon termination, your license under this Agreement also shall terminate.

Instead of termination and prior to any termination, EA may issue you a warning, suspend or alter your access to a particular EA Service or your EA Account, remove or revoke Entitlements at an EA Account or device level, remove or delete any Content which is in violation with this Agreement, or ban your device or machine from accessing specific EA Services. If EA takes any action described in this Section, you will not be entitled to a refund (subject to any statutory refund rights) and no Entitlements will be credited to you or converted to cash or other forms of reimbursement.

EA may terminate any EA Service at any time by giving at least thirty days' notice either via email (if available), within the affected EA Service, or on the service updates page of EA's website (https://www.ea.com/service-updates). After online service termination, no software updates will be applied to our games and we can't guarantee our games will continue to function on newer or updated operating systems or be available for download via application distribution

services such as the iOS App Store and the Google Play Store. Any games available via such application distribution services after online service termination may be removed without further notice to you.

If you believe that any action has been taken against your Account or device in error, please contact Customer Support at help.ea.com.

If you terminate this agreement, you agree to cease all use of EA Services.

Sections 5, 8-9, 11-15 of this Agreement survive termination of this Agreement.

# 9. Use of Data

EA collects various information when you play our games (even offline) to operate our business, improve our products and services, enforce our rules and communicate with you. We encourage you to read EA's Privacy and Cookie Policy at privacy.ea.com.

When you use an EA Service, EA may collect and store data from your computer or device, including information about your computer or device, hardware, installed software, and operating system (such as IP Address and device ID), information about your EA Service usage, gameplay and usage statistics, system interactions and peripheral hardware. If you play an EA Service offline, this data will be stored on your device and transmitted to EA when your device connects to the Internet. EA uses this information to operate its business, improve its products and services, provide services to and communicate with you (including for marketing purposes), provide software updates, dynamically serve content and software support, enforce this Agreement, and trouble-shoot bugs or otherwise enhance your experience. If you participate in online services, EA also may collect, use, store, transmit and publicly display statistical data regarding game play (including scores, rankings and accomplishments), or identify content that is created and shared by you with other players.

Your data is collected, used, stored and transmitted by EA Inc. in the United States, in accordance with EA's Privacy and Cookie Policy at privacy.ea.com.

You can manage certain data collection preferences in the Settings tab of the EA PC Game client.

# 10. Other Software, Utilities and Tools

If we update our games, you may need new software to keep playing our games.

EA Services may require or allow you to download software, software updates or patches, or other utilities and tools from EA or its licensors onto your computer, entertainment system or device. These technologies may be different across platforms, and the performance of EA Services may vary depending on your computer and other equipment. You understand that certain updates to these technologies may be required in order to continue use of an EA Services. Some of these updates may contain locked features or content that require you to pay an additional fee to access them. You consent to EA automatically installing any available updates for EA Services. Failure to install available updates may render EA Services, including EA PC Games, unplayable.

# 11. Third Parties

> You are responsible for your use of game servers and services not owned by EA.

Some EA Services may give you the option of playing on servers not owned or controlled by EA. EA does not control those services and is not responsible for your use of the EA Service on or through them. These third-party services may subject you to additional or different terms and restrictions.

EA Services may include hyperlinks to third-party websites. Those sites may collect data or solicit personal information from you. EA does not control those sites and is not responsible for their content or for their collection, use or disclosure of personal information.

# 12. Warranties; Limitation of Liability

> EA does not make any promises about our software, but the local law in your country may include certain warranties. The damages you can recover for legal claims are limited.

IF YOU LIVE IN THE EUROPEAN ECONOMIC AREA (EEA), UNITED KINGDOM OR SWITZERLAND, THE EA SERVICES WILL BE PROVIDED WITH REASONABLE CARE AND SKILL AND NO OTHER PROMISES OR WARRANTIES ABOUT THE EA SERVICES ARE MADE. IF YOU LIVE OUTSIDE THE EEA, UNITED KINGDOM AND SWITZERLAND, EA SERVICES ARE LICENSED AND PROVIDED "AS IS." YOU USE THEM AT YOUR OWN RISK. TO THE FULL EXTENT PERMITTED UNDER APPLICABLE LAW, EA GIVES NO EXPRESS, IMPLIED OR STATUTORY WARRANTIES, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS, AND WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR PRACTICE. EA DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE PRODUCT OR EA SERVICE; THAT THE EA SERVICE WILL MEET YOUR REQUIREMENTS; THAT OPERATION OF THE EA SERVICE WILL BE UNINTERRUPTED OR FREE FROM ERRORS, BUGS, CORRUPTION, LOSS, INTERFERENCE, HACKING OR VIRUSES, OR THAT EA SERVICES WILL INTEROPERATE OR BE COMPATIBLE WITH ANY OTHER SOFTWARE. EA DOES NOT WARRANT OR GUARANTEE ANY THIRD-PARTY PRODUCT OR SERVICE OFFERED VIA THE EA APP STORE. SEE https://help.ea.com/en-us/help/account/electronic-arts-warranty-policy/ FOR MORE INFORMATION ON STATUTORY WARRANTY AND OTHER STATUTORY CONSUMER RIGHTS IN YOUR TERRITORY, AND https://help.ea.com/en-au/help/account/electronic-arts-warranty-policy/ FOR RIGHTS AVAILABLE TO AUSTRALIAN CONSUMERS.

IF YOU LIVE IN THE EEA, UNITED KINGDOM OR SWITZERLAND, EA AND ITS EMPLOYEES, LICENSORS AND BUSINESS PARTNERS WILL NOT BE LIABLE TO YOU FOR ANY LOSSES OR DAMAGES ARISING FROM YOUR ACTIONS OR BREACH OF THIS AGREEMENT, OR WHICH ARISE AS A RESULT OF A THIRD PARTY'S (OR ANY OTHER) ACTS OR OMISSIONS BEYOND OUR CONTROL. IF YOU LIVE OUTSIDE THE EEA, UNITED KINGDOM AND SWITZERLAND, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, EA AND ITS EMPLOYEES, LICENSORS AND BUSINESS PARTNERS SHALL NOT BE LIABLE TO YOU FOR ANY LOSSES THAT WERE NOT CAUSED BY EA'S BREACH OF THIS AGREEMENT, OR INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES. THE TYPES OF EXCLUDED DAMAGES INCLUDE, FOR EXAMPLE, FINANCIAL LOSS (SUCH AS LOSS INCOME OR PROFITS), COST OF SUBSTITUTE GOODS OR SERVICES, BUSINESS

INTERRUPTION OR STOPPAGE, LOSS OF DATA, LOSS OF GOODWILL, AND COMPUTER FAILURE OR MALFUNCTION. THIS LIMITATION APPLIES TO ANY CLAIM ARISING OUT OF OR RELATED TO THIS LICENSE OR EA SERVICE, WHETHER BASED IN CONTRACT, TORT, STATUTE, STRICT LIABILITY OR OTHERWISE. IT ALSO APPLIES EVEN IF EA KNEW OR SHOULD HAVE KNOWN ABOUT THE POSSIBILITY OF SUCH DAMAGE. YOU MAY RECOVER ONLY DIRECT DAMAGES IN ANY AMOUNT NO GREATER THAN WHAT YOU ACTUALLY PAID FOR THE APPLICABLE EA SERVICE. EA DOES NOT LIMIT ITS LIABILITY FOR FRAUD, GROSS NEGLIGENCE, WILFUL MISCONDUCT, OR FOR DEATH OR PERSONAL INJURY. SOME JURISDICTIONS DO NOT ALLOW THE ABOVE EXCLUSIONS AND LIMITATIONS, SO SOME OR ALL OF THEM MAY NOT APPLY TO YOU.

If you purchased a physical copy of an EA Service from a physical retail store in the United States and you do not agree to the terms of this Agreement and have not installed or used the EA Service, you may return it for a refund or exchange within thirty (30) days from the date of purchase to the original place of purchase by following the instructions for return available at https://warrantyinfo.ea.com.

# 13. General Terms

## A. Entire Agreement

> This agreement can be changed only in writing signed by EA.

This Agreement, together with any other EA terms that govern your use of EA Services, constitutes the entire agreement between you and EA. The Agreement may not be amended or modified unless made in writing and signed by EA. The failure of EA to exercise any right under this Agreement shall not constitute a waiver of the right or any other right. If any part of this Agreement is held to be unenforceable, all other parts of this Agreement shall continue in full force and effect.

## B. Governing Law

> If you live in the United States, Canada or Japan, this agreement is between you and Electronic Arts Inc. If you live in any other country, this agreement is between you and EA Swiss Sàrl.

**If you live in the EEA, United Kingdom, Switzerland, Brazil, Hong Kong, Mexico or Russia,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of your country of residence govern this Agreement and your use of EA Services; and (iii) you expressly agree that exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the courts of your country of residence.

**If you live in the Republic of Korea,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of Korea, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the courts of Korea.

**If you live in the United States, Canada or Japan,** (i) this Agreement is between you and Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City, CA 94065, USA; (ii) the laws of the State of California, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that for claims and disputes not subject to the arbitration agreement below, exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the federal or state courts that govern San Mateo County, California, and you expressly consent to the exercise of personal jurisdiction of such courts.

**If you in live in any other country,** (i) this Agreement is between you and EA Swiss Sàrl, a company registered in the Geneva Companies Registry with company registration number: CH-660-2328005-8 and with offices at 8 Place du Molard, 1204 Geneva, Switzerland; (ii) the laws of the State of California, excluding its conflicts-of-law rules, govern this Agreement and your use of EA Services; and (iii) you expressly agree that for claims and disputes not subject to the arbitration agreement below, exclusive jurisdiction for any claim or action arising out of or relating to this Agreement or EA Services shall be the federal or state courts that govern San Mateo County, California, and you expressly consent to the exercise of personal jurisdiction of such courts.

The UN Convention on Contracts for the International Sale of Goods (Vienna, 1980) shall not apply to this Agreement or to any dispute arising out of or relating to this Agreement.

## C. Export

You must follow all export laws, and you agree you are not a prohibited person under export laws.

You agree to follow U.S. and other export control laws and agree not to transfer an EA Service to a foreign national, or national destination, that is prohibited by such laws. You also acknowledge you are not a person with whom EA is prohibited from doing business under these export control laws.

# 14. Changes to this Agreement

This agreement can be updated by EA at any time. If you do not agree to certain meaningful changes, you may not be able to play our games.

EA may modify this Agreement from time to time, so please review it frequently. For EA players who accepted a previous version of this Agreement, the revisions will become effective 30 days after posting at terms.ea.com. Your continued use of EA Services means you accept the changes. Once you accept a version of the Agreement, we will not enforce future material changes without your express agreement to them. If you are asked to accept material changes to this Agreement and you decline to do so, you may not be able to continue to use the EA Service provided.

# 15. Dispute Resolutions by Binding Arbitration

This section only applies if you live outside of Quebec, Russia, Switzerland, Brazil, Mexico, the member states of the EEA, United Kingdom and the Republic of Korea.

If you have a dispute, you agree to send details in writing to EA, and then arbitrate. You agree that any claim you bring against EA is in your individual capacity, and not as a class member, class representative, or as part of a class action.

**THIS SECTION APPLIES TO ALL CONSUMERS AND PEOPLE WHO ACCEPTED THE TERMS OF THIS AGREEMENT. IT EXCLUDES RESIDENTS OF QUEBEC, RUSSIA, SWITZERLAND, BRAZIL, MEXICO, THE MEMBER STATES OF THE EEA, UNITED KINGDOM AND THE REPUBLIC OF KOREA. BY ACCEPTING THE TERMS OF THIS AGREEMENT, YOU AND EA EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION.**

This Section 15 offers a streamlined way to resolve disputes between us if they arise. Most of your concerns can be resolved quickly and satisfactorily by logging into the EA customer support interface with your Account at help.ea.com. If EA cannot resolve your concern, you and EA agree to be bound by the procedure set forth in this Section to resolve any and all disputes between us.

This Section 15 is an agreement between you and EA, and applies to our respective agents, employees, subsidiaries, predecessors, successors, beneficiaries and assigns. This agreement to arbitrate evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 15 and any arbitration carried out under this Section. This Section 15 shall be interpreted broadly and shall survive termination of this Agreement.

## A. Claims Covered by Arbitration

All disputes, claims or controversies arising out of or relating to this Agreement, any EA Service and its marketing, or the relationship between you and EA, including the validity, enforceability, and scope of this Section 15 ("Disputes"), shall be determined exclusively by binding arbitration. This includes claims that accrued before you entered into this Agreement. The only Disputes not covered by this Section 15 are claims (i) regarding the infringement, protection or validity of your, EA's or EA's licensors' trade secrets, copyright, trademark or patent rights; (ii) if you reside in Australia, to enforce a statutory consumer right under Australian consumer law; and (iii) brought in small claims court.

## B. Informal Negotiations

You and EA shall first attempt to resolve any Dispute informally for at least 30 days before initiating arbitration. The informal negotiations begin upon receipt of written notice from one party to the other ("Notice of Dispute"). The Notice of Dispute must: (a) include the full name and contact information of the complaining party; (b) describe the nature and basis of the claim or dispute; and (c) set forth the specific relief sought. EA will send its Notice of Dispute to your billing or email address. You will send your Notice of Dispute to: Electronic Arts Inc., 209 Redwood Shores Parkway, Redwood City CA 94065, ATTENTION: Legal Department.

## C. Binding Arbitration

If you and EA cannot resolve a Dispute informally, you or EA may elect to have the Dispute finally and exclusively resolved by binding arbitration. Any election to arbitrate by one party shall be final and binding on the other. The arbitration shall be administered by the American Arbitration Association under its Consumer Arbitration Rules ("AAA Consumer Rules"), which are available at www.adr.org or by calling 1-800-778-7879, with the following modifications:

1. Arbitration fees and costs shall be governed by the AAA Consumer Rules. If such costs are determined by the arbitrator to be excessive, or if you send EA a notice to the Notice of Dispute address above indicating that you are unable to pay the administrative fees required to initiate an arbitration, EA will pay all AAA administrative fees.

2. If the Dispute does not exceed $25,000, the arbitration will be conducted solely on the basis of written submissions.

3. The parties may bring any dispositive motion or motions during the course of the proceedings.

4. The arbitrator shall make a decision in writing, which will include the findings and conclusions on which the decision is based. The arbitrator has the authority to issue any relief allowed by applicable law, but the arbitrator shall have no authority to issue any relief on any basis other than an individual basis. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

The arbitrator must follow applicable law, and any award may be challenged if the arbitrator fails to do so. You and EA may litigate in court to compel arbitration, to stay proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

## D. Limitations

**YOU AND EA AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING AS TO ALL DISPUTES.** The arbitrator shall not consolidate another person's claims with your claims, and shall not preside over any type of representative or class proceeding. If this paragraph D is found to be unenforceable, then the entirety of this agreement to arbitrate shall be null and void.

## E. Location

If you live in the United States, arbitration will take place in the county in which you reside. For residents outside the United States, arbitration shall be initiated in the County of San Mateo, State of California, United States of America, and you and EA agree to submit to the personal jurisdiction of that court, in order to compel arbitration, to stay the proceeding pending arbitration, or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator.

## F. Recovery

If the arbitrator rules in your favor on the merits of any claim you bring against EA and issues you an award that is greater in monetary value than EA's last written settlement offer made before EA makes its final written submissions to the arbitrator, then EA will:

1. Pay you 150% of your arbitration award, up to $5,000 USD over and above your arbitration award; and

2. Reimburse the arbitration fees that you paid to the AAA.

## G. Changes to this Arbitration Agreement

EA will not enforce material changes to this agreement to arbitrate, unless you expressly agree to the changes.

## H. Severability

If any clause within this Section 15 (other than the Class Action Waiver clause in paragraph D above) is found to be unenforceable because it would preclude a particular claim or remedy (such as public injunctive relief), that claim or remedy (and only that claim or remedy) must be severed from arbitration and may be brought in court, while any remaining claims or remedies will be resolved through arbitration. If any clause within this Section 15 (other than the Class Action Waiver clause set forth in paragraph D above) is found to be unenforceable for any other reason, that clause will be severed from this Section 15 and the remainder of this Section 15 will remain in full force and effect.

# 16. Supplemental Terms for PlayStation®

Additional terms apply to PlayStation™Store purchases.

### A. For Purchases in PlayStation™Store in North America

Purchase and use of items are subject to the Network Terms of Service and User Agreement. This online service has been sublicensed to you by Sony Interactive Entertainment America.

### B. For Purchases in PlayStation™Store in Europe

Any content purchased in an in-game store will be purchased from Sony Interactive Entertainment Network Europe Limited ("SIENE") and be subject to PlayStation™Network Terms of Service and User Agreement which is available on the PlayStation™Store. Please check usage rights for each purchase as these may differ from item to item. Unless otherwise shown, content available in any in-game store has the same age rating as the game.

# 17. Supplemental Terms Applicable to Purchases for Mobile Devices

Additional terms apply to mobile device purchases.

If you live in the United States, Canada or Japan, the seller of Content and Entitlements purchased from EA for use on a mobile device is Electronic Arts Inc. If you live in any other country, the seller of such Content and Entitlements purchased from EA is EA Swiss Sàrl. Any EA subsidiary identified as the seller of the Content and Entitlements on the mobile app store is acting in its capacity as agent of either Electronic Arts Inc. or EA Swiss Sàrl.

**Last Updated: June 30, 2022**

Current Terms of Service/User Agreement

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

CASEY DUNN, Individually and on          )
Behalf of G.D., a Minor; and             )
THOMAS DUNN,                             )
                                         )
        Plaintiffs,                      )
                                         )
    v.                                   )          Case No. 3:23-cv-00224-JM
                                         )
ACTIVISION BLIZZARD, INC.;               )
INFINITY WARD, INC.;                     )
TREYARCH CORP.;                          )
SLEDGEHAMMER GAMES, INC.;                )
MICROSOFT CORPORATION;                   )          Hon. James M. Moody Jr.
EPIC GAMES, INC.;                        )
ELECTRONIC ARTS, INC.;                   )
UBISOFT DIVERTISSEMENTS, INC.            )
d/b/a UBISOFT MONTREAL;                  )
NINTENDO OF AMERICA, INC.;               )
GOOGLE LLC; and                          )
JANE & JOHN DOE I-XX,                    )
                                         )
        Defendants.                      )

RESPONSE IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC.'S
MOTION TO COMPEL ARBITRATION

Plaintiffs Casey Dunn, individually and on behalf of G.D., a minor, and Thomas

Dunn hereby respond and state their opposition to the *Motion to Compel Arbitration* (Dkt.

97) under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, filed by Defendant Electronic

Arts, Inc. ("EA"). The *Motion* should be denied as it presupposes, that this dispute is

within the scope of the arbitration agreement and EA has a valid, enforceable arbitration

agreement with Plaintiffs Casey Dunn and G.D.—it does not. *See* Amended Complaint

(Dkt. 2) ("Am. Compl.") ¶¶ 7, 10, 16, 18-19, 25-30, 32, 235-238, 240, 243, 245, 251-252, 387-



EXHIBIT

C

398, 413-416; *see also* Exhibit 1 – Affidavit of Casey Dunn (Dkt. 125-1) ("EXHIBIT 1"); Exhibit 2 – Affidavit of Thomas Dunn (Dkt. 125-2) ("EXHIBIT 2").[1]  Absent a valid agreement with Casey Dunn, Thomas Dunn, or G.D., the arbitration clause in the User Agreement cannot be enforced against G.D. or Casey Dunn. *See Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 741-742 (8th Cir. 2014). Such is the case here.

Moreover, even if an agreement existed, it would not enforceable because the arbitration clause is unconscionable and, therefore, it would not be valid. *See BHC Pinnacle Pointe Hosp., LLC v. Nelson*, 2020 Ark. 70, at 13, 594 S.W.3d 62, at 71. The Court can decide these issues, over EA's protests, as the delegation clause cannot apply until there is a finding of a valid, enforceable contract. *Holley v. Bitesquad.com LLC*, 416 F.Supp.3d 809, 814 (8th Cir. 2019).

In further support thereof, Plaintiffs state as follows:

## INTRODUCTION[2]

The Dunn family brings this suit due to harm experienced by G.D., including video game addiction (also called internet gaming disorder) and brain damage, as a proximate result of using Defendants' video game products.  Some of those products are designed, developed, manufactured, published, sold, and supplied by EA, i.e., the Battlefield video game.

---

[1] Exhibits 1 and 2 are the sworn affidavits of Casey Dunn and Thomas Dunn, respectfully. These affidavits were attached to Plaintiffs' Response in Opposition to the Activision Defendants' Motion to Compel (Dkt. 125) Because these affidavits are applicable to this Response, and rather that reattach duplicative document, Plaintiffs incorporate and adopt those exhibits by reference pursuant to FED. R. CIV. P. 10(c). For purposes of this Response and consistency, Plaintiffs will refer to them as Exhibit 1 and Exhibit 2 here.
[2] The facts contained herein are based on Amended Complaint (Dkt. 2), unless otherwise noted.

EA intentionally designed its Battlefield video game to utilize addictive mechanisms knowing that the design would cause harm and injure users. Specifically, EA utilizes patented technologies that prey on minors' and young adults' still-developing brains by manipulating the brain's chemical reward systems to deliberately create addictive engagement and compulsive use. At no point did EA warn anyone that its Battlefield video games were designed to cause addiction and would result in harm to its users. Certainly, EA never warned Plaintiffs of these harms.

EA designed Battlefield to be addictive—and then sold and supplied those products to consumers without giving any warning about the risk of addiction and brain damage associated with using those products. EA did this knowing that other video game companies—like Nintendo, Activision, Google, Epic Games, Ubisoft, and Microsoft—were also using the same addictive technologies and artificial intelligence in their product designs because those companies had entered into licensing agreements with Activision and other companies to utilize the same patented technologies. These video game companies profited from employing addictive designs, artificial intelligence, and psychological tactics to enhance user engagement and addict users to their products. These companies also induced users to engage in addictive microtransactions while using their products in combination through revenue splitting agreements. *See* Am. Compl..

As a result of EA's successful efforts to create and distribute an intentionally addictive product without any warning as to its dangerous properties, while actively deceiving the public regarding the safety of their Battlefield video game products, G.D. has been injured and Plaintiffs have been damaged. *See* Am. Compl. Plaintiffs thus bring

3

forth products liability claims for strict liability and negligence, ordinary negligence, outrage, violations of the Arkansas Deceptive Trade Practices Act, deceit, fraud, civil conspiracy, and loss of consortium. *Id.*

To avoid responsibility for their conduct, EA filed a joint motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). *See* Game Developers' Motion to Dismiss (Dkt. 102). EA concurrently filed this Motion (Dkt. 97), asking the court to compel arbitration as to Casey Dunn and G.D.'s claims and to stay the litigation as to Thomas Dunn's claims. Because there is not a valid, enforceable agreement to arbitrate between EA and Casey Dunn or G.D., EA's Motion must be denied.

### STATEMENT OF FACTS[3]

EA, along with EA Digital Illusions CE AB ("DICE"), design, develop, manufacture, publish, distribute, and supply the video game series, Battlefield.[4] Battlefield was first released in 2002 and the series is now comprised of multiple separate games. The series features a particular focus on large maps, teamwork, and combined arms warfare. Generally, the games feature large-scale, online multiplayer battles. The Battlefield series averages thousands of players per day and has sold 88.7 million copies

---

[3] Plaintiffs have responded to EA's Motion to Dismiss (Dkt. 102) and that opposition brief (Dkt. 120) thoroughly explains Plaintiffs' causes of action, legal theories, and factual allegations supporting those claims against EA. Rather than fully restate the same here, Plaintiffs incorporate and adopt by reference the Statement of Facts contained in their opposition brief (Dkt. 121) pursuant to FED. R. CIV. P. 10(c).

[4] On February 21, 2024, Plaintiffs filed a *Notice of Dismissal* for Defendant DICE (Dkt. 68 and 73) based on Battlefield Defendants representations that DICE is wholly owned indirect subsidiary of EA with DICE performing services only for EA and at EA's direction and DICE having no other customer. EA agreed in writing that EA (a) will not assert any defenses, or resist discovery, on any ground related to DICE's dismissal in those cases---that is, EA will respond exactly as it would respond if DICE were still a party, EA will raise the same objections that would apply if DICE were still a party, and (b) EA will not contest liability on any ground related to the distinction between EA and its subsidiary DICE.

across all of its games. The Battlefield Defendants intentionally created and developed the Battlefield series with psychologically addictive features and tactics to ensure players would keep coming back to the game, playing longer, and spending more in in-game purchases within the game. Am. Compl. ¶¶ 48, 50, 344-347.

To play Battlefield, EA requires users to have an EA account and to agree to EA's User Agreement in order to play Battlefield. *See* Nair Decl. (Dkt. 97-2) ¶17. That User Agreement has an arbitration agreement, which EA seeks to enforce against Casey Dunn and G.D. now. In support of EA's position that a valid arbitration agreement exists, it points to "a child's use of adult EA accounts registered to what appears to be their mother's e-mail addresses." EA Brf. at 2. EA claims that G.D.'s actions created a binding agreement with Casey Dunn and G.D..

G.D., currently thirteen-years-old, has used their Nintendo Switch and Xbox Series X to download and play video games, including Fortnite, Call of Duty, Battlefield, and Rainbow Six. G.D. has been diagnosed with Dyslexia and Attention Deficit Hyperactivity Disorder; G.D. is unable to attend school like other children their age, has an individualized education plan, and struggles with comprehension as a result of the gaming addiction caused by Defendants' video game products, including Battlefield. G.D. created their EA account on their own and without parental involvement. Am. Compl. ¶¶ 25-30, 235-240, 245, 409-411; *see also* EXHIBIT 1; EXHIBIT 2. If G.D. entered any agreements in connection with creating that account, G.D. was incapacitated by their age of minority and infirmities (dyslexia, ADHD, video game addiction) when doing so and the Dunns expressly disaffirmed any and all such contracts on G.D.'s behalf. Further, any

5

alleged agreements that G.D. entered into subsequent to filing suit are a result of their video game addiction—e.g., their inability to control their impulsivity and compulsive game play, along with severe emotional and physical withdrawal symptoms when the video games are inaccessible—are invalid due to G.D.'s incapacitation by age and infirmity (addiction) and have been disaffirmed. Am. Compl.¶¶ 413-416.

Again, neither Casey Dunn nor Thomas Dunn set up an account with, or entered into any agreements with, EA. *See* EXHIBIT 1 ¶¶ 4, 8; EXHIBIT 2 ¶¶ 4, 8. Nor did Casey or Thomas Dunn have notice of or any knowledge of the terms or conditions, including the existence of an arbitration clause, in the EA's User Agreement sought to be enforced here.[5] EXHIBIT 1 ¶ 8; EXHIBIT 2 ¶ 8. Finally, Casey and Thomas Dunn were not aware G.D. was using their personal information to create accounts to play video games. EXHIBIT 1 ¶¶ 5-7, 9; EXHIBIT 2 ¶¶ 5-7, 9

### STANDARD OF REVIEW

When a defendant files a motion to compel arbitration and documentation outside the pleadings are attached, a motion to compel arbitration is reviewed under a standard similar to the summary judgment standard. *See, e.g., Holley v. Bitesquad.com LLC,* 416 F.Supp.3d 809, 815 (E.D. Ark. 2019); *Neb. Mach. Co. v. Cargotec Sols., LLC,* 762 F.3d 737, 741-742 (8th Cir. 2014). If a material fact dispute is raised concerning the making of the arbitration agreement, then the court shall proceed summarily to trial on that issue. *See, e.g., Jackson v. Walmart, Inc.,* 15 F.4th 860, 864-865 (8th Cir. 2021); *Holley,* 416 F.Supp.3d at

---

[5] Plaintiffs note that while Thomas Dunn is only able to interact with G.D. while playing video games with them, Am. Compl. ¶ 243, Thomas Dunn has not created a EA account and, in playing with G.D., had no knowledge of EA's User Agreement. *See* EXHIBIT 2 ¶ 8.

815; *Neb. Mach. Co.*, 762 F.3d at 743; 9 U.S.C. § 4. Trial on the fact issue of whether there is a valid agreement to arbitrate exists shall be by jury (if so requested by the party against whom the arbitration agreement is sought to be enforced) or by the court (if no jury trial is requested). *See, e.g., Holley*, 416 F.Supp.3d at 815; *Neb. Mach. Co.*, 762 F.3d at 743; 9 U.S.C. § 4. Discovery may also be ordered if questions of fact remain to be developed on the issues of whether a valid arbitration agreement exists (including defenses to enforcement) and on arbitrability *See Alexander v. Pipeline Prods.*, No. 1:16-cv-00005-KGB, 2017 U.S. Dist. LEXIS 221465, *15-17 (E.D. Ark. Mar. 13, 2017) (citations omitted) (citing, *inter alia, Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764 (3rd Cir. 2013); *Neb. Mach. Co.*, 762 F.3d 737).

In this case, arbitration cannot be compelled. The undisputed factual allegations set forth in the Amended Complaint and the Dunns' sworn affidavits defeat EA's position that a valid arbitration exists. Alternatively, and in the event the Court deems there to be a fact issue on the issue of whether a valid and enforceable agreement exists, Plaintiffs request limited discovery on the issue and a trial by jury.

<u>**ARGUMENT IN OPPOSITION**</u>

Arbitration, although favored by Federal and Arkansas law, is not required to be compelled simply because one party asserts the existence of an arbitration agreement. Rather, the FAA provides that the court being asked to compel arbitration has jurisdiction to consider issues relating to the making and performance of the agreement to arbitrate, which includes the authority to determine whether a contract is enforceable since that is a question relating to whether the parties actually agreed to arbitrate. *See Holley,* 416

7

F.Supp.3d at 816-817 (citing numerous Supreme Court and Eighth Circuit decisions supporting this position); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404 (1967) (explaining that under the FAA, 9 U.S.C. §§ 4 and 2, the court's jurisdiction to decide matters related to the making and performance of the agreement to arbitrate includes judicial challenges traditionally available to other forms of contract). The Court's jurisdiction exists to decide validity and enforceability of an arbitration agreement, even when a User Agreement contains a delegation clause. *See Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019); *Holley*, 416 F. Supp. 3d at 814; *Daniel v. ABM Indus.*, No. 4:21-cv-00269-KGB, 2022 U.S. Dist. LEXIS 61189, *8-9, 2022 WL 993801 (E.D. Ark. Mar. 31, 2022). This is because "[a]rbitration is a matter of contract law, and favored status notwithstanding, parties cannot be compelled to arbitrate unless they have contractually agreed to be bound by arbitration." *Shockley*, 929 F.3d at 1017. "[T]he construction and legal effect of an agreement to arbitrate are to be determined by th[e] court as a matter of law." *Courtyard Gardens Health & Rehab, LLC v. Quarles*, 2013 Ark. 228, at 6, 428 S.W.3d 437, 442 (Ark. 2013).

Courts "are not inclined to find that a party has waived its right to ordinary judicial process without an express and specific agreement." *Case Int'l Co. v. T.L. James & Co.*, 907 F.2d 65, 67 (8th Cir. 1990). Thus, the party seeking to compel arbitration bears the burden of proving that a valid and enforceable agreement exists and, if so, that the particular dispute falls within the terms of the arbitration clause. *Shockley*, 929 F.3d at 1017. In deciding the motion, the court must answer those two threshold questions by applying ordinary state-law principles governing the formation of contracts. *Aneke v.*

8

*Davison Design & Dev.,* 4:20-cv-00270-KGB, 2021 U.S. Dist. LEXIS 34156, *7, 2021 WL 724379 (E.D. Ark. Feb. 24, 2021) (citing *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944 (1995)). Under these principles, an arbitration agreement may be "invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Torres v. Simpatico, Inc.,* 781 F.3d 963, 968 (8th Cir. 2015) (quoting *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996)). If the court finds the parties have a valid, enforceable arbitration agreement that encompasses the dispute, only then can arbitration be ordered. *Robinson v. EOR-ARK, LLC,* 841 F.3d 781, 784 (8th Cir. 2016). This is consistent with the FAA, which provides that a motion to compel arbitration can be granted only once the court hears the parties and is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." *Duncan v. Int'l Mkts. Live, Inc.,* 20 F.4th 400, 402 (8th Cir. 2021) (citing 9 U.S.C. § 4).

Arkansas law applies.[6] The essential elements of a valid and enforceable agreement are (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations. *Asset Acceptance, LLC v. Newby,* 2014 Ark. 280, at

---

[6] EA argues that California law applies after the court finds there is a valid agreement, EA BRF. pp. 10-11 and pp. 10-12, n.3; however, there is not a valid, enforceable arbitration agreement, Compl. ¶¶ 414-416, the court must decide the motion under Arkansas law. *See Northport Health Servs. of Ark., LLC v. Posey,* 930 F.3d 1027, 1030 (8th Cir. 2019) (explaining the forum state's contract law applies when considering a motion to compel arbitration). Further, EA's position "presupposes that [Plaintiffs are] subject to the terms of" the User Agreement, which is improper when the issue before the court is whether an agreement to arbitrate even exists. *Asset Acceptance, LLC v. Newby,* 2014 Ark. 280, at 10, 437 S.W.3d 119, 124-125 (Ark. 2014) (citations omitted); *see also See Holley,* 416 F.Supp.3d at 817 (rejecting the defendant's argument that an arbitrator, not the court, should determine the issue of arbitrability '"puts the cart before the horse, as it presumes the arbitration provision formed part of the contract at issue"') (quoting *Neb. Mach. Co. v. Cargotec Sols., LLC,* 762 F.3d 737, 741 n.2 (8th Cir. 2014)). Accordingly, Arkansas law applies as the forum state and because there is not a valid agreement that would trigger the User Agreement's choice-of-law provision.

5, 437 S.W.3d 119, 122 (Ark. 2014); *see also Aneke*, 2021 U.S. Dist. LEXIS 34156, at \*10. In answering these questions, "[t]he same rules of constructions and interpretation apply to arbitration agreements as apply to agreements in general" and, therefore, courts "are also guided by the legal principle that contractual agreements are construed against the drafter." *Courtyard Rehab & Health Ctr., LLC v. Estate of Tice*, 2022 Ark. App. 327, at 5-6 (Ark. Ct. App. 2022). The proponent of the arbitration agreement bears the burden of proving the existence of each of these essential elements. *Id.* (citing *Colonel Glenn Health & Rehab, LLC v. Aldrich*, 2020 Ark. App. 222, 599 S.W.3d 344 (Ark. Ct. App. 2020).

Further, Arkansas courts apply two legal principles when deciding whether a valid contract was entered into: "(1) a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and *if there is no meeting of the minds, there is no contract* and (2) it is well settled that in order to make a contract *there must be a meeting of the minds as to all terms*, using objective indicators." *Alltel Corp. v. Sumner*, 203 S.W.3d 77 (Ark. 2005) (emphasis added); *see also Williamson v. Sanofi Winthrop Pharm., Inc.*, 60 S.W.3d 428 (Ark. 2001). Without both of these terms, a valid contract does not exist, and any arbitration clause would be invalid.

Arkansas courts emphasis on the "meeting of the minds," or mutual acceptance, with notice and effective communication, is so that it is clear the parties understand what they are agreeing to be bound too. To this avail, Arkansas law provides that:

> To enter a binding agreement, both parties must manifest assent to the particular terms of the contract. For a party to assent to a contract, however, the terms of the contract, including an arbitration agreement, must be effectively communicated. Documents alleged to be incorporated into a contract by reference do not become part of the contract unless the reference

10

is clear and unequivocal and the terms of the incorporated document were
known or easily available to the contracting parties.

*BSi Grp. LLC v. Exbanc Corp.*, 3:23-cv-00127-BSM, 2023 WL 7140512, 2023 U.S. Dist. LEXIS

196700, *3-4 (quoting *Altice USA, Inc. v. Campbell*, 2023 Ark. App. 123, 661 S.W.3d 720, 726

(Ark. Ct. App. 2023); *AT&T Corp. v. Clark Cnty. ex rel. Tucker*, 2018 Ark. App. 207, 547

S.W.3d 697, 702-03 (Ark. Ct. App. 2018)) (cleaned up); *see also Alltel Corp. v. Sumner*, 360

Ark. 573, 576, 203 S.W.3d 77, 80 (2005) (same). In other words, whether an agreement to

arbitrate exists depends on whether there has been mutual agreement, with notice as to

the terms and subsequent assent. *LNH One, LLC v. Gaspar*, 2024 Ark. App. 93, at 6-7;

*Madison Cos., LLC v. Williams*, 2016 Ark. App. 610, at 5, 508 S.W.3d 901, 905; *Asset*

*Acceptance, LLC v. Newby*, 2014 Ark. 280, at 7, 437 S.W.3d 119, 123 (Ark. 2014).

In "deciding whether the parties entered into a valid contract," the court must

keep in mind the following:

> (1) a court cannot make a contract for the parties but can only construe and
> enforce the contract that they have made; and if there is no meeting of the
> minds, there is no contract; and (2) it is well settled that in order to make a
> contract there must be a meeting of the mins as to all terms, using objective
> indicators. **Both parties must manifest assent to the particular terms of the
> contract**. For a party to assent to a contract, the terms of the contract must
> be effectively communicated.

*Asset Acceptance, LLC v. Newby,* 2014 Ark. 280, at 7-8, 437 S.W.3d 119, 123 (Ark. 2014)

(emphasis added, citations omitted); *see also Madison Cos.,* 2016 Ark. App. 610, at 5-6, 508

S.W.3d at 905 (same); *Kelly's Heirs v. McGuire,* 15 Ark. 555, 597 (Ark. 1855) ("The assent,

which is requisite to give validity to a promise, supposes a free, fair, and serious exercise

of the reasoning faculty").

11

Whether a meeting of the minds occurred is judged by objective indicators. *Madison Cos.*, 2016 Ark. App. 610, at 6, 508 S.W.3d at 905. Nevertheless, a party's manifestation of assent to a contract may be proven or disproven by spoken words or by conduct. *See Madison Cos.*, 2016 Ark. App. 610, at 6-8, 508 S.W.3d at 905-906; *Childs v. Adams*, 322 Ark. 424, 433, 909 S.W.2d 641, 645 (1995). Thus, "parties may become bound by the terms of the contract even if they do not sign it" but only "if their assent is otherwise indicated, such as by the acceptance of benefits under the contract or by the acceptance of the other's performance." *Asbury Auto. Grp., Inc., v. McCain*, 2013 Ark. App. 338, at 6. However, if a company relies on its practices and procedures to support the existence of an arbitration agreement, "there must be specific evidence that the company implemented those practices and procedures such that notices to the affected party can be reasonably inferred from the circumstances." *Asset Acceptance*, 2014 Ark. 280, at 8, 437 S.W.3d at 124 (citing *Alltel Corp. v. Sumner*, 360 Ark. 573, 203 S.W.3d 77 (Ark. __)). Regardless, for a party to assent to a contract, "the terms of the contract, including an arbitration agreement, must be effectively communicated." *Erwin-Keith, Inc. v. Stewart*, 2018 Ark. App. 147, at 9, 546 S.W.3d 508, 512 (Ark. Ct. App. 2018).

These principles apply even in instances where defendant seeks to compel arbitration based on alleged electronic or online agreement with the plaintiff. *See, e.g., Madison Cos., LLC v. Williams*, 2016 Ark. App. 610, 508 S.W.3d 901; *Foster v. Walmart, Inc.*, 15 F.4th 860 (8th Cir. 2021); *Holley v. Bitesquad.com LLC*, 416 F.Supp.3d 809 (E.D. Ark. 2019); *Perficient, Inc. v. Palfery*, 4:20-cv-618-MTS, 2022 U.S. Dist. LEXIS 68281, 2022 WL 1102117 (E.D. Mo. Apr. 13, 2022). Such is the case here.

12

In this case, it is undisputed. Casey Dunn never signed the agreement. Exhibit 1. EA had the burden of bringing forth this evidence. It did not. Therefore, it cannot enforce the arbitration agreement against Casey Dunn and G.D.  Nor can EA establish a valid enforceable agreement with G.D. – and therefore there can be no consideration of whether the third-party beneficiary doctrine evens applies (it would not). Accordingly, as discussed below, EA's motion should be denied.

## A. There is not a valid agreement to arbitrate.

EA asks this Court to compel arbitration of G.D. and Casey Dunn's claims, while staying Thomas Dunn's claims due to the absence of a "non-arbitrating" party. EA Brf. p. 21.  Plaintiffs do not disagree that there is not a valid arbitration agreement between EA and Thomas Dunn.  There is also not a valid agreement between EA and Casey Dunn or G.D.. *See* Am. Compl. ¶¶ 26-30, 413-416; EXHIBIT 1. Nevertheless, EA avers that "Plaintiffs' claims fall within the scope of the arbitration agreement" and its "records suggest that Plaintiff Casey Dunn assented to EA's User Agreement, on behalf of herself and for Plaintiff G.D. as a third-party beneficiary. In addition, EA's records suggest that Plaintiff G.D. himself accepted the User Agreement on multiple occasions over the following years, including after the filing of the Amended Complaint." EA Mot. ¶ 2. However, that is not the order in which the Court determines whether it can compel arbitration.  The first, and primary, question is whether a valid agreement exists. *See Shockley*, 929 F.3d at 1017.

It is well settled that whether a valid agreement exists that can be enforced against Plaintiffs is the threshold issue – and nonsignatories cannot be bound to an arbitration

13

agreement unless there is clear evidence of intent to benefit the nonsignatory. *See LNH One, LLC v. Gaspar,* 2024 Ark. App. 93, at 7 (Ark. Ct. App. 2024); *Ashley Operations, LLC v. Morphis,* 2021 Ark. App. 505, at 9, 639 S.W.3d 410, 415-416 (Ark. Ct. App. 2021); *Innifree Health & Rehab v. Jordan,* 2020 Ark. App. 518, at 4-5 (Ark. Ct. App. 2020).

Here, EA seeks to apply the arbitration agreement to G.D. through Casey Dunn's purported assent to the User Agreement and through G.D.'s own actions. Neither is a viable option. First, there is not a valid arbitration agreement between Casey Dunn and EA. EA has not put forth unequivocal proof that she accepted the User Agreement, and Casey Dunn has shown she did not, EXHIBIT 1. *See Madison Cos,* 2016 Ark. App. 610, 508 S.W.3d 901; *Holley,* 416 F.Supp.3d 809; *Foster,* 15 F.4th 860; *Perficient,* 2022 U.S. Dist. LEXIS 6281,. Since there is not a valid agreement with Casey Dunn, then G.D. cannot be a third-party beneficiary to whom the User Agreement applies. *See Innisfree Health & Rehab,* 2020 Ark. App. 518, at 4-5 (citations omitted). EA has the burden of proof on this issue. *See, e.g., Shockley,* 929 F.3d at 1017. It did not meet it. Thus, since there is no proof of a valid agreement to arbitrate, then the analysis stops and the motion to compel arbitration must be denied. *See id.* at 1020 (holding that "[t]he absence of proof of unequivocal acceptance of an agreement to arbitrate renders the provision unenforceable" and "the arbitration provision was not a validly formed contract due to a lack of acceptance"); *Bsi Grp. LLC v. Exbanc Corp.,* 3:23-cv-00127-BSM, 2023 U.S. Dist. LEXIS 196700, *3-5, 2023 WL 7140512 (E.D. Ark. Oct. 11, 2023) (finding that without proof of a valid agreement, arbitration cannot be compelled).

14

Second, G.D. was incompetent to enter an agreement due to their age of minority and infirmities (video game addiction, dyslexia, ADHD). *Watson v. Billings*, 38 Ark. 278, 281 (Ark. 1881). Moreover, any contract G.D. may have entered with EA was voided through disaffirmance – which is G.D.'s absolute right to exercise under Arkansas law. *Davie v. Padgett*, 117 Ark. 544, 548, 176 S.W.3d 333, 334 (Ark. 1915); *Crockett Motor Co. v. Thompson*, 177 Ark. 495, 496-497, 6 S.W.2d 834, 835 (Ark. 1928); *St. Louis, I.M. & S. Railway v. Higgins*, 44 Ark. 293, 297 (Ark. 1884). Accordingly, a valid agreement does not exist between EA and G.D., such that EA's request to compel arbitration must be denied.

**1. G.D., a dyslexic minor, lacked the capacity and competency to manifest assent.**

The first requirement of any contract is that all parties be competent. *Asset*, 2014 Ark. 280, at 5, 437 S.W.3d at 122. Parties must also have a meeting of the minds and demonstrate mutual acceptance of the agreement. *Id.* Those elements are missing here.

Arkansas has long recognized the incapacity of children to knowingly enter contracts. *See, e.g., Davie v. Padgett*, 117 Ark. 544, 548, 176 S.W.3d 333, 334 (Ark. 1915) ("The contract of an infant is not absolutely void, but is only voidable at the instance of the infant himself" and "only the infant can take advantage of that incapacity to contract"); *Watson v. Billings*, 38 Ark. 278, 281 (Ark. 1881) (Minors "cannot, by their own acts, acquire any ability to contract"). It is public policy that all contracts entered into by minors are subject to disaffirmance up until the age of majority, after which those contracts must be ratified by some act of the minor. *See, e.g., Lamb v. Midwest Mut. Ins. Co.*, 296 F. Supp. 131, 133 (W.D. Ark. 1969), aff'd, 421 F.2d 179 (8th Cir. 1970); *Davie*, 117

15

Ark. at  548, 176 S.W.3d at 334; *Bozeman v. Browning*, 31 Ark. 364, 373-374 (Ark. 1876); *accord Sims v. Everhardt*, 102 U.S. 300, 308-310 (1880).

Arkansas contract law also recognizes that parents and guardians have assert the defense of minority and a right to disaffirm any contracts entered into by their children. *See, e.g., Crockett Motor Co. v. Thompson*, 177 Ark. 495, 496-497, 6 S.W.2d 834, 835 (Ark. 1928). "The bringing of suit is an unequivocal act of disaffirmance" of a minor's contract," as the right of a minor to avoid their contract "is a legal right established for the protection of the infant." *St. Louis, I.M. & S. Railway v. Higgins*, 44 Ark. 293, 297 (Ark. 1884).

And finally, Arkansas has long held that "an infant is not estopped by his misrepresentations to avail himself of the right to disaffirm his contracts." *Arkansas Reo Motor Car Co. v. Goodlett*, 163 Ark. 35, 38-39, 258 S.W.975, 976 (Ark. 1924); *see also Watson*, 38 Ark. at 281-282 ("It does not follow, however, that infants, even by their own false representations to those with whom they contract, can denude themselves of the protection thrown around them by the policy of the law" and "infants would lose all protection, if they were bound by their contracts made by improper artifices in the heedlessness of youth, before they had learned the value of character and the just obligation of moral duties."). In sum, Arkansas "is firmly committed to the rule that an infant may disaffirm his contracts, except those made in the course of his necessities, notwithstanding the other parties to the contracts may be unaware of the infant's disabilities." *Arkansas Reo Motor Car*, 163 Ark. at 39, 258 S.W. at 976.

In this case, because G.D. is a minor, G.D. lacked the capacity to contract and any contracts they may have entered can be disaffirmed by G.D. (or their parents) prior to the

16

age of majority. EA's attempts to avoid this well-settled Arkansas law to establish a valid and enforceable arbitration agreement with G.D., a dyslexic child with ADHD, should be rejected.  Further, because of the effect of gaming addiction on G.D.'s brain, which has caused comprehension problems, further weighs against G.D.'s ability to comprehend the terms of the User Agreement and manifest assent. Am. Compl. ¶¶ 216-231, 437, 560.

G.D.'s minority and other disabilities render them incompetent to enter a valid and enforceable agreement. Even if G.D. had the capacity to understand EA's User Agreement, G.D. (and their parents on G.D.'s behalf) have the absolute right to disaffirm any agreements entered prior to the age of majority. *See, e.g., Crockett Motor Co., supra; St. Louis, I.M. & S. Railway, supra.* Moreover, since G.D. was incompetent to enter any agreement *and* any contracts G.D. may have entered have been disaffirmed on G.D.'s behalf, EA cannot rely upon G.D.'s purported acceptance of the User Agreement that could only be accessed by knowingly clicking on a slightly-variable, embedded hyperlink and G.D.'s "continued" use of Battlefield to bind either G.D. or Casey Dunn to the arbitration agreement.

There is no question that G.D. is and has been a minor for all relevant periods surrounding the claims in this matter. *See* Am. Compl. ¶ 26. Defendants do not dispute G.D.'s age at any stage of their pleadings or motions. Because G.D. is a minor, G.D. lacks the capacity to contract, and thus expressly disaffirms any contract they may have made

17

with EA. *See id.* ¶¶ 414.[7] EA attempts to argue that G.D. accepted the User Agreement when setting up their EA Account that G.D. and Casey Dunn are bound by G.D.'s actions. However, because G.D. is at all relevant times an incompetent minor, none of G.D.'s reviewed and purported acceptances of EA's User Agreement are valid, enforceable contracts. As a result, G.D. is not a competent party who could manifest assent to Microsoft's agreements and therefore, cannot be compelled to participate in arbitration proceedings. And regardless, any such contracts have been disaffirmed and are unenforceable.

In sum, the answer to the threshold question of whether a valid agreement exists with G.D. and the answer is "No." Arkansas law requires competent parties, as well as mutual agreement (or "meeting of the minds") involving a notice and effective communication of the terms along with subsequent assent, for a valid agreement to exist. *See, e.g., Asset Acceptance,* 2014 Ark. 280, at 5, 7-8, 437 S.W.3d at 122, 123; *Madison Cos.,* 2016 Ark. App. 610, at 5-6, 508 S.W.3d at 905; *see also Kelly's Heirs v. McGuire*, 15 Ark. 555, 597 (Ark. 1855) ("The assent, which is requisite to give validity to a promise, supposes a free, fair, and serious exercise of the reasoning faculty."). No proof of either exists here. G.D. is a dyslexic minor with ADHD and comprehension issues who has the incapacity to contract and an absolute right to disaffirm any agreements G.D. may have entered.

---

[7] EA cannot argue that G.D.'s alleged agreement to their contract is now valid as G.D. has used their products through the age of majority since G.D. is still a minor. *See* Am. Compl. ¶ 26.

18

There is simply not a valid agreement based on the facts of this case. The Motion should be denied.

### 2. Casey Dunn is not a signatory to the User Agreement, did not create an EA Account, and did not assent to or accept EA's User Agreement at any time.

EA claims that Casey Dunn is bound to the User Agreement because G.D. used her email address to set up an account. But for G.D. to so bind Casey Dunn, they would have to have authority to act on her behalf. No such authority existed here; G.D. did not have Casey Dunn's permission to use her personal information or to enter contracts on her behalf. Moreover, Casey Dunn did not enter an agreement with EA. *See* Exhibit 1. EA's attempt to create an arbitration agreement where there is none but be rejected.

Here, viewing the record in the light most favorable to the Plaintiffs, it is evident no valid and enforceable agreement was ever created because there is no credible evidence that Casey Dunn ever consented to and accepted the terms of EA's User Agreement. And absent proof of acceptance and assent to the terms, there can be no agreement.

To be clear, EA put forth no "proof of unequivocal acceptance of an agreement to arbitrate" or manifestation of assent to the MSA by Casey Dunn—which is fatal to their position she can be bound to the arbitration clause or could bind G.D. to arbitration. *See, e.g., Shockley,* 929 F.3d at 1020; *Madison Cos.,* 2016 Ark. App. 610, at 7-8, 508 S.W.3d 901, 906; *Perficient,* 2022 U.S. Dist. LEXIS 68281, *11-16. Further, Thomas Dunn unequivocally did not enter a User Agreement with EA. EXHIBIT 2 ¶ 4. He did not authorize G.D. to enter

19

a User Agreement with EA on his behalf. *Id.* ¶ 8.  Nor did he benefit from G.D.'s invalid and disaffirmed agreement, *Id.* ¶.

### 3.  The arbitration clause cannot be enforced because it is unconscionable.

Even if EA is correct that a valid arbitration agreement exists (it does not),  the arbitration clause cannot be enforced because it is an unconscionable contract of adhesion. *See* Am. Compl. ¶ 416.

Adhesion contracts are agreements offered on a "take it or leave it" basis and "are not inherently sinister and automatically unenforceable." *Hennesey v. Kohl's Corp.*, 571 F. Supp. 3d 1060, 1072 (E.D. Mo. 2021); *see also Circle v. Chase Bank USA*, 583 F.3d 549, 554 (8th Cir. 2009). That does not mean that such agreements cannot be unconscionable and, therefore, unenforceable. *See BHC Pinnacle Pointe Hosp., LLC v. Nelson,* 2020 Ark. 70, at 13, 594 S.W.3d 62, at 71 (recognizing that even if an arbitration agreement exists, the agreement may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability). EA's arbitration clause falls into the unconscionable and unenforceable category.

The Arkansas Supreme Court has said the following regarding "unconscionability" in the context of contract formation:

> While "unconscionability" is not precisely defined in the law, one of the earliest applications of the doctrine described an unconscionable contract as one that 'no man in his senses and not under delusion would make on the one hand, and … no honest and fair man would accept on the other." James J. White & Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 4-1 (3d ed. 1988) (quoting *Earl of Chesterfield v. Janssen* (1750) 28 Eng. Rep. 82, 100 (K.B.). In essence, to be unconscionable, a contract must oppress one party and actuate the sharp practices of the other.

> In White & Summers, the concept of unconscionability is analyzed in terms of "procedural unconscionability" and "substantive unconscionability." Procedural unconscionability encompasses contracts where there is an absence of meaningful choice on the part of one of the parties together with contract terms that are unreasonably favorable to the other party. *Id.* § 4-3. Substantive unconscionability generally involves excessive price or restriction of remedies. *Id.* §§ 4-4 – 4-6.

*LegalZoom.com, Inc. v. McIllwain,* 2013 Ark. 370, at 6-7, 429 S.W.3d 261, 264.

The arbitration clause at issue here is unconscionable. It requires users to consent to arbitration of harms and damages caused by EA's defective and dangerous video products, without disclosing to those users, their parents, or consumers, generally, that EA's Battlefield video game had been specifically developed and designed to be addictive. EA did not communicate to users, their parents, or consumers, generally, that Battlefield was designed to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that EA uses to develop and design AI technologies and other addictive features for use in the design of Battlefield. EA does not warn the users or the public that that Battlefield is addictive and causes harm, including brain damage, to users (particularly minors and neurodivergent individuals). Instead, EA is exploiting consumers, particularly minors and young adults, through the use of unfair, unconscionable, and deceptive conduct and trade practices to increase their revenue at the expense of users' safety. *See* Am. Compl. ¶¶ 7, 8, 10, 16, 18, 36-44, 59-60, 65, 67-68, 70, 103, 108-113, 149, 151-155, 161-165, 178, 249-252, 297-318, 320, 434(b), 437(b), 477(b), 580(g)(ii), 627. If EA had communicated these things in connection with the arbitration

21

clause, i.e., if it had provided a warning that Battlefield contains addictive properties, is designed to addictive and for use with addictive video games, and is particularly harmful to minors, young adults, and neurodivergent people, "no man in his senses and not under delusions would make" this agreement, and "no honest and fair man would accept" it. *LegalZoom.com,* 2013 Ark. 370, at 6, 429 S.W.3d at 264 (internal quotations and citation omitted).   For instance, if there was an addiction warning on Battlefield, only an incompetent and delusional man would agree to give up their right to a jury trial and arbitrate EA's intentional harms, including claims related to EA's decision to design their video game products to cause video game addiction and be used with video games EA knows to be addictive.

It also cannot be ignored that EA presents its arbitration agreement to minors and neurodivergent individuals like G.D., the very people the game is known to harm because such individuals are more likely to experience the gaming addiction caused by EA's products—and forces them to give up their right *and their parents' right* to seek relief in a court of law—and then expects the minor to understand and abide by the terms of the agreement. No honest and fair person or company would do this. Nor would an honest person present gaming addicts with arbitration agreements they have no choice but to go along with because they cannot control their game play. No honest and fair person would accept an agreement that forces children to give up their rights to litigate claims arising from use of Battlefield based on language they cannot possibly understand. Nor would they retain the right to pursue all remedies available under law for a user's wrongdoing, while limiting the user to resolving disputes with an arbitrator when the

22

company knows that the user is going to be harmed by the product. But this is exactly the type of provision EA seeks to rely upon now to force Plaintiffs into arbitration. The "binding" arbitration agreement is unconscionable. It oppresses users and their parents, like Plaintiffs, while rewarding EA's wrongful conduct and dangerous business practices related to the addictive design of their Battlefield video game series.

**B. This Court has jurisdiction to adjudicate the validity and enforceability of the arbitration agreement.**

EA seeks to have this Court avoid resolving these threshold questions of validity and enforceability by pointing to the "delegation clause" in the arbitration agreement. This position is without merit and '"puts the cart before the horse, as it presumes the arbitration provision formed part of the contract at issue."' *Holley*, 416 F.Supp.3d at 817 (quoting *Neb. Mach. Co.*, 762 F.3d at 741 n.2).

This Court has jurisdiction to decide issues relating to the making and performance of an agreement to arbitrate, and whether an enforceable contract exists is a question that informs whether the parties actually agreed to arbitrate. *See Prima Paint*, 388 U.S. at 403-404; *Holley*, 416 F.Supp.3d at 816-817. Likewise, whether an arbitration agreement may be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability for the court to determine, even where the parties incorporate "a clear and unmistakable expression of the parties' intent to reserve the question of arbitrability for the arbitrator and not the court. *Daniel v. ABM Indus.*, 4:21-cv-00269-KGB, 2022 U.S. Dist. LEXIS 61189, *8-9, 2022 WL 993801 (E.D. Ark. Mar. 31, 2022) (citing *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th

23

Cir. 2014), *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009), *Neb. Mach. Co.*, 762 F.3d

at 740-41 n.2). And similarly, the actual question of whether an arbitration clause itself is

"unconscionable" is a component of "the threshold issue of whether there is a valid

arbitration clause to enforce." *LegalZoom.com*, 2013 Ark. 370, at 7 (citing *Prima Paint*, 388

U.S. 395). As shown above, these elements are lacking here and no valid contract exists;

therefore, the delegation clause cannot be triggered.

**C. A stay of Thomas Dunn's claims pending arbitration is unnecessary.**

There is not a valid agreement to arbitrate in this case. Therefore, EA's request to

stay Thomas Dunn's claims pending arbitration is moot.

CONCLUSION

For the reasons stated herein, EA's arbitration agreement is not enforceable against

Casey Dunn and G.D. EA's motion to compel arbitration and allow these proceedings to

continue to be litigated in front of this Court. Alternatively, and in the event the Court

deems there to be a fact issue on the issue of whether a valid and enforceable agreement

exists, Plaintiffs request limited discovery on the issue and a trial by jury

Respectfully submitted, this 12th day of April, 2024,

Plaintiffs Casey Dunn, individually and on behalf of
G.D., a minor, and Thomas Dunn

By:      Breean Walas
**BULLOCK WARD MASON LLC**
Breean "BW" Walas (AR2006077)
Tina Bullock (admitted *pro hac vice*)
Danielle Ward Mason (admitted *pro hac vice*)
3350 Riverwood Pkwy., Suite 1900
Atlanta, Georgia 30339
(833) 296-5291

24

bwalas@bwmlaw.com
tina@bwmlaw.com
danielle@bwmlaw.com

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**CASEY DUNN, Individually and on
Behalf of G.D., a minor; and
THOMAS DUNN**                                                    **PLAINTIFFS**


**v.**                                  **No. 3:23CV00224 JM**

**ACTIVISION BLIZZARD, INC.;
INFINITY WARD, INC.;
TREYARCH CORP.; SLEDGEHAMMER
GAMES, INC.; MICROSOFT CORPORATION;
EPIC GAMES, INC.; ELECTRONIC ARTS, INC.; UBISOFT
DIVERTISSEMENTS INC. d/b/a UBISOFT MONTREAL;
UBISOFT ENTERTAINMENT; NINTENDO OF AMERICA, INC.;
GOOGLE LLC; and JANE & JOHN DOES I-XX**            **DEFENDANTS**


### ORDER

The Clerk of the Court is directed to stay this case pending arbitration. The motions to

dismiss filed at docket entries 102, 104 and 122 are terminated. The parties may refile the

motions following the completion of arbitration.

IT IS SO ORDERED this 7th day of January, 2025.


_____
James M. Moody Jr.
United States District Judge


**EXHIBIT
D**

# ADDENDUM

**Some internal notes, stamps or typing on the Declaration sheet may appear. The intended use for these is internal only and may not have been a part of the policy received by the insured.**

**Policy fees, inspection fees or taxes, or additional instructional stamps may have appeared on the policy received by the insured but may not appear on this copy.**



EXHIBIT

**E**

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

IL 00 23 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

IL 02 68 01 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **1.**, **2.**, **3.** and **5.** of the **Cancellation** Common Policy Condition are replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

**2. Cancellation Of Policies In Effect**

   **a. 60 Days Or Less**

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **(1)** 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph **A.2.b.** below.

   **(2)** 15 days before the effective date of cancellation if we cancel for any of the reasons included in Paragraph **A.2.b.** below.

   **b. For More Than 60 Days**

   If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed below, provided we mail the first Named Insured written notice at least 15 days before the effective date of cancellation:

   **(1)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(2)** Conviction of a crime arising out of acts increasing the hazard insured against;

**(3)** Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

**(4)** After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

**(5)** Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, which results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

**(6)** Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

 © Insurance Services Office, Inc., 2013

**(7)** A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

**(8)** Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Department of Financial Services, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Department of Financial Services.

**3.** We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7.** If one of the reasons for cancellation in Paragraph **A.2.b.** or **D.2.b.(2)** exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

**C.** The following conditions are added:

**1. Nonrenewal**

If we decide not to renew this policy we will send notice as provided in Paragraph **C.3.** below.

**2. Conditional Renewal**

If we conditionally renew this policy subject to:

**a.** A change of limits;

**b.** A change in type of coverage;

**c.** A reduction of coverage;

**d.** An increased deductible;

**e.** An addition of exclusion; or

**f.** Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph **C.3.** below.

**3. Notices Of Nonrenewal And Conditional Renewal**

**a.** If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

**(1)** The expiration date; or

**(2)** The anniversary date if this is a continuous policy.

**b.** Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

**c.** Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

**d.** If we violate any of the provisions of Paragraph **C.3.a., b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

**(1)** And if notice is provided prior to the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel;

    **(2)** And if the notice is provided on or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

  **e.** If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

    **(1)** Upon expiration of the 60-day period, unless Subparagraph **(2)** below applies; or

    **(2)** Notwithstanding the provisions in Paragraphs **d.(1)** and **d.(2)**, as of the renewal date of the policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the policy.

  **f.** We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

**D.** The following provisions apply when the Commercial Property Coverage Part, the Farm Coverage Part or the Capital Assets Program (Output Policy) Coverage Part is made a part of this policy:

  **1.** Items **D.2.** and **D.3.** apply if this policy meets the following conditions:

    **a.** The policy is issued or issued for delivery in New York State covering property located in this state; and

    **b.** The policy insures:

      **(1)** For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

      **(2)** For loss of or damage to personal property other than farm personal property or business property; or

      **(3)** Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

  **c.** The portion of the annual premium attributable to the property and contingencies described in **1.b.** exceeds the portion applicable to other property and contingencies.

**2.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

  **2. Procedure And Reasons For Cancellation**

    **a.** We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      **(1)** 15 days before the effective date of cancellation if we cancel for nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due; or

      **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

    **b.** But if this policy:

      **(1)** Has been in effect for more than 60 days; or

      **(2)** Is a renewal of a policy we issued;

    we may cancel this policy only for one or more of the following reasons:

      **(1)** Nonpayment of premium, provided however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

      **(2)** Conviction of a crime arising out of acts increasing the risk of loss;

      **(3)** Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

      **(4)** Discovery of willful or reckless acts or omissions increasing the risk of loss;

      **(5)** Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

        **(a)** Issued the policy; or

        **(b)** Last voluntarily renewed the policy;

**(6)** The Superintendent of Financial Services' determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

**(7)** Required pursuant to a determination by the Superintendent of Financial Services that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

**3.** The following are added:

**a. Conditional Continuation**

Instead of cancelling this policy, we may continue it on the condition that:

**(1)** The policy limits be changed; or

**(2)** Any coverage not required by law be eliminated.

If this policy is conditionally continued, we will mail or deliver to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**b. Nonrenewal**

If, as allowed by the laws of New York State, we:

**(1)** Do not renew this policy; or

**(2)** Condition policy renewal upon:

    **(a)** Change of limits; or

    **(b)** Elimination of coverage;

we will mail or deliver written notice of nonrenewal or conditional renewal:

    **(a)** At least 45 days; but

    **(b)** Not more than 60 days;

before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**E.** The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions, the Commercial Property Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

When the property is subject to the Anti-arson Application in accordance with New York Department of Financial Services' Insurance Regulation No. 96, the following provisions are added:

If you fail to return the completed, signed and affirmed anti-arson application to us:

**1.** Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

**2.** Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

The cancellation provisions set forth in **E.1.** and **E.2.** above supersede any contrary provisions in this policy including this endorsement.

If the notice in **E.1.** or **E.2.** above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**F.** The following applies to the Commercial Property Coverage Part, the Farm Coverage Part and the Capital Assets Program (Output Policy) Coverage Part:

Paragraphs **f.** and **g.** of the **Mortgageholders** Condition are replaced by the following:

**f. Cancellation**

**(1)** If we cancel this policy, we will give written notice to the mortgageholder at least:

    **(a)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

    **(b)** 30 days before the effective date of cancellation if we cancel for any other reason.

**(2)** If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

**(a)** The effective date of cancellation of the insured's coverage; or

**(b)** 10 days after we give notice to the mortgageholder.

**g. Nonrenewal**

**(1)** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**(2)** If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

**(a)** The expiration date of the policy; or

**(b)** 10 days after we give notice to the mortgageholder.

**G.** The following provisions apply when the following are made a part of this policy:

Commercial General Liability Coverage Part

Employment-Related Practices Liability Coverage Part

Farm Liability Coverage Form

Liquor Liability Coverage Part

Products/Completed Operations Liability Coverage Part

**1.** The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

**2.** The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

© Insurance Services Office, Inc., 2013

POLICY NUMBER: NGO0001162

IL 09 85 12 20

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)** ███████ |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** |
| Certified Acts - General Liability            ███████ |
| |
| **Additional information, if any, concerning the terrorism premium:** |
| |

| SCHEDULE – PART II |  |
|---|---|
| **Federal share of terrorism losses       80  %** | |
| (Refer to Paragraph **B.** in this endorsement.) | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

## A. Disclosure Of Premium

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

## B. Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

## C. Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

 © Insurance Services Office, Inc., 2020 **IL 09 85 12 20**



N2G Worldwide Insurance Services, LLC



# Commercial
# General Liability



# N2G Worldwide Insurance Services, LLC

With N2G, powered by Nationwide and Generali, you benefit from decades of global underwriting experience, differentiated local capabilities, customized, client-focused coverage solutions, and remarkable customer service.

We are always here to help serve your risk management needs and gladly provide you access to global and local coverage experts, industry-leading risk engineering capabilities and experienced claim professionals.

We thank you for your business and welcome you to the world of N2G.

Kevin M. Strong
Chief Executive Officer
N2G Worldwide Insurance Services, LLC



At N2G, we're here to make filing a claim easy and convenient for you, whenever and wherever you need our services and support. To submit your claim online, visit n2g.com/claims or email claims@n2g.com.



## N2G Worldwide Insurance Services, LLC

At N2G, we offer an exceptionally broad portfolio of products, strong expertise for domestic and foreign exposures, seamless global capabilities and concierge-level service and claim coordination.

## BACKED BY 2 INSURANCE POWERHOUSES



### Nationwide

**Fortune 100 Company**

**A+** AM Best Rating

**6th** largest US domestic specialty commercial lines insurer

**9th** largest commercial insurer

Nationwide has been serving business customers for over 95 years

### Generali Global Corporate & Commercial

More than **1,000** professionals working across 9 main offices

Complete insurance solutions in over **165** countries

More than **1,000** multinational programs

GC&C is part of the Generali Group that serves 69 million customers

N2G partners exclusively with Nationwide and Generali Global Corporate & Commercial to underwrite global commercial accounts.



## Worldwide Solutions

Global Property
General Liability
Workers' Compensation

Commercial Auto
Foreign Casualty Package
Umbrella



Underwritten by: National Casualty Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675 • A Stock Company

# NOTICE:

**THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                                     President

The information contained herein replaces any similar information contained elsewhere in the policy.

**National Casualty Company**
**Scottsdale Indemnity Company**
**Scottsdale Insurance Company**
**Scottsdale Surplus Lines Insurance Company**

## CLAIM REPORTING INFORMATION

Your insurance policy has been placed with a Nationwide® insurance company.

Our commitment to you is to provide fast, fair claim service. Promptly reporting an event that could lead to a claim, as required by your policy, helps us fulfill this commitment to you. Please refer to your policy for this and all other terms and conditions.

To report a claim, you may contact us twenty-four (24) hours a day, seven days a week, by calling 1-800-423-7675, or via our website at https://n2g.com/claims.html or via email at claims@n2g.com.

Thank you for your business and as always, we appreciate the opportunity to serve you.

| **HOW TO REPORT A CLAIM** |
|---|
| Call **1-800-423-7675,** or visit our website at https://n2g.com/claims.html or via email at claims@n2g.com.<br><br>In order to expedite this process, please be prepared to furnish as much of the following information as possible:<br>    •  Your policy number<br>    •  Date, time and location of the loss/accident<br>    •  Details of the loss/accident<br>    •  Name, address and phone number of any involved parties<br>    •  If applicable, name of law enforcement agency or fire department along with the incident number<br>**Please refer to your policy for specific claim reporting requirements.** |



**National Casualty Company**
**Scottsdale Indemnity Company**
**Scottsdale Insurance Company**
**Scottsdale Surplus Lines Insurance Company**

## NOTICE—FRAUD WARNINGS

**FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. (Not applicable in AL, AR, CA, CO, DC, FL, KS, KY, LA, ME, MD, MN, NE, NJ, NY, OH, OK, OR, RI, TN, VA, VT, or WA.)

**NOTICE TO ALABAMA APPLICANTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**NOTICE TO CALIFORNIA APPLICANTS. For your protection California law requires the following to appear on this form:** Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**NOTICE TO COLORADO APPLICANTS:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**WARNING TO DISTRICT OF COLUMBIA APPLICANTS:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**NOTICE TO FLORIDA APPLICANTS:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**NOTICE TO KANSAS APPLICANTS:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.



**NOTICE TO KENTUCKY APPLICANTS:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**NOTICE TO MAINE APPLICANTS:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NOTICE TO MARYLAND APPLICANTS:** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO MINNESOTA APPLICANTS:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**NOTICE TO NEW JERSEY APPLICANTS:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**NOTICE TO OHIO APPLICANTS:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA APPLICANTS:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**FRAUD WARNING (APPLICABLE IN ARKANSAS, LOUISIANA AND RHODE ISLAND):** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**FRAUD WARNING (APPLICABLE IN VERMONT, NEBRASKA AND OREGON):** Any person who intentionally presents a materially false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

**FRAUD WARNING (APPLICABLE IN TENNESSEE, VIRGINIA AND WASHINGTON):** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

**NEW YORK OTHER THAN AUTOMOBILE FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**NEW YORK AUTOMOBILE FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, and any person who, in connection with such application or claim, knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.



## COMMON POLICY DECLARATIONS

| | Underwritten by: National Casualty Company<br>Home Office:<br>One Nationwide Plaza • Columbus, Ohio 43215<br>Administrative Office:<br>18700 North Hayden Road • Scottsdale, Arizona 85255<br>1-800-423-7675 • A Stock Company | **Policy Number** |
|---|---|---|
| NEW<br>Renewal of Number | | NGO0001162 |

**ITEM 1.** NAMED INSURED AND MAILING ADDRESS

Electronic Arts Inc
As Per Named Insured Extension Schedule
145 West 45th Street
New York, NY 10036

AGENT NAME AND ADDRESS

N2G Worldwide Insurance Services, LLC
111 Town Square Place
Suite 340
Jersey City, NJ 07310

Agent No.: 29602        Program No.: None

**ITEM 2.** POLICY PERIOD    From: 10/01/2023    To: 10/01/2024    Term: 366 Days

**12:01 A.M., Standard Time at the mailing address shown in ITEM 1.**

Business Description: Global leader in digital interactive entertainment

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage. This premium may be subject to adjustment.

| Coverage Part(s) | Premium Summary |
|---|---|
| Commercial General Liability Coverage Part | |
| Commercial Property Coverage Part | |
| Commercial Crime And Fidelity Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Professional Liability Coverage Part | |
| Capital Assets Program (Output Policy) Coverage Part | |
| Employment-Related Practices Liability Coverage Part | |
| **Total Policy Premium** | |
| **Policy Total** | |

Form(s) and Endorsement(s) made a part of this policy at time of issue:

**See Schedule of Forms and Endorsements**

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORM(S) AND ENDORSEMENT(S), IF ANY, COMPLETE THE ABOVE-NUMBERED POLICY.

OP-D-1-0520 (01 21)                Page 1 of 2

 Nationwide

**NAMED INSURED EXTENSION SCHEDULE**

```
Electronic Arts Inc
Bingo Acquisition Corporation
Cosmic Pop LLC
Creatif Studios LLC
Crowdstar LLC
EA Entertainment, Inc.
EA Mobile (Canada Holdings) Inc.
Tiburon
Electronic Arts Inc.
Electronic Arts Productions Inc.
Electronic Arts Redwood LLC
Fishing Games LLC
Gems Interactive LLC
Glu Games LLC
Glu Mobile LLC
Glu Newco LLC
GlytchCo Games LLC
Griptonite Games LLC
Playdemic LLC
PopCap Games, LLC
Prairie-Winnetka Holdings, LLC
Respawn Entertainment, LLC
Crocodile Productions
```

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH
THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORM(S)
AND ENDORSEMENT(S), IF ANY, COMPLETE THE ABOVE-NUMBERED POLICY.



# SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER: | EFFECTIVE DATE: |
|---|---|
| NGO0001162 | 10/01/2023 |

**NUMBER**             **TITLE**

### COMMON

| | |
|---|---|
| IL 00 17 (11-98) | Common Policy Conditions |
| IL 00 23 (07-02) | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL 02 68 (01-14) | New York Changes - Cancellation And Nonrenewal |
| IL 09 85 (12-20) | Disclosure Pursuant To Terrorism Risk Insurance Act |

### GENERAL LIABILITY

| | |
|---|---|
| Policy Jacket (06-23) | Policy Jacket |
| UT-COVPG-NY (03-21) | Cover Page |
| NOTX0178CW-N2G (08-21) | Claim Reporting Information |
| NOTX0650CW (03-22) | Notice-Fraud Warnings |
| OP-D-1-0520 (01-21) | Common Policy Declarations |
| CL-SD-1-N2G (01-21) | Commercial General Liability Coverage Part Supplemental Declarations |
| CG 00 01 (04-13) | Commercial General Liability Coverage Form |
| CG 20 01 (04-13) | Primary And Noncontributory - Other Insurance Condition |
| CG 20 11 (04-13) | Additional Insured - Managers Or Lessors Of Premises |
| CG 20 15 (04-13) | Additional Insured - Vendors |
| CG 20 26 (04-13) | Additional Insured - Designated Person Or Organization |
| CG 20 28 (04-13) | Additional Insured - Lessor Of Leased Equipment |
| CG 21 06 (05-14) | Exclusion - Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability - With Limited Bodily Injury Exception |
| CG 21 47 (12-07) | Employment-Related Practices Exclusion |
| CG 21 53 (01-96) | Exclusion - Designated Ongoing Operations |
| CG 21 71 (01-15) | Exclusion Of Other Acts Of Terrorism Committed Outside The United States; Cap on Losses From Certified Acts of Terrorism |
| CG 21 96 (03-05) | Silica Or Silica-Related Dust Exclusion |
| CG 24 26 (04-13) | Amendment Of Insured Contract Definition |
| CG 34 34 (12-19) | Total Pollution Exclusion With A Building Heating, Cooling And Dehumidifying Equipment Exception And A Hostile Fire Exception |
| CG 40 15 (12-19) | Cannabis Exclusion With Hemp Exception |
| GL-601-N2G (03-21) | Magellan General Liability Pak + (N2G Worldwide) |
| GL-666 (06-22) | PFC/PFAS Exclusion |
| UT-131g (03-92) | Asbestos Exclusion |
| UT-3G (03-92) | Amendment to Personal & Advertising Injury Definition |
| CG 04 35 (12-07) | Employee Benefits Liability Coverage |
| GL-685-N2G-NY (11-22) | Employee Benefits Liability - New York |

Underwritten by: National Casualty Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675 • A Stock Company

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

Policy Number: NGO0001162                         Effective Date: 10/01/2023

(12:01 A.M. Standard Time)

Named Insured: Electronic Arts Inc               Agent Number: 29602

| **LIMITS OF INSURANCE** | | |
|---|---|---|
| General Aggregate Limit (other than Products/Completed Operations) | $2,000,000 | |
| Products/Completed Operations Aggregate Limit | $2,000,000 | |
| Personal and Advertising Injury Limit | $2,000,000 | any one person or organization |
| Each Occurrence Limit | $2,000,000 | |
| Damage to Premises Rented to You Limit | $1,000,000 | any one premises |
| Medical Expense Limit | $50,000 | any one person |

**DESCRIPTION OF BUSINESS**

Form of business:

❑ Individual      ❑ Partnership      ❑ Joint Venture      ❑ Limited Liability Company      ❑ Trust

☒ Organization including a corporation (other than Partnership, Joint Venture or Limited Liability Company)

Business Description: Global leader in digital interactive entertainment

Location of all premises you own, rent or occupy:


See Schedule


**CLASSIFICATION AND PREMIUM**

| Classification | Code No. | *Premium Basis | Rate | | Advance Premium | |
|---|---|---|---|---|---|---|
| | | | Pr/Ops | Prod/Comp Ops | Pr/Ops | Prod/Comp Ops |
| | | See Schedule | | | | |

| **AUDIT PERIOD:** | ☒ Non-Auditable | ❑ Annually | ❑ Other | |
|---|---|---|---|---|

| **FORMS AND ENDORSEMENTS (other than applicable forms and endorsements shown elsewhere in the policy)** |
|---|
| Forms and endorsements applying to this Coverage Part and made part of this policy at time of issue: |

*(a) Area, (c) Total Cost, (m) Admission, (p) Payroll, (s) Gross Sales, (u) Units, (o) Other

THIS SUPPLEMENTAL DECLARATIONS AND THE COMMERCIAL LIABILITY DECLARATIONS, TOGETHER
WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS
COMPLETE THE ABOVE-NUMBERED POLICY.

 Nationwide®

| ALL PREMISES YOU OWN, RENT OR OCCUPY | |
|---|---|
| LOC NO. | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 001-001 | 209 Redwood Shores Pkwy<br>San Mateo<br>Redwood City, CA 94065 |



| | CLASSIFICATION AND PREMIUM | | | | | | |
|---|---|---|---|---|---|---|---|
| LOC NO. | CLASSIFICATION | CODE NO. | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
| | | | | Prem/ Ops | Prod/Comp Ops | Prem/ Ops | Prod/Comp Ops |
| 001-001 | Computer Software Mfg - Pre-packaged<br>Products-completed operations are subject to the General Aggregate Limit<br>TERRITORY: 007 | 51942 | | | | | |
| | Computer Software Mfg - Pre-packaged<br>Products-completed operations are subject to the General Aggregate Limit<br>TERRITORY: 007 | 51942 | | | | | |
| | Computer Software Mfg - Pre-packaged<br>Products-completed operations are subject to the General Aggregate Limit<br>TERRITORY: 007 | 51942 | | | | | |
| | Computer Software Mfg - Pre-packaged<br>Products-completed operations are subject to the General Aggregate Limit<br>TERRITORY: 007 | 51942 | | | | | |



| | | | | | CLASSIFICATION AND PREMIUM | | | |
|---|---|---|---|---|---|---|---|---|
| **LOC NO.** | **CLASSIFICATION** | **CODE NO.** | **PREMIUM BASE** | **RATE** | | **ADVANCE PREMIUM** | | |
| | | | | Prem/ Ops | Prod/Comp Ops | Prem/ Ops | Prod/Comp Ops | |
| | Terrorism - Certified Acts | | | | | | | |
| | Additional Insured - Lessor of Leased Equipment - Any person or organization who | 49950 | | | | | | |
| | Additional Insured - Managers or Lessors of Premises - Any person or organizatio | 49950 | | | | | | |
| | Additional Insured - Designated Person or Organization - Any person or organizat | 49950 | | | | | | |
| | Primary and Noncontributory - Other Insurance Condition | 49950 | | | | | | |
| | Employee Benefits Liability | 73444 | | | | | | |


Nationwide

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

 © Insurance Services Office, Inc., 2012

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

 © Insurance Services Office, Inc., 2012

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

 © Insurance Services Office, Inc., 2012 **CG 00 01 04 13**

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

 © Insurance Services Office, Inc., 2012

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

   **a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

     **(1)** On premises you own or rent;

     **(2)** On ways next to premises you own or rent; or

     **(3)** Because of your operations;

     provided that:

       **(a)** The accident takes place in the "coverage territory" and during the policy period;

       **(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

       **(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   **b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

     **(1)** First aid administered at the time of an accident;

     **(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

     **(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

   **a. Any Insured**

     To any insured, except "volunteer workers".

   **b. Hired Person**

     To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   **c. Injury On Normally Occupied Premises**

     To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

     To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

     To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

     Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

     Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   **a.** All expenses we incur.

   **b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   **c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   **e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   **f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

  **a.** Damages under Coverage **A**; and

  **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

  **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

    **(1)** How, when and where the "occurrence" or offense took place;

    **(2)** The names and addresses of any injured persons and witnesses; and

    **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

  **b.** If a claim is made or "suit" is brought against any insured, you must:

    **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

  **c.** You and any other involved insured must:

    **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    **(2)** Authorize us to obtain records and other information;

    **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

    **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

  **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

  **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

  **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

### 5. Premium Audit

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

### 6. Representations

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012

COMMERCIAL GENERAL LIABILITY
CG 20 01 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIMARY AND NONCONTRIBUTORY – OTHER INSURANCE CONDITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The following is added to the **Other Insurance** Condition and supersedes any provision to the contrary:

**Primary And Noncontributory Insurance**

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

**(1)** The additional insured is a Named Insured under such other insurance; and

**(2)** You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

POLICY NUMBER: NGO0001162

**COMMERCIAL GENERAL LIABILITY**
**CG 20 11 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| **Designation Of Premises (Part Leased To You):** |
|---|
| As required by written contract or written agreement |

| **Name Of Person(s) Or Organization(s) (Additional Insured):** |
|---|
| Any person or organization whom you are required to add as an additional insured under written contract, written agreement or written permit currently in effect or becoming effective during the term of the policy and executed prior to the "bodily injury" or "property damage." |

| **Additional Premium:** |
|---|
| Included |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to be a tenant in that premises.

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

POLICY NUMBER: NGO0001162

**COMMERCIAL GENERAL LIABILITY**
**CG 20 15 04 13**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) (Vendor) | Your Products |
|---|---|
| See Schedule | See Schedule |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) (referred to throughout this endorsement as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business.

However:

**1.** The insurance afforded to such vendor only applies to the extent permitted by law; and

**2.** If coverage provided to the vendor is required by a contract or agreement, the insurance afforded to such vendor will not be broader than that which you are required by the contract or agreement to provide for such vendor.

**B.** With respect to the insurance afforded to these vendors, the following additional exclusions apply:

**1.** The insurance afforded the vendor does not apply to:

**a.** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**b.** Any express warranty unauthorized by you;

**c.** Any physical or chemical change in the product made intentionally by the vendor;

**d.** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

© Insurance Services Office, Inc., 2012

**e.** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

**f.** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

**g.** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

**h.** "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

**(1)** The exceptions contained in Sub-paragraphs **d.** or **f.;** or

**(2)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**2.** This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**C.** With respect to the insurance afforded to these vendors, the following is added to **Section III – Limits Of Insurance**:

If coverage provided to the vendor is required by a contract or agreement, the most we will pay on behalf of the vendor is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

    © Insurance Services Office, Inc., 2012    CG 20 15 04 13

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) (Vendor) | Your Product |
|---|---|
| Any person or organization whom you are required to add as an additional insured under written contract, written agreement or written permit currently in effect or becoming effective during the term of the policy and executed prior to the "bodily injury" or "property damage" | As required by written contract or written agreement |

POLICY NUMBER: NGO0001162

**COMMERCIAL GENERAL LIABILITY**
**CG 20 26 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| Any person or organization whom you are required to add as an additional insured under written contract, written agreement or written permit currently in effect or becoming effective during the term of the policy and executed prior to the "bodily injury" or "property damage." |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

1. In the performance of your ongoing operations; or

2. In connection with your premises owned by or rented to you.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

POLICY NUMBER: NGO0001162

**COMMERCIAL GENERAL LIABILITY**
**CG 20 28 04 13**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Name Of Additional Insured Person(s) Or Organization(s):** |
| --- |
| Any person or organization whom you are required to add as an additional insured under written contract, written agreement or written permit currently in effect or becoming effective during the term of the policy and executed prior to the "bodily injury" or "property damage." |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

COMMERCIAL GENERAL LIABILITY
CG 21 06 05 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

POLICY NUMBER:NGO0001162

**COMMERCIAL GENERAL LIABILITY**
**CG 21 53 01 96**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - DESIGNATED ONGOING OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Description of Designated Ongoing Operation(s):**
SPECIAL EVENTS PROMOTED, PRODUCED, SANCTIONED BY, ORGANIZED, OR CONTRACTED BY
ANY NAMED INSURED, SUCH AS: COMPETITIVE GAMING EVENTS, COMPETITIONS OR
EXHIBITIONS; ATHLETIC OR SPORTS CONTESTS OR EXHIBITIONS; AUTO, MOTORCYCLE OR BOAT
RACES OR EVENTS, BIKING EVENTS; EVENTS WITH INFLATABLE AMUSEMENT DEVICES OF ANY
KIND, SUCH AS MOONWALKS AND SLIDERS; CONCERTS OR ANY KIND, SUCH AS ROCK, RAP, HIP
HOP, JAM, TECHNO, OR PUNK; OR BUNGEE JUMPING EVENTS.

**Specified Location (If Applicable):**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph **2.,** Exclusions of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section **I -** Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such operations are conducted by you or on your behalf. If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described ongoing operations conducted at that "location".

For the purpose of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**COMMERCIAL GENERAL LIABILITY**
**CG 21 71 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

© Insurance Services Office, Inc., 2015

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

   b. The act resulted in damage:

      (1) Within the United States (including its territories and possessions and Puerto Rico); or

      (2) Outside of the United States in the case of:

         (a) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

         (b) The premises of any United States mission; and

   c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

   Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

D. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

 © Insurance Services Office, Inc., 2015 **CG 21 71 01 15**

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

    **2. Exclusions**

        This insurance does not apply to:

        **Silica Or Silica-Related Dust**

        **a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

        **b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

        **c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

    **2. Exclusions**

        This insurance does not apply to:

        **Silica Or Silica-Related Dust**

        **a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

        **b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

    **1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

    **2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

 © ISO Properties, Inc., 2004

COMMERCIAL GENERAL LIABILITY
CG 24 26 04 13

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

© Insurance Services Office, Inc., 2012

COMMERCIAL GENERAL LIABILITY
CG 34 34 12 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART

Exclusion **j.** under Paragraph **2. Exclusions** of **Section I – Coverages – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**j. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

(a) "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

(b) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(i) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(ii) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

COMMERCIAL GENERAL LIABILITY
CG 40 15 12 19

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CANNABIS EXCLUSION WITH HEMP EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The following exclusion is added:

This insurance does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of:

**a.** The design, cultivation, manufacture, storage, processing, packaging, handling, testing, distribution, sale, serving, furnishing, possession or disposal of "cannabis"; or

**b.** The actual, alleged, threatened or suspected inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of "cannabis"; or

**2.** "Property damage" to "cannabis".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph **A.1.** or **A.2.** above.

However, Paragraph **A.1.b.** does not apply to "bodily injury" or "property damage" arising out of the actual, alleged, threatened or suspected inhalation, ingestion, absorption or consumption of, or contact with, "cannabis" by:

**(1)** An insured; or

**(2)** Any other person for whom you are legally responsible

but only if the "bodily injury" or "property damage" does not arise out of your selling, serving or furnishing of "cannabis" to any person described above.

**B.** The exclusion in Paragraph **A.** does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of goods or products containing or derived from hemp, including, but not limited to:

**a.** Seeds;

**b.** Food;

**c.** Clothing;

**d.** Lotions, oils or extracts;

**e.** Building Materials; or

**f.** Paper.

**2.** "Property damage" to goods or products described in Paragraph **B.1.** above.

However, Paragraphs **B.1.** and **B.2.** above do not apply to the extent any such goods or products are prohibited under an applicable state or local statute, regulation or ordinance in the state wherein:

**(1)** The "bodily injury" or "property damage" occurs;

**(2)** The "occurrence" which caused the "bodily injury" or "property damage" takes place; or

**(3)** The offense which caused the "personal and advertising injury" was committed;

**3.** "Personal and advertising injury" arising out of the following offenses:

**a.** False arrest, detention or imprisonment; or

**b.** The wrongful eviction from, wrongful entry into, or invasion of the right or private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

**C.** The following definition is added to the **Definitions** section:

"Cannabis":

**1.** Means:

Any good or product that consists of or contains any amount of Tetrahydrocannabinol (THC) or any other cannabinoid, regardless of whether any such THC or cannabinoid is natural or synthetic.

**2.** Paragraph **C.1.** above includes, but is not limited to, any of the following containing such THC or cannabinoid:

**a.** Any plant of the genus Cannabis L., or any part thereof, such as seeds, stems, flowers, stalks and roots; or

**b.** Any compound, byproduct, extract, derivative, mixture or combination, such as:

**(1)** Resin, oil or wax;

**(2)** Hash or hemp; or

**(3)** Infused liquid or edible cannabis;

whether or not derived from any plant or part of any plant set forth in Paragraph **C.2.a.**

 © Insurance Services Office, Inc., 2018 **CG 40 15 12 19**

Underwritten by National Casualty Company

# ENDORSEMENT
## NO. _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MAGELLAN GENERAL LIABILITY PAK +
## (N2G WORLDWIDE)

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

It is understood and agreed that the following extensions only apply in the event that no other specific coverage for the indicated loss exposure is provided under this policy. If such specific coverage applies, the terms, conditions, and limits of that coverage are the sole and exclusive coverage applicable under this policy, unless otherwise noted on this endorsement. The following is a summary of the Limits of Insurance and additional coverages provided by this endorsement. For complete details on specific coverages, consult the policy contract wording.

| Coverage Applicable | Limit of Insurance | Page # |
|---|---|---|
| Additional Insured—Vendors | Included | 6 |
| Additional Insured—Grantor of Franchise or License | Included | 7 |
| Additional Insured—Managers or Lessors of Premises | Included | 7 |
| Additional Insured—Co-owner of Insured Premises | Included | 7 |
| Additional Insured—Controlling Interest | Included | 7 |
| Additional Insured—Lessor of Leased Equipment | Included | 7 |
| Additional Insured—Mortgagee, Assignee or Received | Included | 8 |
| Additional Insured—Owners or Other Interest From Whom Land has been leased. | Included | 8 |
| Additional Insured—State or Political Subdivision | Included | 8 |
| Blanket Waiver of Subrogation | Included | 9 |
| Blanket Primary and Non-contributory | Included | 9 |
| Broadened definition of Bodily Injury | Included | 9 |
| Broad Form Named Insured | Included | 5 |
| Damage to Premises Rented to you | $1,000,000 any one premises | 4 |
| Delivery Errors and Omissions | $25,000 any one "occurrence" $50,000 Annual Aggregate $500 Deductible | 2 |
| Duties in the event of Occurrence, Claim or Suit | Included | 8 |
| Incidental Medical Malpractice | Included | 5 |
| Liberalization | Included | 9 |

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



| Coverage Applicable | Limit of Insurance | Page # |
|---|---|---|
| Newly Formed or Acquired Organizations | Included | 5 |
| Non-owned Watercraft Extension | Included | 4 |
| Personal and Advertising Injury | Included | 9 |
| Property of others in the Care, Custody or Control of the insured (Expanded Property Damage) | $25,000 any one "occurrence" $500 deductible | 4 |
| Supplementary Payments—Bail Bonds | $2,500 | 5 |
| Supplementary Payments—Loss of Earnings | $500 per day | 5 |
| Unintentional Failure to Disclose a Hazard | Included | 9 |

## A. DELIVERY ERRORS AND OMISSIONS

The following is added to **SECTION I—COVERAGES:**

**DELIVERY ERRORS AND OMISSIONS**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of a failure to deliver or a misdelivery of items you hold for sale by you or any of your "employees" or by a concessionaire trading under your name.

**b.** We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of such "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any claim and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in paragraph **3. Limits of Insurance and Deductible** below; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**c.** This insurance applies only to errors in deliveries that take place or omissions of such deliveries that should have taken place in the "coverage territory" and during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a.** Intentional error or intentional misdelivery or intentional failure to deliver.

**b.** "Bodily injury," "property damage" or "personal and advertising injury."

**c.** Discrimination based on a customer's race, color, national origin, religion, gender, marital status, age, sexual orientation or preference, physical or mental condition or residence location.

**d.** Fines or penalties imposed on any insured.

**e.** Liability for damages which the insured is obligated to pay by reason of the assumption of liability in a contract or agreement, whether or not such contract or agreement is an "insured

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

 Nationwide

contract." This exclusion does not apply to liability for damages that the insured would have had in the absence of the contract or agreement.

    **f.**  Non-pecuniary relief including but not limited to injunctive and other equitable relief.

**3. Limits of Insurance and Deductible**

For the purposes of this Delivery Errors and Omissions coverage, the following is added to **SECTION III—LIMITS OF INSURANCE:**

    **a.**  The most we will pay under this Delivery Errors and Omissions coverage for the sum of all damages arising out of any one "occurrence" is $25,000 subject to a $50,000 Annual Aggregate Limit. Subject to the any one "occurrence" limit set forth in this paragraph, the Annual Aggregate Limit is the most we will pay for the sum of all damages under this Delivery Errors and Omissions coverage. The Limits of Insurance set forth in this paragraph are the most we will pay regardless of the number of insureds, acts, errors or omissions resulting in covered damages, claims made or "suits" brought, or persons or organizations making claims or bringing "suits." For purposes of determining the Limits of Insurance, any loss based upon a series of related errors, omissions and negligent acts constitutes only one "occurrence" which will be deemed to have arisen when the first error, omission or negligent act of that series occurred.

    **b.**  The Limits of Insurance of Delivery Errors and Omissions coverage apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Annual Aggregate and in which event the Annual Aggregate will be increased in proportion to the period of extension.

    **c.**  Our obligation under the Delivery Errors and Omissions coverage to pay damages on your behalf applies only to the amount of damages in excess of the five hundred dollars ($500) deductible as a result of any one "occurrence," regardless of the number of persons or organizations who sustain damages because of that "occurrence." We may pay any part or all of this deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**4.** For the purposes of this Delivery Errors and Omissions coverage, **SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS,** subsection **2. Duties In The Event Of Occurrence, Offense, Claim Or Suit** is deleted in its entirety and replaced by the following:

    **2. Duties in The Event of a Delivery Error or Omission**

        **a.**  You must see to it that we are notified as soon as practicable of an error or omission which may result in a claim. To the extent possible, notice should include:

            **(1)** How, when and where the error or omission took place; and

            **(2)** The names and addresses of the person(s) making claim against you.

        **b.**  If a claim is made or "suit" is brought against any insured, you must:

            **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

            **(2)** Notify us as soon as practicable.

        You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



    **c.** You and any other involved insured must:

        **(1)** Immediately send us copies of pertinent correspondence received in connection with the claim or "suit";

        **(2)** Authorize us to obtain records and other information;

        **(3)** Cooperate with us in our investigation or settlement of the claim or defense against the "suit"; and

        **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an error or omission to which this insurance may apply.

    **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

**5. Supplementary Payments**

The **SUPPLEMENTARY PAYMENTS—COVERAGES A AND B** also apply to this Delivery Errors and Omissions Coverage.

**B. SECTION I—COVERAGES, COVERAGE A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY, paragraph 2. Exclusions** is amended as follows:

**1.** Non-owned Watercraft Extension

Subparagraph **g.(2)(a)** is deleted in its entirety and replaced by the following:

**(a)** Less than fifty-one (51) feet long; and

**2.** Property Of Others In The Care, Custody Or Control Of The Insured (Expanded Property Damage)

    **a.** Paragraph **j.** is amended as follows:

        **(1)** Subparagraphs **j.(3), (5),** and **(6)** are deleted in their entirety.

        **(2)** Subparagraph **j.(4)** is deleted in its entirety and replaced by the following:

            **(4)** Personal Property in the care, custody or control of the insured while being transported by any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.

    **b.** The most we will pay for damages for "property damage" coverage provided by this coverage in any one "occurrence" is $25,000.

    **c.** Our obligation to pay for a coverage loss applies only to the amount of loss in excess of five hundred dollars ($500).

    **d.** We may pay any part or all of this deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

    **e.** This insurance is excess over any valid and collectible insurance.

**3.** Damage To Premises Rented To You

    **a.** The last paragraph of **2. Exclusions** is deleted in its entirety and replaced by the following:

    If Damage To Premises Rented To You is otherwise excluded, exclusions **c.** through **n.** do not apply to damage by fire, lightning, explosion, smoke or sprinkler leakage to premises while rented to you or temporarily occupied by you with permission of the owner.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



   **b.** With respect to the insurance afforded under this provision, **SECTION III—LIMITS OF IN-SURANCE,** subsection **6** is deleted in its entirety replaced by the following:

      **6.** Subject to **5.** Above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, lightning, explosion, smoke or sprinkler leakage, while rented to or temporarily occupied by you with permission of the owner. The limit is increased to $1,000,000.

**C. SECTION I—COVERAGES, SUPPLEMENTARY PAYMENTS—COVERAGES A AND B** is amended as follows:

   **1.** Bail Bonds

     Subparagraph **1.b.** is deleted in its entirety and replaced by the following:

     **b.** Up to $2,500 for cost of bail bonds required because of accidents or traffic law violations aris-ing out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   **2.** Loss of Earnings

     Subparagraph **1. d.** is deleted in its entirety and replaced by the following:

     **d.** All reasonable expenses incurred by the insured at our request to assist use in the investiga-tion or defense of the claim or "suit," including actual loss of earnings up to five hundred dol-lars ($500) a day because of time off from work.

**D. ADDITIONAL INSUREDS**

   **SECTION II—WHO IS AN INSURED** is amended as follows:

   **1.** Newly Formed or Acquired Organizations

     Paragraph **3.a.** is deleted in its entirety and replaced by the following:

     **a.** Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   **2.** Broad Form Named Insured

     The following is added to subsection **2.:**

     Any organization which is a legally incorporated entity of which you own a majority interest of the voting stock on the effective date of this Coverage Form will be a Named Insured, provided there is no other available insurance to that organization.

   **3.** Incidental Medical Malpractice

     Subparagraph **2.a.(1)(d)** does not apply to a physician, nurse, emergency medical technician or paramedic employed by you if you are not engaged in the business or occupation of providing medical, paramedical, surgical, dental, x-ray or nursing services.

   **4.** The following is added:

     **a. Additional Insured–Automatic Status When required in a Written Agreement with You** in-cludes person(s) or organization(s) described in Paragraphs **(1)–(9)** below with whom you have agreed in in a written contract or written agreement that such person or organization be added as an additional insured on your policy during the policy period shown in the Declarations.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



**b.** The insurance afforded to such additional insureds:

    **(1)** Only applies to the extent permitted by law; and

    **(2)** Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**c.** If coverage provided to the additional insured is required by a written contract or written agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

    **(1)** Required by the written contract or written agreement; or

    **(2)** Available under the applicable Limits of Insurance shown in the Declarations;

    whichever is less.

    The coverage provided does not increase the applicable Limits of Insurance

**d.** The person or organization added as an insured by this endorsement is an insured only to the extent you are held liable due to:

    **(1)** Vendors

    But only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business.

    The following additional exclusions apply:

    **(a)** The insurance afforded the vendor does not apply to:

        **(i)** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

        **(ii)** Any express warranty unauthorized by you;

        **(iii)** Any physical or chemical change in the product made intentionally by the vendor;

        **(iv)** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

        **(v)** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

        **(vi)** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

        **(vii)** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

        **(vii)** "Bodily injury" or "property damage" arising out of the negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf and which was not caused in whole or in part by you or any person or organization acting on your behalf. However, this exclusion does not apply to:

            **(aa)** The exceptions contained in Subparagraphs **(iv)** or **(vi)** above; or

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



      **(bb)** Such inspections, adjustments, tests or servicing as the vendor has agreed with you to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

   **(b)** This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**(2)** Grantor of Franchise or License

But only with respect to their liability as grantor of a franchise or license to you.

However, their status as additional insured under this policy ends:

   **(a)** When their contract or agreement with you granting the franchise or license ends or expires.

   **(b)** When your licenses is terminated or revoked prior to expiration of the license as stipulated by the contract or agreement.

**(3)** Managers or Lessors of Lease Premises

But only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you.

This insurance does not apply to:

   **(1)** Any "occurrence" which takes place after you cease to be a tenant in that premises.

   **(2)** Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization.

However, their status as additional insured under this policy ends when you cease to be a tenant of such premises.

**(4)** Co-owners of Insured Premises

But only with respect to their liability as co-owner of the premises.

However, their status as additional insured under this policy ends when you cease to be co-owner of such premises with that person or organization.

**(5)** Controlling Interest

But only with respect to their liability arising out of their financial control of you, or premises they own, maintain or control while you lease or occupy these premises.

This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

However, their status as additional insured under this policy ends when they cease to have such controlling interest.

**(6)** Lessors of Leased Equipment

But only with respect to liability for "bodily injury," "property damage" or "personal and advertising injury" caused in whole or in part, by your maintenance, operation, or use of equipment leased to you by such person(s) or organization(s).

This insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012


Nationwide

However, their status as additional insured under this policy ends when their lease, contract or agreement with you for such leased equipment ends.

**(7)** Mortgagee, Assignee, or Receiver

As respect to their liability as mortgagee, assignee, or receiver, and arising out of the ownership, maintenance or use of the premises by you.

This insurance does not apply to structural alterations, new constructions and demolition operations performed by or for that person or organization.

However, their status as additional insured under this policy ends when their status as mortgagee, assignee or receiver ends.

**(8)** Owners or Other Interest from Whom Land has been Leased

Only with respect to liability for "bodily injury," "property damage" or "personal and advertising injury" caused, in whole or in part, by you or those acting on your behalf in connection with the ownership, maintenance or use of that part of the land leased to you.

This insurance does not apply to:

**(a)** Any "occurrence" which takes place after you cease to lease the land.

**(b)** Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization.

However, their status as additional insured under this policy ends when you cease to lease that land.

**(9)** State or Political Subdivisions–Permits Relating to Premises

With respect to the following hazards for which the state or governmental agency or subdivision or political subdivision has issued a permit or authorization in connection with premises you own, rent or control and to which this insurance applies:

**(a)** The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings, sidewalk vaults, street banners or decorations and similar exposures; or

**(b)** The ownership, maintenance or use of any elevators covered by this insurance.

This insurance does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard."

However, such state or political subdivisions status as additional insured under this policy ends when the permit ends.

**E.  SECTION IV–COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended as follows:

**1.** Knowledge Of An Occurrence

The following is added to subsection **2. Duties in the Event of Occurrence, Offense, Claim or Suit:**

Knowledge of an "occurrence" or offense by the agent or "employee" of any insured does not constitute knowledge by any insured unless one of that insured's "executive officers" or anyone responsible for administering that insured's insurance program has knowledge of the same or has been notified of the same by the agent, or "employee."

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



**2.** Unintentional Failure To Disclose A Hazard

The following is added to subsection **6. Representations:**

Your failure to disclose all hazards or prior "occurrences" or offenses existing as of the inception date of the policy shall not prejudice the coverage afforded by this policy provided such failure to disclose all hazards or prior "occurrences" or offenses is not intentional. This provision does not affect our right to collect additional premium or exercise our right of cancellation or nonrenewal

**3.** Blanket Waiver of Subrogation

The following is added to subsection **8. Transfer of Rights of Recovery Against Others to Us:**

If required by written contract executed prior to loss, we waive any right of subrogation we may have against the contracting person or organization because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazards."

**4.** The following condition is added:

**Liberalization**

If we revise or replace a coverage part that is part of this policy during the policy period to provide more coverage without additional premium charge, that coverage part will automatically provide the additional coverage as of the date we adopt the revision.

**5.** Blanket Primary and Non-contributory

The following is added to subsection **4. Other Insurance** and supersedes any provision to the contrary:

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:

**(1)** The additional insured is a Named Insured under such other insurance: and

**(2)** You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

**F.  SECTION V—DEFINITIONS** is amended as follows:

**1.** Broadened definition of Bodily Injury

Subsection **3.** "Bodily injury" is deleted in its entirety and replaced by the following:

"Bodily injury" means bodily injury, sickness or disease sustained by a person.  This includes mental anguish, mental injury, shock, fright or death sustained by that person which results from that bodily injury, sickness or disease..

**2.** Personal and Advertising Injury

The following is added to subsection **14.** "Personal and advertising injury":

Discrimination because of race, color, creed, national origin, age, sex or physical disability, where insurance therefore is not prohibited by law, but only if such discrimination is:

**(1)** Not done intentionally by or at the direction of:

    **(a)** The insured; or

    **(b)** Any executive officer, director, stockholder, partner or member of the insured staff; and

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



**(2)** Not directly or indirectly related to the employment, prospective employment or termination of employment of any person or persons by any insured.

AUTHORIZED REPRESENTATIVE                    DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

**Nationwide**

Underwritten by National Casualty Company

**ENDORSEMENT
NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PFC/PFAS EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I—COVERAGES, COVER-AGE A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and Paragraph **2. Exclusions** of **SECTION I—COVERAGES PRODUCTS/COMPLETED OPERATIONS, BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

This insurance does not apply to:

**"PFC/PFAS"**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged, threatened or suspected inhalation, ingestion, absorption or consumption of, con-tact with, exposure to, existence of, or presence of, any "PFC/PFAS"; or

**b.** Any loss, cost or expense arising out of, in whole or in part, the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "PFC/PFAS" by any insured or by any other person or entity.

This exclusion applies regardless of whether any other cause, event, material, substance, good or product contributed concurrently or in any sequence to such injury or damage. This exclusion also applies regardless of whether any "PFC/PFAS" is contained, used, included, involved or incorporated intentionally, accidentally or unknowingly in or on a good or product, component part of a good or product, or otherwise by any insured or by any other person or entity. This exclusion applies regardless of whether the inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of any "PFC/PFAS" occurs within or outside any building or other structure.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I—COVERAGES, COVER-AGE B—PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance does not apply to:

**"PFC/PFAS"**

**a.** "Personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged, threatened, or suspected inhalation, ingestion, absorption or consumption of, con-tact with, exposure to, existence of, or presence of, any "PFC/PFAS"; or

**b.** Any loss, cost or expense arising out of, in whole or in part, the abating, testing for, monitoring,

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012

GL-666 (06-22)

 **Nationwide**

cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "PFC/PFAS," by any insured or by any other person or entity.

This exclusion applies regardless of whether any other cause, event, material, substance, good or product contributed concurrently or in any sequence to such injury or damage. This exclusion also applies regardless of whether any "PFC/PFAS" is contained, used, included, involved or incorporated intentionally, accidentally or unknowingly in or on a good or product, component part of a good or product, or otherwise by any insured or by any other person or entity. This exclusion applies regardless of whether the inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of any "PFC/PFAS" occurs within or outside any building or other structure.

**C.** The following definition is added to **SECTION V—DEFINITIONS:**

"PFC/PFAS" means:

**a.** Any fluorosurfactant, perfluorinated chemical or compound, or perfluoroalkyl or polyfluoroalkyl substance, including but not limited to any per- or polyfluorinated acid (including, without limitation, perfluorooctanoic acid (PFOA), perfluorooctanesulfonic acid (PFOS), and per- and polyfluorether carboxylic acids), per- or polyfluorinated sulfonamide, per- or polyfluorinated iodide, per- or polyfluorinated aldehyde, per- or polyfluorinated sulfonyl fluoride, per- or polyfluorinated fluorotelomer substance or per- or polyfluorinated sulfonamido substance; or

**b.** Any perfluoroalkane or polyfluoroalkane substance, including but not limited to carbon tetrafluoride, perfluorooctane, and perfluoro-2-methylpentane; or

**c.** Any fluorinated polymers, including but not limited to fluoropolymers, perfluoropolyethers and side-chain-fluorinated polymers; or

any of the associated homologues, isomers, salts, esters, alcohols, acids, precursor chemicals and derivatives, and related degradation or by-products of any such constituent.

The addition of this endorsement does not imply that other policy provisions, including but not limited to any pollution exclusion, do not exclude coverage for "PFC/PFAS"-related injury, damage, loss, cost or expense.

**All other conditions and provisions of the policy remain unchanged by this endorsement.**

_____ / _____
AUTHORIZED REPRESENTATIVE                          DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



# National Casualty Company

**ENDORSEMENT NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ASBESTOS EXCLUSION

The coverage afforded by this policy does not apply to bodily injury, personal injury or property damage arising out of:

1. Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos; or

2. The use of asbestos in construction or manufacturing any good, product or structure; or

3. The removal of asbestos from any good, product or structure; or

4. The manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The coverage afforded by the policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense of claim or suit related to any of the above.

_____  /  _____
AUTHORIZED REPRESENTATIVE              DATE

UT-131g (3-92)

# National Casualty Company

**ENDORSEMENT
NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT TO PERSONAL AND ADVERTISING INJURY DEFINITION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**SECTION V—DEFINITIONS**, subsection **14**. "Personal and advertising injury" is deleted in its entirety and replaced by the following:

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b**. Malicious prosecution; or

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

_____/_____

AUTHORIZED REPRESENTATIVE                       DATE

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

POLICY NUMBER: NGO0001160

**COMMERCIAL GENERAL LIABILITY**
**CG 04 35 12 07**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYEE BENEFITS LIABILITY COVERAGE

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.**
**PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Limit Of Insurance | | Each Employee Deductible | Premium |
|---|---|---|---|---|
| **Employee Benefits Programs** | INCLUDED | **each employee** | INCLUDED | ■■■■■■ |
| | INCLUDED | **aggregate** | | |
| **Retroactive Date:** | 07/01/1993 | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | |

**A.** The following is added to **Section I – Coverages:**

**COVERAGE – EMPLOYEE BENEFITS LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Paragraph **D.** (Section **III** – Limits Of Insurance); and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**b.** This insurance applies to damages only if:

**(1)** The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

**(2)** The act, error or omission, did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

**(3)** A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under Paragraph **F.** of this endorsement.

**c.** A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **a.** above.

A "claim" received and recorded by the insured within 60 days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

**d.** All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

**2. Exclusions**

This insurance does not apply to:

**a. Dishonest, Fraudulent, Criminal Or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

**b. Bodily Injury, Property Damage, Or Personal And Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

**c. Failure To Perform A Contract**

Damages arising out of failure of performance of contract by any insurer.

**d. Insufficiency Of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

**e. Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation**

Any "claim" based upon:

**(1)** Failure of any investment to perform;

**(2)** Errors in providing information on past performance of investment vehicles; or

**(3)** Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**f. Workers' Compensation And Similar Laws**

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**g. ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**h. Available Benefits**

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**i. Taxes, Fines Or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j. Employment-Related Practices**

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

**B.** For the purposes of the coverage provided by this endorsement:

**1.** All references to Supplementary Payments – Coverages **A** and **B** are replaced by Supplementary Payments – Coverages **A, B** and **Employee Benefits Liability.**

**2.** Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**C.** For the purposes of the coverage provided by this endorsement, Paragraphs **2.** and **3.** of **Section II – Who Is An Insured** are replaced by the following:

**2.** Each of the following is also an insured:

**a.** Each of your "employees" who is or was authorized to administer your "employee benefit program".

**b.** Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

    **c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

    **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

    **b.** Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**D.** For the purposes of the coverage provided by this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

  **1. Limits Of Insurance**

    **a.** The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

      **(1)** Insureds;

      **(2)** "Claims" made or "suits" brought;

      **(3)** Persons or organizations making "claims" or bringing "suits";

      **(4)** Acts, errors or omissions; or

      **(5)** Benefits included in your "employee benefit program".

    **b.** The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

    **c.** Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

      **(1)** An act, error or omission; or

      **(2)** A series of related acts, errors or omissions

    negligently committed in the "administration" of your "employee benefit program".

    However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance.

  **2. Deductible**

    **a.** Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

    **b.** The deductible amount stated in the Schedule applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

    **c.** The terms of this insurance, including those with respect to:

      **(1)** Our right and duty to defend any "suits" seeking those damages; and

      **(2)** Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

    apply irrespective of the application of the deductible amount.

    **d.** We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

**E.** For the purposes of the coverage provided by this endorsement, Conditions **2.** and **4.** of **Section IV – Commercial General Liability Conditions** are replaced by the following:

  **2. Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

    **a.** You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

      **(1)** What the act, error or omission was and when it occurred; and

(2) The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

**b.** If a "claim" is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the "claim" or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

**c.** You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

(1) This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

(a) No Retroactive Date is shown in the Schedule of this insurance; or

(b) The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

(2) When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

**F.** For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added, or, if this endorsement is attached to a claims-made Coverage Part, replaces any similar Section in that Coverage Part:

**EXTENDED REPORTING PERIOD**

**1.** You will have the right to purchase an Extended Reporting Period, as described below, if:

**a.** This endorsement is canceled or not renewed; or

**b.** We renew or replace this endorsement with insurance that:

**(1)** Has a Retroactive Date later than the date shown in the Schedule of this endorsement; or

**(2)** Does not apply to an act, error or omission on a claims-made basis.

**2.** The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

**3.** An Extended Reporting Period of five years is available, but only by an endorsement and for an extra charge.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**a.** The "employee benefit programs" insured;

**b.** Previous types and amounts of insurance;

**c.** Limits of insurance available under this endorsement for future payment of damages; and

**d.** Other related factors.

The additional premium will not exceed 100% of the annual premium for this endorsement.

The Extended Reporting Period endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

**4.** If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for claims first received and recorded during the Extended Reporting Period.

The extended reporting period aggregate limit of insurance will be equal to the dollar amount shown in the Schedule of this endorsement under Limits of Insurance.

Paragraph **D.1.b.** of this endorsement will be amended accordingly. The Each Employee Limit shown in the Schedule will then continue to apply as set forth in Paragraph **D.1.c.**

**G.** For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

**1.** "Administration" means:

**a.** Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

**b.** Handling records in connection with the "employee benefit program"; or

**c.** Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include handling payroll deductions.

**2.** "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

**3.** "Claim" means any demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

4. "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

   a. Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

   b. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

   c. Unemployment insurance, social security benefits, workers' compensation and disability benefits;

   d. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

   e. Any other similar benefits designated in the Schedule or added thereto by endorsement.

H. For the purposes of the coverage provided by this endorsement, Definitions **5.** and **18.** in the **Definitions** Section are replaced by the following:

   5. "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

   18. "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

       a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

       b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

© ISO Properties, Inc., 2006

CG 04 35 12 07    ☐

Underwritten by National Casualty Company

# ENDORSEMENT
# NO. _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EMPLOYEE BENEFITS LIABILITY—NEW YORK

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**THIS ENDORSEMENT IS ATTACHED TO AND IS PART OF YOUR COMMERCIAL GENERAL LIABILITY COVERAGE PART AND PROVIDES CLAIMS-MADE COVERAGE. PLEASE READ ALL PROVISIONS CAREFULLY, AND CONTACT YOUR AGENT IF YOU HAVE ANY QUESTIONS.**

1. **This endorsement applies only to damage arising out of an act, error, or omission in the "administration" of your "Employee Benefit Program," between the retroactive date, if any, shown in the schedule of this endorsement and the end of the policy period.**

2. **This endorsement applies only to claims made against the insured on or after the inception date and before the end of the policy period and all coverage under this endorsement ceases upon termination of this endorsement, except for the automatic basic extended reporting period, unless you purchase the supplemental extended reporting period coverage.**

3. **Claims submitted after the extended reporting period terminates will not be covered and the insured may have coverage gaps.**

4. **A basic extended reporting period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for a period of sixty (60) calendar days.**

5. **A supplemental extended reporting period for one (1) year is available, but only by endorsement and for an additional charge. The supplemental extended reporting period starts at termination. The additional premium for the supplemental extended reporting period shall be 75% of the annual premium for this Employee Benefits endorsement.**

6. **During the first several years of the claims made relationship, claims made rates are comparatively lower than occurrence rates. The insured can expect substantial annual premium increases, independent of overall rate level increases, until the claims made relationship reaches maturity.**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

 Nationwide®

### SCHEDULE

| Coverage | Limit Of Insurance | | Each Employee Deductible | Premium |
|---|---|---|---|---|
| **Employee Benefits Programs** | $1,000,000 | each employee | $1,000 | ▓▓▓▓ |
| | $2,000,000 | aggregate | | |
| **Retroactive Date** | 07/01/1993 | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | |

**A.** The following is added to **Section I – Coverages**:

### COVERAGE – EMPLOYEE BENEFITS LIABILITY

**1. Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages, even if the allegations are groundless, false, or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

        **(1)** The amount we will pay for damages is limited as described in paragraph **D.** (Section **III** – Limits Of Insurance); and

        **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

    **b.** This insurance applies to damages only if:

        **(1)** The act, error or omission is negligently committed in the "administration" of your "employee benefit program";

        **(2)** The act, error or omission did not take place before the Retroactive Date, if any, shown in the Schedule nor after the end of the policy period; and

        **(3)** A "claim" for damages, because of an act, error or omission, is first made against any insured, in accordance with paragraph **c.** below, during the policy period or an Extended Reporting Period we provide under paragraph **F.** of this endorsement.

    **c.** A "claim" seeking damages will be deemed to have been made at the earlier of the following times:

        **(1)** When notice of such "claim" is received and recorded by any insured or by us, whichever comes first; or

        **(2)** When we make settlement in accordance with paragraph **a.** above.

    A "claim" received and recorded by the insured within sixty (60) days after the end of the policy period will be considered to have been received within the policy period, if no subsequent policy is available to cover the claim.

    **d.** All "claims" for damages made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including damages claimed by such "employee's"

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

GL-685-N2G-NY (11-22)    Page 2 of 9



dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

## 2. Exclusions

This insurance does not apply to:

### a. Dishonest, Fraudulent, Criminal Or Malicious Act

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

### b. Bodily Injury, Property Damage, Or Personal And Advertising Injury

"Bodily injury," "property damage" or "personal and advertising injury."

### c. Failure To Perform A Contract

Damages arising out of failure of performance of a contract by any insured.

### d. Insufficiency Of Funds

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program."

### e. Inadequacy Of Performance Of Investment/Advice Given With Respect To Participation

Any "claim" based upon:

**(1)** Failure of any investment to perform;

**(2)** Errors in providing information on past performance of investment vehicles; or

**(3)** Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program."

### f. Workers' Compensation And Similar Laws

Any "claim" arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

### g. ERISA

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

### h. Available Benefits

Any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

### i. Taxes, Fines Or Penalties

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

### j. Employment-Related Practices

Damages arising out of wrongful termination of employment, discrimination, or other employment-related practices.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**B.** For the purposes of the coverage provided by this endorsement:

    **1.** All references to Supplementary Payments – **Coverages A** and **B** are replaced by Supplementary Payments – **Coverages A**, **B** and Employee Benefits Liability.

    **2.** Paragraphs **1.b.** and **2.** of the Supplementary Payments provision do not apply.

**C.** For the purposes of the coverage provided by this endorsement, paragraphs **2.** and **3.** of **Section II – Who Is An Insured** are replaced by the following:

    **2.** Each of the following is also an insured:

        **a.** Each of your "employees" who is or was authorized to administer your "employee benefit program."

        **b.** Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

        **c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

    **3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However:

        **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

        **b.** Coverage under this provision does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**D.** For the purposes of the coverage provided by this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

    **1. Limits Of Insurance**

        **a.** The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

            **(1)** Insureds;

            **(2)** "Claims" made or "suits" brought;

            **(3)** Persons or organizations making "claims" or bringing "suits";

            **(4)** Acts, errors or omissions; or

            **(5)** Benefits included in your "employee benefit program."

        **b.** The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program."

        **c.** Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one "employee," including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

            **(1)** An act, error or omission; or

            **(2)** A series of related acts, errors or omissions negligently committed in the "administration" of your "employee benefit program."

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



However, the amount paid under this endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program."

The Limits of Insurance of this endorsement apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the policy period shown in the Declarations of the policy to which this endorsement is attached, unless the policy period is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance except that the Aggregate Limit will be increased in direct proportion to the period of extension.

**2. Deductible**

    **a.** Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Schedule as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

    **b.** The deductible amount stated in the Schedule applies to all damages sustained by any one "employee," including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

    **c.** The terms of this insurance, including those with respect to:

        **(1)** Our right and duty to defend any "suits" seeking those damages; and

        **(2)** Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or "claim"

    apply irrespective of the application of the deductible amount.

    **d.** We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

**E.** For the purposes of the coverage provided by this endorsement, Conditions **2.** and **4.** of **Section IV – Commercial General Liability Conditions** are replaced by the following:

    **2. Duties In The Event Of An Act, Error Or Omission, Or "Claim" Or "Suit"**

    **a.** You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim." To the extent possible, notice should include:

        **(1)** What the act, error or omission was and when it occurred; and

        **(2)** The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

    **b.** If a "claim" is made or "suit" is brought against any insured, you must:

        **(1)** Immediately record the specifics of the "claim" or "suit" and the date received; and

        **(2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

    **c.** You and any other involved insured must:

        **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

        **(2)** Authorize us to obtain records and other information;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**(3)** Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Schedule of this insurance and that applies to an act, error or omission on other than a claims-made basis, if:

**(a)** No Retroactive Date is shown in the Schedule of this insurance; or

**(b)** The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this insurance.

**(2)** When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay for the loss in absence of this insurance; and the total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

**F.** For the purposes of the coverage provided by this endorsement, the following Extended Reporting Period provisions are added:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**EXTENDED REPORTING PERIOD**

1. We will provide one or more Extended Reporting Periods, as described below, if:

   a. This endorsement is cancelled or not renewed for any reason; or

   b. We renew or replace this endorsement with insurance that does not apply to an act, error, or omission on a claims-made basis; or

   c. We renew or replace this endorsement with insurance that has decreased in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion or any other change less favorable to the insured.

2. Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They apply only to claims to which the following applies:

   a. The claim is first made during the Extended Reporting Period;

   b. The act, error, or omission occurs before the end of the policy period; and

   c. The act, error, or omission did not commence before the Retroactive Date, if any.

   Once in effect, the Extended Reporting Periods may not be cancelled.

3. A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for sixty (60) days.

   The Basic Extended Reporting Period does not reinstate or increase the Limit of Insurance.

4. No later than thirty (30) days after the end of the policy period, we will advise you of the Basic Extended Reporting Period described in paragraph **3.**, of this Section. We will also advise you of the availability and importance of purchasing the Supplemental Extended Reporting Period, as described in paragraph **5.** of this Section.

5. A Supplemental Extended Reporting Period lasting one year is available, but only by endorsement and for an additional charge. If you purchase a Supplemental Extended Reporting Period, such coverage replaces and supersedes the coverage provided by the Basic Extended Reporting Period set forth in **F.3.** above. This supplemental period starts with the end of the policy period.

6. You must give us a written request for the endorsement within:

   a. Sixty (60) days from the effective date of termination of coverage; or

   b. Thirty (30) days from the date of mailing or delivery of the advice required in paragraph **4**,

   whichever period is greater.

7. The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due and any premium or co-payment you owe us for coverage provided under this policy. This premium charge is seventy-five percent (75%) of the policy period. The premium charged shall be based upon the rates for such coverage in effect on the date the policy was issued or last renewed.

   If cancellation of this endorsement is for non-payment of premium or fraud on the part of the insured and if this endorsement has been in effect for at least one year, we will provide you with a premium quotation for the Supplemental Extended Reporting Period only if you request it. The request must be made by you to us within sixty (60) days after the effective date of the termination of this endorsement.

   The Supplemental Extended Reporting Period endorsement shall set forth the terms, not inconsistent with this Section **F.**, applicable to the Supplemental Extended Reporting Period, including a

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

GL-685-N2G-NY (11-22)                    Page 7 of 9



provision to the effect that this insurance is excess over any other insurance, whether primary, excess, contingent, or on any other basis; whose policy period begins or continues after the Supplemental Extended Reporting Period takes effect.

8. If the Supplemental Extended Reporting Period is in effect, we will provide supplemental aggregate limits of insurance described below, but only for "claims" first received and recorded during the Supplemental Extended Reporting Period. The Limit of Insurance for the Supplemental Extended Reporting Period shall be equal to the Employee Benefits Liability Coverage Aggregate Limit of Insurance shown in the Schedule of this endorsement and in effect at the end of the policy period.

9. An insured who is either employed by or otherwise affiliated with you during the policy period shall continue to be covered under this policy and any extended reporting period, even after the affiliation has ended, for such insured's act, error, or omission during the period of affiliation.

10. Extended Reporting Period coverage shall be provided, upon termination of coverage, to any insured, if:

    **a.** You have been placed in liquidation or bankruptcy or if you permanently cease operations;

    **b.** You or your designated trustee do not purchase extended reporting period coverage;

    **c.** Such insured requests the extended reporting period coverage within 120 days of the termination of coverage; and

    **d.** Such insured pays the additional charge for the coverage.

**G.** For the purposes of the coverage provided by this endorsement, the following definitions are added to the **Definitions** Section:

1. "Administration" means:

    **a.** Giving counsel, other than legal advice, to "employees," including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    **b.** Handling records in connection with the "employee benefit program"; or

    **c.** Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program.

However, "administration" does not include handling payroll deductions.

2. "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

3. "Claim" means any demand, or "suit," made by an "employee" or an "employee's" dependents and beneficiaries, for damages as the result of an act, error or omission.

4. "Employee benefit program" means a program providing some or all of the following benefits to "employees," whether provided through a "cafeteria plan" or otherwise:

    **a.** Group life insurance, group accident or health insurance, dental, vision and hearing plans, and flexible spending accounts, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

    **b.** Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

GL-685-N2G-NY (11-22)    Page 8 of 9



    **c.** Unemployment insurance, social security benefits, workers' compensation and disability benefits;

    **d.** Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

    **e.** Any other similar benefits designated in the Schedule or added thereto by endorsement.

**H.** For the purposes of the coverage provided by this endorsement, definitions **5.** and **18.** in the **Definitions** Section are replaced by the following:

    **5.** "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker.

    **18.** "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

        **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

        **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**All terms and conditions of this policy apply unless modified by this endorsement.**

_____/_____
          AUTHORIZED REPRESENTATIVE         DATE

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Nationwide®**

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004

# ADDENDUM

**Some internal notes, stamps or typing on the Declaration sheet may appear.  The intended use for these is internal only and may not have been a part of the policy received by the insured.**

**Policy fees, inspection fees or taxes, or additional instructional stamps may have appeared on the policy received by the insured but may not appear on this copy.**

**EXHIBIT**

**F**



N2G Worldwide Insurance Services, LLC



# Commercial Umbrella



## N2G Worldwide Insurance Services, LLC

With N2G, powered by Nationwide and Generali, you benefit from decades of global underwriting experience, differentiated local capabilities, customized, client-focused coverage solutions, and remarkable customer service.

We are always here to help serve your risk management needs and gladly provide you access to global and local coverage experts, industry-leading risk engineering capabilities and experienced claim professionals.

We thank you for your business and welcome you to the world of N2G.

Kevin M. Strong
Chief Executive Officer
N2G Worldwide Insurance Services, LLC



At N2G, we're here to make filing a claim easy and convenient for you, whenever and wherever you need our services and support. To submit your claim online, visit n2g.com/claims or email claims@n2g.com.



## N2G Worldwide Insurance Services, LLC

At N2G, we offer an exceptionally broad portfolio of products, strong expertise for domestic and foreign exposures, seamless global capabilities and concierge-level service and claim coordination.

# BACKED BY 2 INSURANCE POWERHOUSES



### Nationwide

Fortune **100** Company

A+
AM Best Rating

**6th**
largest US domestic specialty commercial lines insurer

**9th**
largest commercial insurer

Nationwide has been serving business customers for over 95 years

### Generali Global Corporate & Commercial

More than
**1,000**
professionals working across 9 main offices

Complete insurance solutions in over
**165**
countries

More than
**1,000**
multinational programs

GC&C is part of the Generali Group that serves 69 million customers

N2G partners exclusively with Nationwide and Generali Global Corporate & Commercial to underwrite global commercial accounts.



## Worldwide Solutions

Global Property
General Liability
Workers' Compensation

Commercial Auto
Foreign Casualty Package
Umbrella

 **Nationwide®**

Underwritten by: National Casualty Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675 • A Stock Company

# NOTICE:

**THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary

President

The information contained herein replaces any similar information contained elsewhere in the policy.

**National Casualty Company**
**Scottsdale Indemnity Company**
**Scottsdale Insurance Company**
**Scottsdale Surplus Lines Insurance Company**

## CLAIM REPORTING INFORMATION

Your insurance policy has been placed with a Nationwide® insurance company.

Our commitment to you is to provide fast, fair claim service. Promptly reporting an event that could lead to a claim, as required by your policy, helps us fulfill this commitment to you. Please refer to your policy for this and all other terms and conditions.

To report a claim, you may contact us twenty-four (24) hours a day, seven days a week, by calling 1-800-423-7675, or via our website at https://n2g.com/claims.html or via email at claims@n2g.com.

Thank you for your business and as always, we appreciate the opportunity to serve you.

| HOW TO REPORT A CLAIM |
|---|
| Call **1-800-423-7675,** or visit our website at https://n2g.com/claims.html or via email at claims@n2g.com. |
| In order to expedite this process, please be prepared to furnish as much of the following information as possible: <br> • Your policy number <br> • Date, time and location of the loss/accident <br> • Details of the loss/accident <br> • Name, address and phone number of any involved parties <br> • If applicable, name of law enforcement agency or fire department along with the incident number <br> **Please refer to your policy for specific claim reporting requirements.** |



**National Casualty Company**
**Scottsdale Indemnity Company**
**Scottsdale Insurance Company**
**Scottsdale Surplus Lines Insurance Company**

## NOTICE—FRAUD WARNINGS

**FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. (Not applicable in AL, AR, CA, CO, DC, FL, KS, KY, LA, ME, MD, MN, NE, NJ, NY, OH, OK, OR, RI, TN, VA, VT, or WA.)

**NOTICE TO ALABAMA APPLICANTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**NOTICE TO CALIFORNIA APPLICANTS. For your protection California law requires the following to appear on this form:** Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**NOTICE TO COLORADO APPLICANTS:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**WARNING TO DISTRICT OF COLUMBIA APPLICANTS:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**NOTICE TO FLORIDA APPLICANTS:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**NOTICE TO KANSAS APPLICANTS:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.



**NOTICE TO KENTUCKY APPLICANTS:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**NOTICE TO MAINE APPLICANTS:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NOTICE TO MARYLAND APPLICANTS:** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO MINNESOTA APPLICANTS:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**NOTICE TO NEW JERSEY APPLICANTS:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**NOTICE TO OHIO APPLICANTS:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA APPLICANTS:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**FRAUD WARNING (APPLICABLE IN ARKANSAS, LOUISIANA AND RHODE ISLAND):** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**FRAUD WARNING (APPLICABLE IN VERMONT, NEBRASKA AND OREGON):** Any person who intentionally presents a materially false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

**FRAUD WARNING (APPLICABLE IN TENNESSEE, VIRGINIA AND WASHINGTON):** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

**NEW YORK OTHER THAN AUTOMOBILE FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**NEW YORK AUTOMOBILE FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, and any person who, in connection with such application or claim, knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.



### DECLARATIONS
#### COMMERCIAL LIABILITY UMBRELLA POLICY

# National Casualty Company

**Policy Number**
UNO0000178

NEW
Renewal of Number

Home Office: One Nationwide Plaza • Columbus, OH 43215
Administrative Office:
18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675
A STOCK COMPANY

**ITEM 1.** NAMED INSURED AND MAILING ADDRESS

Electronic Arts Inc
As Per Named Insured Extension Schedule
145 West 45th Street
New York, NY 10036

AGENT NAME AND ADDRESS

N2G Worldwide Insurance Services, LLC
111 Town Square Place
Suite 340
Jersey City, NJ 07310

Agent No.: 29602        Program No.: None

**ITEM 2.** POLICY PERIOD        From: 10/01/2023        To: 10/01/2024

**12:01 A.M. Standard Time at your mailing address shown above.**

**ITEM 3.** DESCRIPTION OF BUSINESS

FORM OF BUSINESS:

☐ Individual    ☐ Partnership    ☐ Joint Venture    ☐ Limited Liability Company    ☐ Other

☒ Organization, including a Corporation (But Not including a Partnership, Joint Venture or Limited Liability Company)

BUSINESS DESCRIPTION: Global leader in digital interactive entertainment

**ITEM 4.** LIMITS OF INSURANCE:

| | |
|---|---|
| Each Occurrence Limit (Liability Coverage) | $10,000,000 |
| Personal and Advertising Injury Limit | $10,000,000 |
| Any one person or organization | |
| Aggregate Limit (Liability Coverage) (except with respect to "covered autos") | $10,000,000 |
| Other: | |
| Retained Limit: (1) Underlying Insurance (See **ITEM 5.**); or (2) Self-Insured Retention | $10,000 |

**ITEM 5.** SCHEDULE OF UNDERLYING INSURANCE:

See Schedule A

**ITEM 6.** PREMIUM COMPUTATION:

☐ Flat Premium ................................................

☐ Audit Period (if applicable):    ☐ Annually    ☐ Semi-Annually    ☐ Quarterly    ☐ Monthly

Estimated Deposit Premium ................................

Estimated Exposure Base: _____ Rate: _____ Per: _____

Policy Minimum Premium ................................

**ITEM 7.** ENDORSEMENTS ATTACHED TO THE POLICY AT INCEPTION:

See Schedule of Forms and Endorsements

THIS COMMERCIAL LIABILITY UMBRELLA DECLARATIONS AND THE SCHEDULE A, TOGETHER WITH THE COMMON POLICY CONDITIONS AND THE COVERAGE FORM(S) AND ENDORSEMENT(S), IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.



**NAMED INSURED EXTENSION SCHEDULE**

```
Electronic Arts Inc
Bingo Acquisition Corporation
Cosmic Pop LLC
Creatif Studios LLC
Crowdstar LLC
EA Entertainment, Inc.
EA Mobile (Canada Holdings) Inc.
Electronic Arts - Tiburon, A Florida Corporation
Electronic Arts Inc.
Electronic Arts Productions Inc.
Electronic Arts Redwood LLC
Fishing Games LLC
Gems Interactive LLC
Glu Games LLC
Glu Mobile LLC
Glu Newco LLC
GlytchCo Games LLC
Griptonite Games LLC
Playdemic LLC
PopCap Games, LLC
Prairie-Winnetka Holdings, LLC
Respawn Entertainment, LLC
```

THIS COMMERCIAL LIABILITY UMBRELLA DECLARATIONS AND THE SCHEDULE A, TOGETHER WITH
THE COMMON POLICY CONDITIONS AND THE COVERAGE FORM(S) AND ENDORSEMENT(S),
IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.



# SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER:<br>UNO0000178 | EFFECTIVE DATE:<br>10/01/2023 |
|---|---|

**<u>NUMBER</u>**          **<u>TITLE</u>**

**UMBRELLA**

| | |
|---|---|
| UT-COVPG-NY (03-21) | Cover Page |
| NOTX0178CW-N2G (08-21) | Claim Reporting Information |
| NOTX0650CW (03-22) | Notice-Fraud Warnings |
| UM-D-1-0117 (01-21) | Commercial Liability Umbrella Declarations |
| UM-SP-1-NY (01-21) | Schedule A - Schedule Of Underlying Insurance Umbrella Liability - New York |
| UM-SP-2 (07-96) | Supplementary Schedule Of Underlying Insurance Umbrella Liability |
| CU 00 01 (04-13) | Commercial Liability Umbrella Coverage Form |
| IL 00 17 (11-98) | Common Policy Conditions |
| IL 09 85 (12-20) | Disclosure Pursuant To Terrorism Risk Insurance Act |
| CU 01 25 (06-22) | New York Changes |
| CU 01 51 (05-02) | New York Changes - Transfer Of Duties When A Limit Of Insurance Is Used Up |
| CU 02 14 (06-20) | New York Changes - Cancellation And Nonrenewal |
| CU 21 16 (09-00) | Exclusion - Designated Ongoing Operations |
| CU 21 23 (02-02) | Nuclear Energy Liability Exclusion Endorsement |
| CU 21 26 (04-13) | Exclusion - Cross Suits Liability |
| CU 21 27 (12-04) | Fungi Or Bacteria Exclusion |
| CU 21 31 (01-15) | Exclusion Of Other Acts Of Terrorism Committed Outside The United States; Cap On Losses From Certified Acts Of Terrorism |
| CU 21 36 (01-08) | Exclusion Of Punitive Damages Related To A Certified Act Of Terrorism |
| CU 21 50 (03-05) | Silica Or Silica-Related Dust Exclusion |
| CU 21 52 (12-05) | Total Pollution Exclusion With A Building Heating, Cooling And Dehumidifying Equipment Exception And A Hostile Fire Exception |
| CU 21 86 (05-14) | Exclusion - Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability - With Limited Bodily Injury Exception |
| CU 24 03 (12-19) | Waiver Of Transfer Of Rights Of Recovery Against Others To Us (Waiver Of Subrogation) |
| UM-0160 (07-02) | Asbestos Exclusion |
| UM-0821 (07-02) | Lead Contamination Exclusion |
| UM-2407 (06-22) | PFC/PFAS Exclusion |

Underwritten by: National Casualty Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675 • A Stock Company

## SCHEDULE A—SCHEDULE OF UNDERLYING INSURANCE
## UMBRELLA LIABILITY—NEW YORK

Policy No.: <u>UNO0000178</u>                                    Effective Date: <u>10/01/2023</u>
                                                                         12:01 A.M. Standard Time

Named Insured: <u>Electronic Arts Inc</u>                    Agent No.: <u>29602</u>

| INSURER, POLICY NUMBER AND POLICY PERIOD | TYPE OF COVERAGE | APPLICABLE LIMITS | |
|---|---|---|---|
| **Insurer's Name** <br> National Casualty Company <br><br> **Policy Number** <br> NGO0001162 <br><br> **Policy Period** <br> <u>10/01/2023</u> to <u>10/01/2024</u> <br><br> * General Aggregate Applies | **Commercial General Liability** | **Applicable Limits** <br><br> <u>$2,000,000</u> | Each Occurrence |
| | | <u>$2,000,000</u> | Personal and Advertising Injury |
| | | <u>$2,000,000</u> | General Aggregate (other than products/ completed operations) * Per Location |
| | | <u>$2,000,000</u> | Products/Completed Operations Aggregate |
| **Insurer's Name** <br> National Casualty Company <br><br> **Policy Number** <br> NGO0001161 <br><br> **Policy Period** <br> <u>10/01/2023</u> to <u>10/01/2024</u> | **Auto Liability** | **Bodily Injury and Property Damage Limit** <br><br> <u>$1,000,000</u> Each Accident <br><br> **Uninsured/Underinsured Motorist** <br><br> <u>$1,000,000</u> Each Accident or <br><br> _____ Each Person <br><br> _____ Each Accident | |
| **Insurer's Name** <br><br> **Policy Number** <br><br> **Policy Period** <br> _____ to _____ | **Auto Dealers Liability** | **Applicable Limits** <br><br> _____ | Covered Autos Liability Each Accident |
| | | _____ | General Liability Bodily Injury And Property Damage Liability Each Accident |
| | | _____ | Personal and Advertising Injury Any One Person or Organization |
| | | _____ | General Liability Aggregate |
| | | _____ | Products and Work You Performed Aggregate |



Underwritten by: National Casualty Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675 • A Stock Company

## SCHEDULE A—SCHEDULE OF UNDERLYING INSURANCE
## UMBRELLA LIABILITY—NEW YORK (continued)

Policy No.: <u>UNO0000178</u>                    Effective Date: <u>10/01/2023</u>

                                                                    12:01 A.M. Standard Time

Named Insured: <u>Electronic Arts Inc</u>            Agent No.: <u>29602</u>

| INSURER, POLICY NUMBER AND POLICY PERIOD | TYPE OF COVERAGE | APPLICABLE LIMITS | |
|---|---|---|---|
| **Insurer's Name** <br> Safety National Casualty Corporation <br> **Policy Number** <br> LDC4065968 <br> **Policy Period** <br> <u>01/01/2023</u> to <u>01/01/2024</u> | **Employer's Liability** | **Bodily Injury Limit** | |
| | | <u>$1,000,000</u> | Each Accident (by accident)** |
| | | <u>$1,000,000</u> | Policy Limit (by disease)** |
| | | <u>$1,000,000</u> | Each Employee (by disease)** |
| | | ** Workers Compensation or Employers Liability is not applicable where an "employee" is subject to the New York Workers Compensation Law | |



# National Casualty Company

## SUPPLEMENTARY SCHEDULE OF UNDERLYING INSURANCE
## UMBRELLA LIABILITY

Policy No. UNO0000178        Effective Date: 10/01/2023

12:01 A.M. Standard Time

Named Insured Electronic Arts Inc

Agent No.     29602

| | |
|---|---|
| **Type of Coverage:** Foreign General Liability Information | **Applicable Limits** |
| **Insurer:** National Casualty Company | $2,000,000   Each Occurrence |
| **Policy Number:** NGO0000752 | $2,000,000   Personal And Advertising Injury |
| **Policy Period:** 10/01/2023 to 10/01/2024 <br><br> * General Aggregate Applies | $4,000,000   General Aggregate (other than products/completed operations) *Per Location |
| | $4,000,000   Products/Completed Operations Aggregate |

| | |
|---|---|
| **Type of Coverage:** Foreign Contingent Employer's Liability | **Applicable Limits** |
| **Insurer:** National Casualty Company | $1,000,000   Each Accident |
| **Policy Number:** NGO0000752 | $1,000,000   Each Insured Person |
| **Policy Period:** 10/01/2023 to 10/01/2024 | $1,000,000   Aggregate |



# National Casualty Company

## SUPPLEMENTARY SCHEDULE OF UNDERLYING INSURANCE
## UMBRELLA LIABILITY

Policy No. UNO0000178

Effective Date: 10/01/2023

12:01 A.M. Standard Time

Named Insured Electronic Arts Inc

Agent No.    29602

---

**Type of Coverage:** Foreign Automobile Liability

**Applicable Limits**

**Insurer:** National Casualty Company

$1,000,000   Each Accident

**Policy Number:** NGO0000752

**Policy Period:** 10/01/2023 to 10/01/2024

N/A    Aggregate

---

**Type of Coverage:** Employee Benefits Liability

**Applicable Limits**

**Insurer:** National Casualty Company

$1,000,000   Each Occurrence

**Policy Number:** NGO0001162

**Policy Period:** 10/01/2023 to 10/01/2024

$2,000,000   Aggregate

---



COMMERCIAL LIABILITY UMBRELLA
CU 00 01 04 13

# COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend. But:

**(1)** The amount we will pay for the "ultimate net loss" is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" or "property damage" that is subject to an applicable "retained limit". If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "bodily injury" or "property damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "underlying insurance".

**c.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.a.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**d.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.a.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**e.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.a.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**f.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage" involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

This exclusion does not apply to the extent that valid "underlying insurance" for the liquor liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the liquor liability risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. ERISA**

Any obligation of the insured under the Employee Retirement Income Security Act of 1974 (ERISA), and any amendments thereto or any similar federal, state or local statute.

**f. Auto Coverages**

(1) "Bodily injury" or "property damage" arising out of the ownership, maintenance or use of any "auto" which is not a "covered auto"; or

(2) Any loss, cost or expense payable under or resulting from any first-party physical damage coverage; no-fault law; personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law.

**g. Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

With respect to injury arising out of a "covered auto", this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits. For the purposes of this insurance, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

This exclusion does not apply to the extent that valid "underlying insurance" for the employer's liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the employer's liability risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**h. Employment-related Practices**

"Bodily injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraph (a), (b), or (c) above is directed.

This exclusion applies whether the injury-causing event described in Paragraph (a), (b) or (c) above occurs before employment, during employment or after employment of that person.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**i. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

(2) "Pollution cost or expense".

This exclusion does not apply if valid "underlying insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the pollution risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**j. Aircraft Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 50 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

**(4)** The extent that valid "underlying insurance" for the aircraft or watercraft liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" or "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the aircraft or watercraft risks described above will follow the same provisions, exclusions and limitations that are contained in the "underlying insurance", unless otherwise directed by this insurance; or

**(5)** Aircraft that is:

**(a)** Chartered by, loaned to, or hired by you with a paid crew; and

**(b)** Not owned by any insured.

**k. Racing Activities**

"Bodily injury" or "property damage" arising out of the use of "mobile equipment" or "autos" in, or while in practice for, or while being prepared for, any prearranged professional or organized racing, speed, demolition, or stunting activity or contest.

**l. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**m. Damage To Property**

"Property damage" to:

**(1)** Property:

**(a)** You own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property; or

**(b)** Owned or transported by the insured and arising out of the ownership, maintenance or use of a "covered auto".

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

© Insurance Services Office, Inc., 2012

**CU 00 01 04 13**

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(1)(b)**, **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to liability assumed under a written Trailer Interchange agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**n. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**o. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**p. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**q. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**r. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**s. Professional Services**

"Bodily injury" or "property damage" due to rendering of or failure to render any professional service. This includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**(3)** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

**(4)** Engineering services, including related supervisory or inspection services;

**(5)** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**(6)** Any health or therapeutic service treatment, advice or instruction;

**(7)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy;

**(8)** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardiovascular fitness, bodybuilding or physical training programs;

**(9)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(10)** Body piercing services;

**(11)** Services in the practice of pharmacy;

**(12)** Law enforcement or firefighting services; and

**(13)** Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", involved the rendering of or failure to render any professional service.

**t. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

This exclusion does not apply if valid "underlying insurance" for the electronic data risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". The insurance provided under this Coverage Part will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**u. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "personal and advertising injury" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. At our discretion, we may investigate any offense that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend. But:

**(1)** The amount we will pay for the "ultimate net loss" is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" that is subject to an applicable "retained limit". If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "personal and advertising injury" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "underlying insurance".

**c.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a.** "Personal and advertising injury":

**(1) Knowing Violation Of Rights Of Another**

Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**(2) Material Published With Knowledge Of Falsity**

Arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**(3) Material Published Prior To Policy Period**

Arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**(4) Criminal Acts**

Arising out of a criminal act committed by or at the direction of the insured.

**(5) Contractual Liability**

For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to:

**(a)** Liability for damages that the insured would have in the absence of the contract or agreement; or

**(b)** Liability for false arrest, detention or imprisonment assumed in a contract or agreement.

**(6) Breach Of Contract**

Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**(7) Quality Or Performance Of Goods – Failure To Conform To Statements**

Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**(8) Wrong Description Of Prices**

Arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**(9) Infringement Of Copyright, Patent, Trademark Or Trade Secret**

Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**(10) Insureds In Media And Internet Type Businesses**

Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**(11) Electronic Chatrooms Or Bulletin Boards**

Arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**(12) Unauthorized Use Of Another's Name Or Product**

Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**(13) Pollution**

Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(14) Employment-related Practices**

To:

**(a)** A person arising out of any:

**(i)** Refusal to employ that person;

**(ii)** Termination of that person's employment; or

**(iii)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(b)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraph **(i)**, **(ii)** or **(iii)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraph **(i)**, **(ii)** or **(iii)** above occurs before employment, during employment or after employment of that person.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**(15) Professional Services**

Arising out of the rendering of or failure to render any professional service. This includes but is not limited to:

**(a)** Legal, accounting or advertising services;

**(b)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**(c)** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

**(d)** Engineering services, including related supervisory or inspection services;

**(e)** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**(f)** Any health or therapeutic service treatment, advice or instruction;

**(g)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy;

**(h)** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardiovascular fitness, bodybuilding or physical training programs;

**(i)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(j)** Body piercing services;

**(k)** Services in the practice of pharmacy;

**(l)** Law enforcement or firefighting services; and

**(m)** Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

**(16) War**

However caused, arising, directly or indirectly, out of:

**(a)** War, including undeclared or civil war;

**(b)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(c)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**(17) Recording And Distribution Of Material Or Information In Violation Of Law**

Arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(a)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(b)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(c)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(d)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**b.** "Pollution cost or expense".

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend, when the duty to defend exists:

**a.** All expenses we incur.

**b.** Up to $2,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "occurrence" we cover. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** When we have the right but not the duty to defend the insured and elect to participate in the defense, we will pay our own expenses but will not contribute to the expenses of the insured or the "underlying insurer".

**3.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** Except for liability arising out of the ownership, maintenance or use of "covered autos":

**a.** If you are designated in the Declarations as:

**(1)** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**(2)** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**(3)** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**(4)** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**(5)** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**b.** Each of the following is also an insured:

**(1)** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(a)** "Bodily injury" or "personal and advertising injury":

**(i)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" in the course of his or her employment or performing duties related to the conduct of your business or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(ii)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(a)(i)** above; or

**(iii)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)(i)** or **(ii)** above.

**(b)** "Property damage" to property:

**(i)** Owned, occupied or used by;

**(ii)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**(2)** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**(3)** Any person or organization having proper temporary custody of your property if you die, but only:

   **(a)** With respect to liability arising out of the maintenance or use of that property; and

   **(b)** Until your legal representative has been appointed.

**(4)** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**c.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**(1)** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**(2)** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**(3)** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

**2.** Only with respect to liability arising out of the ownership, maintenance or use of "covered autos":

**a.** You are an insured.

**b.** Anyone else while using with your permission a "covered auto" you own, hire or borrow is also an insured except:

**(1)** The owner or anyone else from whom you hire or borrow a "covered auto". This exception does not apply if the "covered auto" is a trailer or semitrailer connected to a "covered auto" you own.

**(2)** Your "employee" if the "covered auto" is owned by that "employee" or a member of his or her household.

**(3)** Someone using a "covered auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a "covered auto".

**(5)** A partner (if you are a partnership), or a member (if you are a limited liability company) for a "covered auto" owned by him or her or a member of his or her household.

**(6)** "Employees" with respect to "bodily injury" to:

   **(a)** Any fellow "employee" of the insured arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

   **(b)** The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph **(a)** above.

**c.** Anyone liable for the conduct of an insured described above is also an insured, but only to the extent of that liability.

**3.** Any additional insured under any policy of "underlying insurance" will automatically be an insured under this insurance.

Subject to Section **III** – Limits Of Insurance, if coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**a.** Required by the contract or agreement, less any amounts payable by any "underlying insurance"; or

**b.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "underlying insurance".

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made, "suits" brought, or number of vehicles involved; or

   c. Persons or organizations making claims or bringing "suits".

2. The Aggregate Limit is the most we will pay for the sum of all "ultimate net loss" under:

   a. Coverage **A,** except "ultimate net loss" because of "bodily injury" or "property damage" arising out of the ownership, maintenance or use of a "covered auto"; and

   b. Coverage **B.**

3. Subject to Paragraph **2.** above, the Each Occurrence Limit is the most we will pay for the sum of all "ultimate net loss" under Coverage **A** because of all "bodily injury" and "property damage" arising out of any one "occurrence".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all "ultimate net loss" because of all "personal and advertising injury" sustained by any one person or organization.

5. If there is "underlying insurance" with a policy period that is nonconcurrent with the policy period of this Commercial Liability Umbrella Coverage Part, the "retained limit(s)" will only be reduced or exhausted by payments for:

   a. "Bodily injury" or "property damage" which occurs during the policy period of this Coverage Part; or

   b. "Personal and advertising injury" for offenses that are committed during the policy period of this Coverage Part.

   However, if any "underlying insurance" is written on a claims-made basis, the "retained limit(s)" will only be reduced or exhausted by claims for that insurance that are made during the policy period, or any Extended Reporting Period, of this Coverage Part.

   The Aggregate Limit, as described in Paragraph **2.** above, applies separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – CONDITIONS

1. **Appeals**

   If the "underlying insurer" or insured elects not to appeal a judgment in excess of the "retained limit", we may do so at our own expense. We will also pay for taxable court costs, pre- and postjudgment interest and disbursements associated with such appeal. In no event will this provision increase our liability beyond the applicable Limits of Insurance described in Section **III** – Limits Of Insurance.

2. **Bankruptcy**

   a. **Bankruptcy Of Insured**

      Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

   b. **Bankruptcy Of Underlying Insurer**

      Bankruptcy or insolvency of the "underlying insurer" will not relieve us of our obligations under this Coverage Part.

   However, this insurance will not replace the "underlying insurance" in the event of bankruptcy or insolvency of the "underlying insurer". This insurance will apply as if the "underlying insurance" were in full effect.

3. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense, regardless of the amount, which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**4. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**5. Other Insurance**

**a.** This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**b.** When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of the insurance provided under this Coverage Part; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

**6. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**7. Representations Or Fraud**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us;

**c.** We have issued this policy in reliance upon your representations; and

**d.** This policy is void in any case of fraud by you as it relates to this policy or any claim under this policy.

**8. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**9. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**10. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**11. Loss Payable**

Liability under this Coverage Part does not apply to a given claim unless and until:

**a.** The insured or insured's "underlying insurer" has become obligated to pay the "retained limit"; and

**b.** The obligation of the insured to pay the "ultimate net loss" in excess of the "retained limit" has been determined by a final settlement or judgment or written agreement among the insured, claimant and us.

**12. Transfer Of Defense**

When the underlying limits of insurance have been used up in the payment of judgments or settlements, the duty to defend will be transferred to us. We will cooperate in the transfer of control to us of any outstanding claims or "suits" seeking damages to which this insurance applies which would have been covered by the "underlying insurance" had the applicable limit not been used up.

**13. Maintenance Of/Changes To Underlying Insurance**

Any "underlying insurance" must be maintained in full effect without reduction of coverage or limits except for the reduction of the aggregate limit in accordance with the provisions of such "underlying insurance" that results from payment of claims, settlement or judgments to which this insurance applies.

Such exhaustion or reduction is not a failure to maintain "underlying insurance". Failure to maintain "underlying insurance" will not invalidate insurance provided under this Coverage Part, but insurance provided under this Coverage Part will apply as if the "underlying insurance" were in full effect.

If there is an increase in the scope of coverage of any "underlying insurance" during the term of this policy, our liability will be no more than it would have been if there had been no such increase.

You must notify us in writing, as soon as practicable, if any "underlying insurance" is cancelled, not renewed, replaced or otherwise terminated, or if the limits or scope of coverage of any "underlying insurance" is changed.

**14. Expanded Coverage Territory**

**a.** If a "suit" is brought in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from defending the insured, the insured will initiate a defense of the "suit". We will reimburse the insured, under Supplementary Payments, for any reasonable and necessary expenses incurred for the defense of a "suit" seeking damages to which this insurance applies, that we would have paid had we been able to exercise our right and duty to defend.

If the insured becomes legally obligated to pay sums because of damages to which this insurance applies in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from paying such sums on the insured's behalf, we will reimburse the insured for such sums.

**b.** All payments or reimbursements we make for damages because of judgments or settlements will be made in U.S. currency at the prevailing exchange rate at the time the insured became legally obligated to pay such sums. All payments or reimbursements we make for expenses under Supplementary Payments will be made in U.S. currency at the prevailing exchange rate at the time the expenses were incurred.

**c.** Any disputes between you and us as to whether there is coverage under this policy must be filed in the courts of the United States of America (including its territories and possessions), Canada or Puerto Rico.

**d.** The insured must fully maintain any coverage required by law, regulation or other governmental authority during the policy period, except for reduction of the aggregate limits due to payments of claims, judgments or settlements.

Failure to maintain such coverage required by law, regulation or other governmental authority will not invalidate this insurance. However, this insurance will apply as if the required coverage by law, regulation or other governmental authority was in full effect.

## SECTION V – DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

4. "Coverage territory" means anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

5. "Covered auto" means only those "autos" to which "underlying insurance" applies.

6. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

7. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work", or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

   g. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraphs f. and g. do not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   (2) That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

**(3)** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a "covered auto" over a route or territory that person or organization is authorized to serve by public authority.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Pollution cost or expense" means any loss, cost or expense arising out of any:

**a.** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**b.** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**17.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

**18.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

With respect to the ownership, maintenance or use of "covered autos", property damage also includes "pollution cost or expense", but only to the extent that coverage exists under the "underlying insurance" or would have existed but for the exhaustion of the underlying limits.

For the purposes of this insurance, with respect to other than the ownership, maintenance or use of "covered autos", electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**19.** "Retained limit" means the available limits of "underlying insurance" scheduled in the Declarations or the "self-insured retention", whichever applies.

**20.** "Self-insured retention" means the dollar amount listed in the Declarations that will be paid by the insured before this insurance becomes applicable only with respect to "occurrences" or offenses not covered by the "underlying insurance". The "self-insured retention" does not apply to "occurrences" or offenses which would have been covered by "underlying insurance" but for the exhaustion of applicable limits.

**21.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent or the "underlying insurer's" consent.

**22.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**23.** "Ultimate net loss" means the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of settlement or judgments or any arbitration or other alternate dispute method entered into with our consent or the "underlying insurer's" consent.

**24.** "Underlying insurance" means any policies of insurance listed in the Declarations under the Schedule of "underlying insurance".

**25.** "Underlying insurer" means any insurer who provides any policy of insurance listed in the Schedule of "underlying insurance".

**26.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**27.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**28.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

    a. Make inspections and surveys at any time;

    b. Give you reports on the conditions we find; and

    c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    a. Are safe or healthful; or

    b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

    Copyright, Insurance Services Office, Inc., 1998

POLICY NUMBER: UNO0000178

IL 09 85 12 20

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)** ████████ |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** |
| Certified Acts - Umbrella Liability                                        ████████ |
| |
| |
| **Additional information, if any, concerning the terrorism premium:** |
| |
| **SCHEDULE – PART II** |
| **Federal share of terrorism losses      80  %** |
| (Refer to Paragraph **B.** in this endorsement.) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

## A. Disclosure Of Premium

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

## B. Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

## C. Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2020

**IL 09 85 12 20**

COMMERCIAL LIABILITY UMBRELLA
CU 01 25 06 22

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** The following is added to Paragraph **1. Insuring Agreement** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

When we have a duty to defend, we will defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent.

**B.** The following is added to Exclusion **2.h. Employment-related Practices** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This exclusion does not apply to "bodily injury" arising out of discrimination based on disparate impact or vicarious liability.

**C.** Exclusion **2.k. Racing Activities** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**k. Racing Activities**

"Bodily injury" or "property damage" arising out of the use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged professional or organized racing, speed, demolition, or stunting activity or contest.

**D.** The following is added to Paragraph **1.a. Insuring Agreement** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

When we have a duty to defend, we will defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent.

**E.** Only with respect to liability arising out of the ownership, maintenance or use of "covered autos", the following are added to Paragraph **1.** of **Supplementary Payments:**

**h.** We will pay all expenses incurred by an insured for first aid to others at the time of an "occurrence".

**i.** The cost of appeal bonds.

**F.** Paragraph **1.c.** of **Section II – Who Is An Insured** is replaced by the following:

**c.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar valid and collectible insurance available to that organization. However:

**(1)** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**(2)** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**(3)** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

**G.** Paragraph **2.b.(6)** of **Section II – Who Is An Insured** is replaced by the following:

**(6)** "Employees" with respect to "bodily injury" to any fellow "employee" of the insured arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business.

However, this exclusion only applies if the fellow "employee" is entitled to benefits under any workers' compensation, unemployment compensation or disability benefits law, or any similar law.

**H.** Paragraph **5.** of **Section III – Limits Of Insurance** is replaced by the following:

**5.** If there is "underlying insurance" with a policy period that is nonconcurrent with the policy period of this Commercial Liability Umbrella Coverage Part, the "retained limit(s)" will only be reduced or exhausted by the amount of judgments and settlements for:

**a.** "Bodily injury" or "property damage" which occurs during the policy period of this Coverage Part; or

**b.** "Personal and advertising injury" for offenses that are committed during the policy period of this Coverage Part.

**I. Section IV – Conditions** is revised as follows:

**1.** The following is added to Paragraph **3. Duties In The Event Of Occurrence, Offense, Claim Or Suit:**

**e.** Notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York state, with particulars sufficient to identify the insured, shall be considered to be notice to us.

**2.** Paragraph **4. Legal Action Against Us** is replaced by the following:

**4. Legal Action Against Us**

**a.** Except as provided in Paragraph **b.,** no person or organization has a right under this Coverage Part:

**(1)** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**(2)** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**b.** With respect to "bodily injury" and "personal and advertising injury" claims, if we deny coverage or do not admit liability because an insured or the injured person, someone acting for the injured person or other claimant fails to give us written notice as soon as practicable, then the injured person, someone acting for the injured person or other claimant may bring an action against us, provided the sole question is whether the denial of coverage or nonadmission of liability is based on the failure to provide timely notice.

However, the injured person, someone acting for the injured person or other claimant may not bring an action if within 60 days after we deny coverage or do not admit liability, we or an insured:

**(1)** Brings an action to declare the rights of the parties under the policy; and

**(2)** Names the injured person, someone acting for the injured person or other claimant as a party to the action.

**3.** Paragraph **d.** of Condition **7. Representations Or Fraud** is replaced by the following:

**d.** We do not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in connection with any loss or damage for which coverage is sought under this policy.

However, with respect to liability arising out of the ownership, maintenance, or use of "covered autos", we will provide coverage to such insured for damages sustained by any person who has not made fraudulent statements or engaged in fraudulent conduct if such damages are otherwise covered under the policy.

**4.** Paragraph **b.** of Condition **6. Premium Audit** is replaced by the following:

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. An audit to determine the final premium due or to be refunded will be completed within 180 days after the expiration date of the policy. But the audit may be waived if the total annual premium attributable to the auditable exposure base is not reasonably expected to exceed $1,500. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

**5.** Except as provided in Paragraph **4.** above, the **Examination Of Your Books And Records** Common Policy Condition continues to apply.

**6.** Paragraph **11. Loss Payable** is replaced by the following:

**11. Loss Payable**

Liability under this Coverage Part does not apply to a given claim unless and until:

**a.** The insured or insured's "underlying insurer" has become obligated to pay the "retained limit"; and

**b.** The obligation of the insured to pay the "ultimate net loss" in excess of the "retained limit" has been determined by a written agreement between the insured, claimant and us.

**7.** Paragraph **13. Maintenance Of/Changes To Underlying Insurance** is replaced by the following:

**13. Maintenance Of/Changes To Underlying Insurance**

Any "underlying insurance" must be maintained in full effect without reduction of coverage or limits except for the exhaustion of the aggregate limit in accordance with the provisions of such "underlying insurance" that results from payment of claims, settlements or judgments to which this insurance applies.

Such exhaustion or reduction is not a failure to maintain "underlying insurance". Failure to maintain "underlying insurance" will not invalidate insurance provided under this Coverage Part, but insurance provided under this Coverage Part will apply as if the "underlying insurance" were in full effect.

If there is an increase in the scope of coverage of any "underlying insurance" during the term of this policy, our liability will be no more than it would have been if there had been no such increase.

You must notify us in writing as soon as practicable if any "underlying insurance" is cancelled, not renewed, replaced or otherwise terminated, or if the limits or scope of coverage of any "underlying insurance" is changed.

**8.** The following provision is added and supersedes any provision to the contrary:

Failure to give notice to us as required under this Coverage Part shall not invalidate any claim made by the insured, injured person or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by the insured, injured person or other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

**J.** **Section V – Definitions** is revised as follows:

The "insured contract" definition is replaced by the following:

"Insured contract" means:

**a.** A lease of premises;

**b.** A sidetrack agreement;

**c.** An easement or license agreement in connection with vehicle or pedestrian private railroad crossings at grade;

**d.** Any other easement agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**e.** An indemnification of a municipality as required by ordinance, except in connection with work for a municipality;

**f.** That part of any contract or agreement entered into, as part of your business, by you or any of your "employees", pertaining to the rental or lease of any "auto"; or

**g.** That part of any other contract or agreement pertaining to your business under which you assume the tort liability of another to pay damages because of "bodily injury" or "property damage" to a third person or organization, if the contract or agreement is made prior to the "bodily injury" or "property damage". Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

An "insured contract" does not include that part of any contract or agreement:

**a.** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver;

**b.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a "covered auto" over a route or territory that person or organization is authorized to serve by public authority; or

**c.** Under which the insured assumes liability for injury or damage caused by the dumping, discharge or escape of:

**(1)** Irritants, pollutants or contaminants that are, or that are contained in, any property that is:

**(a)** Being moved from the place where such property or pollutants are accepted by the insured for movement into or onto the "covered auto";

**(b)** Being transported or towed by the "covered auto";

**(c)** Being moved from the "covered auto" to the place where such property or pollutants are finally delivered, disposed of or abandoned by the insured;

**(d)** Otherwise in the course of transit; or

**(e)** Being stored, disposed of, treated or processed in or upon the "covered auto" other than fuels, lubricants, fluids, exhaust gases or other similar pollutants that are needed for, or result from, the normal electrical, hydraulic or mechanical functioning of the "covered auto" or its parts.

**(2)** Irritants, pollutants or contaminants not described in **(1)** above, unless:

**(a)** The pollutants or any property in which the pollutants are contained is upset, overturned or damaged as a result of the maintenance or use of the "covered auto"; and

**(b)** The discharge, dispersal, release or escape of the pollutants is caused directly by such upset, overturn or damage.

Paragraph **11.** "Loading or unloading" does not apply.

**K.** The following provision is added:

It is hereby understood and agreed that, notwithstanding anything in this policy to the contrary, with respect to such insurance as is afforded by this policy, the terms of this policy, as respects coverage for operations in the state of New York, must conform to the coverage requirements of the applicable insurance laws of the state of New York or the applicable regulations of the New York Department of Financial Services; provided, however, that the company's limits of insurance, as stated in this policy, are excess of the limits of any underlying insurance or self-insurance, as stated in the Declarations, or in any attached endorsement.

**L. Changes In Forms And Endorsements**

All references to his or her, he or she, him or her or brother or sister are replaced by their, they, them or sibling, respectively.

COMMERCIAL LIABILITY UMBRELLA
CU 01 51 05 02

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES – TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

The following **Condition** is added to **Section IV – Conditions:**

**TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP**

**a.** If we conclude that, based on "occurrences", offenses, claims or "suits" which have been reported to us and to which this insurance may apply, the:

   **(1)** Aggregate Limit;

   **(2)** Personal and Advertising Injury Limit; or

   **(3)** Each Occurrence Limit;

is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

**b.** When a limit of insurance described in Paragraph **a.** above has actually been used up in the payment of judgments or settlements:

   **(1)** We will notify the first Named Insured, in writing, as soon as practicable, that:

      **(a)** Such a limit has actually been used up; and

      **(b)** Our duty to defend "suits" seeking damages subject to that limit has also ended.

   **(2)** If we have a duty to defend we will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

   We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

   **(3)** The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

**c.** The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with Paragraph **b.(2)** above.

The duty of the first Named Insured to reimburse us will begin on:

   **(1)** The date on which the applicable limit of insurance is used up, if we sent notice in accordance with Paragraph **a.** above; or

   **(2)** The date on which we sent notice in accordance with Paragraph **b.(1)** above, if we did not send notice in accordance with Paragraph **a.** above.

**d.** The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

© ISO Properties, Inc.,  2001

**COMMERCIAL LIABILITY UMBRELLA**
**CU 02 14 06 20**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**I.** If you are an individual and a "covered auto" you own is predominantly used for nonbusiness purposes, the **Cancellation** Common Policy Condition is replaced by the following:

**Ending This Policy**

**A. Cancellation**

1. You may cancel the entire policy by returning it to us or by giving us advance notice of the date cancellation is to take effect.

2. When this Policy is in effect less than 60 days and is not a renewal or continuation policy, we may cancel the entire policy for any reason, provided we mail you notice within this period. If we cancel for nonpayment of premium, we will:

   **a.** Mail you at least 15 days' notice; and

   **b.** Inform you of the amount due.

   Payment of premium will be considered on time if made within 15 days after we mail you notice of cancellation. If we cancel for any other reason, we will mail you at least 20 days' notice.

3. When this Policy is in effect 60 days or more or is a renewal or continuation policy, we may cancel it or any insurance deemed severable only for one or more of the following reasons:

   **a.** Nonpayment of premium, provided, however, that a notice of cancellation on this ground shall inform you of the amount due. If we cancel for this reason, we will mail you at least 15 days' notice. Payment of premium will be considered on time if made within 15 days after we mail you notice of cancellation.

   **b.** Your driver's license or that of a driver who lives with you or customarily uses the "covered auto" has been suspended or revoked during the policy period, other than a suspension issued pursuant to Subdivision (1) of Section 510(b) of the Vehicle and Traffic Law, or one or more administrative suspensions arising out of the same incident which has or have been terminated prior to the effective date of cancellation. If we cancel for this reason, we will mail you at least 20 days' notice.

   **c.** We replace this Policy with another one providing similar coverages and the same limits for a "covered auto" of the private passenger type. The replacement policy will take effect when this Policy is cancelled, and will end a year after this Policy begins or on this Policy's expiration date, whichever is earlier. This paragraph applies only to renewal policies.

   **d.** This Policy was obtained through fraud or material misrepresentation. If we cancel for this reason, we will mail you at least 20 days' notice.

   **e.** Any insured made a fraudulent claim. If we cancel for this reason, we will mail you at least 20 days' notice.

   If one of the reasons listed in this Paragraph **3.** exists, we may cancel the entire policy.

   For policies written for a period of more than one year or without a fixed expiration date, we may cancel for the reasons in Paragraphs **a.** through **e.** above, subject to New York Laws, only at an anniversary of its original effective date. If we cancel such a policy, we will mail you at least 45 but not more than 60 days' notice.

**4.** Instead of cancellation, we may condition continuation of this Policy on a change of limits or elimination of any other coverage not required by law. If we do this, we will mail you notice at least 20 days before the date of the change.

**5.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**6.** If this Policy is cancelled, we will send you any premium refund due. The refund will be pro rata.

However, when the premium is advanced under a premium finance agreement, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**B. Nonrenewal**

**1.** If this Policy is written for a period of less than one year and we decide, subject to New York Laws, not to renew or continue it, or to condition renewal or continuation on a reduction of Liability Coverage or elimination of any other coverage, we will mail or deliver to you written notice at least 45 but not more than 60 days before the end of the policy period.

**2.** We will have the right not to renew or continue a particular coverage, subject to New York Laws, only at the end of each 12-month period following the effective date of the first of the successive policy periods in which the coverage was provided.

**3.** We do not have to mail notice of non-renewal if you, your agent or broker or another insurance company informs us in writing that you have replaced this Policy or that you no longer want it.

**C. Mailing Of Notices**

We will mail or deliver our notice of cancellation, reduction of limits, elimination of coverage or nonrenewal to the address shown on the Policy. However, we may deliver any notice instead of mailing it. If notice is mailed, a United States Postal Service certificate of mailing will be sufficient proof of notice.

**II.** For all policies other than those specified in Section **I.**, the **Cancellation** Common Policy Condition is completely replaced by the following:

**A.** Paragraphs **1.**, **2.**, **3.** and **5.** of the **Cancellation** Common Policy Condition are replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

**2. Cancellation Of Policies In Effect**

**a. 60 Days Or Less**

We may cancel this Policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph **A.2.a.(3)** or Paragraph **A.2.b.** below.

**(2)** 15 days before the effective date of cancellation if we cancel for any of the reasons included in Paragraph **A.2.b.** below.

**(3)** 20 days before the effective date of cancellation if we cancel because one or more underlying policies providing primary or intermediate coverage were cancelled where:

**(a)** Such cancellation is based upon Paragraphs **A.2.b.(1)** through **A.2.b.(8)** below; and

**(b)** Such policies are not replaced without lapse.

**b. For More Than 60 Days**

If this Policy has been in effect for more than 60 days, or if this Policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed below, provided we mail the first Named Insured written notice at least 15 days before the effective date of cancellation:

**(1)** Nonpayment of premium, provided, however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

**(2)** Conviction of a crime arising out of acts increasing the hazard insured against;

**(3)** Discovery of fraud or material misrepresentation in the obtaining of the Policy or in the presentation of a claim;

**(4)** After issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

**(5)** Material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the Policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the Policy was issued or last renewed;

**(6)** Cancellation is required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

**(7)** A determination by the Superintendent that the continuation of the Policy would violate, or would place us in violation of, any provision of the Insurance Code;

**(8)** Suspension or revocation during the required policy period of the driver's license of any person who continues to operate a "covered auto", other than a suspension issued pursuant to Subdivision (1) of Section 510(b) of the Vehicle and Traffic Law or one or more administrative suspensions arising from the same incident which has or have been terminated prior to the effective date of cancellation; or

**(9)** Cancellation of one or more of the underlying policies providing primary or intermediate coverage where:

**(a)** Such cancellation is based upon Paragraphs **(1)** through **(8)** of this Paragraph **A.2.b.;** and

**(b)** Such policies are not replaced without lapse.

**3.** We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the Policy and to the authorized agent or broker.

**5.** If this Policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7.** Regardless of the number of days this Policy has been in effect, if:

**a.** This Policy covers "autos" subject to the provisions of Section 370 of the New York Vehicle and Traffic Law; and

**b.** The Commissioner of the Department of Motor Vehicles deems this Policy to be insufficient for any reason;

we may cancel this Policy by giving you notice of such insufficiency 45 days before the effective date of cancellation to permit you to replace this Policy.

**8.** The effective date of cancellation stated in the notice shall become the end of the policy period.

**9.** Notice will include the reason for cancellation. We will mail or deliver our notice to the first Named Insured at the address shown in the Policy and to the authorized agent or broker. However, we may deliver any notice instead of mailing it. Proof of mailing will be sufficient proof of notice.

**C.** The following Conditions are added:

**1. Nonrenewal**

If we decide not to renew this Policy, we will send notice as provided in Paragraph **C.3.** below.

**2. Conditional Renewal**

If we conditionally renew this Policy subject to:

**a.** A change of limits;

**b.** A change in type of coverage;

**c.** A reduction of coverage;

**d.** An increased deductible;

**e.** An addition of exclusion; or

**f.** Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph **C.3.** below.

We may conditionally renew this Policy subject to the requirements stipulated by the Maintenance Of Underlying Insurance condition of Section **IV** – Conditions. In the event of failure to comply with the aforementioned condition as of the expiration date of the Policy, or 60 days after mailing or delivering the notice of conditional renewal, the conditional renewal shall be deemed to be an effective notice of nonrenewal.

**3. Notices Of Nonrenewal And Conditional Renewal**

**a.** If we decide not to renew this Policy or to conditionally renew this Policy as provided in Paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 30 but not more than 120 days before:

**(1)** The expiration date; or

**(2)** The anniversary date if this is a continuous policy.

**b.** Notice will be mailed or delivered to the first Named Insured at the address shown in the Policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

**c.** Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

**d.** If we violate any of the provisions of Paragraph **C.3.a., b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

**(1)** And if notice is provided prior to the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60-day period, has replaced the coverage or elects to cancel;

**(2)** And if the notice is provided on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

**e.** If you elect to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

**(1)** Upon expiration of the 60-day period, unless Subparagraph **(2)** below applies; or

**(2)** Notwithstanding the provisions in Paragraphs **d.(1)** and **d.(2)**, as of the renewal date of the Policy if the conditional renewal notice was sent at least 30 days prior to the expiration or anniversary date of the Policy.

**f.** We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the Policy has been replaced or is no longer desired.

**D.** The aggregate limits of this Policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

**E.** The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

**III.** Paragraph **10. When We Do Not Renew** of **Section IV – Conditions** does not apply.

POLICY NUMBER: UNO0000178

COMMERCIAL LIABILITY UMBRELLA
CU 21 16 09 00

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - DESIGNATED ONGOING OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

## SCHEDULE

**Description Of Designated Ongoing Operation(s):**

See attached schedule.

**Specified Location (If Applicable):**

Not applicable.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to "bodily injury" or "property damage" arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such operations are conducted by you or on your behalf. If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described ongoing operations conducted at that "location".

For the purpose of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

Description of Designated Ongoing Operation(s):
SPECIAL EVENTS PROMOTED, PRODUCED, SANCTIONED BY, ORGANIZED, OR CONTRACTED BY ANY
NAMED INSURED, SUCH AS: COMPETITIVE GAMING EVENTS, COMPETITIONS OR EXHIBITIONS;
ATHLETIC OR SPORTS CONTESTS OR EXHIBITIONS; AUTO, MOTORCYCLE OR BOAT RACES OR
EVENTS, BIKING EVENTS; EVENTS WITH INFLATABLE AMUSEMENT DEVICES OF ANY KIND, SUCH
AS MOONWALKS AND SLIDERS; CONCERTS OF ANY KIND, SUCH AS ROCK, RAP, HIP HOP, JAM,
TECHNO, OR PUNK; OR BUNGEE JUMPING EVENTS.

COMMERCIAL LIABILITY UMBRELLA
CU 21 23 02 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**I.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**II.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

© ISO Properties, Inc.,  2001                    □

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

COMMERCIAL LIABILITY UMBRELLA
CU 21 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CROSS SUITS LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Cross Suits**

Any claim made or "suit" brought by any Named Insured under this policy against another Named Insured under this policy for damages because of "bodily injury" or "property damage".

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Cross Suits**

Any claim made or "suit" brought by any Named Insured under this policy against another Named Insured under this policy for damages because of "personal and advertising injury".

© Insurance Services Office, Inc., 2012

COMMERCIAL LIABILITY UMBRELLA
CU 21 27 12 04

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**FUNGI OR BACTERIA**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**FUNGI OR BACTERIA**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

COMMERCIAL LIABILITY UMBRELLA
CU 21 31 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in US dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   **a.** Physical injury that involves a substantial risk of death; or

   **b.** Protracted and obvious physical disfigurement; or

   **c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part or underlying insurance to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or underlying insurance.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   **a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

**b.** The act resulted in damage:

    **(1)** Within the United States (including its territories and possessions and Puerto Rico); or

    **(2)** Outside of the United States in the case of:

        **(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

        **(b)** The premises of any United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**D.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015
**CU 21 31 01 15**

COMMERCIAL LIABILITY UMBRELLA
CU 21 36 01 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES
# RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

COMMERCIAL LIABILITY UMBRELLA
CU 21 50 03 05

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**SILICA OR SILICA-RELATED DUST**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**SILICA OR SILICA-RELATED DUST**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

**COMMERCIAL LIABILITY UMBRELLA**
**CU 21 52 12 05**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

Exclusion **i.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**i. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

**(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

**(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

For the purposes of this insurance, hostile fire means one that becomes uncontrollable or breaks out from where it is intended to be.

**(2)** "Pollution cost or expense".

COMMERCIAL LIABILITY UMBRELLA
CU 21 86 05 14

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** Exclusion **2.t.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**t. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

POLICY NUMBER:   UNO0000178

**COMMERCIAL LIABILITY UMBRELLA**
**CU 24 03 12 19**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US (WAIVER OF SUBROGATION)

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s): |
|---|
| See schedule below |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following is added to Paragraph **9. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV – Conditions:**

We waive any right of recovery against the person(s) or organization(s) shown in the Schedule above because of payments we make under this Coverage Part. This endorsement applies only to the person(s) or organization(s) shown in the Schedule above.

**SCHEDULE**

ANY PERSON OR ORGANIZATION WHOM YOU ARE REQUIRED TO ADD AS AN ADDITIONAL INSURED
UNDER WRITTEN CONTRACT, WRITTEN AGREEMENT OR WRITTEN PERMIT

© Insurance Services Office, Inc., 2018

**CU 24 03 12 19**

# National Casualty Company

**ENDORSEMENT NO.** _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

### COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

The following is added to paragraph **2. Exclusions** of **Section I—Coverage A—Bodily Injury And Property Damage Liability** and paragraph **2. Exclusions** of **Section I—Coverage B—Personal And Advertising Injury Liability:**

This insurance does not apply to:

(1) "Bodily Injury," "Property Damage" or "Personal and Advertising Injury" in any way or to any extent arising out of or involving asbestos, asbestos fibers, or any product containing asbestos or asbestos fibers.

(2) Any economic loss, diminution of property value, abatement costs, or any other loss, cost or expense including equitable relief, in any way or to any extent arising out of or involving asbestos, asbestos fibers or any product containing asbestos or asbestos fibers.

(3) Any fees, fines, costs, or expenses of any nature whatsoever in the investigation or defense of any claim or suit arising out of or involving asbestos, asbestos fibers, or any product containing asbestos or asbestos fibers.

_____    _____
AUTHORIZED REPRESENTATIVE                    DATE

# National Casualty Company

**ENDORSEMENT NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LEAD CONTAMINATION EXCLUSION

This endorsement modifies insurance provided under the following:

### COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

The following exclusion is added to paragraph **2. Exclusions** of **Section I—Coverage A—Bodily Injury And Property Damage:**

This insurance does not apply to any premises, site or location which is or was at any time owned, or occupied by, or rented or loaned to, any insured, or from the operations of the insured, which result in:

**a.** "Bodily injury" arising out of the ingestion, inhalation or absorption of lead in any form;

**b.** "Property Damage" arising from any form of lead;

**c.** Any loss, cost or expense arising out of any:

  **(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

  **(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

The following exclusion is added to paragraph **2. Exclusions** of **Section I—Coverage B—Personal And Advertising Injury Liability:**

This insurance does not apply to "personal and advertising injury" arising from:

**a.** Any form of lead; or

**b.** Any loss, cost or expense arising out of any:

  **(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

  **(2)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

_____     /     _____
AUTHORIZED REPRESENTATIVE              DATE

Underwritten by National Casualty Company

**ENDORSEMENT NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PFC/PFAS EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL LIABILITY UMBRELLA COVERAGE PART**

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I—COVERAGES, COVERAGE A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

This insurance does not apply to:

**"PFC/PFAS"**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged, threatened or suspected inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of, any "PFC/PFAS"; or

**b.** Any loss, cost or expense arising out of, in whole or in part, the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "PFC/PFAS" by any insured or by any other person or entity.

This exclusion applies regardless of whether any other cause, event, material, substance, good or product contributed concurrently or in any sequence to such injury or damage. This exclusion also applies regardless of whether any "PFC/PFAS" is contained, used, included, involved or incorporated intentionally, accidentally or unknowingly in or on a good or product, component part of a good or product, or otherwise by any insured or by any other person or entity. This exclusion applies regardless of whether the inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of any "PFC/PFAS" occurs within or outside any building or other structure.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I—COVERAGES, COVERAGE B—PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance does not apply to:

**"PFC/PFAS"**

**a.** "Personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged, threatened, or suspected inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of, any "PFC/PFAS"; or

**b.** Any loss, cost or expense arising out of, in whole or in part, the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "PFC/PFAS," by any insured or by any other person or entity.

 Nationwide

This exclusion applies regardless of whether any other cause, event, material, substance, good or product contributed concurrently or in any sequence to such injury or damage. This exclusion also applies regardless of whether any "PFC/PFAS" is contained, used, included, involved or incorporated intentionally, accidentally or unknowingly in or on a good or product, component part of a good or product, or otherwise by any insured or by any other person or entity. This exclusion applies regardless of whether the inhalation, ingestion, absorption or consumption of, contact with, exposure to, existence of, or presence of any "PFC/PFAS" occurs within or outside any building or other structure.

**C.** The following definition is added to **SECTION V—DEFINITIONS:**

"PFC/PFAS" means:

**a.** Any fluorosurfactant, perfluorinated chemical or compound, or perfluoroalkyl or polyfluoroalkyl substance, including but not limited to any per- or polyfluorinated acid (including, without limitation, perfluorooctanoic acid (PFOA), perfluorooctanesulfonic acid (PFOS), and per- and polyfluorether carboxylic acids), per- or polyfluorinated sulfonamide, per- or polyfluorinated iodide, per- or polyfluorinated aldehyde, per- or polyfluorinated sulfonyl fluoride, per- or polyfluorinated fluorotelomer substance or per- or polyfluorinated sulfonamido substance; or

**b.** Any perfluoroalkane or polyfluoroalkane substance, including but not limited to carbon tetrafluoride, perfluorooctane, and perfluoro-2-methylpentane; or

**c.** Any fluorinated polymers, including but not limited to fluoropolymers, perfluoropolyethers and side-chain-fluorinated polymers; or

any of the associated homologues, isomers, salts, esters, alcohols, acids, precursor chemicals and derivatives, and related degradation or by-products of any such constituent.

The addition of this endorsement does not imply that other policy provisions, including but not limited to any pollution exclusion, do not exclude coverage for "PFC/PFAS"-related injury, damage, loss, cost or expense.

**All other conditions and provisions of the policy remain unchanged by this endorsement.**

_____    _____/_____

AUTHORIZED REPRESENTATIVE                                    DATE

Includes copyrighted material of ISO Properties, Inc., with its permission.
Copyright, ISO Properties, Inc., 2012



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number   1

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| UNO0000178 | 10/01/2023 | National Casualty Company |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| Electronic Arts Inc<br>As Per Named Insured Extension<br>145 West 45th Street<br>New York, NY 10036 | N2G Worldwide Insurance Services, LLC<br>111 Town Square Place<br>Suite 340<br>Jersey City, NJ 07310 |

COVERAGE PARTS AFFECTED
Commercial Liability Umbrella Coverage Part

CHANGES
It is understood and agreed that the policy is amended as follows:

The following forms are added:
UT-3g (03-92) Amendment to Personal and Advertising Injury Definition

All other terms and conditions remain unchanged.

_____
Authorized Representative Signature

Copyright, Insurance Services Office, Inc.,  1983
Copyright, ISO Commercial Risk Services, Inc.,  1983

IL 12 01 11 85

**National Casualty Company**

**ENDORSEMENT NO. _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT TO PERSONAL AND ADVERTISING INJURY DEFINITION

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA COVERAGE PART**

**SECTION V—DEFINITIONS**, subsection **14**. "Personal and advertising injury" is deleted in its entirety and replaced by the following:

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

   **a.**  False arrest, detention or imprisonment;

   **b**.  Malicious prosecution; or

   **c.**  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

_____    /
AUTHORIZED REPRESENTATIVE                            DATE

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number    2

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| UNO0000178 | 10/01/2023 | National Casualty Company |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| Electronic Arts Inc<br>As Per Named Insured Extension<br>145 West 45th Street<br>New York, NY 10036 | N2G Worldwide Insurance Services, LLC<br>111 Town Square Place<br>Suite 340<br>Jersey City, NJ 07310 |

COVERAGE PARTS AFFECTED

CHANGES

It is understood and agreed that the policy is amended as follows:

**The Named Insured is amended as follows:**
Electronic Arts Inc
As Per Named Insured Extension

**All other terms and conditions remain unchanged.**

_____

Authorized Representative Signature

Copyright, Insurance Services Office, Inc., 1983
Copyright, ISO Commercial Risk Services, Inc., 1983

IL 12 01 11 85                                         Page 1 of 3  ☐

**NAMED INSURED EXTENSION SCHEDULE**

POLICY NUMBER: UNO0000178                    POLICY CHANGES EFFECTIVE: 10/01/2023

```
Electronic Arts Inc
Bingo Acquisition Corporation
Cosmic Pop LLC
Creatif Studios LLC
Crowdstar LLC
EA Entertainment, Inc.
EA Mobile (Canada Holdings) Inc.
Electronic Arts - Tiburon, A Florida Corporation
Electronic Arts Inc.
Electronic Arts Productions Inc.
Electronic Arts Redwood LLC
Fishing Games LLC
Gems Interactive LLC
Glu Games LLC
Glu Mobile LLC
Glu Newco LLC
GlytchCo Games LLC
Griptonite Games LLC
Playdemic LLC
PopCap Games, LLC
Prairie-Winnetka Holdings, LLC
Respawn Entertainment, LLC
BioWare ULC
Carpetville Limited
Chillingo Limited
Codemasters Development Company Ltd.
Codemasters Group Holdings Limited UK
Codemasters Group Limited
Codemasters Holdings Limited
Codemasters Limited
Codemasters Studios Sdn. Bhd.
Codex Games Limited
Criterion Software Limited
Digital Illusions CE AB
EA Digital Illusions CE AB
EA Mexico S.de R.L. de C.V.
EA Mobile (Canada) ULC
EA Swiss Sárl
Electronic Arts (Canada), Inc.
Electronic Arts Asia Pacific Pte Ltd
Electronic Arts Computer Software (Shanghai) Co., Ltd.
Electronic Arts Finland OY
Electronic Arts Games (India) Private Limited
Electronic Arts Geneva Sàrl
Electronic Arts GmbH
Electronic Arts Ltda
Electronic Arts Ireland Limited
Electronic Arts Israel Ltd (f.k.a. Gulfstream Purchase Ltd)
Electronic Arts Italia s.r.l.
Electronic Arts K.K.
Electronic Arts Korea LLC
```

**NAMED INSURED EXTENSION SCHEDULE**

POLICY NUMBER: UNO0000178                    POLICY CHANGES EFFECTIVE: 10/01/2023

```
Electronic Arts Limited
Electronic Arts Nederland B.V.
Electronic Arts Polska Sp. Z.O.O.
Electronic Arts Productions Services (UK) Limited
Electronic Arts Proprietary Limited
Electronic Arts Publishing SARL
Electronic Arts Romania SRL
Electronic Arts Singapore Pte. Ltd.
Electronic Arts Software S.L.
Electronic Arts Sweden AB
Glu Toronto Inc.
Griptonite Games India Private Limited
IoTech Engine Limited
IoTech Finance SARL
IoTech Studios Limited
Middleware Limited
Pine Interactive Ltd.
Playdemic Development Limited
Playdemic Limited
Playfish Limited
Slightly Mad Studios Limited
Slightly Mad Studios Pte. Ltd.
SMS Apollo Limited
SMS Hydra
SMS Phoenix Limited
SMS Virgo Limited
The Codemasters Software Company Limited
```